UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
MATTHEW RAYMOND,

                              Plaintiff,

vs.                           18-CV-1467

TROY MITCHELL, et al.,

                              Defendants.
-------------------------------------------x

        Transcript of a Telephone Conference held on

June 3, 2020, the HONORABLE ANDREW T. BAXTER, United

States District Judge, Presiding.

                    *Jodi L. Hibbard, RPR, CSR, CRR*
                *Official United States Court Reporter*
                      *100 South Clinton Street*
                   *Syracuse, New York  13261-7367*
                          *(315) 234-8547*

A P P E A R A N C E S

For Plaintiff:          EMERY CELLI LAW FIRM
                        Attorneys at Law
                        600 Fifth Avenue
                        10th Floor
                        New York, New York  10020
                          BY:  EMMA LERNER FREEMAN, ESQ.
                               KATHERINE R. ROSENFELD, ESQ.

For Defendants:         LIPSITZ GREEN SCIME CAMBRIA, LLP
(Auburn CF dfts.)       Attorneys at Law
                        42 Delaware Avenue
                        Suite 120
                        Buffalo, New York  14202
                          BY:  PATRICK MACKEY, ESQ.
                               DIANE M. PERRI ROBERTS, ESQ.

For Defendant:          MEYERS BUTH LAW GROUP
(Hoppins)               Attorneys at Law
                        21 Princeton Place
                        Orchard Park, New York  14127
                          BY:  CHERYL MEYERS BUTH, ESQ.

For Defendant:          NEW YORK STATE ATTORNEY GENERAL
(John Doe)              Syracuse Regional Office
                        300 S. State Street
                        Suite 300
                        Syracuse, New York  13202
                          BY:  AIMEE COWAN, ESQ.

1          (The Court and Counsel all present by

2          telephone, 2:00 p.m.)

3          THE COURT:  All right, good afternoon, this is

4    Judge Baxter.  This is Raymond versus Mitchell, 9:18-CV-1467.

5    Do we have counsel for plaintiff on the line?

6          MS. FREEMAN:  Yes, your Honor, good afternoon, this

7    is Emma Freeman for the plaintiff Matthew Raymond.

8          THE COURT:  All right.  Do we have counsel for the

9    Auburn defendants?

10          MR. MACKEY:  Good afternoon, your Honor, Patrick

11    Mackey with Lipsitz, Green on behalf of all defendants except

12    defendant Hoppins.

13          THE COURT:  All right.

14          MS. BUTH:  Good afternoon, Judge Baxter, Cheryl

15    Meyers Buth for defendant Hoppins.

16          MS. ROSENFELD:  And your Honor, good afternoon, I

17    just wanted you to know that this is Katie Rosenfeld also for

18    plaintiff along with Emma Freeman.

19          THE COURT:  Okay.  And although she was still

20    listed on the docket as the attorney for the John Doe

21    defendant, we advised Ms. Cowan that she doesn't need to be

22    on the line since I think, because of her conflict, she

23    wouldn't be able to stay in even if the John Doe is

24    identified.

25          So ten months ago, plaintiff's counsel filed a

letter motion regarding a number of discovery disputes they

had with defense counsel -- did somebody just join us?

MS. PERRI ROBERTS:  Diane Perri Roberts from

Lipsitz, Green, Scime, Cambria.

THE COURT:  All right, so we've got -- are you

waiting for Mr. Nelson Covert, Barry Nelson Covert or not?

MS. PERRI ROBERTS:  No, Barry is not going to be on

the call, Pat Mackey should be on the call already, though, I

think.

THE COURT:  He is.

MS. COWAN:  I'm here, also.

THE COURT:  Oh, all right, do you want to stay on,

or --

MS. COWAN:  Nicole left it up to me, she said

because the John Doe is still on the docket I guess, that I

could listen in if I wanted to, so I'm here.

THE COURT:  I suppose in theory your conflict might

not disqualify you from John Doe since you wouldn't have had

any communications with him but you've had communications

with other counsel, so anyway, I'll leave it up to you, if

you want to stay on, I'll leave it up to you.

MS. COWAN:  Okay, thanks, your Honor.

THE COURT:  Okay.  So ten months ago plaintiff's

counsel filed a letter motion regarding a number of discovery

disputes that they had with defense counsel who at that time

1    was Ms. Cowan.  The letter motion is Docket Number 24.

2          Because of a conflict of interest that developed on

3    the part of the AG's office, all of the defendants

4    subsequently were appointed new counsel in November and

5    December of last year, and I asked them to respond to

6    plaintiff's issues regarding discovery.

7          After a continuance because of logistical problems

8    related to the COVID-19 epidemic, counsel for all of the

9    defendants other than Ms. Hoppins filed a letter brief in

10    response to plaintiff's letter motion to compel, which is

11    Docket Number 70.  Ms. Buth, is defendant Hoppins joining in

12    the position of the other defendants on this, or are you

13    going to ask to be heard separately on that?

14          MS. BUTH:  Your Honor, I didn't file a letter

15    because I didn't think the disputes pertained to my client,

16    she was a nurse at the facility, not an officer, and if

17    Ms. Freeman or, you know, other plaintiff's counsel, you

18    know, and I can't work -- can't work out her previous

19    request, then you know, we can, I assume, come back to your

20    Honor, but I don't see that as applying to my client so I

21    didn't file a letter motion.

22          THE COURT:  Okay, fair enough.  Bear with me, I'm

23    just jotting a note here.  Okay.  So the defendants,

24    presumably after consultation with DOCCS, have agreed to

25    provide some discovery that was previously withheld, so it

looks like the scope of the discovery dispute has been
somewhat reduced.  The goal today is to try to address the
remaining discovery disputes and hopefully get the litigation
back on track here.

So is there any new information that has come to
light after the defense response or any change in the
plaintiff's position following the receipt of the defense
response that we should talk about before I dive in here?

MS. FREEMAN:  Yes, your Honor, this is Emma Freeman
for Matthew Raymond, the plaintiff.  Nothing major has
changed factually, but I do think that it would be useful to
talk through some of the remaining categories of documents,
because certainly we're willing to compromise where it's
reasonable and aren't just going to hold the line set forth
in our letter as a matter of course.  So if the court's
amenable, I would like to make a few comments about the
specific categories of documents still at issue.

THE COURT:  Okay.  Go ahead.

MS. FREEMAN:  Thank you.  So first I'd like to
address the personnel file, specifically of defendant
Mitchell, and I think as a useful framing device, I want to
remind the court that this is not a typical use of force or
excessive force case.  Defendant Mitchell is really an
exceptional defendant.  Since 2002, before discovery, we are
already aware of seven lawsuits other than this one making

allegations of mostly excessive force and in one case sexual

harassment and the fact patterns in some of those cases, as

far as we can discern, are in some cases startlingly similar

to the ones here.  At least two other inmates have sued

defendant Mitchell for assault specifically around their

genital area.  They've experienced punching and kicking in

the groin, anus, and testicles just as Mr. Mitchell did, and

even the sexual harassment trial, which defendants claim is

irrelevant, contain testimony which we just disclosed with

Mr. Mitchell's fixation with penises and inmates' penis size.

This is a man who is a known predator, who has a pattern of

behavior and a pattern of abuse of inmates.  So in discussing

some of these disclosure issues, you know, we would ask the

court to keep in mind this really is an exceptional scenario

with exceptional facts.

So with respect to defendant Mitchell's personnel

file, of course we're not seeking personal information, you

know, relating to his banking information or his family or

anything of the like and I'm certain that we can work with

defense counsel on the boundaries of that kind of personal

information.  But performance evaluations are clearly

relevant to the case here, which contains, among other

things, a claim for negligent retention when you have an

abuser like defendant Mitchell who has been beating inmates

since 2002 and likely before that, performance evaluations

are certainly part of the broad scope of discovery we're
entitled to.

And I would say the same, your Honor, respecting
documents relating to defendant Mitchell's suspension.  I
don't believe this is contained in the letter but in
defendants' document responses and objections, they seem to
indicate that the -- the suspension wasn't related to the
incident alleged in the complaint and therefore isn't
relevant.  We don't agree with that, your Honor.  Lieutenant
Mitchell was suspended without pay after a hoard of lawsuits
were filed against him.  We are entitled to know the basis of
that suspension, partly because of the pattern of behavior
that we've alleged.

And lastly, your Honor, I'd like to turn to prior
complaints and charges of misconduct against Lieutenant
Mitchell as well as use-of-force incidents which we see as
related.  Even if prior complaints and charges of misconduct
don't specifically contain excessive force allegations, we
are entitled to them.  There's a lot of evidence, as I set
forth for the court, that Lieutenant Mitchell continuously
engages in sexually abusive and bullying misconduct, whether
or not it involves excessive force.  And under, you know, the
Federal Rules of Evidence 404(b)(2), this evidence can be
admissible at trial which of course isn't a criteria for
discoverability, but we intend to use that evidence at trial

1    should the case proceed that far, to show that defendant

2    Mitchell has a pattern in terms of the way he abuses the

3    inmates that are purportedly in his care.

4           And as for the use-of-force incidents, your Honor,

5    it seems that the defendants' only objection to disclosing

6    use-of-force records for defendant Mitchell is based on the

7    way that the records are maintained, and I understand from

8    his letter that they are not indexed by officer but only by

9    inmate.  I think clarification from the defendants on this

10   point would be useful.  You know, our understanding from

11   other litigation, including a 2019 Third Department case, is

12   that those documents have previously been withheld by DOCCS

13   on the basis of state privilege because they were ostensibly

14   produced in order to facilitate employee evaluations.  And if

15   that's true, your Honor, it can't be the case that they are

16   not accessible by officer; otherwise, how could they be used

17   for performance evaluation purposes?  And in any case, you

18   know, even if there were, even if the records are in fact

19   maintained as the defendants say, because of the exceptional

20   nature of defendant Mitchell, if ever there were a case where

21   some additional burden were appropriate during discovery

22   phase, we submit, your Honor, that this case is it.  This is

23   beyond a bad apple.  This is truly a predator.  And we need

24   to understand why he was able to maintain his employment at

25   DOCCS so long such that he was there long enough to abuse and

1  harm Mr. Raymond.  So I'd be happy, your Honor, to speak to

2  any specific points that you have questions about, but those

3  are the preliminary points I wanted to make.

4          THE COURT:  All right.  Let me ask a few questions

5  and then I'll give defendants a chance to respond, I wasn't

6  necessarily going to start with argument, but that's okay.

7  So the -- I guess my sense from reading some of the papers,

8  and I'm obviously not as deeply into this as the lawyers, was

9  that some of the prior sexual harassment incidents or

10  allegations involved staff as opposed to inmates.  Am I wrong

11  about that?

12          MR. MACKEY:  Your Honor, this is Patrick Mackey on

13  behalf of Officer Mitchell.  The -- assuming we're all

14  talking about the same claim, it was a sexual harassment

15  claim by a fellow employee, and it was pretty far back.

16  We're talking about 2006, 2007, where these charges were

17  levied and at the end of the day, those charges were

18  dismissed against Officer Mitchell.  So we're talking about

19  charges not related to use of force, we're talking about

20  charges that happened over 10 years ago, and we're talking

21  about charges that were ultimately dismissed against Officer

22  Mitchell so I think there's a lot of reasons why anything

23  related to those particular, that particular claim really

24  isn't discoverable, at this point.

25          MS. FREEMAN:  Your Honor, I'd respond only that as

1    I said, we've disclosed a good deal of testimony from that

2    trial that happened in 2012 that buttresses our claim of

3    defendant Mitchell's engagement in a pattern of abuse.  And

4    that specifically is the fixation with penises and penis

5    size.  A good amount of Lieutenant Mitchell's typical abuse

6    is genitalia focused, and for that reason, the Penny Collins

7    trial is relevant and it's certainly discoverable.  The rules

8    of civil procedure are very broad in terms of what's

9    discoverable.

10           THE COURT:  And what do we know, Mr. Mackey, about

11   the reasons for the suspension of this particular defendant

12   Mitchell?

13           MR. MACKEY:  Your Honor, with respect to Officer

14   Mitchell's suspension, from what we've gathered so far is

15   that the suspension is related to a matter that happened

16   after the allegations in this case.  In this case plaintiff

17   Raymond is alleging that there was use of excessive force on

18   September 14th of 2016.  What we've been able to decipher so

19   far is that any suspension related to Officer Mitchell

20   happened after September 14th of 2016.

21           I do want to let your Honor know that we're

22   still -- this is something we're still digging into.  I have

23   further requests into DOCCS and the Labor Relations Bureau

24   for more information regarding suspension, so unfortunately I

25   guess we can say we have incomplete information so far, but

you know, if we get more information regarding the suspension
and, you know, we determine it's, you know, related to
another event of use of excessive force and, you know, if
it's within -- and I know you've read my response letter
regarding where we think there should be a narrow or limited
time period.  So if some of this information that we still
haven't gotten but we eventually should get leads to show
that the suspension had something to do with excessive force
and falls within that two-year period, then we're probably
more inclined to say that's discoverable.  But at this point
from the information we have, it doesn't look like it's
discoverable in our eyes just because it happened after
Mr. Raymond's alleged event, and we're not even sure if it's
related to use of excessive force.  This is information we're
still waiting for from DOCCS and the Labor Relations Bureau.

And this is probably a good point to bring this up,
your Honor.  We were getting information, we requested
information from DOCCS, the Labor Relations Bureau, OSI, and
things were moving rather smoothly when we first started, but
there have been some delays in the last month or so and
obviously that's related to the pandemic.  So I don't think
this is something we can't get, I think it's just a delay at
this point, of getting this information.  So once we have a
further idea of what this information provides, we'll have a
better idea of whether, you know, we think it falls within

1    that discoverable scope.

2         MS. FREEMAN: Your Honor, this is Emma Freeman, a

3 few points in response to that. It's really not relevant

4 that Lieutenant Mitchell was suspended after he assaulted

5 Matthew Raymond. For one thing, the suspension could have

6 been based on conduct that happened before the assault, but

7 in any case, it doesn't matter whether the suspension was for

8 excessive force. What if it was for say lying to supervisors

9 or any other issue that goes to credibility? The defendant

10 is not in a position to make a determination about whether

11 that is responsive and relevant to our claims. So I'm glad

12 to hear that Mr. Mackey is working with, you know, the

13 relevant sources to obtain additional information, but we

14 would request that they be required to turn over whatever

15 information is in their possession about the suspension,

16 because no matter what the basis for it was, it impacts the

17 case and it's certainly discoverable.

18         In response to what Mr. Mackey referenced about the

19 time limitation of two years before the incident that was

20 proposed in the letter response, again, your Honor, I would

21 remind you that the first known incident, again, even before

22 discovery of assault by defendant Mitchell, is in 2002.

23 There is absolutely no basis to cabin our review of documents

24 to a two-year period that it seems to me was arbitrarily

25 cherrypicked from a handful of pro se cases that are

1  extremely different as a matter of fact than this one.  We

2  didn't put a time limit on the response, we have a negligent

3  retention claim and because this man has been abusing

4  inmates, we assume, for almost as long as he's been employed

5  by DOCCS and in this case on these facts, a broad timeframe

6  is more than appropriate.

7        MR. MACKEY:  Your Honor, there's --

8        THE COURT:  Do we know when he started with DOCCS?

9        MR. MACKEY:  Start date, I don't know offhand.

10 It's at least probably about 20 years.  He retired about -- I

11 think two years ago.  So it's probably early 2000, late

12 1990s.

13       MS. FREEMAN:  That's my understanding.

14       MR. MACKEY:  Your Honor, again --

15       THE COURT:  Go ahead.

16       MR. MACKEY:  Well, I just wanted to touch on a

17 couple of things.  I mean there is -- obviously you've

18 reviewed the letter, but there is a lot of legal authority

19 allowing limitations of this type of discovery, one of them

20 being that only, only prior complaints related to similar

21 actions, similar complaints of use of excessive force really

22 should be the only type of prior complaints that are

23 discoverable.  And then the use of a time limitation is also

24 quite common and we've cited several cases to that.  Two

25 years has been used.  There's a case where one year has been

used, there's a case that three years has been used.  So
we're looking at a time period, you know, one, two, three
years, may be considered reasonable.  To say they should be
getting documents from 2000 or 2002, we're talking about a
16-year span up to the date he retired.  That's when we're
getting rather -- or we're in the unreasonable stage.  You
know, if a claim of use of force in 2004, whether it's
excessive -- claimed excessive or not, really is irrelevant
to what happened, what allegedly happened in 2016.  So I
think it's reasonable for both of those limitations to be
applied -- the time limit, and also the type of complaints
that may have been levied against Officer Mitchell.

That and, you know, I understand that, you know, to
go back to the request for the personnel file, I think it was
submitted as a blanket request and that's the basis of our
objection.  You know, but we're still in the process of
reviewing personnel files for Mr. Mitchell and the other
defendants, and if there's information in those files that
are discoverable, we will turn those over.  But we're not
just going to turn over an entire personnel file that
contains a lot of information that's entirely irrelevant to
this case.

And then with respect, the issue of whether these
documents are indexed or how they're indexed, it's pretty
clear, I've been in contact with DOCCS, they've informed me

1   that any request for grievances in the past that named

2   Officer Mitchell or any other defendant, these type of

3   complaints or use of force where the name Officer Mitchell

4   and the other defendants was in the document, that's not

5   indexed by officers' names, it's indexed by the name of the

6   inmate that was identified in those papers.  So it would be

7   quite the burden, and again, there's case law that supports

8   this, unduly burdensome to require DOCCS to go through every

9   single use-of-force report or every single grievance that was

10  ever filed at the Auburn facility for the span of these --

11  Officer Mitchell's and the other defendants' career, and even

12  for a limited two-year period, because now we're talking

13  about tens of thousands of pages of documents that they would

14  have to go through to try to find these individuals' names.

15  And this is for information that's not even directly related

16  to the allegations of September 14th of 2016.  This is all

17  just for peripheral information, which you know, is probably

18  inadmissible at the end of the day.  But to go through this

19  full -- to go through, having to go through all these tens of

20  thousands of pages of documents for information that's not

21  even directly related to the case is rather burdensome and

22  unfair to my clients and DOCCS.

23          I guess the other thing was -- well, I guess that's

24  probably the main issues I wanted to hit upon.

25          THE COURT:  All right.  Let me broach one more

1    subject and it doesn't sound like Ms. Cowan dropped off so

2    you may be the most knowledgeable about this, but Mr. Mackey,

3    obviously you can respond to it if you know.  There -- there

4    is a office or a section of DOCCS called the office of labor

5    relations, which as I understand it from prior cases

6    maintains files by employee that would include incidents of

7    prior misconduct, at least to the extent that it resulted in

8    being -- it was sustained and resulted in discipline.  I

9    don't know, and if Mr. Mackey or Ms. Cowan know, I'd be

10   interested in learning whether those files from the office of

11   labor relations might include allegations against a specific

12   officer even if they did not result in discipline but

13   resulted in some sort of an investigation.

14            MR. MACKEY:  That, I'm not too sure of, your Honor.

15   We have been in contact with the Labor Relations Bureau, that

16   is the office we're still waiting on some further information

17   from.  From what I understand is they would have information

18   like you mentioned, your Honor, about any type of discipline

19   that was levied against an officer, any type of, you know,

20   suspension or leave, anything like that would show up in

21   these files, it's essentially the personnel files.  Whether

22   that, personnel files would have information related to

23   complaints and charges that essentially went nowhere or were

24   unfounded, I'm not a hundred percent sure, but through my

25   conversations with DOCCS and the Labor Relations Bureau, I

1    would think not.  I don't think that type of information

2    would be included in the files that it maintains.  It really

3    would just maintain any type of documents or records related

4    to suspensions and discipline and things that were found

5    against the officer.

6            THE COURT:  Ms. Cowan, if you're out there,

7    anything you want to add to that?

8            MS. COWAN:  Not really, your Honor, I don't know

9    the answer to that question but I do know that it won't

10   include something like a copy of all grievances filed against

11   that officer.  I know it doesn't include that.  I'm not

12   entirely sure if there was some sort of investigation done

13   that resulted in no disciplinary action, I don't know if they

14   have those files or not.  But I'm sure that BLR could help in

15   that regard.

16           THE COURT:  All right.  So I guess I was trying to

17   get a sense of whether it was like OSI or the Office of

18   Special Investigations or the IG's office that would have

19   files on cases they investigated even if the -- it was not,

20   the complaint was not sustained.  So okay.

21           Ms. Freeman, anything else you need to say?

22           MS. ROSENFELD:  Judge, this is Katie Rosenfeld, it

23   seems like --

24           THE COURT:  Oh, I'm sorry, I'm sorry, I picked the

25   wrong name.

1          MS. ROSENFELD:  No, no, you picked the right

2     name --

3          MS. FREEMAN:  I'm so sorry, your Honor, I was

4     speaking on mute, and I apologize.  Thank your for picking up,

5     Katie.

6          THE COURT:  Okay, either of you can speak, I didn't

7     mean to single out you, Ms. Freeman, I just picked the wrong

8     name off the docket sheet.

9          MS. FREEMAN:  No, I apologize and I'm sorry for

10    muting myself.  I did want to say a few things specifically

11    about the use-of-force incident.  You know, if Mr. Mackey is

12    going to maintain the position that the records are only

13    indexed by inmate, we I think would appreciate an affidavit

14    of recordkeeping, particularly in light of the Third

15    Department case that I mentioned suggesting that the records

16    are created for a purpose that it couldn't possibly be used

17    for if they were indexed as Mr. Mackey suggests.  Certainly

18    we have no interest in, you know, asking DOCCS to burden

19    itself for no reason, but again, under the really

20    extraordinary facts of this case, we can't be deprived of

21    information about use-of-force documents relating to

22    Lieutenant Mitchell without a really good reason.  And any

23    additional burden we would submit, again, is justified.

24          On the time limit, your Honor, again, the fact that

25    other more run-of-the-mill excessive force cases have used

1    one-, two-, or three-year timeframe is immaterial to this

2    case and I haven't heard anything from Mr. Mackey or anything

3    of the defendants other than a general sense of, well, I

4    don't really want to look back that far as to why we're not

5    entitled to documents in the beginning of Lieutenant

6    Mitchell's employment given that, without the benefit of

7    discovery, proffered information about seven other lawsuits

8    beginning with an incident in 2002.  Those are relevant.

9    They go to a pattern which is an argument that we've been

10   making from the beginning of this case, and they are plainly

11   discoverable.

12            MR. MACKEY:  Your Honor, just one quick comment.

13   The cases that we've cited does show that, you know,

14   documents or records related to a pattern are discoverable to

15   a point.  They're discoverable to show a pattern and really a

16   pattern that can only be established when it's limited to a

17   short time period, so it goes back to our original argument

18   is that, you know, these type of requests are allowed, but

19   there should be a time limit to it and a reasonable time

20   limit.  You know, we said two years is fair, we got that

21   number because we saw cases that said one year and we saw

22   cases that said three years, so two years is, you know, more

23   with -- well within the reason of what courts have found in

24   the past.

25            THE COURT:  Okay.  So let me, let me start by

1   making sure we've -- the areas of dispute that I think were

2   resolved have in fact been resolved.  So did we gain somebody

3   or lose somebody there?  Did somebody new sign on?  Okay,

4   maybe Ms. Cowan ran for her life, I don't know.  All right.

5          So as I understand it, plaintiff's medical records,

6   the use-of-force packet for the September 14th, 2016

7   incident, the chronological history display, and inmate

8   disciplinary history have already been disclosed.  Am I right

9   about that?

10          MR. MACKEY:  Yes.

11          THE COURT:  Okay.  And the defendants have now

12   agreed to produce the plaintiff's legal file and rap sheet

13   from DOCCS?

14          MR. MACKEY:  Those have been produced.

15          THE COURT:  Okay.  So from the plaintiff's

16   perspective, are there any remaining issues with respect to

17   those documents that I just ticked through?

18          MS. FREEMAN:  No, your Honor, we received a large

19   production from the defendants on the 22nd, and while I

20   haven't been able to verify that the documents are all

21   contained, I assume that they are and we can raise any issues

22   I'm sure offline if they come up but I think those documents

23   are all set.

24          THE COURT:  Okay.  So the next issue, the DOCCS OSI

25   investigation relating to this incident again from 9/14/2016

1   has now apparently been finalized and the defendants have

2   agreed to produce the final investigative report subject to

3   the terms of the protective order.  In my experience, the

4   final investigative reports from OSI tend to be relatively

5   concise summaries, and DOCCS may not, at least at first, in

6   the first instance disclose supporting investigative

7   materials including investigative reports.  So can you

8   clarify, Mr. Mackey, what DOCCS is prepared to turn over in

9   connection with this particular investigation?  Are we just

10  talking about the final report or are there other supporting

11  materials that you are, or have disclosed or are going to

12  disclose?

13          MR. MACKEY:  What we received from the OSI was

14  their final investigative report which was, which had

15  attached to it, you know, the underlying documents, use of

16  force related to this incident and inmate misbehavior report

17  related to this incident, any memos prepared at the Auburn

18  facility related to that incident.  And that's what we turned

19  over.  We haven't, and I can double check this, but I don't

20  believe we withheld anything that we got from OSI.  We

21  essentially turned over to plaintiff what we got from OSI

22  which was the final investigative report.

23          THE COURT:  But not necessarily witness interviews?

24          MR. MACKEY:  That -- no, there was no witness

25  interviews related to the report.  But we didn't get it.  We

1    didn't receive anything like that.

2         THE COURT:  Okay.  All right.  So I mean, I think

3    it is a good starting point for the plaintiffs to see the

4    final report.  That may trigger follow-up requests for

5    supporting information, and while I'm certainly not going to

6    prejudge this, I might -- it would be reasonable to expect

7    that I might eventually order disclosure of reports of

8    interviews to the extent they relate to the named parties in

9    this action to the extent they exist, and I know, you know,

10   to a certain extent, the use-of-force reports, you know, are

11   maybe what OSI relies upon but I think in some instances they

12   go back and re-interview witnesses and typically the results

13   of that will be summarized in the final investigative report

14   but not necessarily.  So, you know, again, I'll let the

15   plaintiffs review the report and, you know, to the extent

16   there are follow-up requests that you can't work out with

17   counsel and with DOCCS, then I can get -- I can get back

18   involved, but again, you know, to the extent there may be

19   interview reports of the named parties, I think that might

20   be -- that might be fair game as well to the extent they

21   exist and haven't been turned over.

22        The other thing I would mention is that it is not

23   uncommon for DOCCS to redact certain information from an

24   investigative report such as the names of other inmates who

25   might have provided information or might have been witnesses.

1    That can interfere with a plaintiff's efforts to identify

2    potential nonparty witnesses or inmate witnesses, and so that

3    may be a subject of some further discussions, and you know,

4    while I, while I think, you know, I think there are issues of

5    inmate privacy and institutional security that provide some

6    basis for redactions, you know, to the extent the materials

7    suggest a real promising potential witness, we can discuss

8    whether that witness name or that inmate name needs to be

9    disclosed.

10        The plaintiffs have also asked for the results of

11   any investigation by the Department of Justice with respect

12   to the September 14th, 2016 incident, and the defendants

13   assert that they are not in possession or control of such

14   documents so I guess I need to ask Mr. Mackey, does that just

15   mean you didn't get one from DOCCS or does that mean there

16   isn't one or that DOCCS doesn't have one?

17        MR. MACKEY:  We did not receive anything from DOCCS

18   regarding a Department of Justice investigation.  Whether one

19   exists or not, I couldn't tell you either way, your Honor.

20        THE COURT:  Okay.  Well, I have, again, a recent

21   experience with another OSI investigation at Auburn for which

22   there was a parallel Department of Justice investigation and

23   there was a separate OSI final investigative report on the

24   Department of Justice investigation.  So I think, Mr. Mackey,

25   it is worth inquiring.  I don't know, Ms. Rosenfeld or

Ms. Freeman, whether you have some concrete information that

there was a parallel investigation or not involving the feds?

MS. FREEMAN:  We do, that's our understanding, your

Honor.  Obviously we don't know much more than that, but we

made the request not as a, you know, fishing expedition but

because we have a basis to think there was a parallel

investigation, yes.

THE COURT:  The case I worked on involved a

particular correction officer who was accused of planting

weapons on inmates and it's a case Ms. Cowan handled and as I

say, there were two investigative reports so I think,

Mr. Mackey, you may need to follow up with OSI and inquire

whether there was a separate investigation, whether it was a

joint investigation with OSI and whether there's a report

from that, just so that we can, you know, address whether

there's something in that that is fairly discoverable.

MR. MACKEY:  I can do that, your Honor.

THE COURT:  All right.  So then from plaintiff's

perspective, you know, with those kind of open-ended issues

there, is there anything else we need to talk about in terms

of the OSI documents?

MS. FREEMAN:  No, your Honor, I think your approach

is the right one, that we will certainly raise any issues

with defendants in the first instance once we've had a look

at the final report that was produced.

1          THE COURT:  Okay.  And I -- Jodi's probably got

2    your name or your voices by now, but that was Ms. Freeman,

3    yes?

4          MS. FREEMAN:  Yes, I apologize, your Honor.

5          THE COURT:  All right.  So the primary area of

6    dispute involves the discoverability of personnel and

7    disciplinary documents relating to the named defendants.  Let

8    me start by briefly putting a little bit of the applicable

9    law on the record here since I'm going to rely on the record

10   of this proceeding rather than write on it.

11         As with any discovery issue, I think the extent to

12   which personnel and disciplinary records of law enforcement

13   and correctional personnel are discoverable, turns largely on

14   the concept of proportionality, which requires the court to

15   balance the importance of the discovery in resolving material

16   issues in the litigation against the burden or expense of

17   production.  That standard, of course, is established in

18   Federal Rule of Civil Procedure 26(b)(1).  The New York Civil

19   Rights Law Section 50-a establishes certain limitations on

20   the disclosure of confidential law enforcement personnel

21   records under state law.  While the federal cases indicate

22   that that privilege is entitled to some consideration in

23   connection with discovery issues in civil rights cases, it

24   is -- the New York privilege is not controlling in federal

25   civil rights actions.  That's established by, among other

1    cases, *Mercado v. Division of New York State Police*, 989

2    F.Supp. 521 at 522, a Southern District of New York case from

3    1998.

4    I'm quoting from now from another case, "In a civil

5    rights action against the police, police internal

6    investigations files are discoverable when they involve

7    allegations of similar misconduct.  It is 'the prevailing

8    practice' of courts in the Second Circuit 'to limit discovery

9    of a defendant's disciplinary history to complaints, whether

10   substantiated or not, about conduct similar to the conduct

11   alleged in the complaint.'"  That's from *Session v.*

12   *Rodriguez*, a District of Connecticut case from June 4, 2008,

13   reported at 2008 WL 2338123, at *2, which in turn cites other

14   authorities including *Gibbs v. City of New York*, Eastern

15   District of New York case from February 4th, 2008, which in

16   turn collects other cases.

17   I would also reference a case I think cited in this

18   case, *Simcoe v. Gray*, 2012 WL 104 -- 1044505, at *3, a

19   Western District of New York case from March 28th, 2012,

20   which held, and I'm quoting, "Prior complaints made against

21   the defendants, whether substantiated or not, are

22   discoverable in Section 1983 civil rights actions so long as

23   the complaints are similar to the constitutional violations

24   alleged in the complaint or are relevant to the defendant's

25   truth or veracity."

1          The claim in this civil rights case is one of

2     excessive force, and the issue is whether the defendants'

3     conduct here also blends into issues of sexual harassment or

4     bullying, and plaintiff's counsel has illuminated that a

5     little bit for me in terms of discussing some of the prior

6     incidents here.  So you know, while I buy into the line of

7     authority which says that you shouldn't necessarily open

8     discovery to all sorts of prior misconduct if they're

9     unrelated to the constitutional violations alleged in the

10    particular action, I recognize the need to consider

11    broadening the category a little bit, and I'll get specific

12    in a little bit.

13         There seems to be extensive documentation of at

14    least defendant Mitchell's prior alleged involvement both in

15    excessive force issues and sexual harassment issues from a

16    number of lawsuits.  I think plaintiff's counsel has

17    emphasized that but I think that kind of cuts both ways in

18    the sense of, you know, proportionality I think allows me to

19    consider whether there is ample evidence already available to

20    one side to support their position that there's been a

21    pattern of misconduct which might, you know, argue for not

22    necessarily going back as far to pile on with other incidents

23    that perhaps were less compelling and did not result in

24    lawsuits or investigations or discipline.  But you know, I do

25    think I need to draw a bracket around the types of misconduct

1    involved based on the issues of proportionality so we don't

2    get too far afield and, at least with respect to defendant

3    Mitchell, there seems to be a lot of material available for

4    plaintiff's counsel to work with.

5            I think, I take Mr. Mackey's point that there is a

6    lot of material in personnel records which are not

7    particularly relevant to the particular misconduct alleged in

8    this case or the credibility of the employee, and that many

9    personnel records are sensitive and confidential.  I do,

10   however, see some reason to consider disclosure of

11   performance appraisal forms, you know, particularly in light

12   of the fact that there is, you know, there is a claim of

13   negligent supervision or retention at least with respect to

14   defendant Mitchell.

15           And the -- with respect to his suspension, as I

16   will discuss in a minute, the fact that it happened after

17   this incident I don't think is controlling but there may be

18   some further investigation required to get into whether or

19   not the suspension was sufficiently related, or the

20   misconduct leading to the suspension was significantly

21   related to the alleged misconduct or constitutional

22   violations in this case.

23           The burden of production of records that might

24   relate to the unreasonable use of force against inmates or

25   sexual harassment involving inmates is going to vary with the

type of records.  As defendants point out and as I think I

understand from handling prior discovery disputes in DOCCS

cases, use-of-force reports and inmate grievances are not

filed or indexed by the officer involved but by inmate so

trying to find records that relate only to a particular

officer is extremely time consuming and burdensome for DOCCS.

I think there are cases, particularly from the Western

District of New York, that say that DOCCS cannot avoid the

discovery of relevant grievances and use-of-force reports

based on self-imposed logistical burdens in finding and

producing such documents relating to a particular officer.

But there are other cases, including some cited in the

defense brief at page 3, that have not ignored the burden

that DOCCS would face from searching records systems geared

toward management of its inmates for information about a

particular DOCCS employee.  And you know, again, plaintiffs

have raised some issues as to whether sort of the common

understanding of what is and isn't readily available from the

records of grievances and use-of-force reports may be

something that we need to confirm, but I do, you know, think

I have to consider the burden of production in making the

proportionality analysis.

        I do think there are more readily available sources

of documents that will tend to be more probative of whether a

DOCCS employee has engaged in a pattern of similar misconduct

in the past.  One source that we've mentioned would be the

files of the DOCCS Office of Special Investigations or OSI

which was formerly called the Inspector General's office or

the IG.  While the vast majority of inmate grievances are

found to be without merit and are unlikely to produce useful

evidence, an incident that has escalated to an OSI or an IG

investigation I think is much more likely to have merit and

to be relevant in trying to establish pattern evidence under

Rule of Evidence 404(b).  Also, the DOCCS office of labor

relations, which we've also discussed, maintains files by

employees which would reflect any discipline imposed on a

correctional officer based on sustained allegations of

misconduct, and may also contain complaints of misconduct

that did not ultimately result in the imposition of

discipline but were considered and investigated, although

that is a little unclear.

So I am going to order the defendants, with the

cooperation of DOCCS, to produce the following categories of

documents for each named defendant during a timeframe which I

will discuss in a minute.

The first would be any reports or other records

relating to allegations involving the use of excessive or

unreasonable force or sexual harassments involving inmates,

and I'm emphasizing that to say I'm -- I've concluded that

sexual harassments of coemployees is going to be a different

1    kettle of fish that is less relevant that I'm not ordering

2    produced.

3           And the second category of documents would involve

4    making false claims or allegations or providing false

5    statements or testimony.  And all -- both categories of

6    records to the extent they are maintained in the files of the

7    DOCCS office of labor relations for that defendant.

8           Now, as I say, it may be that such records will not

9    be found in the office of labor relations files unless the

10   allegations were determined to be founded and resulted in

11   discipline; however, records relating to any such allegations

12   that are maintained in the office of the files of -- I'm

13   sorry, in the files of the office of labor relations should

14   be disclosed even if the allegations were ultimately not

15   found to be substantiated.  The fact that the allegations

16   resulted in a disciplinary investigation of the officer would

17   make it sufficiently relevant to be discoverable.  Also the

18   plaintiffs should, for each named defendant, be provided with

19   any reports or other records of any investigations by DOCCS,

20   OSI, or IG relating to the incident on September 14th, 2016,

21   which has already been produced.  But also any other

22   investigation of claims, again, involving the use of

23   excessive or unreasonable force or sexual harassment on

24   inmates and/or making false claims or allegations or

25   providing false statements or testimony.  These records

should be disclosed whether or not the OSI or IG ultimately
determined whether the allegations were substantiated.

Finally, the defendants shall produce in discovery
any personnel or disciplinary records to the extent that
defendants are going to rely on them in defending this
action.

So now DOCCS will be given some leeway, at least
initially, in redacting limited information from any such
documents that raise privacy or security concerns, and again,
I think I suggested that earlier this primarily relates to
the names of other inmates, but plaintiff's counsel may later
address any concerns about such redactions if, for example,
it prevents access to a promising potential inmate witness.

With respect to timeframe, defense counsel cites
several cases which reflect the fact that applying the rule
of proportionality in discovery often results in limiting the
timeframe for which discovery of evidence or other misconduct
or constitutional violations is limited.

In the case of defendant Mitchell, because he is
the primary alleged wrongdoer and appears to have an alarming
disciplinary history, I am going to make that timeframe
broader for him than I am for the other defendants for which
there does not seem to be such evidence of prior misconduct.
I would note that, contrary to defense counsel's brief, there
is case authority for the proposition that similar misconduct

1    after an alleged civil rights violation may be sufficiently

2    relevant to be discoverable.  For that I would cite *Barrett*

3    *v. City of New York*, Eastern District of New York case from

4    2006, reported at 237 F.R.D. 39 at 41, which held that

5    documents and information relating to investigations that

6    postdate the filing of the current action could be relevant

7    in the civil rights case and should be disclosed.  Similar

8    holding in *Wisniewski v. Claflin*, Eastern District of

9    New York case from April 16, 2007, reported at 2007 WL

10   1120464, at *3.  So for defendant Mitchell, I'm going to

11   order production of the categories of documents that I've

12   previously discussed from the beginning of 2014 through the

13   end of 2017, a period of four years.  And again, in light

14   of -- you know, I understand that the lawsuit suggests the

15   the pattern of conduct going back further, and I think based

16   on the volume of evidence that the plaintiff's counsel has

17   from the litigation, the prior lawsuits, a four-year period

18   bracketing the incident here should provide ample evidence of

19   pattern evidence.  I'm not ruling out consideration of

20   expanding that period after they've reviewed what they get

21   for that four-year period on top of what they find in the

22   records of litigation, but I think that that is, under the

23   principles of proportionality, a reasonable timeframe.

24          For the other named defendants who, again, there

25   seems to be less of a track record of prior misconduct,

1   relevant misconduct, I will narrow the timeframe from

2   September 2014 through and including September 2017, a period

3   of three years bracketing the incident.

4            All right, does anybody need any clarification or

5   have any questions with respect to my rulings with respect to

6   the personnel and disciplinary records before we move on?

7            MS. FREEMAN:  Your Honor, this is --

8            MR. MACKEY:  Your Honor -- go ahead.

9            MS. FREEMAN:  Thank you, Pat.  This is Emma Freeman

10  for the plaintiff.  I did want to clarify whether your ruling

11  with respect to disciplinary records includes

12  suspension-related documents that I understand Mr. Mackey is

13  still in the process of obtaining.

14           THE COURT:  Yeah, so I guess the one thing I will

15  say about that is I think if the suspension implicates the

16  categories of prior misconduct that I've outlined both on

17  unreasonable and excessive force and sexual harassment of

18  inmates, that information should be disclosed even if it was

19  more than -- if it was after the end of 2017.  So that I

20  would probably, the only change I would make with respect to

21  that would be to expand the period for the evidence of the

22  reasons for suspension beyond 2017, if they involve

23  sufficiently similar types of misconduct, and I would do that

24  because I think it would be relevant to DOCCS' failure to

25  suspend or terminate defendant Mitchell earlier if the

ultimate grounds for the suspension were similar to prior

incidents of misconduct that occurred.  So that's a good

question, and it does -- did warrant a little clarification.

MS. FREEMAN:  Thank you, your Honor.  Just one

follow-up.  You just listed again excessive and unreasonable

force and sexual harassment.  If the suspension were related

to the other category you listed, false claims or false

testimony, would that also be produced?

THE COURT:  Yes, correct.

MS. FREEMAN:  Thank you, your Honor.

THE COURT:  All right.  Mr. Mackey?

MR. MACKEY:  Your Honor, I did have a quick

question.  Could you clarify the period of time for Officer

Mitchell, what was the dates again?

THE COURT:  Beginning of 2014 to the end of 2017.

So four years.

MR. MACKEY:  Okay, that's what I wrote down, okay,

thank you.

THE COURT:  All right.  Okay.  So the one remaining

area of dispute if I've got my information straight relates

to the request for information about the location of

stationary cameras in various areas of the Auburn facility,

including the medical unit, infirmary corridors, and the SHU.

Is that still a bone of contention between the parties or

have you worked that out as well?

1          MR. MACKEY:  Your Honor, we haven't had any

2     discussions regarding that since we submitted the letter so I

3     believe, without putting words in Emma's mouth, that is still

4     an issue.

5          MS. FREEMAN:  It is still an issue, your Honor, but

6     it might be helpful if I could say a word or two, because we

7     are happy to narrow the request somewhat.  We don't need to

8     pursue information about the location of cameras anywhere

9     throughout the facility.  But in their recent production,

10    defendants did give us a video which I haven't yet received

11    for technological reasons that I understand shows plaintiff

12    being escorted back to the Auburn facility from his time at

13    the Auburn Community Hospital and I know that Pat will

14    correct me if that's an inaccurate statement.  And so in

15    light of the fact that that video from September of 2016 was

16    preserved and has appropriately been produced, the

17    information that we really need about videos and video

18    cameras is the presence or absence of a camera in the room

19    where the assault occurred, and the presence or absence of

20    cameras in the hallway immediately outside of that room.  So

21    we, insofar as the defendants don't agree to produce that

22    information and certainly any video if it exists, then we

23    still do have a dispute, but we are happy to narrow the

24    request to just those two areas.

25          THE COURT:  All right.  That sounds pretty close,

1  Mr. Mackey, to what you were at least willing to explore if

2  I'm correct.

3          MR. MACKEY:  What -- I guess what our main concern

4  was that, and maybe this has been alleviated by what

5  Ms. Freeman just said, was essentially providing a layout of

6  where all the cameras are and where they aren't, because then

7  we're basically giving the blueprints of the facility

8  security wise and obviously that would cause a major issue,

9  security issue within the facility.  I'm not even sure what

10 the issue of location, whether there were cameras in the --

11 well, let me back up.  One is, my clients don't even -- there

12 wasn't even any type of use of force that even led to a

13 preparing of a use-of-force document, so for them, this use

14 of force that Mr. Raymond is claiming happened is fiction, it

15 never really happened, so I'm not quite sure what room

16 Ms. Freeman may be referring to or what hallways Ms. Freeman

17 may be referring to because there was no event that happened

18 once Mr. Raymond returned to the Auburn facility.  So I guess

19 that kind of muddies up the issue because we don't even know

20 what room they may be referring to.

21          THE COURT:  I think they're talking about, I think

22 it was described as the medical unit emergency treatment

23 room, which is where he alleges he was assaulted, and I think

24 Ms. Freeman has added to that the, I would say the immediate

25 adjacent corridors, and I, I think she's basically asking,

1  you know, absence or presence of cameras in those areas, and

2  I think the understanding is there probably weren't any.

3        MR. MACKEY:  Well, I guess maybe the way to cut to

4  the chase, your Honor, is that we can ask DOCCS if there's

5  any footage from that particular day of those locations.  I

6  don't think we really need to get into documentation of

7  whether cameras exist there or not, but we --

8        THE COURT:  I don't think we're talking -- we're

9  talking about back in 2016, which presumably wouldn't

10  necessarily tell you where they are now, so it seems to me a

11  reasonable request for DOCCS, and this can be through

12  witnesses I suppose if the defendants know this but they may

13  not, but you know, basically, they're looking for the answer,

14  was there camera coverage in the medical unit emergency

15  treatment room in September 2016 or in the immediate adjacent

16  corridors.  Yes or no.

17        MS. FREEMAN:  That's correct, your Honor, as to the

18  framing of the question, and I just add that the final OSI

19  investigation report that was just produced to us makes clear

20  that Mr. Raymond was taken to the medical wing of Auburn when

21  he returned from the hospital.  So I understand Mr. Mackey

22  and his clients' position that there was no use of force, but

23  certainly we are entitled to know not just whether or not

24  there were cameras, but if there were, whether there is

25  actually camera footage, even if it's no longer been

1    preserved for whatever reason.

2         THE COURT:  Yeah, I mean I -- I think that is

3    something that would typically be ordered in an excessive

4    force case.  You know, I get the security concerns about a

5    map of where everything is in the facility, I think where

6    they put cameras has evolved over time so whether there were

7    or were not cameras now three-and-a-half years ago I don't

8    think really raises a serious security concern.  And I would

9    almost bet that even if there were cameras, there's not going

10   to be any footage around unless there was some preservation

11   request.  I would say that the escort videos are typically a

12   handheld camera and my sense is that the preservation of

13   those and the preservation of stationary video cameras are

14   kind of a whole different critter.  But all right.  So, and

15   I -- and again, I don't know where you're, who you're going

16   to get that from, that might end up being an affidavit from

17   the assistant superintendent for security or something like

18   that, but I think that's, that's what you need to produce.

19        And I guess the other loose end that I forgot about

20   is Ms. Freeman I think requested a confirmation about the

21   lack of cross-referencing of use-of-force reports and

22   grievances by DOCCS employee, which as I say, is the common

23   understanding of people who handle these types of cases, but

24   she's found information to suggest maybe that's not the case.

25   My guess, Ms. Freeman, is what they're suggesting is, you

know, to the extent it ends up in the office of labor
relations files, it might be -- it might be by officer but I
think that's another area where some sort of an affidavit
from, if not a party, somebody at DOCCS would be appropriate.
And I get, you know, Mr. Mackey, that you are not an AG and
that complicates coordination with DOCCS but it sounds like
you've actually managed to get a foothold into that
bureaucracy, so usually when you have an order from me, that
will help you get what you need.

          MS. ROSENFELD:  Your Honor -- oh, I'm sorry, I
didn't mean to interrupt you, this is Katie Rosenfeld, just
had one more thing I wanted to ask but I didn't mean to
interrupt you.

          THE COURT:  No, I'm done, go ahead.

          MS. ROSENFELD:  Okay.  So at the risk of trying
your Honor's patience, I just, while you were speaking I just
wanted to go back to one item in your earlier ruling about
the production limits.  You know, I certainly understand the
court's decision about the timeframe for Lieutenant Mitchell
being four years and for the others being three years and the
kind of trying to, you know, appropriately allocate burden in
terms of proportionality.  I wanted to ask the court if you
might make an exception with respect to timeframe to two --
two known incidents that are outside of that timeframe but
for whom, because we know the name of the inmate involved,

there would be no burden associated with the production of
the OSI files or the BLS files relating to those two, and
those would be Dino Caroselli from 2002 who was paid $55,000
for an assault involving broken hand, ankles, teeth, loose
teeth and a nose, and then in 2008, Richie Thomas who alleged
that Lieutenant Mitchell assaulted him while he was
handcuffed just as Mr. Raymond's assault and was paid $20,000
to settle his case.  So those two files are outside the
timeframe that your Honor referenced, but as your Honor
noted, OSI files may sometimes contain summaries or other
information related to that person, and so by pulling two
more files that are outside that time period based on those
two specific people, I think it could be very fruitful for us
with relatively little additional burden to the defendants.

THE COURT:  So you're looking for the OSI
investigation reports for those two?

MS. ROSENFELD:  Exactly, your Honor.

THE COURT:  What do you have from the litigation
with respect to those two incidents?

MS. ROSENFELD:  Just the complaint, your Honor.

THE COURT:  And then it settled?

MS. ROSENFELD:  Correct.

MR. MACKEY:  Your Honor, I guess I would just go
back to the argument that we're talking about 2002 and 2008,
and if plaintiff is looking to develop a pattern of behavior,

1   a pattern is usually, as the courts have ruled in numerous

2   cases, the pattern's usually what happens within a relatively

3   small time period and you know, we've discussed one year, two

4   year, three year. But if we're talking about 2002 which is

5   16 -- 14 years before the alleged event and 2008 which is

6   eight years before the alleged event, I don't really think

7   that lends or leads towards establishing a pattern and I

8   think it just -- it's a little too far back, at least with

9   the 2002 case, way far back, in that it's beyond what is

10   usually done by the courts in allowing certain

11   discoverable -- documents to be discoverable when it's

12   closely related in time lines.

13          MS. ROSENFELD: And I appreciate that and the

14   reason that I raise it, your Honor and Mr. Mackey, is that

15   there are both issues of negligent retention and with the

16   superintendent of the facility having very long-standing

17   knowledge of Mr. Mitchell's problems, including these two

18   specific incidents, and then balancing the issue of burden in

19   retrieving and locating things. And so I think where OSI is

20   already going to be asked to do a search for these four

21   years, giving them the two additional names of these very

22   specific incidents and asking for two more files is really

23   not burdensome, but again, these files may contain

24   information and are likely to contain information regarding

25   who at the facility even back then, which may include

1  Superintendent Graham, was aware of these incidents and knew

2  about them, and also additional information about Lieutenant

3  Mitchell therein.

4         THE COURT:  Okay.

5         MR. MACKEY:  Burdensome argument, your Honor, it's

6  also a relevance argument just because of the great span of

7  time.

8         THE COURT:  Right, and I guess what I'm going to do

9  is I'm going to punt on that request and let's see what the

10 discovery I've ordered produces to you in terms of a pattern

11 and if, you know, if you conclude that there's some serious

12 hole in that that one or more of these cases would fill, then

13 I'll consider that.  I mean, you know, part of the issue of

14 proportionality is providing you with a reasonable

15 opportunity to develop the available evidence to, you know,

16 to make your case, and seems to me you're going to have

17 plenty, but after you've collected what I've ordered, I won't

18 preclude you from coming back and raising that issue again.

19        MS. ROSENFELD:  Thank you, your Honor, we'll do as

20 you advise of course.  Thank you.

21        THE COURT:  All right.  So are there any

22 outstanding discovery issues that I have missed?

23        MS. FREEMAN:  Not from plaintiff's end, your Honor,

24 this is Emma Freeman.

25        MR. MACKEY:  I don't believe so, your Honor.

1      THE COURT:  All right, so Mr. Mackey, it sounds

2  like it's a little unclear to you how long it's going to take

3  you to produce this stuff and I understand you're somewhat at

4  the mercy of DOCCS who is right now somewhat at the mercy of

5  an epidemic.

6      MR. MACKEY:  Right.

7      THE COURT:  So I think the thing to do is to give

8  you a couple three weeks to get back in touch with your

9  client and communicate what I've ordered and get a ballpark

10  from them as to timeframe and then we can revise the

11  schedule.  Right now the fact discovery deadline is going to

12  be expiring on August 10th and seems pretty clear that's

13  going to need to be extended but seems to make sense to give

14  you a couple three weeks to, you know, get a better sense of

15  what you can accomplish and in what timeframe before we bump

16  out the schedule.  And then -- go ahead.

17      MR. MACKEY:  I was going to say, your Honor, I will

18  definitely contact my contact person at DOCCS who has been

19  essentially the middleman between my communications with the

20  Labor Relations Bureau and OSI.  It's tough to get from them

21  a response as to how long it will take but I'll let them know

22  that you specifically mentioned that and maybe that helps in

23  getting them to give me more of a concrete answer as to when

24  I can expect to get these documents.  I mentioned earlier

25  that we're still waiting on a few and it's probably been

1    close to a month already since we initially asked for them

2    so -- probably more than that, actually, now we're in June,

3    but I'll try my best to, you know, lean on them to get it to

4    us as soon as they can.

5            THE COURT:  Okay.  And what -- so what I will do is

6    I will put my specific rulings in an order and that will give

7    you something to flash in front of DOCCS, hopefully will help

8    you get their attention.  I'll look for a status report from

9    you by June 25th, and you know, whatever -- wherever you are

10   at that point, let me know and if -- to the extent you've got

11   enough information that the parties can agree to an extension

12   of the schedule, you can put a proposed schedule in the

13   status report.

14           MR. MACKEY:  Okay.

15           THE COURT:  All right.  Is there anything else we

16   need to discuss this afternoon?

17           MS. FREEMAN:  Not from plaintiffs, your Honor.

18           MR. MACKEY:  I don't believe so.

19           THE COURT:  Ms. Buth, anything from you?

20               (No response.)

21           THE COURT:  Oh, she may be the one who signed off.

22   Okay.  All right.  So we'll look for that status report on

23   June 25th and we'll go from there in terms of revising the

24   schedule and perhaps setting up a follow-up conference.  All

25   right.  Everybody --

1          MR. MACKEY:  Your Honor.

2          THE COURT:  Yes.

3          MR. MACKEY:  One quick question.  Like you said, it

4    would be helpful for me to flash an order requiring the

5    disclosure of the documents you mentioned earlier, it would

6    help me in getting the documents from DOCCS and OSI and Labor

7    Relations Bureau.  When do you think that order would become

8    available for me to use to get the process moving?

9          THE COURT:  Tomorrow at the latest.

10          MR. MACKEY:  Okay.  That will work.

11          THE COURT:  Okay?  Okay.  All right.  Thanks,

12    everybody.

13                    (Proceedings Adjourned, 3:12 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4          I, JODI L. HIBBARD, RPR, CRR, CSR, Federal

 5    Official Realtime Court Reporter, in and for the

 6    United States District Court for the Northern

 7    District of New York, DO HEREBY CERTIFY that

 8    pursuant to Section 753, Title 28, United States

 9    Code, that the foregoing is a true and correct

10    transcript of the stenographically reported

11    proceedings held in the above-entitled matter and

12    that the transcript page format is in conformance

13    with the regulations of the Judicial Conference of

14    the United States.

15

16                    Dated this 12th day of September, 2020.

17

18

19                          /S/ JODI L. HIBBARD

20                          JODI L. HIBBARD, RPR, CRR, CSR
                            Official U.S. Court Reporter
21

22

23

24

25
```