UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
MATTHEW RAYMOND,

                              Plaintiff,

vs.                              18-CV-1467

TROY MITCHELL, et al.,

                              Defendants.
-------------------------------------------x

        Transcript of a Telephone Conference held on

October 27, 2020, the HONORABLE ANDREW T. BAXTER,

United States Magistrate Judge, Presiding.

                    *Jodi L. Hibbard, RPR, CSR, CRR*
                *Official United States Court Reporter*
                    *100 South Clinton Street*
                *Syracuse, New York  13261-7367*
                        *(315) 234-8547*

                    A P P E A R A N C E S

                       (By Telephone)

For Plaintiff:        EMERY CELLI LAW FIRM
                      Attorneys at Law
                      600 Fifth Avenue
                      10th Floor
                      New York, New York  10020
                        BY:  EMMA LERNER FREEMAN, ESQ.
                             KATHERINE R. ROSENFELD, ESQ.

For Defendants:       LIPSITZ GREEN SCIME CAMBRIA, LLP
(Auburn CF dfts.)     Attorneys at Law
                      42 Delaware Avenue
                      Suite 120
                      Buffalo, New York  14202
                        BY:  PATRICK MACKEY, ESQ.
                             DIANE M. PERRI ROBERTS, ESQ.
                             BARRY NELSON COVERT, ESQ.

For Defendant:        MEYERS BUTH LAW GROUP
(Hoppins)             Attorneys at Law
                      21 Princeton Place
                      Orchard Park, New York  14127
                        BY:  CHERYL MEYERS BUTH, ESQ.
                             LAURIE BAKER, ESQ.

For Defendant:        NEW YORK STATE ATTORNEY GENERAL
(John Doe)            Syracuse Regional Office
                      300 S. State Street
                      Suite 300
                      Syracuse, New York  13202
                        BY:  AIMEE COWAN, ESQ.

1    (The Court and all counsel present by

2        telephone, 2:30 p.m.)

3        THE COURT:  All right, good afternoon, this is

4    Judge Baxter.  This is Raymond v. Mitchell, et al.,

5    9:18-CV-1467, can I have the appearances for plaintiff,

6    please?

7        MS. ROSENFELD:  Sure.  Good afternoon, your Honor,

8    this is Katie Rosenfeld from Emery Celli for plaintiff

9    Matthew Raymond, and my colleague Emma Freeman is also on the

10    phone with me.

11        MS. LERNER FREEMAN:  Good afternoon, your Honor,

12    this is Emma.

13        THE COURT:  Good afternoon, all right.  For the

14    Auburn Correctional Facility defendants?

15        MR. MACKEY:  Good afternoon, your Honor --

16        MS. PERRI ROBERTS:  Good afternoon -- go ahead,

17    Pat.

18        MR. MACKEY:  Sorry, your Honor, this is Patrick

19    Mackey on behalf of all defendants other than defendant Geer.

20        MS. PERRI ROBERTS:  No, Patrick, actually it's, we

21    represent defendant Geer, it's defendant Aimee Hoppins who's

22    represented by --

23        MR. MACKEY:  I'm sorry, I said Geer, I meant

24    Hoppins.

25        THE COURT:  Okay.  There's another lawyer for that

1  group?

2          MS. MEYERS BUTH:  Judge, Cheryl Meyers Buth on

3  behalf of Aimee Hoppins, good afternoon.

4          MS. BAKER:  Good afternoon, Judge, and Laurie Baker

5  on behalf of Aimee Hoppins as well.

6          THE COURT:  Okay.  All right.  We have anybody else

7  on the line?

8          MS. COWAN:  Yes, your Honor, this is Aimee Cowan

9  for the John Doe defendants.

10          THE COURT:  Okay.

11          MS. COWAN:  Sorry.

12          THE COURT:  That's all right.  All right.  Is that

13  everybody?

14          MR. COVERT:  Your Honor, Barry Covert and Diane

15  Roberts, I don't know if you announced but we're also on, we

16  are with Patrick Mackey, co-counsel with Mr. Mackey.

17          THE COURT:  Okay.  All right.  So we have a couple

18  of issues to address today.  The first relates to the request

19  from the plaintiff that I enter an order and, protective

20  order, I guess, to disclose some information relating to an

21  FBI investigation that may implicate at least defendant

22  Mitchell.  Have there been any new developments with respect

23  to that, have the parties discussed that any further or

24  anything like that?

25          MS. ROSENFELD:  Your Honor, this is Ms. Rosenfeld,

1    there have not beyond the submission of the letters to the

2    court.

3              THE COURT:  Okay.  So I did communicate with Tom

4    Spina who is the Assistant U.S. Attorney in this district who

5    is sort of the liaison between the various FBI or Justice

6    Department lawyers involved in the *Touhy* review.  My purpose

7    in doing so was to try to see if they wanted to participate

8    in this conference, which they ultimately decided not to.

9    But I did get some additional information from him with

10   respect to the government's position so I'm going to say a

11   little bit about that, and then we'll see if we can sort out

12   how to proceed here.

13             I do not think that the FBI's current position

14   constitutes a finding that the relevance of the requested

15   investigative records outweighs the privacy interests of the

16   persons referenced in the report in the supporting documents.

17   The FBI is reviewing the report and in the process of

18   gathering supporting investigative documents and they are

19   still waiting to make a determination as to whether they will

20   comply with the subpoena based on the *Touhy* standards.

21             Mr. Spina tells me that as of late last week when I

22   spoke with him or maybe earlier in the week, they needed

23   about 30 more days to continue their review before starting

24   to crystallize their position.  The government has reserved

25   its right to assert privilege with respect to the documents

1   which could include a determination that the law enforcement

2   privilege should be invoked, for example, to protect sources

3   from harm, or to protect the privacy of persons referenced

4   who were not charged with crimes.

5   The contours of the law enforcement privilege are

6   examined in, among other cases, *Miller v. Mehltretter*, a

7   Western District of New York case from 2007 reported at 478

8   F.Supp.2d 415 at 424.  While the government lawyers would be

9   happy to have the court make a ruling with respect to the

10  Privacy Act issues so they could cover their bases and reduce

11  the burden of review and redaction, they have not taken the

12  position that disclosure is appropriate under Privacy Act

13  standards pending further review of the documents.

14  Now the Privacy Act standards for me to consider in

15  whether to order disclosure of these documents are for the

16  most part the usual standards for discovery under the Federal

17  Rules including concepts of proportionality.  The case law

18  seems to agree that the Privacy Act does not create a

19  privilege or require a showing of compelling need to overcome

20  privacy interests, but it calls for a more considered and

21  cautious balancing of the harm caused by disclosure versus

22  the relevant need and proportionality considerations.  And

23  sort of the classic case that articulates the standards for

24  deciding whether the court should issue an order compelling

25  disclosure of documents covered by the Privacy Act is a

District of Columbia Circuit case from 1987, *Laxalt v. McClatchy*, which is reported at 809 F.2d 885 at 888 to 889, and at least for now I'm not going to recite those standards in detail. But district courts in the Second Circuit have applied the *Laxalt* standards in deciding when to issue disclosure or protective orders under the Privacy Act with some variation in emphasis. So a few -- I'll cite a few cases by way of example, *Pascal Abidor, National Association of Criminal Defense Lawyers v. Johnson*, an Eastern District of New York case from June 2nd, 2016, reported at 2016 WL 3102017, at *7, which held that while documents covered by the Privacy Act "may be released pursuant to court order, in making a decision to release such information, 'the court must 'accord proper weight to the policies underlying ... statutory protections, and ... compare them with the factors supporting discovery in a particular lawsuit.''" ... "[t]his analysis includes a balancing of 'the need for disclosure against potential harm to the subject of disclosure.'" There's quite a bit of internal quotation marks that I'm not going to bother trying to sort out while I'm doing this orally.

I'd also cite *Upstate Shredding, LLC v. Ferrous, Inc.*, a Northern District of New York case from March 2nd, 2016, reported at 2016 WL 865299, at *17, and that held, and I'm quoting, "The 'protected interests' in the Privacy Act

1  'reflect a congressional judgment that certain delineated

2  categories of documents may contain sensitive data which

3  warrants a more considered and cautious treatment' in

4  discovery.... "Procedurally, then, whether the District Court

5  considers a request for a Privacy Act order in the discovery

6  context it must consider the use of protective orders and the

7  possibility of in camera inspection.'"

8           There's also an earlier Northern District of

9  New York case which applies the *Laxalt* standards, that would

10  be *Mary Imogene Bassett Hospital v. Sullivan*, 1991 case from

11  this district, 136 F.R.D. 42 at 49.

12          So I'm going to make a few comments with respect to

13  the submissions the parties have made so far just to sort of

14  guide further consideration and discussion of this issue.

15          I would disagree with the plaintiff's suggestion

16  that the discovery they seek from the FBI does not create a

17  burden on anyone.  It certainly maybe doesn't create a burden

18  on the defendants but it has created a substantial burden on

19  the FBI to gather and review records from an investigation

20  that was completed almost 15 years ago.  And I would note

21  that the Federal Rules of Civil Procedure are particularly

22  protective of nonparties in evaluating the burden from

23  discovery demands.  That's established in the Rules of Civil

24  Procedures Rule 45(d)(1).  And with all due respect, I think

25  the defendants got it completely backwards on the

significance of the Privacy Act in this particular case.  To
the extent that the FBI report implicates named defendants in
excessive force or other similar misconduct, that weighs in
favor of disclosure in this action despite the defendants'
privacy interests.  There are clearly other factors that
would determine relevance, including the fact that the
investigation looked into conduct nine or more years before
the incidents in this case, and that no named defendants were
charged or were disciplined.  But with -- I don't have a lot
of details but I do have some sense from my discussion with
Tom Spina that at least defendant Mitchell is referenced in
the report.  To the extent the FBI report implicates others,
in particular nonparties, in misconduct, that is when the
relevance of the information to this action weakens and the
privacy interests of nonparties becomes more compelling.

At the end of the day, I believe I need to evaluate
the extent to which the report provides relevant evidence of
misconduct of defendants named in this case to be able to do
the balancing required by the Privacy Act and the normal
requirements of federal discovery.  And that, in my view,
will likely require an in camera review of the very lengthy
FBI report and perhaps more voluminous supporting documents.
The FBI's ongoing review of that material may prove to be
helpful to me in being able to focus on the extent to which
that report and the investigative materials may reference

1      defendants in this case.  So I am inclined to wait for them

2      to complete their, at least their initial review of these

3      materials before I call for an in camera review.

4            In the meantime, I'm going to suggest one thing

5      that defendants in particular can do to reduce the scope of

6      the burden on the FBI in this case, and that is determine

7      which of the named defendants worked at the Auburn facility

8      between 2001 and 2005 which is the time period the

9      investigation by the FBI looked at, so that we can limit the

10     number of names that the FBI and I will be trying to find in

11     the report and in the supporting materials.

12            And then the other thing I would note and I

13     don't -- you know, I'm not, again, I'm not being critical,

14     this is kind of an obscure issue, but I'm not sure that the

15     sort of generic protective order that was already entered in

16     this case, even though it's somewhat detailed, and the very

17     terse order that the plaintiffs have provided here would

18     really be what the FBI was looking for if I were inclined to

19     make a finding under the Privacy Act that some of this

20     information needs to be disclosed.  And I know, I think the

21     plaintiffs cited the *Cepeda* case which has a much more

22     tailored and detailed Privacy Act protective order which may

23     be more what the FBI is looking for.

24            So that having been said, I will give each side a

25     chance to make any comments or seek any clarification of my

1    proposed course of action starting with the plaintiffs.  And

2    again, please identify yourself when you're speaking.

3              MS. ROSENFELD:  Thank you, your Honor, this is

4    Katie Rosenfeld for Mr. Raymond.  I think just to take the

5    last thing you said first, the terse protective order that we

6    submitted was one that Mr. Spina actually shared with me as a

7    model that had been given to him by Ms. Ivashkiv.  So I had

8    actually just literally cut and pasted from another

9    protective order that had been suggested by FBI-OGC.  I'm

10   happy to submit a different one, I had thought that using the

11   one that the FBI had presented as an example from another

12   case would be helpful, but I'm happy to obviously do a more

13   detailed one as the court suggested.

14             THE COURT:  Oh, okay, well, that's interesting, I

15   didn't know that and it certainly is reasonable to use the

16   model that the government provided to you.  Okay.

17             MS. ROSENFELD:  Yeah, I mean I agree with you, your

18   Honor, I thought it was a bit terse, but I thought it would

19   make sense to just use what they gave us but obviously we can

20   tailor it as the case may be.

21             You know, in terms of the burden on the FBI, you

22   know, we certainly don't mean to be dismissive of the burden.

23   I would note, your Honor, that when I -- the FBI, in response

24   to our FOIA request that was made last year, had already

25   pulled this 178-page report and engaged in a redaction

1    process, and so when I spoke with Ms. Ivashkiv in the Office

2    of General Counsel of the FBI and with Mr. Spina, I sent them

3    copies of that report and suggested that perhaps since

4    another part of their agency had already pulled this document

5    and started the redaction process, it would lower the burden

6    in terms of having to locate the document.

7           I also want to tell the court that we started on a

8    process through FOIA to obtain this and they provided it in,

9    the first 50 pages of the 178 pages in a very highly redacted

10   form, and it was actually at that point that we asked, that

11   we said, you don't need to continue, we don't want to take up

12   more of the resources of the agency with this extensive

13   redaction process which is not even producing a usable

14   document for us.  And so we voluntarily withdrew our FOIA and

15   said you don't need to continue redaction beyond the 50 pages

16   you've already provided because we didn't want to burden them

17   with unnecessary work.

18          So I guess all that is to say, your Honor, there is

19   a document out there that the FBI has already pulled out of

20   its files and is known to it, and that was in one way we

21   hoped this would not be so burdensome on the agency.  But I

22   understand your Honor's concerns on that front.

23          THE COURT:  So let me -- before you move on, let me

24   just amplify on that a little bit.  I mean, in addition, you

25   can imagine if there is a 170-page report, there's a ton of

1    underlying investigative materials, and I think the FBI has

2    construed your subpoena to include and require the review of

3    those underlying materials.

4         The other issue, and I'm, you know, I'm not

5    underestimating the difficulty of the very, very detailed

6    redactions that were made by the FBI but they basically

7    redacted everything which is a lot easier than trying to sort

8    out where in 178 pages of a report and a ton of investigative

9    materials one of, you know, half a dozen employees or former

10   employees of DOCCS might be referenced.  So I appreciate what

11   you've said about the burden and I'm certainly, you know, not

12   prejudging that issue, but, you know, my sense from talking

13   with Tom Spina is a part of the reason that they are -- you

14   know, gave you the impression that they're happy to turn over

15   the whole thing unredacted as long as I put my name on the

16   order, you know, is because they're trying to avoid a very

17   tedious and time-consuming review and redaction process.  But

18   that doesn't do me a lot of good.

19        MS. ROSENFELD:  I see.  So your Honor, just to, I

20   guess further working backwards to start with your initial

21   comment, you know, I certainly hope that the court doesn't

22   feel that we in any way have misrepresented what the FBI told

23   us.  As you saw we just submitted to the court as Exhibit A

24   in our reply letter, the letter from the FBI to us stating

25   their position, and in that letter, the FBI-OGC did inform us

that they had conducted the *Touhy* analysis with regard to our

request and had found that we, we meaning plaintiff, had

satisfied *Touhy* in terms of establishing the relevance of the

documents to our case and then they note that the next step

would be whether we would obtain a Privacy Act order and

whether they would have additional privileges and objections

to assert.

THE COURT:  Okay, let me interject there, and I've

read that letter and I can understand why you came to that

conclusion, and I certainly, as I say, the FBI and the

government would be happy to kind of pass the buck to me to

take the responsibility for making the decision as to, you

know, weighing relevancy and privacy, but I don't -- I don't

think that's their position now.  But I'm certainly not

accusing you of misrepresenting their position because I

understand that that letter could be read the way you've

interpreted it.

MS. ROSENFELD:  Right, and I also spoke with

Ms. Ivashkiv, your Honor, and specifically was, it sounds

like maybe their position has evolved and that your Honor has

a more up-to-date status on their position and so obviously

once the documents are produced to you for in camera review,

it sort of moots what their position is.  But just to be

clear, the main document that we're seeking, that I spoke

with Ms. Ivashkiv about is the 178-page report, and I will

1   clarify this with both Ms. Ivashkiv and Mr. Spina in writing

2   after this call, we are not asking them to produce every

3   underlying investigative document that's set into that final

4   set of conclusions and I agree that that would be burdensome.

5   So I will clarify that with them.

6          You know, I do want to point out, your Honor, that

7   this issue of the timeframe, like I'm sure you'll deal with

8   this when you get to looking at the actual submission, but

9   you know, we've -- the attempt to cabin the timeframe of

10  discovery here I believe is very misguided because the very

11  allegation in our complaint is that the fact that

12  Mr. Mitchell was allowed to work there for so long despite

13  having been identified so long ago as someone with abusive or

14  violent propensities is a, perhaps supports punitive damages

15  and certainly deliberative indifference against the

16  superintendent for permitting this person to stay there for

17  30 years.  So I don't think that something that is remote in

18  time here with respect to the question of whether the

19  individual, Mr. Mitchell, committed this particular assault,

20  we could disagree about that, but what we are saying that

21  it's important to and I think it really supports the further

22  back you go, is that it's relevant to the question of

23  supervisory liability of continuing to employ this known

24  predator who the FBI itself may have identified in this

25  investigation and not subjecting that person to additional

1   surveillance or monitoring or check-ins or whatever the case

2   may be.

3           THE COURT:  Okay, let me, let me interject again

4   and I'm -- I don't mean to break your flow here but you

5   reminded me of something.  One of the suggestions in the

6   defense letter was that, in both letters was some lack of

7   clarity as to when, what Superintendent Graham knew and when

8   he knew it with respect to the contents of the report and

9   perhaps the ongoing conduct of Mitchell and there was a

10  suggestion that you may be looking to postpone the Graham

11  deposition until you get whatever FBI documents I authorize

12  the release of.  You know, one thing that I think argues

13  against that is the need to clarify the extent to which

14  Graham was involved in the investigation or the report or

15  aware of the investigation and the report.  And obviously,

16  you know, you've got to make your decision as to when you

17  think it's best to do that deposition but that, you know,

18  it's not entirely clear that the report is necessarily -- was

19  necessarily communicated to Graham and that that would be as

20  relevant to his supervisory liability as would, for example,

21  a number of lawsuits that you've cited that came

22  subsequently, some are relatively recently against Mitchell

23  and others.

24          MS. ROSENFELD:  Of course, and that's obviously

25  something we need to explore with him in that position and

1    have pointed out that this report was issued in March and he

2    started in October of that year. And you're right, your

3    Honor, it's possible that he never knew about it, never heard

4    of it, he didn't know who was interviewed and it has no

5    bearing. On the other hand, this large multi-agency law

6    enforcement investigation involving 50 officers at the

7    facility, one could also imagine that an incoming

8    superintendent would be briefed on it or would make it his

9    business to know about what had occurred so he could run the

10    facility going forward in a safe and humane way.

11    So I agree, your Honor, we don't know at this point

12    exactly how it cuts and that's something we'll have to

13    explore with Mr. Graham at his deposition. But this is

14    obviously discovery, this is not trial, we're -- you know,

15    we're not at the stage where we're talking about whether this

16    kind of evidence is going to be admissible at a trial, we're

17    simply talking about whether it's going to be produced in

18    discovery as part of these claims and I think given that

19    standard, these materials should be -- and the fact that we

20    later can argue about what the jury gets to hear about, I

21    think should be a separate inquiry than the presumptively

22    broad nature of discovery here, particularly when we've made

23    this kind of facial showing of relevance which frankly is

24    supported by what the defendants say in their letter which is

25    now we've learned that Mr. Mitchell does remember being

1  interviewed by the FBI, or by a New York State police

2  officer, I'm sorry, I don't want to misspeak.  They mentioned

3  that he did recall that he had been interviewed by several

4  law enforcement members around this time.  You know, they've

5  sort of put his -- they've cast his participation in a

6  certain way now in this letter to the court which of course

7  we have no ability to test without the underlying documents.

8         So, you know, I understand your Honor's going to be

9  doing an in camera submission and I don't want to belabor

10 these points, but this lawsuit really is about how DOCCS

11 allowed this person to continue to work at this facility, he

12 was sued in the aughts, he was sued in the tens, he was sued

13 in the teens, you know, this is somebody who should not have

14 been working there all these years and I think that the large

15 multi-agency law enforcement investigation being conducted

16 which includes the interviews of him and the extent to which

17 his coworkers and supervisors knew about that, going forward

18 is something that we should be permitted to explore in

19 discovery.  And I guess I would respectfully ask, your Honor,

20 that to the extent that there is an in camera submission and

21 your Honor has -- you know, determines that there's

22 additional judgment calls or legal arguments, that we be

23 given the opportunity to make another submission if it would

24 be helpful to the court.

25         THE COURT:  Okay, fair enough, and I, you know, I

certainly -- but the fact that I'm doing an in camera review
I think reflects the fact that I have not made a hard and
fast determination as to a timeframe, you know, that
inherently is no longer proportional if it's older than a
certain amount.  But you know, and I am guessing here because
I did not get into any detail with Mr. Spina and I'm not sure
he had the details, but my sense is while Mr. Mitchell may be
discussed or referenced in this report, I do not have the
sense that he was identified as one of the, you know, 10
recurring mal-actors or mal-feasors or whatever that was
driving a lot of the problem.  So you know, the extent of his
participation is going to be important and, you know, as I
suggested earlier, other information about the extent to
which Graham was really in the loop on this are going to be
important in my decision as to proportionality.  And I
certainly am happy once I get a better handle on things to
give each side a further opportunity to be heard.

MS. ROSENFELD:  Your Honor, I don't think that the
document is going to reflect the extent to which Mr. Graham
was in the loop because whether he -- his superintendent role
did start after that.  I think that's something that's going
to have to be determined in his deposition.  And in
discussion about whether he was given the report, told about
it, what kind of system he implemented once he learns that a
number of officers have been implicated, all of those

1   questions I think are going to be in his deposition, but I
2   think without the benefit of being able to see the report and
3   understand what was going on at the facility, because it's
4   not just about defendant Mitchell, your Honor, it's about a
5   culture that allowed this to continue, you know, for many,
6   many years, and whether Mr. Mitchell was the ringleader in
7   2005 or at that point he was a follower, he certainly became
8   a ringleader at the facility later.  And so all of this I
9   think is fair game for us to conduct discovery about.
10          THE COURT:  Okay.  I'll start with Mr. Mackey or
11  whoever on your side, you want to say anything?
12          MR. MACKEY:  Thanks, your Honor, yes, it is Patrick
13  Mackey for the defendants.  Your Honor, I mean there was
14  several issues I wanted to get across with this particular
15  motion and maybe I won't get into it just because of the way
16  you've informed us that there's going to be an in camera
17  review of the documents.  I was going to get into how this is
18  a fishing expedition and, you know, irrelevance of some of
19  this information but I think I'll pare back my arguments just
20  so I don't belabor the point.
21          One thing your Honor did ask is about who was
22  working at the facility during the investigation.  I think
23  the investigation was 2001 to 2005.  So of the nine
24  defendants we represent, three were working at that time.
25  One was Troy Mitchell who we've already acknowledged was --

started work during that period, another was Thomas Phillips,

and this is information that was provided for me by DOCCS,

Thomas Phillips looks like he started at Auburn in October of

1990 and would have been present at the time of the

investigation, and the other defendants, Thomas Giancola

looks like he started at Auburn in September of '95 and it

appears he was also at Auburn during the investigation.  So

if there's an interest in trying to narrow it down as to who

was actually there at that time, at Auburn, it's Mitchell,

Thomas Phillips, and Thomas Giancola.

THE COURT:  Okay, that's helpful, thank you.

MR. MACKEY:  You're welcome.  So like I said, I'll

pare back my arguments.  I think the one thing I really

wanted to hit on was the issue with the Privacy Act, and I

know your Honor mentioned that if there are names, for

instance, Mr. Mitchell is named in the report, that that may

make the report more relevant.  And I guess that kinda -- I

kinda disagree, I mean obviously a lot depends on how he's

mentioned.  If he's just mentioned in passing, I think that

definitely lends towards the report being somewhat irrelevant

to him and in general irrelevant to this case.  But there's

also the argument that if he's, you know, named more than in

passing, if he's named as possibly a target of the

investigation like you mentioned there was 10 individuals who

were -- seemed to be more targeted for the investigation, I

1   do think the Privacy Act does kind of step in when we're

2   dealing with how we're balancing the burdens.  As your Honor

3   mentioned earlier, there's a balancing of need versus harm

4   and in this particular light I mentioned, or I cited in the

5   letter the Supreme Court case of *Douglas Oil* and that case is

6   important because it makes the mention that if you're part of

7   an investigation, and in that case there was a grand jury

8   that did not -- and the individuals named in the grand jury

9   were eventually exonerated, that they should be considered as

10   individuals or information related to those individuals

11   should not be disclosed so they're not held up to public

12   ridicule.  And I mention this in the letter and I just

13   thought it would be better to mention it again, that it

14   appears that there was a grand jury convened related to this

15   investigation, but there were no indictments.  Mr. Mitchell,

16   and from what we gathered, no one else was indicted, and he

17   was never disciplined for it, he was never criminally charged

18   for it.  So even if he's named in this report more than just

19   in passing, I think the Privacy Act kind of lends towards the

20   idea that he was never charged with anything or disciplined

21   for anything and his name shouldn't be released on a public

22   document.  Not a public document, a document related to law

23   enforcement, that may result in public ridicule to him and

24   possibly some others if these other individuals are also

25   named in the report.  So --

1          THE COURT:  Right, and let me --

2          MR. MACKEY:  Judge --

3          THE COURT:  -- just as I've done this to your

4     opponent, so I'll do this to you, I think the -- I think the

5     grand jury context is significantly different than this

6     context but it is a fair consideration and I appreciate that.

7     You could argue, if I were channeling Ms. Rosenfeld here,

8     that the absence of discipline at Auburn may reflect the

9     culture of allowing this violent conduct and that might make

10    it more relevant so it's kind of a -- you know, it's kind of

11    a complex issue, but go ahead.

12         MR. MACKEY:  Right.  And I kind of, last, what I

13    was also going to mention and I think you mentioned this

14    already, is that with respect to Mr. Graham who was the

15    superintendent, he came in in October of 2005 where this

16    investigation was done in March of 2005, so obviously he

17    wasn't there for the investigation, I'd be surprised if

18    there's any possible way his name would show up in the

19    report, he wasn't there yet, but we're also dealing with a

20    report that was kept under wraps, and you know, when asked,

21    he said he'd never seen the report, and he's never been told

22    who was in the report.  So I understand what Ms. Rosenfeld

23    said, she might want to dig into that with depositions and I

24    guess that's fine, but I think that should also, if they're

25    looking towards supervisory liability, you know, I find it

1   difficult to say how someone who's never been shown the

2   report or provided information to the report could then be

3   said to be, what was the term they used, deliberately

4   indifferent to the report.

5           And my final thought, your Honor, is that, and

6   maybe this goes more towards relevance, is that we're dealing

7   with a document, and when I say document I mean a report,

8   that was put together in March of 2005, and that's 11 years

9   before the alleged incident of September 2016.  So obviously

10  the report has no direct relation to the events of

11  September 2016.  At best, and I think this is a stretch, have

12  some of type of tangential relationship but it seems to be a

13  big leap to claim that there's some relevance into a report

14  that was prepared in 2005 related to allegations of excessive

15  force in 2016.  So I think that's important when we're --

16  when your Honor's looking at this report and making the -- or

17  balancing the need versus harm, is that we're not talking

18  about a report that is directly related or reports on the

19  events of September 2016.  We're talking about a document

20  that has absolutely no connection to what happened or what

21  allegedly happened in September of 2016, and the fact that

22  they're so far apart, 11 years and more because the

23  investigation started in 2001, and the fact that they are not

24  directly related means we're really looking for some

25  information, it's really lending towards a speculative

subpoena, I'll use the word fishing expedition, but it also
lends towards irrelevance.  How relevant could this document
really be in this case when we're talking about alleged use
of force in September of 2016, and we're talking about a
report that didn't lead to any indictments that was released
in 2005?  It seems to be a stretch to me.

THE COURT:  Okay, fair enough.  Ms. Buth or
Ms. Baker, anything you want to say on the subject?

MS. PERRI ROBERTS:  No, your Honor.

MS. MEYERS BUTH:  No, thanks, Judge.

THE COURT:  Okay.  Ms. Rosenfeld?

MS. ROSENFELD:  Your Honor, yes, I just wanted to
say one thing which is that, you know, I think that
defendants' counsel appears to be privy to some information
via DOCCS that we are not privy to.  So for example, the
information that this did go to a grand jury, that there was
no indictment, that certain people were or were not
interviewed, you know, all of that may or may not be the
case.  I take counsel at his word that it went to grand jury
and there was no indictment but we don't have access to any
of that information.  And I think that the reason that it's
important to have the documents produced so that everybody is
fairly on the same page in terms of the value and
significance of this investigation to the case and deciding,
you know, what role it may play at trial.  So I just, you

1    know, this issue about it going to a grand jury but not --

2    there not being an indictment, I think there's a lot of

3    reasons that that may happen.  I'm not aware of anything to

4    do with the grand jury and, again, DOCCS has produced no

5    discovery about this and has refused to produce it to us,

6    although it appears they're sharing information informally

7    with defendants' counsel that they then bring forward, you

8    know, as helpful, right?  So they took the position, DOCCS

9    took the position it would not provide any documents to us

10   about this investigation, but yet has shared information as

11   it deems helpful with Mr. Mackey.  So I think there's a

12   disparity in access to information in order to evaluate the

13   situation which is why we issued this nonparty subpoena, to

14   try to rectify that.

15              THE COURT:  Yeah, the only thing I will say, and

16   Mr. Mackey, you can weigh in on this or not if you wish, but

17   I mean, he also has three clients who were there at the time

18   so that may be the source of his information as opposed to

19   DOCCS, but I don't know.

20              MR. MACKEY:  Your Honor --

21              THE COURT:  Go ahead.

22              MR. MACKEY:  You're correct, this is nothing that

23   we got from DOCCS.  We've been talking with our clients

24   regarding this, and I mean DOCCS, it's not a refusal to turn

25   over information, this is an FBI investigation, DOCCS

1  wouldn't have this information so --

2            MS. ROSENFELD:  Well, respectfully it was a joint

3  DOCCS New York State --

4            MR. MACKEY:  If I can finish.  If I can finish.

5  But your Honor, yes, I mean the information about not being

6  charged, not being disciplined, understanding that there was

7  a grand jury convened and no indictment, that's information

8  we're getting directly from our clients, not from DOCCS.

9            THE COURT:  Okay.  So I am going to communicate

10 further with Mr. Spina, I'm -- I would appreciate,

11 Ms. Rosenfeld, if you followed through with your stated

12 intention to let them know that you're focusing on the report

13 and don't necessarily need them to dig up all the supporting

14 investigative materials which might short circuit their

15 investigation or their, you know, their document review.  I

16 will share, Mr. Mackey, your information about the three

17 defendants who were present at the facility at the time, and

18 then, you know, basically see, try to arrange to get the

19 report submitted to me for in camera review as soon as they,

20 you know, basically have been able to do their initial review

21 and can share with me any shortcuts to try to figure out the

22 extent to which the defendants are implicated here.  Okay.

23            So the next issue, changing gears now, is the

24 deposition of the plaintiff.  So I guess I have a couple of

25 questions based on your two letter briefs, and I -- by the

1    way, I apologize for not getting back to you sooner,

2    Mr. Mackey, your team with your desire to file a response but

3    I had a wedding anniversary with my wife and was not frankly

4    responding to emergency requests.  So you filed your response

5    anyway so it worked out.  But the suggestion, Ms. Rosenfeld,

6    was that you were prepared to conduct your part of the

7    deposition of your client from the city remotely even if he

8    was going to appear in person in Buffalo, was that the

9    original plan?

10         MS. ROSENFELD:  That's not the plan, your Honor.

11   The original plan was that we noticed the deposition -- I'm

12   sorry.  That they asked to conduct the deposition in Buffalo

13   and I was going to, or my colleague or both of us were going

14   to travel to Buffalo to be there in person at their office

15   with our client.

16         THE COURT:  Okay.  And I'm taking --

17         MS. ROSENFELD:  And then we would -- I'm sorry,

18   your Honor.

19         THE COURT:  Go ahead.

20         MS. ROSENFELD:  I was just going to say, and then

21   we were going to return a second time on November 20th to

22   take Mr. Mitchell's deposition also in person at their office

23   before --

24         THE COURT:  Okay.  And I'm presuming that your

25   client lives in the Buffalo area?

1    MS. ROSENFELD:  He lives -- he lives, I'm aware

2  exactly, yes, he lives close, relatively close to there, I'm

3  not sure if it's Buffalo proper but somewhere nearby.

4    MS. LERNER FREEMAN:  I believe it is in the suburbs

5  of Buffalo and we can provide the court with specific

6  information if that's needed.  This is Emma Freeman.

7    THE COURT:  Okay.  And you alluded to some medical

8  conditions the plaintiff has that might make him more

9  vulnerable to the COVID situation, and I know that's a

10  sensitive subject and we can figure out some other way to

11  communicate that to me if you don't want to do it on the

12  record.  But I think that would be relevant to my

13  determination as to, you know, whether it's appropriate and

14  reasonable for him to not want to go through with the

15  in-person deposition.

16    MS. ROSENFELD:  Well, your Honor, the request to

17  not go through with the in-person deposition stems largely

18  from counsel.  So I don't want to place Mr. Raymond's medical

19  condition at the center of this.  I think it's an additional

20  concern, as is the health of anybody at these depositions.

21  You know, he has ongoing neurological problems, having

22  surgery on November 17th, you know, he has medical problems

23  but I -- this is, you know, the issue that I think we really

24  are focused on is the risks involved in all of us being

25  together in the room, not just to Mr. Raymond but to my

1  opposing counsel, to the court reporter, to -- and the risks

2  associated with travel, hotel stays and all of that.  So I

3  don't want to overstate or sort of inflate the issue about

4  Mr. Raymond's medical condition because I think really the

5  issue is that it's not wise at this point for anybody to be

6  in a confined space in a group of eight people at this

7  juncture for 10 hours.

8          THE COURT:  Okay.  And do you have a sense of

9  whether your client would have to take public transportation

10 to the deposition as opposed to just drive downtown?

11         MS. ROSENFELD:  I don't know, your Honor.  But your

12 Honor, I have to say that the idea that we would be forced to

13 remotely defend our client's deposition is a real -- imposes

14 a huge difficulty and if your Honor orders that, then I'm

15 going to have to end up going to Buffalo anyway because I

16 would never allow my client to be alone deposed with the

17 other counsel present and not have me present.

18         THE COURT:  Okay, that's a fair point.  All right.

19 So the defense arrangements, you're proposing that the

20 plaintiff come in and that the New York lawyers either need

21 to come out there or they need to defend the deposition

22 remotely.  How would that work?  You suggested that you would

23 provide them some confidential way to communicate during the

24 deposition; would there be just the witness on camera, would

25 the questioning lawyer be on camera from Buffalo, what are

1    you proposing here?

2         MS. PERRI ROBERTS:  Your Honor, this is Diane Perri

3    Roberts, I'll take the lead on our end on this subject.  We

4    offered a couple different options and one option would be,

5    although I now understand they don't want to defend -- I'll

6    use the word defend their client's deposition without being

7    physically present, but if they had their client come into

8    our office and they were remote in the deposition, we could

9    arrange a separate conference room with a phone in the event

10   their client needed to, in a permissible manner, communicate

11   with them during the course of the deposition if there was a

12   question about privilege or anything like that, we would have

13   a separate room that their client could go to to make that

14   telephone call to talk to the attorneys, you know, outside of

15   anything that our office or the court reporter would even be

16   able to hear.  So that was the way we thought that could be

17   handled.

18         THE COURT:  All right.  And would the questioning

19   lawyer also be on a separate camera or would it just be the

20   witness that would be visible to somebody who was appearing

21   remotely?

22         MS. PERRI ROBERTS:  I believe it would be the

23   witness but we could certainly, if it provided a greater

24   level of comfort, look into having a camera on the

25   questioning attorney, too.  I know that's not usually the way

1    it's done, but we could, I'm sure, make that type of an

2    arrangement.

3           THE COURT:  Okay.  All right.  Well, so I think --

4    I mean, I live in upstate New York, as do the defense

5    attorneys, and we may be a little less concerned about the

6    COVID situation in part because we got through it much more

7    gently than our colleagues in the New York City area did.

8    I've -- my wife is particularly paranoid about this issue so

9    it's something we talk about a lot and we, you know, look

10   into a lot and the Buffalo area is still in relatively good

11   shape in terms of controlling the virus, but that having been

12   said, I think things are going to continue in the fall and

13   winter to get worse.  I would not want to have to travel by

14   plane to do my job.  You know, I'm doing some proceedings in

15   person in Syracuse but, for example, I'm having a -- what we

16   call an exhaustion hearing which is kind of like a bench

17   trial where I'm going to have, you know, a bunch of lawyers

18   and witnesses in an Albany courtroom socially distanced and

19   I'm going to preside from Syracuse, not because I necessarily

20   would be concerned about being in that particular courtroom,

21   but I don't particularly want to like spend a night in a

22   hotel in Albany.  So I am not inclined to force lawyers to

23   proceed with an out-of-town in-person deposition.  And I

24   would, you know, I would note that plaintiff's counsel have

25   from the start not tried to gain any tactical advantage,

they're doing all the defense depositions remotely which,
particularly for defendant Mitchell I think is, you know, is
I'm sure something that the plaintiff's lawyer would prefer
not to do.  So the question then becomes do we delay things
for six months or four months or some fairly substantial
amount of time to see if things improve and we can get back
to a situation where people are more comfortable traveling
and doing in-person depositions, or do we just take our lumps
with the current COVID situation and move forward with these
remote depositions with the understanding that everybody is
going to be at a little bit of a disadvantage.  You know, I
know there was a concern about documents, you know, being
difficult to show on the screen and that sort of thing and I
know that a lawyer doesn't necessarily want to telegraph the
nature of their questioning by providing all the documents in
advance, but, you know, as I say, I've conducted proceedings
where the documents have been marked in advance so everybody
can refer to a hard copy if they need to look at a hard copy.
And again, I understand that's different than what we're used
to and not necessarily ideal, but given the fact that both
sides are going to operate with the same disadvantages, I
guess I would vote for moving forward with the current
schedule and doing all the depositions remotely.  But I will
hear from the defense in terms of the option of delay, if you
want to go that way.

1      MS. PERRI ROBERTS:  Yes, your Honor.  Again, it's

2  Diane Perri Roberts.  One thing I do want to bring up and

3  this is an opportune time to do it, is that we somewhat

4  recently, because of some document issues, were contacted by

5  assistant state -- Assistant Attorney General for the state

6  Bonnie Levy who is defending an action in the Court of Claims

7  that Mr. Raymond has commenced against, I believe it's DOCCS,

8  and we also just recently got from Assistant Attorney General

9  Levy a scheduling order that has recently been entered in

10  that Court of Claims action in which plaintiff's counsel

11  apparently represented to the judge, I believe it's Diane

12  Fitzgerald, Judge Fitzgerald in the Court of Claims --

13      MS. ROSENFELD:  Fitzpatrick.

14      MS. PERRI ROBERTS:  -- Fitzpatrick, that the intent

15  was to move forward with one set of depositions across the

16  Court of Claims action and the federal, this federal court

17  action such that each individual defendant in a federal court

18  action who also obviously is being brought up in the Court of

19  Claims at least by name and going to be deposed, that they

20  would only be deposed one time.  So we also now have an

21  issue, and again, this has just been made aware to us very

22  recently, that there's depositions scheduled and they've done

23  a discovery calendar in that matter, a scheduling order that

24  those depositions are to be done no later than, I believe it

25  is July of 2021, so I would expect those would be being

scheduled sometime in the spring.  And it begs the question
of why can't we just do one set of depositions in the spring
and get these done at one time since, again, plaintiff's
counsel's already represented to the Court of Claims that the
intention is to do one set of depositions to cover the Court
of Claims action and the federal court action.

THE COURT:  Ms. Cowan, Bonnie Levy is an AAG?

MS. COWAN:  Bonnie Levy is, yes.

THE COURT:  Wow, okay, I didn't know that.

MS. COWAN:  About 10 years.

THE COURT:  Oh, okay.  So Ms. Rosenfeld, what do
you think about the delay option?

MS. ROSENFELD:  Your Honor, we filed this case in
2018.  Ms. Cowan, through no fault of her own, had to
withdraw, counsel came in, we had extensive delay while they
got up to speed which we accommodated as professional counsel
do.  The case is getting old.  We agreed on these depositions
in the fall.  I would note that the Court of Claims action
has been pending for many -- if not years, there's no -- the
fact that it's a surprise to defendants' counsel, I don't
know why it is.  I mean, it's been out there, it's making its
way slowly.  We had spoke with Ms. Levy about how it would be
great if everybody could do depositions together but she is
not ready to do depositions and since has said that she would
have to follow.  So this is a federal court action, it's

pending, we would like to just keep the schedule that we all have worked all fall to put together. The only difference now is we do it remote. And I completely agree with your Honor, we're extremely disappointed not to take our own depositions in person and to be with our client in person for his deposition. It's not ideal by any stretch, but we've all set aside the days, we've all prepared, I don't understand why we would adjourn an entire schedule of depositions for the month of November and early December. And unfortunately I'm not super optimistic that things will be different in four months. And I don't think it's in our client's interest to have further delay in proceeding with this case.

THE COURT: All right. Did -- the Court of Claims action I'm assuming is just like personal injury claims against the state?

MS. ROSENFELD: Correct.

THE COURT: Relating to the same incident?

MS. ROSENFELD: Correct.

THE COURT: And you represent the plaintiff in that as well?

MS. ROSENFELD: Correct.

THE COURT: Okay. And Ms. Levy is not ready to do joint depositions even if they're remote?

MS. ROSENFELD: My understanding when we talked to Ms. Levy last was that she was not ready to start

1  depositions, that she was reviewing documents, you know, I

2  feel a little uncomfortable speaking for her although we've

3  worked very well together, but yes, that was my understanding

4  because we notified her we were in the process of scheduling

5  these and I believe she said you'll just sort of have to go

6  ahead without me at this point because I'm not -- I can't

7  start now.  And we --

8             THE COURT:  And you --

9             MS. ROSENFELD:  I'm sorry, your Honor, I just

10  wanted to say one more thing.  And because -- whatever,

11  that's sufficient, your Honor, yes.

12             THE COURT:  Ms. Cowan, I'm assuming you don't have

13  any insights as to Ms. Levy's case?

14             MS. COWAN:  I don't, your Honor, I can certainly

15  speak to her.  It would surprise me that she would be willing

16  to have depositions go forward without her being involved.  I

17  know that typically it's our practice in this office if

18  there's a federal matter and a state court matter, that we do

19  joint depositions so that our clients aren't being deposed

20  twice.  But I don't know what communication she had with

21  plaintiff's counsel, I have to admit.  So to me, if it were

22  me, I would want just one set of depositions to be completed.

23  And I would be very shocked that she doesn't want to be

24  present at least remotely for the depositions.

25             THE COURT:  Okay.

1          MR. MACKEY:  Your Honor, this is Patrick Mackey.

2     The brief communications I had with Ms. Levy was that she was

3     expecting that she'd be ready after the new year.  To start

4     doing depositions.

5          MS. ROSENFELD:  Your Honor, this is Ms. Rosenfeld,

6     I really object to this kind of 11th hour attempt to delay

7     our depositions based on a case that has been pending in the

8     Court of Claims for the entire time that we've made this

9     schedule.  Nothing has been hidden from defendants,

10    everything has been out in the open, we should be working

11    with Ms. Cowan.  Everybody knew that there was a Court of

12    Claims action and the fact that defendants, for whatever

13    reason, do not want to proceed on the schedule that we all

14    agreed to and are now raising at this very last minute that

15    somehow there should have been overlap between these

16    depositions, I don't think it's appropriate.  We set a

17    schedule, we agreed on it, we've already had years of delay

18    because of the conflicts and late entries and we want to

19    produce our client and we'll produce him twice if we have to.

20    We often do that, unfortunately, and we do it for New York

21    State for the Notice of Claim process, 50-h Hearing, and then

22    for the federal case.  So we are ready to produce our client

23    on November 5th and we would like to proceed with his

24    deposition and we do not think there's any reason for delay.

25    And Ms. Levy, I have no idea when she will be ready but I

don't think the federal court action can fairly be held
captive to her schedule.

THE COURT:  And are you willing to go forward with
the -- your depositions of Mitchell and Graham on the current
schedule or are you going to be looking to postpone those
because of the delay in finding out what you're going to see
in terms of the FBI documents?

MS. ROSENFELD:  I think we would want to postpone
those because of the fact that there is this pending issue
with the additional discovery.

MS. PERRI ROBERTS:  Your Honor, this is Diane Perri
Roberts, if I could be heard.  In terms of, in terms of what
we knew, number one, we are not privy to everything that's
going on in the Court of Claims action but we just very
recently had a letter shared with us, it's dated
September 24th from Judge Fitzpatrick's chambers, and in that
letter, it states that depositions have been noticed but not
scheduled, and I'm just tabbing down to read it to you, the
depositions have been noticed but specific witnesses have not
all been identified.  The intention is to conduct joint
depositions with the federal court action to the extent
possible given the timing of the two cases.  Claimant plans
to depose about 12 witnesses in the federal court action,
defendant anticipates fewer than 10 witnesses for depositions
in this case.  That's from paragraph four of that letter.

1    Again, that letter from the court has a date on it of

2    September 24th.  It issued after the deposition notices came

3    out in this case from plaintiff's counsel on September 15th.

4    Those were sent to us and they were sent to us with a series

5    of dates that we worked very hard to contact our clients and

6    to set things up, but again, we made it very plain that we

7    wanted to depose the plaintiff first, in person, and that has

8    been agreed upon.

9          Now, the thing is, we're talking not only on our

10    end we have nine people who are going to have to sit through

11    a deposition, some of these individuals are retired, they're

12    going to have to sit through a deposition in the federal

13    case, and then sit through a deposition in the Court of

14    Claims case when there's already been a representation that

15    there would be, to the extent possible, joint depositions.

16    That's one point.

17          The other point is in terms of expenditures and

18    things moving forward, you know, we have some people, again,

19    who are retired and may have to -- I don't know if they're

20    going to do these remote in the Court of Claims action,

21    whatever, but I think from the state's perspective, it's

22    definitely -- from everyone's perspective, it's definitely

23    more effective timewise, cost wise to do a deposition one

24    time with an individual on the same set of facts and the same

25    circumstances.  You know, this isn't a long-standing case in

1    terms of something that was filed in 2018 and it really, this

2    is not us bringing this up at the 11th hour, we're not

3    counsel in the Court of Claims action.  But again, just very

4    recently became aware that all of this was going on with

5    depositions and discovery in that case because we were asked

6    to get involved with some of the document production and to

7    help move things along in that Court of Claims action on

8    documents and that's how we became aware of this

9    representation, this deposition.

10          The other thing is, minutes after I submitted my

11   response yesterday, we were copied on an e-mail that went to

12   Ms. Cowan who can mention this but there's also now,

13   plaintiff's counsel has also noticed nine nonparty

14   depositions all to take place immediately following these and

15   across these and into these dates starting November 30th.  So

16   we're looking at right now like something like 19 depositions

17   taking place between November 5th and December 9th I believe

18   was the last date I saw.  So I don't know how anybody can

19   keep up that type of a calendar and I don't even know who's

20   going to be available on what days with these nonparty

21   subpoenas that are apparently going to be going out.

22          THE COURT:  And are these, what, other inmates who

23   were victims, alleged victims of other incidents or --

24          MS. ROSENFELD:  No, your Honor, these --

25          THE COURT:  -- this incident?  Go ahead.

1          MS. ROSENFELD:  These are nonparty witness -- five

2     of them are nonparty, are DOCCS employees that were

3     identified by defendants in their initial Rule 26 disclosures

4     and we don't know what those individuals are going to say at

5     trial, and two of them are nurses, one of them is the

6     investigator on the OSI incident, and the fourth person who

7     is not already identified who wasn't proposed by defendants

8     as a witness is the director of the Bureau of Labor

9     Relations.

10          But your Honor, the Court of Claims, we brought the

11     Court -- the Court of Claims action has been moving

12     relatively slowly, and we introduced Ms. Levy to defense

13     counsel, they omitted that but it was I who e-mailed all of

14     the defendants' counsel together to suggest that there could

15     be cooperation in terms of sharing Bates-stamped documents

16     that have produced in one action in another to try to create

17     an efficiency in that way.  Ms. Levy, we all hoped, we all

18     had talked about joint depositions and Ms. Levy said, I'm not

19     ready, you'll have to go ahead without me.  So the idea that

20     we are now wanting to change the schedule is just, I think

21     it's very out of the blue.  We never talked to Ms. Levy about

22     it, she never asked us to adjourn the deposition, all of this

23     is coming from defendants' counsel today.

24          But what I would say, your Honor, is that we, we

25     have a conferral scheduled with Mr. Mackey tomorrow at

1   10 a.m. on some other discovery disputes.  I think once those

2   disputes are either resolved or not, we had planned to write

3   a single letter to the court about seeking leave to exceed

4   the 10 deposition and then putting any issues that come up in

5   the conferral that are not resolved before the court.  We're

6   trying to get discovery done on the schedule that the court

7   set.  There's been a lot of delays in producing documents by

8   defendants that your Honor will recall, every deadline that

9   your Honor has set for document production, defendants have

10  requested at least twice to extend and for more time.  We

11  received most of the documents in this case in September, we

12  have made enormous efforts to work through them all and to

13  digest them and be ready to take depositions on the schedule

14  that your Honor set.  So if the criticism is that we are

15  working extremely hard after extensive delays on their end to

16  get the case done in the time your Honor set, yes, that's

17  what we're doing.

18          THE COURT:  Okay.  So right now, you have a

19  schedule for the plaintiff and all the named defendants in

20  the next month?

21          MS. ROSENFELD:  Correct, your Honor.

22          THE COURT:  And so Ms. Rosenfeld, if -- I guess you

23  sort of had me until you started to say there were two

24  depositions you wanted to adjourn, which then leads me to be

25  concerned that I'm giving you a tactical advantage here as a

result of, you know, your reticence to travel for a

deposition.  So I think what I'm going to say basically is

that I'm going to direct the parties to continue with the

scheduled depositions, all of which will be conducted

remotely, and to the extent, Ms. Rosenfeld, you feel like you

have materials from the FBI investigation that you get

eventually that you need to follow up on, you may need to do

that in connection with the depositions in connection with

the Court of Claims, and I think the parties should agree and

I don't know if I can compel this or not but, you know,

basically the parties, even if, even if there are overlapping

depositions, the parties should agree that the depositions of

these witnesses will be usable in both cases and Ms. Levy,

you know, may want to at least sit in or listen in on the

depositions that are going to go forward in November and not

have to redepose, redepose everybody or -- you know, so I

guess what I'm saying, Ms. Rosenfeld, is, you know, from your

perspective, this is your one shot at the depositions of

these defendants with, you know, with the possible exception

that if the -- if you get something earth shattering from the

FBI documents, there may be another opportunity to depose the

defendants in connection with the Court of Claims case.  Now

I don't know, I don't know if this requires some, you know,

further coordination with Ms. Levy, but you know, I guess

what I'm saying is, there would be a presumption against you

1  getting another bite at the apple in terms of deposing the

2  defendants in connection with the Court of Claims case.

3        MS. ROSENFELD:  I agree, your Honor, I think we

4  should all agree to use the depositions that we take in this

5  case again for the Court of Claims action except to the

6  extent that there's some extremely significant material that

7  either side wants another hour to question the witness on.

8  So I --

9        THE COURT:  I think, I don't think you can deprive

10  Ms. Levy of another bite at your client in the Court of

11  Claims case.

12        MS. ROSENFELD:  No, but why would she -- why would

13  we have to produce our client twice but not them?

14        THE COURT:  Well, because you are aware of your

15  interest in both sets of litigation and can cover those both

16  during your depositions, whereas she is not prepared and

17  ready to depose your client yet in connection with the Court

18  of Claims case.

19        MS. ROSENFELD:  That makes sense, I understand,

20  okay, that's fine.  I mean, I think we hopefully can use most

21  of what, whatever the defendants' testimony is in this case

22  for the Court of Claims case.  I just want to make sure I

23  understand your Honor's direction with regard to Mr. Graham

24  and Mr. Mitchell.  We'll proceed on the dates that we

25  noticed, and your Honor said if there's some earth-shattering

1  document in the FBI, that might be a basis to, and then I

2  just wasn't sure what that might mean.

3  THE COURT:  Yeah, I'm not sure I thought that

4  through either.  So let me say this.  You've got, you know,

5  you've got a lot of -- I think you should cover with

6  defendant Graham what he knew or didn't know or learned or

7  didn't learn about the FBI investigation which I think you

8  can do without necessarily being privy to all the details and

9  with Mr. Mitchell you can certainly explore whatever

10  involvement he had in that investigation and any conduct of

11  his that was under investigation, and if it turns out there

12  is something in the FBI documents that I let you have that

13  shows that their testimony about what they knew or what they

14  were investigated for is wrong or not true, then I would

15  consider reopening those depositions.

16  MS. ROSENFELD:  Understood, your Honor.

17  THE COURT:  All right.  Mr. Mackey, do you need to

18  say anything or clarify what my ruling is here?  I'm -- you

19  know, you guys are giving me lots of things to do on the fly

20  here which is always a little risky, but I'm trying to, you

21  know, keep things moving here.

22  MR. MACKEY:  Your Honor, I guess my understanding

23  is, and correct me if I'm wrong, is that the depositions to

24  be done of our nine clients, our nine defendants, will be

25  just the one deposition, that there won't be a second

1  deposition of them in the Court of Claims case, is that my --

2  is that understanding correct?

3          THE COURT:  I'm assuming, and you know, I'm

4  assuming that Ms. Levy is not going to redepose the clients

5  in the Court of Claims cases and so yes, I think that's true

6  with the caveat that I just stated which is, if in

7  questioning Graham and Mitchell in particular but maybe also

8  the other two witnesses who were there during the timeframe,

9  Phillips and Giancola, there is, you know, some huge

10  discrepancy between what they say about the investigation

11  which I recognize may be a dim memory for them at this point,

12  I'm not ruling out allowing Ms. Rosenfeld to briefly reopen

13  those depositions to explore that.  But, you know, I think

14  that -- I think that's fairly remote.  But I am not, I am not

15  precluding Ms. Levy from redeposing the plaintiff, but

16  basically I would expect that the defense attorneys would

17  cover their business with the plaintiff in this deposition

18  and wouldn't expect that they would be getting a second bite

19  at the apple when Ms. Levy -- if Ms. Levy decides to depose

20  the plaintiff.

21          MR. MACKEY:  Would that allow then Ms. Levy to

22  participate in the depositions that are coming up next month,

23  the nine defendant depositions?

24          THE COURT:  Absolutely, and if she is to say, you

25  know, I want to sit in on the plaintiff's deposition but I'm

1    going to reserve my right to depose him in my action later,

2    then I'm going to allow that.

3            MR. MACKEY:  Okay.  I guess that covers the -- I

4    mean obviously I can't speak for Ms. Levy, but my guess is

5    that she'd want to participate in the one deposition that's

6    done for each defendant, and I guess that begs the question

7    if it works with her calendar or not, I don't know that.

8            MS. ROSENFELD:  She never said that she wanted to

9    when we've talked with her about the fact that these

10   depositions are occurring.

11           THE COURT:  Okay.  Well, she -- Ms. Cowan, can I

12   ask you to communicate with Ms. Levy and just have her

13   understand that she has that option if she wishes?

14           MS. COWAN:  Sure, absolutely.

15           THE COURT:  And the plaintiff's deposition is what

16   day?

17           MS. ROSENFELD:  It's November 5th, your Honor.

18           THE COURT:  Okay.

19           MS. ROSENFELD:  Your Honor, is this -- is your

20   order something that you will communicate with Judge

21   Fitzpatrick about?  Or should we -- I mean, the fact that the

22   deposition, the order that you just gave with respect to the

23   conduct of depositions in the court against Judge

24   Fitzpatrick's case, should we communicate that to her?

25           THE COURT:  Well, I know Judge Fitzpatrick but I

1   don't know her well enough to -- you know, I coordinate with

2   other federal judges in cases where they're related cases or

3   overlapping cases, I'm not sure that I'm going -- I would

4   feel comfortable doing that here, you know, what -- and I, if

5   you're having a conference tomorrow, I think the lawyers need

6   to make sure they're on the same page, that my suggestion is

7   that you proceed with the defense depositions to, you know,

8   cover any issues you have with them and proceed with the

9   plaintiff to cover any issues that you have with the

10  plaintiff and that those would be available in the Court of

11  Claims case subject to Ms. Levy wanting to depose the

12  plaintiff further or even the defendants if she wanted to,

13  but I can't imagine she would want to do that.  Then I don't

14  know that it has much impact on Judge Fitzpatrick other than

15  the fact that she may be able to avoid having the defense

16  depositions on her tab.

17          MS. PERRI ROBERTS:  Your Honor, this is --

18          THE COURT:  Go ahead.

19          MS. PERRI ROBERTS:  Your Honor, this is Diane Perri

20  Roberts, just on behalf of the defendants our office

21  represents, we just wanted to note for the record our

22  continuing objection that being denied the opportunity to

23  depose the plaintiff in person and that we would much prefer

24  that the depositions be delayed several months until an

25  in-person deposition of the plaintiff could take place.

1    THE COURT:  I appreciate that but I guess my point

2    is you want to depose the plaintiff first and I'm not

3    prepared to delay all these defense depositions which I think

4    can probably be accomplished without having them being

5    repeated in connection with the Court of Claims litigation.

6    So I'm, in the interest of focusing things to move forward a

7    little bit, that's what I ruled.  But certainly I know your

8    continuing objection and I suppose you would have the option

9    to appeal my ruling in front of Judge Sharpe if that's how

10   you feel about it.

11        But so the only other thing that I would suggest

12   you think about, Ms. Rosenfeld, and you know, I know this

13   isn't necessarily consistent with your planned schedule, but

14   if you're talking about deposing these nonparty witnesses in

15   December and if Ms. Levy is going to have a greater interest

16   in participating in those than she might the defendant, you

17   consider, you know, flexibility in waiting until after the

18   first of the year to schedule those so they can be done in

19   one deposition.

20        MS. ROSENFELD:  Absolutely.  We work very well with

21   Ms. Levy and we had a conversation about the federal versus

22   the Court of Claims one and we'll keep her in the loop on the

23   schedule.  She had not raised any concerns to us, so, but we

24   will continue to coordinate with her as you suggest.

25        THE COURT:  And to go back to your prior question I

1   think to the point you think there's anything that needs to

2   be communicated to Judge Fitzpatrick, I would suggest that

3   you do that and if for whatever reason she wants to confer

4   with me, I'm happy to do so, but I guess I'm not going to

5   initiate that.

6           MS. ROSENFELD:  Understood.  Thank you.

7           THE COURT:  All right.  Ms. Cowan, anything else

8   from you?

9           MS. COWAN:  No, your Honor.

10          THE COURT:  Ms. Baker?

11          MS. BAKER:  No, your Honor.

12          THE COURT:  Mr. Mackey?

13          MR. MACKEY:  Um, I guess the one thing I would add,

14  your Honor, is with the nine nonparty depositions, I mean my

15  understanding is these subpoenas haven't even been served yet

16  on all these nine deponents, so I guess I'm comfortable

17  saying I doubt these depositions could go forward in

18  December.  And to be honest with you, I don't, I don't think

19  I have space in my calendar and I don't think Ms. Roberts or

20  Ms. Covert -- Mr. Covert has space in his calendar to fit

21  these depositions that were just noticed up yesterday.  So

22  just to kind of put it out there, I think it would be

23  reasonable to say, at least those depositions, the nonparty

24  is probably something we can't shoehorn in in December or at

25  least early December and it's something that might have to be

1  pushed back a little bit.

2  THE COURT:  Yes, and you know, I know the current

3  deadline for fact discovery is December 10th which is,

4  obviously would be a problem, so I guess what I suggested to

5  Ms. Rosenfeld and she seemed amenable to that is to feel,

6  she's going to feel out Ms. Levy as to whether or not she

7  would want to participate in the nonparty witness depositions

8  and whether those could be scheduled, you know, shortly after

9  the first of the year, probably remotely so that those

10  weren't duplicated.  Because you know, my sense is other than

11  the plaintiff's deposition, the named defendants'

12  depositions, I think notwithstanding the fact that they're

13  two lawsuits, could probably be done once and not have to be

14  repeated with the one caveat that I mentioned with respect to

15  Graham and Mitchell.

16  MR. MACKEY:  Okay.

17  THE COURT:  All right.  Anything else,

18  Ms. Rosenfeld?

19  MS. ROSENFELD:  No, your Honor, thank you for

20  giving us so much of your time today.

21  THE COURT:  Yes, and you're going to have a meeting

22  tomorrow and then you're going to take up more of it, aren't

23  you?

24  MS. ROSENFELD:  Maybe not.  Hopefully we'll be

25  very -- we'll resolve everything.

1          THE COURT:  Hope springs eternal.  All right,

2     everybody stay safe.

3          MS. ROSENFELD:  Thank you, your Honor.

4               (Proceedings Adjourned, 3:51 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4          I, JODI L. HIBBARD, RPR, CRR, CSR, Federal

 5     Official Realtime Court Reporter, in and for the

 6     United States District Court for the Northern

 7     District of New York, DO HEREBY CERTIFY that

 8     pursuant to Section 753, Title 28, United States

 9     Code, that the foregoing is a true and correct

10     transcript of the stenographically reported

11     proceedings held in the above-entitled matter and

12     that the transcript page format is in conformance

13     with the regulations of the Judicial Conference of

14     the United States.

15

16                         Dated this 3rd day of November, 2020.

17

18

19                         /S/ JODI L. HIBBARD

20                         JODI L. HIBBARD, RPR, CRR, CSR
                           Official U.S. Court Reporter
21

22

23

24

25
```