```
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
MATTHEW RAYMOND,

                                    Plaintiff,


-v-                                 18-CV-1467


TROY MITCHELL, ET AL.,

                                    Defendant.
-----------------------------------------------------x
```

**TELEPHONE CONFERENCE TRANSCRIPT**
**BEFORE THE HONORABLE ANDREW T. BAXTER**
September 2, 2022
100 South Clinton Street, Syracuse, New York


For the Plaintiff:

    EMERY, CELLI, BRINCKERHOFF, ABADY, WARD & MAAZEL, LLP
    600 Fifth Avenue
    10th Floor
    New York, New York 10020
    BY:  **KATHERINE R. ROSENFELD, ESQ.**
         **EMMA FREEMAN, ESQ.**

For the Defendant:

    LIPSITZ GREEN SCIME CAMBRIA, LLP
    42 Delaware Street
    Suite 120
    Buffalo, New York 14202
    BY:  **PATRICK MACKEY, ESQ.**

*Hannah F. Cavanaugh, RPR, CRR, CSR, NYACR, NYRCR*
*Official United States Court Reporter*
*100 South Clinton Street*
*Syracuse, New York 13261-7367*
*(315) 234-8545*

 1              (The Court and all parties present by telephone.

 2   Time noted:  1:01 p.m.)

 3              THE COURT:  All right.  This is Raymond versus

 4   Mitchell, 9:18-CV-1467.

 5              Can I have the appearances for plaintiff, please?

 6              MS. FREEMAN:  Good morning, your Honor.  This is Emma

 7   Freeman from Emery, Celli, Brinckerhoff, Abady, Ward & Maazel

 8   for Matthew Raymond, and Katherine Rosenfeld, as well.

 9              THE COURT:  All right.  For the defense?

10              MR. MACKEY:  Good afternoon, your Honor.  Patrick

11   Mackey on behalf of defendants Mitchell, Thomas, Harte,

12   Phillips, and Giancola.

13              THE COURT:  All right.  Anybody else on the defense

14   side?

15              MR. MACKEY:  I believe that's it for the defense,

16   your Honor.  The other defendants are no longer in the case, so

17   we represent the remaining defendants.

18              THE COURT:  Okay.  All right.  So on July 15th,

19   plaintiff filed a motion to re-open discovery with respect to

20   lost income damages.  Defendants filed a reply brief -- a brief

21   in opposition on August 5th.  Plaintiff's brief is Docket No.

22   145, the defendants' is 146.  And then the plaintiffs filed a

23   reply on August 19th, which is Docket No. 148.

24              I have a few questions to start.  Did the defendants

25   depose any of the plaintiff's treating physicians while prior

 1    discovery was pending?

 2              MR. MACKEY:  We did not depose treating physicians,

 3    only the two expert witnesses disclosed by the plaintiff, but

 4    not treating physicians.

 5              THE COURT:  Oh, okay.  So I only saw excerpts of a

 6    deposition of Dr. Vapnek.  Did you also depose the other expert?

 7              MR. MACKEY:  Correct, we deposed Dr. Vapnek and

 8    Dr. Leitch, which are the two plaintiff's expert witnesses.

 9              THE COURT:  Okay.  And have you received records from

10    the prior employers of plaintiff that you subpoenaed, Capital

11    Fence and Square Foot Staffing?

12              MR. MACKEY:  Square Foot Staffing, if memory serves

13    me correct, didn't really have much to produce.  They weren't an

14    employer of the plaintiff.  They are a staffing agency that the

15    plaintiff went through to obtain employment, and so there wasn't

16    really employment records that Square Foot Staffing had, it just

17    had records related to Mr. Raymond's application in an attempt

18    to get employment.

19              There was a subpoena to K&S Contracting Supply where

20    we requested basically the whole file on the plaintiff, his

21    whole employment file.  And the same goes with Capital Fence

22    Company, which was another employer where we requested basically

23    the entire personnel file.  We did get some information on

24    behalf of those two employers.

25              THE COURT:  Okay.  And I guess I'll start with the

 1    plaintiff's counsel on this:  Did plaintiff have other employers

 2    during this time period that we know about?

 3          MS. FREEMAN:  He did, your Honor.  There are a number

 4    of other employers.  I would have to refer to my records to give

 5    you a specific number.  But as we noted for Mr. Mackey, in

 6    advance of filing the motion and in filing the motion, we're

 7    prepared to supplement our discovery responses and provide

 8    whatever records are necessary.  Insofar as that needs to happen

 9    through subpoena, we can facilitate that.

10          THE COURT:  All right.  Who was just speaking,

11    please?

12          MS. FREEMAN:  That was Ms. Freeman for the record.  I

13    apologize, your Honor.

14          THE COURT:  All right.  No worries.

15          Okay.  And the additional expert that the plaintiff

16    wants to depose, is that an economic expert, a medical expert,

17    or some combination of both?

18          MS. FREEMAN:  Your Honor, this is Ms. Freeman again.

19    We'd like to introduce a vocational economics expert who could

20    assist with the computation of the lost income damages that Mr.

21    Raymond is entitled to.  We don't see the need for a further

22    medical expert on our end.

23          THE COURT:  Okay.  And do you expect to have any of

24    your treating physicians or your experts supplement or update

25    their opinions to address work-related vocational abilities?

1              MS. FREEMAN:  Your Honor, I think that Dr. Danforth,

2    who submitted a letter which was attached as an exhibit to

3    plaintiff's opening brief, might sit for a brief deposition to

4    offer some testimony about the facts surrounding the surgical

5    procedures that we referenced in our brief.  I think it's

6    possible that we would get a brief update from Dr. Leitch, but

7    it would be brief.

8              THE COURT:  Okay.  Okay.  So let me -- the parties

9    seem to disagree on what might have to happen if lost income

10   discovery is reopened, so let me make sure I understand each

11   side's position.  From the plaintiff's side, it sounds like you

12   want to add a vocational expert and you have, perhaps, two

13   medical witnesses who may opine on vocational issues --

14             MS. FREEMAN:  We -- I'm sorry, your Honor.  Go ahead.

15             THE COURT:  You have to produce the written discovery

16   that was requested with respect to plaintiff's prior employment

17   income earnings?

18             MS. FREEMAN:  Yes, your Honor.

19             THE COURT:  What else, from your perspective, needs

20   to happen to complete discovery on lost income if we allow it?

21             MS. FREEMAN:  Your Honor, I think -- I expect that

22   Mr. Raymond himself would sit for an abbreviated second

23   deposition so that both sides could elicit testimony with

24   respect to his current medical condition as he sees it and how

25   that would impact his ability to do the kind of work that he was

1  previously doing.

2          THE COURT:  Okay.

3          MR. MACKEY:  Your Honor, if I could add, with respect

4  to what further discovery might be needed, that's accurate.

5  We'd probably want to re-depose Mr. Raymond again regarding any

6  of his claims of lost income or lost wages.  At this point, if

7  the plaintiff was permitted to seek lost income damages in the

8  case, we'd want to have an IME of the plaintiff.  That hasn't

9  been done yet.  And we didn't do that because of the fact that

10 they were told for numerous years that they weren't going for

11 lost income damages.  So if that was the change and lost income

12 damages are now at play, we'd ask for an IME.

13         I guess there's a possibility -- depending on what

14 type of records we get from employers and what other information

15 is disclosed in response to lost income discovery requests,

16 which were served at the beginning of the trial when we didn't

17 realize that the plaintiff was taking the position that they

18 weren't going to seek a lost income, I guess there is the

19 possibility that we'd like to keep open of maybe deposing some

20 of the former employers.  I can't really say at this point if

21 that's necessary or not, but it's a possibility.

22         THE COURT:  And what about a responsive vocational

23 economic expert?

24         MR. MACKEY:  Yeah.  I mean, if another expert or

25 experts are added to this case, obviously we'd want to have an

1    expert that -- to rebut the plaintiff's expert.  Whether it's

2    just the one expert or multiple experts, we'd want to rebut

3    whatever was presented to us.

4            THE COURT:  And would you want to re-open the

5    depositions of the experts or treating doctors of plaintiff to

6    the extent they offered new or supplemental opinions on

7    vocational or economic issues?

8            MR. MACKEY:  Well, Dr. Danforth we haven't deposed,

9    so we definitely would want to depose Mr. Danforth as a treating

10   physician.  If either Dr. Vapnek or Dr. Leitch supplemented

11   their report, which they've already disclosed a little while

12   back, if there was any type of supplements from either of the

13   them, we would want to -- well, you know, obviously after

14   reviewing their supplemental report, there is a good possibility

15   we'd want to re-depose that person again just for the limited

16   purposes of what they added to their -- to their disclosure.

17           THE COURT:  Okay.  And so I'm a little unclear -- I

18   may not have reviewed everything that's been submitted, but what

19   is -- what is plaintiff's current medical condition?

20           MS. FREEMAN:  This is Ms. Freeman, your Honor.

21           Plaintiff's current medical condition is not great,

22   to use a term of art.  He hasn't had any additional abdominal

23   surgeries since the one we noted in his submission.  So I'm

24   looking at the -- the last was in late 2021.  It was a skin

25   graft replacement.  I understand, though, that his abdominal

 1   wound has continued to dehisce, which means that it hasn't

 2   healed properly and remains somewhat open and that his doctors

 3   are considering whether there may be a need for an additional

 4   abdominal surgery of some kind.  And that's something, of

 5   course, that we can update opposing counsel about and update the

 6   Court about as, and if, it becomes necessary.

 7          But the condition of plaintiff's abdominal wall is --

 8   at this point, it's become clear that it's permanently

 9   comprised.  So as of our submission, his condition certainly

10   hasn't improved and it remains uncertain whether he needs yet

11   more surgery.

12          THE COURT:  All right.  And then in terms of his

13   plumbing, his urination, is there -- he is where he is, they're

14   not going to try to do anything else about that?

15          MS. FREEMAN:  My understanding, your Honor, is that

16   the cystoplasty functions as it was intended to function, but

17   that the related surgeries that became necessary and that

18   couldn't have been foreseen at the time of the cystoplasty are

19   what continue to worsen.  And they were, of course, related to

20   the cystoplasty, so, you know, our position that -- is that all

21   of these surgeries are a sequela from the assault, but his

22   urinary condition is essentially the same as it was after the

23   cystoplasty, which happened on November 17, 2020.

24          THE COURT:  Okay.  And I'm sorry to get into the gory

25   details, but is -- I mean, can he void urine as he wishes or is

RAYMOND v. MITCHELL, et al.                    9

1    it more complicated than that?

2              MS. FREEMAN:  Your Honor, my understanding, which

3    admittedly is not as technical as you would hear from Mr.

4    Danforth, of the cystoplasty is that it created a permanent

5    catheterizable channel through his abdominal wall and what it

6    allows him to do is to self-catheterize as he needs to.  So he

7    can't urinate through his penis as he did before, but he is able

8    to urinate without using an indwelling catheter, which causes a

9    lot of discomfort and frequent infection.  So he has essentially

10   a stoma in his abdomen that lets him catheterize as he needs to.

11             THE COURT:  Okay.  Okay.  And has there been any

12   movement from DOCCS on the settlement front?

13             MR. MACKEY:  Your Honor, I could probably help you

14   out with that.  To put it bluntly, your Honor, it's been a

15   frustrating endeavor trying to deal -- trying to get settlement

16   authorization from DOCCS.  It's been going on for quite a few

17   months.  From what I understand, there's -- the State has kind

18   of put in a new procedure for settling -- I don't know if it's

19   these type of cases or all their civil cases -- but what we do

20   is we make a recommendation to DOCCS, DOCCS gets back to the

21   party with their own recommendation, that recommendation then is

22   sent to the Attorney General's Office for final approval.  So

23   where we sit in this case right now is we got a recommendation

24   from DOCCS, but it's in the process of -- DOCCS has sent it to

25   the Attorney General's Office and we're waiting on final

RAYMOND v. MITCHELL, et al.                    10

```
 1   approval from the Attorney General's Office.

 2             So that, I would say, has probably been in the last

 3   four to six weeks that we've been waiting on the Attorney

 4   General.  I mean, it's been frustrating, your Honor, and I wish

 5   I could report better information or more information regarding

 6   settlement, but it's just -- we are sitting on the -- playing

 7   the waiting game with DOCCS and the Attorney General's Office to

 8   give us final approval.  And just so you know, we handle a few

 9   of these types of cases and the same delay is happening in all

10   of them, so I don't think it's case-specific, I think it's just

11   how it's treated internally within the state.

12             So we don't -- as we sit here today, we don't have a

13   final number that we can provide to Ms. Freeman and Ms.

14   Rosenfeld because it hasn't been approved by the Attorney

15   General's Office yet.  And I thought that might be a one- or

16   two-week procedure -- a one- or two-week process and it's

17   turning out to be much longer, unfortunately.

18             THE COURT:  Yeah, that's consistent with my

19   experience with DOCCS in trying to settle cases, so -- okay.

20   All right.  So I'm going to put a little applicable law on the

21   record and then proceed to decide the motion to re-open

22   discovery.  And I may ask a few more questions or give you a

23   brief chance to supplement arguments along the way.

24             The parties agree -- appear to agree on the standards

25   in this Circuit for evaluating a motion to re-open discovery.
```

RAYMOND v. MITCHELL, et al.                                    11

1   As stated in *Moore v. Peters*, a Western District of New York

2   case, from June 6, 2022, reported at 2022 WL 2062550 at page 8,

3   and I'm going to omit most of the citations, "The decision

4   whether to," open -- "The decision whether to re-open discovery

5   is within a District Court's discretion."  "In deciding whether

6   to re-open discovery, courts consider whether good cause

7   exists."  "In analyzing a request to re-open discovery, the

8   courts apply the following six-part test:  One, whether trial is

9   imminent; two, whether the request is opposed; three, whether

10  the non-moving party would be prejudiced; four, whether the

11  moving party was diligent in obtaining discovery within the

12  guidelines established by the court; five, the foreseeability of

13  the need for additional discovery in light of the time allowed

14  for discovery by the district court; and six, the likelihood

15  that the discovery will lead to relevant evidence."  That's the

16  end of the quote.  The party seeking to re-open discovery bears

17  the burden of establishing good cause, see *Costa v. Sears Home*

18  *Improvement Products*, Western District of New York, 2016,

19  reported at 178 F.Supp.3d 108 at 111.

20          The Court, in its discretion, may consider

21  cost-shifting if a plaintiff makes a belated damage disclosure.

22  See, for example, *Pharmacy, Inc. v. American Pharmaceutical*

23  *Partners, Inc.*, an Eastern District of New York case from

24  September 24, 2008, reported at 2008 WL 4415263 at *8.  As noted

25  in *Port of Authority Police Benevolent Association v. Port*

1  *Authority of New York and New Jersey*, a Southern District of New

2  York case, January 19, 2018, reported at 2018 WL 485980 at *2,

3  and I'm quoting now, under Federal Rule of Civil Procedure

4  26(a)(1)(iii), each, "party must, without awaiting a discovery

5  request, provide to the other parties ... a computation of each

6  category of damages claimed by the disclosing party."  Where a

7  party fails to comply with Rule 26(a), the, "party is not

8  allowed to use that information ... at a trial, unless the

9  failure was substantially justified or is harmless," citing

10  Federal Rule of Civil Procedure 37(c)(1).  A court also, "may

11  order payment of the reasonable expenses, including attorney's

12  fees, caused by the failure," citing Rule 37(c)(1)(A).  To

13  determine whether preclusion under Rule 37(c)(1) is warranted,

14  courts consider, "the party's explanation for the failure to

15  comply with the [disclosure requirement]; the importance of the

16  testimony of the precluded witness[es]; the prejudice suffered

17  by the opposing party as a result of having to prepare to meet

18  new testimony; and the possibility of a continuance," citing

19  *Patterson v. Balsamico*, a Second Circuit case from 2006,

20  reported at 440 F.3d 104 at 118.

21          So I'm going to start the analysis by summarizing the

22  pertinent facts and the procedural history of this case.  The

23  motion to re-open discovery relates to plaintiff's claim that

24  defendant Mitchell, and I'm quoting now, "viciously assaulted,"

25  him on September 14, 2016, "using his open hand, closed fist,

1 and baton to deliver blows to [plaintiff's] head, neck, chest,

2 and groin."  See plaintiff's brief at page 2, Docket No. 145-1.

3            Plaintiff was diagnosed, in 2017, with neurogenic

4 bladder, a condition that impedes the bladder's ability to

5 communicate with the brain and the spinal cord.  And I'm

6 essentially tracking the allegations in plaintiff's brief at

7 page two.

8            Plaintiff's experts have opined that his condition

9 was caused by defendant Mitchell's alleged assault, specifically

10 blows to plaintiff's neck and head.  Through late 2020,

11 plaintiff was required to use a suprapubic catheter, which

12 remains indwelling and drains urine through a hole in the

13 abdomen rather than the urethra.  That's, again, all from the

14 plaintiff's allegations in their brief at page two.  The

15 original complaint was filed on December 19, 2018, while

16 plaintiff was still a DOCCS inmate.

17            Plaintiff's initial disclosures on March 11, 2019,

18 did not disclose any lost income damages.  See, defendants'

19 Exhibit A, Docket No. 146-1 at page five.

20            In response to certain of defendants' interrogatories

21 and document demands on June 7, 2019, plaintiff declined to

22 provide discovery regarding special damages, plaintiff's prior

23 employment, and the prior W-2s and tax returns, representing

24 that plaintiff was not seeking damages for lost income.  See,

25 Defendants' Exhibit B at paragraph seven and ten, Docket No.

1    146-1 at 14 and 15 to 16, and Defendants' Exhibit C, paragraphs

2    5 and 12, Docket No. 146-1 at pages 24 and 26.

3              On February 26, 2020, plaintiff was released on

4    parole from DOCCS custody, according to the online DOCCS

5    prisoner locator application.

6              On November 5, 2020, the plaintiff was deposed.  He

7    testified that he found a construction job soon after his

8    release from prison, but that, since August of 2020, he'd been

9    on medical leave from his job because of a bacterial infection

10   of his suprapubic catheter and related wrist -- and related

11   right flank and bladder pain.  See Defendants' Exhibit G, Docket

12   No. 146-1 at 30 to 37.

13             "On November 17, 2020," and I'm quoting now from

14   plaintiff's brief at page two, "Mr. Raymond underwent a

15   procedure called a bladder augmentation cystoplasty designed to

16   replace his suprapubic catheter ... an augmentation cystoplasty

17   enlarges the bladder ... Mr. Raymond was also given a surgically

18   created catheterizable channel through which he can catheterize

19   himself at will, rather than relying on an indwelling suprapubic

20   catheter," end quote from plaintiff's brief at page two.

21             The plaintiff then was treated for a number of

22   postsurgical complications:  First, on November 29, 2020, for

23   abdominal abscess, cellulitis, separation of his surgical

24   incision, and sepsis; on April 8, 2021, for possible malfunction

25   or leaking of his catheterizable channel; and on July 16, 2021,

RAYMOND v. MITCHELL, et al.                    15

1    for a large ventral hernia.

2              Plaintiff updated his initial disclosures on May 19,

3    2021, identifying three additional physicians likely to have

4    discoverable information, but did not update his damage

5    disclosure.  See Defendants' Exhibit G, Docket No. 146-1 at

6    pages 48 to 49.

7              On July 22, 2021, plaintiff's expert neurologist, Dr.

8    Leitch, disclosed an expert report based on an examination of

9    plaintiff in August 2020 and a review of his medical records

10   through January 2021.  She opined that plaintiff's -- and I'm

11   quoting now -- "current diagnosis of neurogenic bladder was

12   caused by the physical assault he sustained on 9/14/16," closed

13   quote.  That's from Plaintiff's Exhibit 1, Docket No. 145-3 at

14   16.  Dr. Leitch further noted, and I'm quoting now, "Mr. Raymond

15   will have to manage his neurogenic bladder condition for the

16   rest of his life.  He will be required to receive ongoing

17   treatment, evaluation, and likely surgical procedures.  There is

18   no cure for neurogenic bladder, and Mr. Raymond's records

19   reflect that his condition will likely be progressive due to

20   accelerated aging stemming from his traumatic brain injuries,"

21   end quote.  See, Docket No. 145-3 at page 15.

22             Although they did not agree with Dr. Leitch's

23   ultimate opinion regarding causation, the defense experts,

24   Dr. Robert Knapp and Dr. John Valvo, acknowledged that Dr.

25   Leitch's examination of the plaintiff was either adequate or

1   thorough.  See plaintiff's reply, Exhibit 2, Docket No. 148-3 at

2   4 and reply Exhibit 3, Docket No. 148-4 at 3.

3           On August 13, 2021, fact discovery closed.

4           Plaintiff thereafter had further postsurgical

5   complications.  On August 16, 2021, plaintiff had an

6   intra-abdominal washout to address an infection in the mesh used

7   in his hernia surgery.  And on November 10, 2021, he had a skin

8   graft replacement to address a chronic abdominal wound.  So see

9   plaintiff's brief at four, Docket No. 145-1 at 7.

10          Plaintiff's urology expert, Dr. Jonathan Vapnek,

11  disclosed a report on December 15, 2021, based on the reports of

12  the other experts and plaintiff's medical records through

13  November 2021.  His report stated, and again I'm quoting, "Mr.

14  Raymond currently manages his augmented neurogenic bladder by

15  intermittent self-catheterization through a catheterizable

16  abdominal channel and can no longer void on his own.  His

17  damages are permanent and causally related to the assault of

18  September 14, 2016.  He will need close urologic monitoring for

19  life because of the substantial complication rate associated

20  with the major reconstructive surgery he underwent in November

21  of 2020."  That's from Defendants's Exhibit F, Docket No. 146-1

22  at page 46.

23          When deposed on March 11th of this year, Dr. Vapnek

24  testified that plaintiff could "likely" perform jobs involving

25  "construction or hard physical labor," but only, and I'm quoting

RAYMOND v. MITCHELL, et al.                    17

1  now, "[if] his abdominal wall, after the other surgeries he has

2  had, if that is now fixed," closed quote.  Dr. Vapnek also

3  cautioned, I don't know -- "I don't know exactly how ... his

4  abdominal wall is doing at present."  That's Plaintiff's

5  Exhibit 6, Docket No. 145-8 at page 3.

6           Starting in December 2021, the parties had sporadic

7  settlement discussions, which included a formal settlement

8  demand made by plaintiff on March 7, 2022, and a request by the

9  defense on May 27th of this year for adjournment of the

10 dispositive motion deadline because they were waiting for

11 settlement authority from DOCCS, which apparently has yet to

12 have been finalized.

13          On May 25, 2022, plaintiff's counsel advised

14 counsel -- opposing counsel for the first time that, in light

15 of, in quotes, "real time developments," closed quote, in

16 plaintiff's medical condition "since July 2019," they would now

17 seek leave from the court to pursue lost income damages.  That's

18 reflected in defense Exhibit E, Docket No. 146-1 at 40 to 41.

19          On June 17, 2022, plaintiff's counsel e-mailed

20 defense counsel, providing an estimate of plaintiff's lost

21 earnings at approximately $100,000 and future earning losses to

22 exceed $1 million.  Plaintiff's counsel noted willingness to now

23 provide discovery previously requested by the defendants in 2019

24 regarding lost income damages, including prior employment,

25 income tax information, W-2 information, et cetera.

 1              On July 8, 2022, Dr. Teresa Danforth, the urologist

 2    who performed plaintiff's bladder augmentation cystoplasty

 3    surgery in November 2020, wrote a letter to plaintiff's counsel

 4    stating the following, and I'm -- this is an extended quote,

 5    "Since his surgery, Mr. Raymond has had significant and

 6    unanticipated postoperative complications, including emergency

 7    hospital admissions for wound dehiscence and infections; a

 8    November 2020 separation in Mr. Raymond's abdominal incision and

 9    resulting abscesses, sepsis, and cellulitis; a July 2021 ventral

10    hernia repair and resulting mesh explantation; an August 2021

11    intra-abdominal washout procedure necessitated by infected mesh;

12    and a November 2021 abdominal skin graft replacement.  These

13    large abdominal surgeries weakened Mr. Raymond's abdominal wall,

14    which remains compromised, and substantially increased the

15    likelihood that he will experience future, similar complications

16    from infection, dehiscence, separation, or other issues.  None

17    of Mr. Raymond's subsequent surgeries was foreseeable at the

18    time of the initial cystoplasty surgery in November of 2020.

19    Ordinarily, an augmentation cystoplasty does not require any

20    follow-up procedures," end quote.  All that is from Plaintiff's

21    Exhibit 2, Docket No. 145-4 at pages 2 to 3.

22              Okay.  So that ends my long summary of the facts and

23    the procedural history, so I'm going to discuss the factors

24    relevant to the motion to re-open discovery and those related to

25    cost shifting somewhat out of order and lump them together where

 1    they overlap.  While some courts appear to merely score which

 2    factors favors which position, I think, in my discretion, I can

 3    determine that some factors may prove more important than others

 4    under the circumstances of this case.  Ultimately, my decision

 5    should be based on the totality of the relevant factors, again,

 6    taking into account all of the -- all of the specific

 7    circumstances of this case.

 8              Obviously, the defendants are opposing plaintiff's

 9    motion to re-open discovery.  However, that's only as

10    significant as the merits of the defendants' basis for opposing

11    the motion to re-open.

12              A trial is not scheduled in this case, and is not

13    likely to be imminent, whether or not I allow additional

14    discovery.  Senior Judge Sharpe's trial calendar is particularly

15    backlogged for various reasons.  While a prolonged delay in

16    completing discovery might further delay the trial date,

17    overall, this factor does not weigh against reopening discovery

18    or allowing a continuance of the prior deadlines, which are now

19    expired.  While the parties disagree to some extent about the

20    extent of the additional discovery that would be required, as I

21    will discuss later, I think we're talking about a delay of,

22    perhaps, four, maybe as many as six, months or so.

23              It is clear to me that discovery regarding lost

24    income damages has, by now, become quite relevant to this case.

25    The various complications following plaintiff's November 2020

RAYMOND v. MITCHELL, et al.                    20

1   surgery seems to have dramatically worsened plaintiff's ability

2   to perform his prior work in construction, and discovery is

3   relevant to explore that and related issues.  Plaintiff's

4   decision not to seek lost income damages in 2019 was a

5   reasonable tactical decision, which helped limit the scope of

6   discovery, given that plaintiff was still incarcerated in state

7   prison and the prognosis for his continuing -- for continuing

8   his prior employment upon release seemed reasonably good.

9   Plaintiff's subsequent medical problems proved that decision, in

10  hindsight, to have been more unfavorable than plaintiff's

11  counsel expected.  So the issue is not whether income discovery

12  is relevant now, because I think it clearly is.  The issue is

13  really whether based on the other factors I'm supposed to

14  consider, foreseeability, diligence, and prejudice, the

15  plaintiff should now be able to change course and resume seeking

16  lost discovery damages.

17          The foreseeability and diligence factors overlap

18  substantially, and they also overlap with a key factor relating

19  to cost shifting, the plaintiff's explanation for changing his

20  mind about lost income damages and the delay in doing so.  I

21  conclude that it became foreseeable to the plaintiff that he

22  would suffer lost employment income somewhere between August and

23  November of 2020, when he had several months of medical leave

24  due to infections around his catheter.

25          Those early medical complications did not necessarily

RAYMOND v. MITCHELL, et al.                    21

1    mean that plaintiff was facing a prolonged loss of work, given
2    the hopes that his November 2020 bladder augmentation
3    cystoplasty surgery would substantially improve his medical
4    condition.  Plaintiff's surgeon, Mr. Danforth, and his expert,
5    Dr. Vapnek, expressed very different opinions on how foreseeable
6    complications from that surgery would be.  And the surgeon seems
7    to have, at least in hindsight, had the, well, less defensible
8    position on that subject.  But, it was certainly clear, by the
9    summer of 2021 when plaintiff had his hernia surgery and then
10   the washout procedure to address substantial complications, that
11   he was facing substantial and prolonged medical problems that
12   would impact negatively his ability to perform his prior work.
13          By no later than August 2021, when fact discovery was
14   just closing and expert closing was continuing, a diligent
15   plaintiff's attorney, in my view, would have raised the issue of
16   putting lost income damages back on the table with opposing
17   counsel and with the court.
18          The fact that plaintiff's counsel broached settlement
19   in December of 2021 does not excuse further delay in raising
20   this issue.  There are times when the parties appropriately
21   tread water on discovery or motion practice, to reduce
22   litigation costs, while they explore settlement options.
23   However, that should not be a unilateral decision of one party.
24   A diligent lawyer should make known to opposing counsel and the
25   Court any plans to expand the scope of their claims or discovery

1    is settlement is not achieved.  Plaintiff's counsel, however,

2    made a tactical decision and did not raise the issue of

3    reopening discovery on lost income damages until May 25th of

4    this year, by which time expert discovery had been completed

5    after several extensions of the deadline.

6            Plaintiff's June 17, 2022, e-mail with unsupported

7    rough estimates of lost income damages does not mitigate

8    counsel's lack of diligence with respect to re-disclosure of the

9    lost income category of damages.

10           Now, plaintiff cites a number of cases in his reply

11   brief at page eight, Docket No. 148, that allows re-opening of

12   discovery when a party's medical condition unexpectedly worsens

13   after the close of discovery, for example, when a plaintiff has

14   a stroke.  But plaintiff's experts in this case, recognized that

15   he had a "progressive" condition, see Dr. Leitch's report from

16   July 22, 2021, and a "permanent" medical problem, as reflected

17   in the Vapnek report of December 15, 2021, further confirming

18   that the impact of plaintiff's medical complications through the

19   summer of 2021 were going to diminish -- were not going to --

20   I'm sorry, further confirming that the impact of plaintiff's

21   medical complications through the summer of 2021 were not going

22   to diminish substantially.

23           In sum, plaintiff's counsel did not exercise

24   reasonable diligence by failing to inform opposing counsel and

25   the Court, by no later than August 20th of 2021, that it would

RAYMOND v. MITCHELL, et al.                    23

1    seek to put income -- lost income damages back on the table,

2    given the clear foreseeability, by then, that plaintiff's

3    deteriorating medical condition would substantially affect his

4    ability to perform his prior work.

5              Turning now to the issue of prejudice to the defense.

6    Prejudice to the defense from plaintiff's delay in seeking to

7    re-open discovery on lost income, in assessing that, the Court

8    has considered a number of circumstances which, frankly, cut in

9    different directions.  To some extent, the plaintiff's cascading

10   medical complications, as to which no party is at fault, would

11   likely have required some further discovery, even after fact

12   discovery closed.  While plaintiff's counsel tries to downplay

13   the significance of the commitment not to seek lost income

14   damages in July of 2019, the defense reasonably relied on that

15   assurance in making tactical decisions regarding the extent to

16   which they needed to pursue such further discovery.

17             If plaintiff had sought lost income damages earlier,

18   the defendants would have had to conduct fact and expert

19   discovery focused on that subject, and they arguably are not

20   significantly prejudiced if they have to pursue that discovery

21   now, given that trial is not imminent.  However, to the extent

22   that the defense, for example, conducted a deposition with the

23   understanding that lost damages were off the table -- lost

24   income damages were off the table, and now needs to re-open a

25   deposition to address such damages, bearing the additional

1  discovery costs would, in my view, be prejudicial and would

2  warrant cost shifting.

3          I don't think defendants can claim that their

4  decision not to do a pre-surgical IME of the plaintiff was

5  caused by plaintiff's representation that he was not seeking

6  lost income damages.  Plaintiff's pre-surgery condition was as

7  relevant to his damages for pain and suffering or loss of life

8  functions as it was to lost income damages.  And, as I noted

9  earlier, both of the defense medical experts were content to

10 rely on the thoroughness of the pre-surgical examination of

11 plaintiff by the medical expert of plaintiff's, Dr. Leitch.

12          So, subject to some further input from both sides, I

13 would be inclined to re-open discovery with respect to lost

14 income damages, but require some cost shifting to plaintiff, to

15 mitigate the prejudice from the plaintiff's delay in seeking to

16 put lost income damages back on the table.  In deciding on the

17 extent to which to shift costs, I am focusing on the extent to

18 which the plaintiff's lack of diligence will require defense

19 counsel to re-open discovery they sought before without the

20 expectation of addressing lost income damages.

21          So off the top of my head, based on what we've said

22 so far, it would seem to me that cost shifting would be relevant

23 to reopening the deposition of the plaintiff to explore lost

24 income damages and reopening the depositions of any of the

25 plaintiff's experts who supplemented their disclosures to

1    address vocational issues or lost income damages.

2            With respect to the other discovery, my gut reaction

3    is, you know, maybe the -- because the plaintiff made choices

4    not to pursue certain levels of discovery that they now think

5    they need to pursue, that that -- they're not unduly prejudiced

6    by the delay in pursuing that discovery and are not required to

7    duplicate any effort.  But before I make a final decision, I'll

8    hear a little bit from each side starting with the plaintiff.

9            MS. FREEMAN:  Good afternoon, your Honor.  This is

10   Ms. Freeman for the plaintiff.

11           We don't have any objection as counsel for the cost

12   shifting that you're proposing with respect to reopening the

13   deposition of the plaintiff, as well as any of the plaintiff's

14   experts who might supplement their disclosures with respect to

15   the issues of lost income or additional economics.  We would,

16   however, like to consult with our client before making any final

17   representations about our position on cost shifting because, of

18   course, it is he who will bear the cost, and so we would --

19           THE COURT:  I -- your last couple of sentences were

20   kind of garbled, maybe because of the speakerphone, so see if

21   you can say that again.

22           MS. FREEMAN:  I apologize, your Honor.  Is this

23   clearer?

24           THE COURT:  Yes, thank you.

25           MS. FREEMAN:  Okay.  Great.

1          I was saying, your Honor, that as counsel we don't,

2     sitting here today, object to the limited cost shifting that

3     you're proposing with respect to reopening plaintiff's

4     deposition or the deposition of any experts who'd supplement.

5     We would, however, like to check with our client because, of

6     course, it's he who will bear those costs.  And so respectfully,

7     we would request the ability to consult with him about the

8     Court's ruling to date and we could return to the Court quickly

9     with a final position.

10          Other than that, your Honor, you know, I would say

11     only that we certainly agree discovery should be reopened, we

12     think the discovery is relevant and necessary, and if there's

13     the need to negotiate some cost shifting, that does seem

14     reasonable to us insofar as our client consents.

15          THE COURT:  Okay.  Mr. Mackey?

16          MR. MACKEY:  Thank you, your Honor.

17          Just what I'd like to add is -- it probably goes

18     towards the -- more of the diligence/foreseeability factors

19     which your Honor mentioned are somewhat overlapping --

20     intertwined.  The idea, I guess, that it was not foreseeable for

21     Mr. Raymond in August of 2020 to realize that he may have issues

22     moving forward with being able to work and the argument that it

23     wasn't foreseeable at that time to seek a request for lost

24     income, I think what's lost in that analysis, your Honor, is

25     that foreseeability doesn't mean, you know, a likelihood.

1          Foreseeability -- and, you know, in just kind of

2    looking up the definition of foreseeable online, on Webster's

3    dictionary, it refers to the possibility of something happening.

4    It's possible that something would happen, it's not that it's

5    likely something will happen.  So with the point that Mr.

6    Raymond, as early as August 2020, had to quit his job because he

7    was unable to work any longer, there is when it started that it

8    was possible that he wasn't going to be able to continue working

9    in the future.  Was it possible it could only be three months or

10   three weeks that he couldn't work?  Sure.  But it was also

11   possible he wouldn't be able to work for two years, three years,

12   or the rest of his life.  There's no way to know at that point.

13          But the point I'm trying to make is that as of

14   August of 2020, it was possible, it was foreseeable, that he may

15   not be able to work again.  And at that point, it's -- is when

16   the plaintiff should have put on the table the fact that they're

17   seeking lost income damages.  And so, you know, to wait two

18   years to finally reveal that or disclose their interest in lost

19   income damages, I think is somewhat prejudicial, especially

20   since that loss -- that time when the plaintiff decided not

21   to -- he couldn't work any longer in August of 2020, that was

22   still a few months before the surgery that he -- that happened.

23          And the prejudice -- and this is kind of leaning more

24   towards the prejudice aspect -- the prejudice factor, is that we

25   determined that there wasn't a need for an IME because there was

1    no interest in seeking lost income.  If there was a possibility

2    that lost income or even a fact that lost income was going to be

3    a measure of damages in this case from the get go, an IME

4    would've been done to determine what his condition was and

5    whether he'd be -- there would be problems in the future of him

6    being able to work.

7            Since there was the -- this position taken from the

8    get go that there was no interest in lost income damages, we

9    were comfortable, and our experts were comfortable, in reviewing

10   the medical records that already existed, reviewing the CT

11   scans, and the medical tests that have already been done to

12   determine what was the cause of the injury, not going into

13   whether his condition would result in him being able to work in

14   the future.

15           So, obviously, we can't un-ring the bell.  The

16   surgery's been done in November, and that's where we argue that

17   the prejudice exists.  We can't go back into the past and

18   examine him now -- physically examine the plaintiff before his

19   surgery was done.  That can't be done, obviously.  And it

20   would've been done -- that examination would've been done had we

21   known at the time that there was an interest in lost income

22   damages, so we feel that there is a prejudice in this case.

23           I know the plaintiff argued in the reply papers that

24   we're exaggerating the prejudice, but I don't think there's any

25   exaggeration because whether his condition at the time in August

RAYMOND v. MITCHELL, et al.                    29

1    and September and October of 2020 necessitated the surgery he

2    had in November of 2020, is something we would've looked into if

3    we'd known that the surgery may cause problems with him in the

4    future being able to work.

5                Other than that, your Honor, it's -- I don't think I

6    have anything else to add.

7                Oh, with respect to cost shifting, I understand

8    that -- I'm just looking at my notes to determine what else

9    we're going to be able to do.  I think maybe the cost shifting

10   related to the IME may be a fair shifting, in addition to the

11   re-deposing the plaintiff and re-deposing the experts.  As I

12   said, we didn't plan on doing an IME because of their position

13   from the outset of this lawsuit.  And now that we're -- it looks

14   like we're going to have to, I think that, you know -- that,

15   maybe, should be part of the cost shifting, as well.

16               THE COURT:  Okay.  So let me -- let me respond to

17   that in a couple of ways.

18               First of all, the plaintiff's physical condition

19   throughout -- after the alleged assault related to a number of

20   categories of potential damages.  One was just pain and

21   suffering and loss of enjoyment of life, which was always was on

22   the table, and then the other was lost income.  And it's -- you

23   know, it's always hard to estimate what measure of damages might

24   prove to be more important or greater.  But it seems to me, you

25   know, you -- you made a tactical decision to live with the

RAYMOND v. MITCHELL, et al.                          30

1    opposing expert's physical examination and the medical records

2    and not to do an IME at that time, and, you know, I'm not sure

3    adding another measure of damages dramatically changes that

4    equation.

5           And I'm also -- it's not clear to me what information

6    you could have to rebut causation of his injuries by doing an

7    IME at that point that you can't get now.  And even if you

8    could, you know, why didn't you do that if you were, you know,

9    worried about the other measures of damages.  Certainly losing

10   the ability to urinate normally impales a pretty substantial

11   pain and suffering or loss of bodily function injury.  So, you

12   know, I'm just not sure that -- you know, you made tactical

13   decisions and you might've -- I see you might've made them

14   differently, but I don't think it prejudices you to the extent

15   that I should deny reopening discovery on this category of

16   damages and precluding them -- precluding the plaintiff from

17   seeking them.

18          With respect to the cost shifting, you didn't have to

19   do an IME then, you have to do one now.  If they had -- if they

20   had done lost damages -- if lost damages income was on the table

21   then and you decided that changed the equation and you wanted to

22   move forward with an IME, you would've had to pay for one then,

23   which you didn't do.  Now, you have to pay for it.  So I don't

24   think you're any worse off in that regard.

25          All right.  But Ms. --

RAYMOND v. MITCHELL, et al.                    31

1              MR. MACKEY:  Could I answer that -- can I answer

2    that, your Honor --

3              THE COURT:  Sure.

4              MR. MACKEY:  -- with respect to the cost shifting?

5              THE COURT:  Sure.

6              MR. MACKEY:  I think the overall cost would've been

7    lower had our expert done an IME, you know, back a year or two

8    ago and then only had to prepare one report.  Now, our expert's

9    going to have to do this IME and, again, look over the past

10   records in reference -- after doing the IME to basically get a

11   full understanding of the plaintiff's condition and then likely

12   have to do a second report.  So what could've been done in one

13   report if the IME was done earlier, now is to be done in a

14   second report, which would require my expert to do additional

15   work -- not just the IME, but additional work in going back in

16   these records and re-examining him again.  So I think there is

17   somewhat of an additional cost there.

18             THE COURT:  Yeah, see --

19             MS. FREEMAN:  Your Honor --

20             THE COURT:  -- I'm not persuaded with that because,

21   you know, there obviously has been intervening medical problems

22   of the plaintiff, which probably would've required you to

23   revisit or update your expert's opinions and to do more work,

24   which would've related, again, to lost bodily function or pain

25   and suffering damages anyway.  So, you know, I hear your

1  argument.

2          Ms. Freeman, I've cut you off a couple times.  Go

3  ahead.

4          MS. FREEMAN:  That's all right, your Honor.  Frankly,

5  you -- you've rather taken the words out of my mouth, but I will

6  say just briefly that we don't think that cost shifting with

7  respect to IME is appropriate.

8          Mr. Mackey's last point that two reports would be

9  necessary I don't, candidly, understand.  An IME would be

10  conducted and one report would be produced.  That's the way it

11  happens customarily, that's the way it would have happened two

12  years ago, one year ago, and that's the way it would happen

13  should we re-open discovery now.

14          And I would like to reiterate the point we made in

15  our brief and that your Honor just made, counsel has no one but

16  himself to blame, with respect to Mr. Mackey, for not conducting

17  an IME in the past.  Lost income damages are just one portion of

18  the reason that an IME is necessary and, frankly, we were

19  surprised that an IME wasn't requested, given that -- the

20  defendant's motion to dispute causation in this case.

21          The only other point I'd like to make, your Honor,

22  with respect to the foreseeability issue as to August 2020, part

23  of the reason that Mr. Raymond elected to conduct the

24  cystoplasty surgery and consulted with a number of doctors on

25  that issue was in the hopes that it would allow him to go back

1   to work.  So Mr. Mackey's point that Mr. Raymond had to take

2   time off of work at that time actually supports the plaintiff.

3   The reason for that surgery and the hope for that surgery was

4   that it would enable him to go back to doing iron work, that it

5   would enable him to go back to doing construction.  And as Mr.

6   Danforth said, that was the expectation, that there would be no

7   follow-up procedures, and that work would be possible.

8           So I -- with that, your Honor, I'm happy to rest on

9   the papers unless you have a different request -- question.

10          THE COURT:  Okay.  So you need to consult with your

11  client.  There are two ways for me to proceed here.  I mean, I'm

12  not necessarily looking for your consent on this, so what I'm

13  inclined to do is to go ahead and make my ruling.  You would

14  then have 14 days to object to the District Court if you have a

15  major problem with it on either side, which will give you an

16  opportunity to contact your client.

17          So I guess I'm -- I'm inclined to plow ahead.  You

18  know, I think one of the difficult issues would be the timeframe

19  in which this supplemental discovery can be completed.  And the

20  longer we wait to -- you know, put the ruling on the table, the

21  longer this is going to be dragged out, which, you know, would

22  also tend to increase the potential of prejudice to the defense

23  or delay of the trial.

24          MS. FREEMAN:  That's fine.  We're prepared to submit

25  something within the 14 days if our client has any issues, but

1    that's a good solution.

2            THE COURT:  Okay.  So I think -- you know, I think I

3    come out in the same place that I did before, notwithstanding

4    Mr. Mackey's valiant arguments.

5            So I conclude that the plaintiff would cover the

6    defense costs, including attorney's fees, for the reopened

7    deposition of plaintiff to address lost income damages.  I would

8    limit the attorney's fees to the time for travel to and

9    conducting the deposition, which could be remote if the parties

10   agree, but not preparation time, which the defense counsel

11   avoided earlier when they didn't have to prepare for a lost

12   income issue coming up at the deposition.  So cost shifting to

13   the extent of attorney's fees, for the travel time, and the time

14   of conducting the deposition, as well as the cost of producing

15   the transcript.

16           Also, to the extent that any of the plaintiff's

17   experts who were deposed earlier that -- those being Dr. Vapnek

18   and Dr. Leitch, to the extent they supplement their reports or

19   their opinions to address vocational issues, lost income damages

20   issues, the plaintiff will cover the defense costs, which would

21   include any fee to the expert, the attorney's fees for travel,

22   and for conducting the deposition, and the cost of the

23   deposition transcript.

24           The remaining discovery relating to lost income

25   damages, in my view, would not appear to involve duplication of

1  effort, but only delay in conducting the discovery, and I

2  would -- I would not order cost shifting.  That includes

3  deposing plaintiff's treating doctors who were not previously

4  deposed, the IME of the plaintiff which was not requested

5  previously, and disclosing and deposing additional economic or

6  vocational experts which the parties would've to do anyway if

7  lost income damages had been on the table earlier.

8          So in terms of scheduling, I would propose the

9  following, which is pretty ambitious, so I'll lay it out and

10  then I'll hear from the parties as to whether you think that's

11  unrealistic, you know, with the understanding that I'm going to

12  err on the side of limiting the timeframe if the defense wants

13  that.  So I would say within 30 days, the plaintiff should be

14  prepared to provide discovery responses with respect to lost

15  income damages that they avoided in 2019 by agreeing not to seek

16  such damages.  And those, you know, rough categories involve

17  prior employment, W-2s, income tax returns.  And I will find

18  that the plaintiff has waived any objections to those demands

19  and just needs to supply the information that was requested.

20          Also, within 30 days, the plaintiff should supplement

21  any disclosures by treating or expert doctors who is going to

22  opine on lost income damages or plaintiff's vocational

23  limitations.  Plaintiff should disclose their new vocational

24  economic expert and plaintiff should submit to an independent

25  medical examination.  So all that within 30 days.  And to the

1  extent any party is seeking records from non-parties, like

2  former employers, they should also get those subpoenas served

3  during the first 30 days.

4          Within 60 days from now, plaintiff should submit to

5  the resumed deposition on lost income issues, including

6  vocational limitations, again, with cost shifting, as I

7  discussed.  That will give the defense some time to digest the

8  written discovery that they've received.  Plaintiff's doctors --

9  their experts who were previously deposed should submit to

10  resumed depositions on any supplemental opinions regarding lost

11  income or vocational issues.  That, again, is the cost shifting.

12  And the defense should conduct depositions of any other of

13  plaintiff's treating doctors that they choose without cost

14  shifting since they were not deposed earlier.  So that's all in

15  the second 60 -- second 30-day period.

16          And then within the next 15 days after that, or

17  within 75 days from now, the defense needs to do any responsive

18  disclosure to plaintiff's new experts or disclose any new

19  defense experts.  So if you have a response to their economic

20  vocational expert or are going to disclose a new expert, you

21  would need to do that within 75 days.

22          And then within 105 days from now, any responsive or

23  reply disclosures.

24          Then, completing depositions within 120 days, or

25  within four months.

RAYMOND v. MITCHELL, et al.                    37

1    So as I say, that's pretty ambitious.  You know, it

2  doesn't necessarily account for problems with expert

3  availability or getting records from third-parties.  So I'll

4  hear from each side as to whether or not you think that should

5  be more flexible or more open-ended or whether you want some

6  time to consult about it among yourselves and see if you can

7  agree on a somewhat different schedule.

8    MS. FREEMAN:  Your Honor, this is --

9    MR. MACKEY:  Your Honor --

10    MS. FREEMAN:  -- Ms. Freeman.  I'm sorry.

11    I was just going to say, your Honor, I'm going to

12  turn this over to my colleague, Ms. Rosenfeld, to address the

13  schedule because I'm actually leaving the Emery, Celli firm in

14  two weeks and so my schedule is not an issue.

15    THE COURT:  Okay.  Ms. Rosenfeld.

16    MS. ROSENFELD:  Yes.  Hi.  Good afternoon, your

17  Honor.

18    I understand the Court's intention to move us along

19  on this and I think that's -- I agree with it and I'd like to

20  get this done efficiently and quickly.  The only limitation that

21  I see here is what your Honor already identified, which is that

22  some of these records belong to third-parties.  So, for example,

23  your Honor, the tax records that you referenced, when we started

24  down this road of seeking the lost income and contacting Mr.

25  Mackey, we did make those requests for the tax records.  I can't

1  exactly tell your Honor when, but it's, you know, around the

2  time of when this came up and we still haven't received those

3  records, for example, and we have our paralegal calling and

4  checking regularly -- you know, frequently, so --

5           THE COURT:  You're trying to get them from your

6  client or you're trying to get them from the IRS?

7           MS. ROSENFELD:  From the IRS.  Our client does not

8  have any of his tax returns.  So we --

9           THE COURT:  Oh, God.  That takes forever.

10          MS. ROSENFELD:  Yeah, so we've submitted, months ago,

11 the request for the tax records to the IRS anticipating that,

12 you know, this would be an issue and months later, we still

13 don't have them.  So that's my only comment in response to the

14 schedule that your Honor proposes.  I think in terms of the

15 pieces that we control of trying to, you know, get the experts

16 back into their seats and giving information to Mr. Mackey that

17 we have, we can certainly do it in the schedule you proposed,

18 but I do anticipate some issues around these other records that

19 we don't control.

20          THE COURT:  Yeah.  So the IRS records -- I mean, I

21 have another case where it's taken -- I don't think they have

22 gotten them yet and it's been more than a year.  The other

23 source of that information would be W-2s.  And if your client

24 doesn't have his tax return, he probably doesn't have his W-2s,

25 but maybe -- maybe those can be obtained from the former

 1  employers more readily than getting the tax returns from the

 2  IRS.

 3          MS. ROSENFELD:  Sure.  Sure.  Yeah, and we -- I think

 4  the issue, your Honor, just to make sure that it's clear, is

 5  that Mr. Raymond was incarcerated between 2015 and 2020, and so

 6  the baseline that we're seeking is from quite a while ago, which

 7  I think also slightly complicates things.  But, yes, we can try

 8  to go to these employers and see if they have the records, and I

 9  think we may have started that process.

10          THE COURT:  Okay.  Mr. Mackey?

11          MR. MACKEY:  Your Honor, with respect to the

12  schedule -- and, again, I appreciate you having the ambitious

13  schedule that you laid out.  The one problem I have, and it's

14  not just my problem, it's kind of a problem with the other

15  attorneys in this case from my firm, as well, is that we have

16  kind of a trial heavy fall coming up.  I have a trial that

17  starts late October and goes into December.  It's probably about

18  a six-week trial.  Ms. Roberts has a trial -- a multi-week trial

19  in November, as well, so it's not like I can hand off anything

20  to her.

21          So that's the only -- I guess that's where we're

22  concerned about -- there's going to be a big gap of time during

23  the fall that, you know, we'll be concentrating on the trial,

24  obviously, and being able to do some of these things that need

25  to be done, whether it be depositions, IMEs, or dealing with

RAYMOND v. MITCHELL, et al.                    40

1    experts and it, you know, will kind of fall to the wayside or

2    fall through the cracks for a little while.

3              So that's -- my only concern is that having an

4    ambitious schedule may kind of backfire for us because I don't

5    know if we'd be able to -- we don't really have the manpower at

6    this point to work with that.

7              THE COURT:  All right.  Well, I'm not adverse to the

8    parties meeting and conferring and coming up with an alternative

9    schedule.  I was, you know, basically trying to come up with the

10   most aggressive schedule that I thought was doable, recognizing

11   that there are always complications and scheduling conflicts.

12   So, you know, I guess I would say for now, the plaintiff's

13   counsel should move forward trying meet the 30-day deadline that

14   I discussed.  And, you know, to the extent you want to do an IME

15   of the plaintiff, it seems to me, you know, try to get that

16   lined up.

17             You know, so I would say the first 30 days you ought

18   to be able to make some progress.  And then, you know, talk

19   about when you can realistically do the depositions and, you

20   know, complications with experts.  And to the extent you propose

21   stretching out the deadlines and both sides agree, I don't have

22   any problem with that.  I just -- you know, as I say, I wanted

23   to address the defense concern about delays in the trial.

24             But I do -- I also think, you know, Judge Sharpe is

25   out of town a good part of the year, has a backlog from COVID of

RAYMOND v. MITCHELL, et al.                    41

```
 1  trials, and, you know, so I don't think you're going to get to

 2  trial anytime soon with him, in any event, but, obviously, the

 3  longer you take with discovery, the more likely it is you could

 4  get pushed off even further.

 5          MR. MACKEY:  Understood.

 6          THE COURT:  All right.  So I will do, I guess,

 7  probably a text entry summarizing the salient parts of my

 8  ruling.  With respect to the schedule, I think I'll emphasize,

 9  you know, what the parties should do over the next -- endeavor

10  to do over the next 30 days.  And most of the burden on that

11  falls on the plaintiff.  And I think, in anticipation of

12  resuming this discovery, they're probably pretty well down the

13  road with most of this, other than maybe the tax returns, which

14  are going to be a problem regardless.

15          And then, you know, I'm fine with the parties then

16  getting back to me and saying, you know, we've conferred about

17  this and the schedules and consulted with potential experts and

18  witnesses and proposing an extended deadline for some or all of

19  this.

20          All right.  Is there anything else?

21          MS. ROSENFELD:  That's fine, your Honor.  Thank you.

22  Thank you for thinking this through with us.

23          THE COURT:  Okay.  That was Ms. Freeman?  You sound

24  kind of --

25          MS. ROSENFELD:  No, I'm sorry.  That was Ms.
```

 1    Rosenfeld.  I apologize.  That was Ms. Rosenfeld.  Ms. Freeman's

 2    off the hook now, so it's just me.

 3              THE COURT:  Okay.  All right.  Mr. Mackey, anything

 4    else you want to say?  Any questions or need for clarification?

 5              MR. MACKEY:  I don't believe so, your Honor.

 6              THE COURT:  Okay.  Enjoy your holiday weekend,

 7    counsel.

 8              MR. MACKEY:  You, as well.

 9              MS. ROSENFELD:  Thank you, your Honor.

10              MS. FREEMAN:  Thank you, your Honor.

11              (Time noted:  2:09 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4                 CERTIFICATE OF OFFICIAL REPORTER
 5
 6
 7             I, HANNAH F. CAVANAUGH, RPR, CRR, CSR, NYACR,
 8   NYRCR, Official U.S. Court Reporter, in and for the United
 9   States District Court for the Northern District of New York, DO
10   HEREBY CERTIFY that pursuant to Section 753, Title 28, United
11   States Code, that the foregoing is a true and correct transcript
12   of the stenographically reported proceedings held in the
13   above-entitled matter and that the transcript page format is in
14   conformance with the regulations of the Judicial Conference of
15   the United States.
16
17             Dated this 15th day of September, 2022.
18
19             s/ Hannah F. Cavanaugh_____
20             HANNAH F. CAVANAUGH, RPR, CRR, CSR, NYACR, NYRCR
21             Official U.S. Court Reporter
22
23
24
25
```