UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MATTHEW RAYMOND,

                    Plaintiff,

        -against-

TROY MITCHELL, *et al*.,

                    Defendants.

Index No. 18 Civ. 01467

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

# TABLE OF CONTENTS

**PAGE NO.**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF RELEVANT FACTS ........................................................................2

A.    The September 14, 2016 Incident: Mr. Raymond is Beaten By Defendant Troy Mitchell and Suffers Injuries to His Face and Body .........................................................2

B.    Former DOCCS Employee Nurse Aimee Hoppins Confirms Plaintiff's Account of Defendant Mitchell's Assault and Documents Plaintiff's Injuries ...........................4

C.    Mr. Raymond Develops Urinary Symptoms Following the September 14, 2016 Incident and Is Diagnosed with Neurogenic Bladder: He Requires a Catheter to Urinate and Undergoes Bladder Augmentation Surgery ...............................................5

LEGAL STANDARD.................................................................................................6

ARGUMENT ...........................................................................................................7

I.    PLAINTIFF'S EXPERTS OFFERS ADMISSIBLE TESTIMONY ABOUT THE CAUSE OF PLAINTIFF'S UROLOGICAL INJURIES ...............................................7

A.    Plaintiff's Experts Satisfy the *Daubert* Legal Standard, Which Requires a Presumption of Admissibility ...................................................................................7

B.    Dr. Leitch and Dr. Vapnek Reliably Opine that Mr. Raymond Suffers from Brain-Based Neurogenic Bladder Caused By the September 14 Incident .........9

1.    Dr. Leitch Considered and Ruled Out Alternative Causes of Mr. Raymond's Neurogenic Bladder.........................................................................10

2.    Defendants' Remaining Critiques of Dr. Leitch's Opinion Do Not Support Exclusion and At Most Go to Weight .............................13

a.    Dr. Leitch's Opinion Does Not Solely Depend on Temporal Proximity............................................................................. 13

b.    Whether Imaging Supports the Experts' Conclusion is Question of Weight for the Jury............................................. 15

c.    Dr. Leitch's Neurological Exam Findings Are Consistent with Her Diagnosis of Brain-Based Neurogenic Bladder....... 16

C.    Defendants Fail to Offer Any Alternative Explanations for the Cause of Mr. Raymond's Neurogenic Bladder Condition .............................................17

D.    Plaintiff's Experts Were Not Required to "Rule Out" Defendants' Counsel's Unsupported Theory that Plaintiff Suffered a Brain Injury on September 13, 2016 ........................................................................................20

E.    Plaintiff's Experts' Testimony Will Be Helpful to the Jury ...........................22

II.    EVEN IF THE COURT WERE TO EXCLUDE THE CAUSATION OPINIONS OF PLAINTIFF'S EXPERTS, SUMMARY JUDGMENT IS NOT APPROPRIATE........................................................................................................23

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

PAGE NO.

## CASES

*Al–Jundi v. Oswald*,
    No. 75 Civ. 0132, 1997 WL 613232 (W.D.N.Y. Oct. 2, 1997)............................................ 25

*Allen v. Coughlin*,
    64 F.3d 77 (2d Cir. 1995) ................................................................................................. 7

*Ambrosini v. Labarraque*,
    101 F.3d 129 (D.C. Cir. 1996) ........................................................................................ 11

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002).................................................................................... 7, 24

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).......................................................................................................... 7

*Borawick v. Shay*,
    68 F.3d 597 (2d Cir. 1995)............................................................................................... 7

*Canino v. HRP, Inc.*,
    105 F. Supp. 2d 21 (N.D.N.Y. 2000)........................................................................ 14, 16

*Chen-Oster v. Goldman, Sachs & Co.*,
    114 F. Supp. 3d 110 (S.D.N.Y. 2015).............................................................................. 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993).................................................................................................. passim

*Delaney v. Bank of Am. Corp.*,
    766 F.3d 163 (2d Cir. 2014).............................................................................................. 7

*DeRienzo v. Metro. Transp. Auth.*,
    694 F.Supp.2d 229 (S.D.N.Y. 2010).............................................................................. 15

*Ellis v. Appleton Papers, Inc.*,
    No. 94 Civ. 558, 2006 WL 346417 (N.D.N.Y. Feb. 14, 2006) ...................................... 13

*Faulkner v. Arista Records LLC*,
    46 F. Supp. 3d 365 (S.D.N.Y. 2014)........................................................................ 7, 16

*Figueroa v. Boston Sci. Corp.*,
    254 F. Supp. 2d 361 (S.D.N.Y. 2003)...................................................................... 11, 14

*In re Term Commodities Cotton Futures Litig.*,
    No. 12 Civ. 5126, 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020)................................... 22

*In re Zyprexa Products Liability Litigation*,
   489 F. Supp. 2d 148 (E.D.N.Y. 2007) .................................................................................. 24

*Ismael v. Charles*,
   No. 18 Civ. 3597, 2020 WL 4003291 (S.D.N.Y. July 15, 2020) ..................................... 10, 12

*Lancaster v. Ethicon, Inc.*,
   No. 19 Civ. 1377, 2020 WL 819291 (N.D.N.Y. Feb. 19, 2020) ........................................... 13

*Lewis v. City of Albany Police Dept.*,
   547 F. Supp. 2d 191 (N.D.N.Y. 2008) .................................................................................. 25

*Miner v. City of Glens Falls*,
   999 F.2d 655 (2d Cir. 1993) .................................................................................................. 25

*Monterey v. City of New York*,
   No. 17 Civ. 4477, 2019 WL 5884466 (S.D.N.Y. Nov. 12, 2019) ................................... 13, 22

*Munafo v. Metro. Transp. Auth.*,
   No. 00 Civ. 0134, 2003 WL 21799913 (E.D.N.Y. Jan. 22, 2003).................................... 18, 20

*Ruggiero v. Warner-Lambert Co.*,
   424 F.3d 249 (2d Cir. 2005).................................................................................................. 12

*Salem v. United States Lines Co.*,
   370 U.S. 31 (1962)................................................................................................................ 25

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*,
   467 F.3d 107 (2d Cir. 2006)..................................................................................................... 9

*Tardif v. City of New York*,
   344 F. Supp. 3d 579 (S.D.N.Y. 2018).................................................................................. 13

*Washington v. Kellwood Co.*,
   105 F. Supp. 3d 293 (S.D.N.Y. 2015).................................................................................. 24

*Wills v. Amerada Hess Corp.*,
   379 F.3d 32 (2d Cir. 2004).................................................................................................... 25

*Zuchowicz v. United States*,
   140 F.3d 381 (2d Cir. 1998).................................................................................................. 14

**RULES**

Fed. R. Civ. P. 56 ........................................................................................................................... 6

Fed. R. Evid. 702 .............................................................................................................. 7, 8, 20

## PRELIMINARY STATEMENT

Defendants' motion for summary judgment relies on strawman arguments that cannot withstand scrutiny.  Defendants ask the Court to withhold from the jury the reliable opinions of Plaintiff's expert urologist and expert neurologist that Mr. Raymond suffered a serious bladder injury because of Defendants' assault on him at Auburn Correctional Facility on September 14, 2016 (the "September 14 Incident").  In support of their motion, Defendants offer no competing explanation from their own experts about what caused Plaintiff's injuries.  Instead, Defendants' counsel proffers several unsupported causation theories—theories actually rejected by Defendants' own experts—and then blames Plaintiff's experts for not rebutting these made-up scenarios.  Defendants' motion for summary judgment must be rejected on multiple grounds.

First, Plaintiff's two experts' opinions that Mr. Raymond's brain-based neurogenic bladder was caused by the September 14 Incident are reliable.  Plaintiff's experts' theory of causation is well-established: Mr. Raymond suffered a traumatic brain injury when he was beaten during the September 14 Incident, and as a result of that brain injury, he developed neurogenic bladder.  Defendants' experts concede that trauma to the brain can cause neurogenic bladder.  Defendants' hodgepodge of criticisms—that Dr. Leitch relies too heavily on temporal proximity, that imaging of Plaintiff's brain is not confirmatory—all go to the weight of the experts' opinions, not to their admissibility.  Defendants are free to argue at trial that the lack of imaging or the reliance on temporal proximity weakens Plaintiff's experts' opinions.

Second, Plaintiff's expert neurologist and expert urologist carefully reviewed the medical records and offered their opinion on causation after considering and rejecting alternative explanations.  They inquired as to how other factors could have caused Plaintiff's neurogenic bladder.  Defendants' claim that Plaintiff's experts failed to perform a "differential diagnosis"— *i.e.*, that Plaintiff was required to "rule out" a September 13, 2016 seizure as the cause of his

neurogenic bladder—is not only incorrect, but Defendants have it exactly backwards. As a matter of law, the need to "rule out" other causes of an injury is triggered if Defendants' experts proffer a plausible different reason for Plaintiff's injuries than the one identified by Plaintiff's experts, and Plaintiff's experts failed to respond to it. But because Defendants' *experts* themselves offer no alternative explanation—in fact, Defendants' own expert testified that the September 13th incident did *not* cause Plaintiff's neurogenic bladder—Plaintiff's experts are not required to "rule out" Defendant's *counsel*'s invented causes for his injuries. And if an explanation about why she ruled out the September 13 seizure as the cause of Plaintiff's bladder injury was somehow required, Dr. Leitch provided one at her deposition. Defendants' attempt to preclude Plaintiff's experts from testifying as to causation must be rejected.

Finally, even if the Court were to find that Plaintiff's experts' opinions about causation to be unreliable, summary judgment is not warranted. At trial, Plaintiff's own testimony, a treating nurse's testimony, and medical records and photographs will establish that he was visibly injured during the September 14 Incident. Plaintiff will testify that he sustained these injuries when Defendant Mitchell struck him. No expert testimony is required to establish that Defendants used excessive force on Plaintiff and inflicted these injuries to him.

Plaintiff has offered admissible expert testimony that the September 14 Incident caused his brain injury-based neurogenic bladder. Summary judgment should be denied.

## STATEMENT OF RELEVANT FACTS

### A.    The September 14, 2016 Incident: Mr. Raymond is Beaten By Defendant Troy Mitchell and Suffers Injuries to His Face and Body

This lawsuit concerns an incident that occurred on September 14, 2016 when Plaintiff was 28 years old and an inmate at Auburn Correctional Facility. On that date, while Plaintiff was handcuffed on an exam table in the prison infirmary, Defendant Troy Mitchell—a then-

DOCCS employee and a correctional lieutenant—punched Plaintiff in the face and torso, hit him in the face and the genitals with a baton, and smacked the face. Ex. 1 (Matthew Raymond deposition transcript) at 213:1–216:21.[1] Other officer defendants stood by and failed to intervene, assisting Defendant Mitchell in the Assault by holding Plaintiff's legs open and pinning them down. *Id*. at 208:10–210:10, 211:3–212:20, 220:14–21, 221:11–22, 225:20–226:10. After the beating, Plaintiff had difficulty walking. He was taken to the Special Housing Unit (SHU), where officers cleaned blood off of his face and put him in clean clothes before he was photographed. *Id*. at 232:12–234:9, 235:20–237:12, 240:1–241:20, 245.

On September 14, 2016, Plaintiff suffered injuries as a result of Defendants' assault, to his neck, face, chest, back, eye, and genitals. *Id*. at 226:20–227:13, 229:16–230:1. He suffered pain during and after the assault. *Id*. at 226:20–227:13, 229:16–230:1, 238, 270:10–271:7. He was bleeding and his eye was swollen shut. *Id.* at 241:3–9, 245:1–4. Contemporaneous medical records and photographs document these injuries. Ex. 2 (photographs); Ex. 3 (Inmate Injury Report); Ex. 4 (Ambulatory Health Record) ("Has reddened and swollen area to left eye, left cheek and left ear, abrasions to upper right chest times two."). Mr. Raymond's wife saw him about a week after the assault and observed yellow marks on his face and collarbone that appeared to be bruising. Ex. 5 (Michelle Raymond deposition transcript) at 71–73. On September 15, 2016, the day after the Incident, Mr. Raymond reported to prison medical staff that he was unable to urinate, a symptom of neurogenic bladder. Ex. 9 (Dr. Robert Knapp deposition transcript) at 74:1–75:6.

---

[1] Unless otherwise indicated, citations to "Ex." are to the Exhibits to the Declaration of Katherine Rosenfeld dated October 6, 2023.

**B.      Former DOCCS Employee Nurse Aimee Hoppins Confirms Plaintiff's Account of Defendant Mitchell's Assault and Documents Plaintiff's Injuries**

Aimee Hoppins, a DOCCS nurse working at the Auburn infirmary on September 14, 2016, observed parts of Mr. Raymond's encounter with Defendant Mitchell and documented his injuries. Ex. 6 (Aimee Hoppins RN deposition transcript) at 50:1–52:24. After Plaintiff returned to the prison from the hospital that day following treatment of a seizure, Nurse Hoppins entered the prison infirmary exam room to examine Plaintiff. *Id.* at 17:4–19:22, 58:5–24. He was sitting handcuffed on the exam table. *Id.* at 60:20–22. Nurse Hoppins testified, "[t]here was no marks on him whatsoever." *Id.* at 21:3–7. In addition to Defendant Mitchell, approximately five other correctional officers were present, one of whom was videotaping Mr. Raymond. *Id.* at 16, 58:1–60:19, 65:4–66:25. After a minute, Defendant Mitchell told Nurse Hoppins that she "needed to leave the exam room." *Id.* at 19:4–25, 21, 58:9–12. About 10-15 minutes later, Defendant Mitchell and other officers exited the exam room, and told Nurse Hoppins that she could go back in. *Id.* at 65:13–25. Nurse Hoppins saw Defendant Mitchell remove and discard latex gloves after he exited the exam room, which had some discoloration on them. *Id.* at 68:2–69:12.

When she re-entered the room, Nurse Hoppins saw Mr. Raymond sitting on the exam table, still handcuffed, and "somewhat crying." *Id.* at 72:4–12. Nurse Hoppins observed that Plaintiff had marks on his face, upper trunk and his arms that had not been present on his body the first time she was in the exam room. *Id.* at 72–74, 139:23–25. It "was obvious that something had occurred" in the exam room when she was asked to step out. *Id.* at 88:21–24. Nurse Hoppins "looked at [Plaintiff's] face, examined it, gave him a glove full of ice. Because we don't have ice bags, so we have to fill them in gloves." *Id.* at 121:15–20. Nurse Hoppins observed swelling to Mr. Raymond's left orbital bone, eye area, left jaw, and left ear. *Id.* at 136:5–137:8, 139:1–25. He had reddened marks on his shoulder and arm, shoulder blade and

4

back.  *Id*. at 139, 147:2–148:11.  That same day, Defendant Mitchell told Nurse Hoppins that he was going to lie about how Mr. Raymond sustained his injuries and destroy the video of the incident to cover up the beating.  *Id*. at 84:3–86:25, 88:1–24.

### C.    Mr. Raymond Develops Urinary Symptoms Following the September 14, 2016 Incident and Is Diagnosed with Neurogenic Bladder: He Requires a Catheter to Urinate and Undergoes Bladder Augmentation Surgery

It is undisputed that Plaintiff first experienced urinary symptoms after the September 14 Incident.  As far back as January 2017, Mr. Raymond's medical records demonstrate "increasing difficulty voiding following the September 14, 2016 incident."  Ex. 13 (expert report of Dr. Jonathan M. Vapnek) at 3.  Defendants' expert neurologist admits that prior to the September 14 Incident, Mr. Raymond did not suffer from any urologic conditions and that Mr. Raymond's urinary symptoms started approximately six months after the September 14 Incident.  Ex. 9 at 30:2–31:12.  These are the same findings of Dr. Valvo, Defendants' expert urologist.  Ex. 7 (Dr. John R Valvo deposition transcript) at 19:11–20 (Q. Okay. And just to make sure that I understand your testimony, before September 14, 2016, it's your opinion that Mr. Raymond did not suffer from any urologic conditions, correct?  A. Correct.  Q. Sometime in late 2016, after September 16, 2016, is it your view that he began to exhibit symptoms of neurogenic bladder?  A. Yes, and I believe it was either in late '16 or January of '17.").

It is also undisputed that Mr. Raymond was diagnosed with neurogenic bladder at Upstate University Hospital in early 2017 and that he now suffers from neurogenic bladder.  Ex. 9 at 30:2–13; Ex. 7 at 18:9–19:25.  Neurogenic bladder is a condition that impedes the bladder's ability to communicate with the brain and spinal cord.  *See* Ex. 11 (expert report of Dr. Sherry A. Withiam Leitch) at 13 ("Neurogenic bladder dysfunction refers to urinary bladder problems due to injury of the central nervous system.  Ordinarily, nerves transmit messages between the bladder, spinal cord, and brain and tell the bladder muscles when to tighten or release.  In

individuals with neurogenic bladder, however, these nerves do not function properly and thus do not transmit sufficient messages to the bladder muscles").

For years after the assault, Mr. Raymond's neurogenic bladder forced him to use a suprapubic catheter.  Ex. 13 at 2-3.  Mr. Raymond's bladder was managed with an indwelling suprapubic catheter from early 2017 through early 2020, when he was released from prison.  *See id*.  Mr. Raymond suffered from a "severe voiding dysfunction."  Ex. 13 at 3.

On November 17, 2020, at age 34, Mr. Raymond underwent a bladder augmentation cystoplasty procedure to replace his suprapubic catheter.  Ex. 11 at 14.  An augmentation cystoplasty enlarges the bladder.  *Id.*  Mr. Raymond was also given a surgically-created catheterizable channel through which he can catheterize himself at will, rather than relying on an indwelling suprapubic catheter.  Ex. 13 at 3.  Mr. Raymond now catheterizes himself through an abdominal stoma.  *See id*. at 4.  The procedure Mr. Raymond underwent is considered a major reconstructive surgery of the bladder.  *Id* at 3.  Mr. Raymond developed an incisional hernia following the surgery and other post-operative complications which required multiple emergency department visits, hospitalizations, and additional surgical procedures.  *See id.*

Defendants' urological expert Dr. Valvo agrees that Mr. Raymond's current urological condition is a permanent one.  Ex. 7 at 69:20–70:6.  Mr. Raymond can no longer void urine on his own and need close urologic monitoring for life.  *See id.*

## LEGAL STANDARD

To win summary judgment, Defendants must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014)

(cleaned up).  A fact is material if it "might affect the outcome of the suit under governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court "may grant summary

judgment only when no reasonable trier of fact could find in favor of the nonmoving party."

*Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (cleaned up).

## ARGUMENT

### I.    PLAINTIFF'S EXPERTS OFFERS ADMISSIBLE TESTIMONY ABOUT THE CAUSE OF PLAINTIFF'S UROLOGICAL INJURIES

Plaintiff offers reliable opinions from two qualified experts that the September 14, 2016

assault caused Mr. Raymond to suffer a permanent bladder injury.  At minimum, these experts'

opinions create genuine disputes of material fact as to the causation of Plaintiff's neurogenic

bladder injury that a jury must resolve.  Defendants are not entitled to summary judgment.

#### A.    Plaintiff's Experts Satisfy the *Daubert* Legal Standard, Which Requires a Presumption of Admissibility

"The federal rules and the express teachings of Daubert" provide for "liberal

admissibility standards" for expert testimony.  *See Amorgianos v. Nat'l R.R. Passenger Corp.*,

303 F.3d 256, 267 (2d Cir. 2002).  "Daubert reinforces the idea that there should be a

presumption of admissibility of evidence," *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995),

making the "rejection of expert testimony . . . the exception rather than the rule."  Fed. R. Evid.

702, advisory cmte. notes (2000); *accord Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d

110, 115 (S.D.N.Y. 2015).  Consistent with "the liberal admissibility standards of the Federal

Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion."

*Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 375 (S.D.N.Y. 2014).  "As long as an

expert's scientific testimony rests upon good grounds, based on what is known, it should be

tested by the adversary process competing expert testimony and active cross-examination—

rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Id*. (citation and quotation marks omitted).

To determine admissibility, the Court must examine (1) whether the witness is qualified, (2) whether the opinion is based on reliable data and methodology, and (3) whether the testimony will assist the trier of fact. Fed. R. Evid. 702.

Here, Defendants do not dispute that Plaintiff's experts are well-qualified.

- Dr. Leitch is a board-certified physician in neurology and psychiatry who has been licensed to practice medicine since 1996. Ex. 12 at 9:4–10. She is Chief of Neurology at the Buffalo VA Medical Center and an assistant professor of neurology at SUNY Buffalo. *Id*. at 10:1–9. She also operates a private practice in neurology. She frequently treats patients with neurogenic bladder due to a variety of neurologic causes as part of her practice. *Id*. at 25:17–26:16. Dr. Leitch physically examined Mr. Raymond on August 25, 2020 and conducted a full neurological exam on him. *Id*. at 28:10–31:23.

- Dr. Vapnek is a board-certified neurologist with over 25 years of experience treating patients. Ex. 14 at 7:8–8:22. He was previously a practitioner at Mount Sinai Medical Center before entering private practice in 2002. *Id*. at 8:19–22. He is an associate clinical professor of urology at the Mount Sinai School of Medicine. His area of subspeciality area of expertise is neurology and voiding dysfunction, and he has presented and written widely on bladder dysfunction. *Id*. at 14:7–18. Over his career, he has treated several hundred patients who suffer from neurogenic bladder. *Id*. at 15:2–20.

In addition to conceding that Plaintiff's experts are qualified, Defendants also do not appear to dispute the third Rule 702 factor—that Plaintiff's experts' opinions would assist the trier of fact because they relate to a material issue in the case (the cause of Mr. Raymond's injuries). Defendants' challenge rests on the second Rule 702 factor: the reliability of Plaintiff's experts' opinions. But Defendants' arguments do not support exclusion. Plaintiff's experts' opinions are reliable and well within the purview of their experience. Defendants may disagree with the conclusions of Dr. Leitch and Dr. Vapnek, or identify gaps or inconsistencies, but these

objections properly "go to the weight of the evidence, not to its admissibility." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC,* 467 F.3d 107, 134 (2d Cir. 2006).

> **B.     Dr. Leitch and Dr. Vapnek Reliably Opine that Mr. Raymond Suffers from Brain-Based Neurogenic Bladder Caused By the September 14 Incident**

Dr. Leitch opines that Mr. Raymond suffers from brain-based neurogenic bladder as a result of the September 14 Incident—specifically, from the blows to Mr. Raymond's head.  Ex. 11 at 13–15.  Dr. Leitch finds that Mr. Raymond suffered a severe traumatic brain injury on September 14, 2016, with "new findings of persistent post-traumatic neurologic injury including neurogenic bladder, headache, personality change, sleep problems, lightheadedness, and increased risk of seizures." *Id.* at 13.  She also opines that "[a]t the time of the incident, Mr. Raymond was neurologically compromised due to previous head injury and seizure disorder." *Id* at 14.  These pre-existing injuries—including from a 2012 work-related injury—rendered him at increased risk of severe sequalae from a traumatic brain injury. *See id*.

Dr. Leitch further concludes that Mr. Raymond developing neurogenic bladder was caused by the brain injury he suffered on September 14, 2016.  The theory that a brain injury caused Mr. Raymond to develop neurogenic bladder is not controversial or novel.  "Traumatic brain injury is well-established cause of neurogenic bladder." Ex. 11. at 13–14.  Defendants' experts *agree* that it is a such a cause.  Ex. 9 at 32:5–9, 34:18–22.  Dr. Knapp has treated patients who suffered neurogenic bladder due to a severe brain injury, including from trauma. *Id.* at 59:8–60:12.  Similarly, Dr. Valvo concedes that trauma to the brain can cause neurogenic bladder.  Ex. 7 at 36:11–37:18.  Plaintiff's experts' theory of causation is well-established.

Dr. Vapnek's analysis as a neurologist accords with Dr. Leitch's causation analysis.  He agrees that the record supports that Mr. Raymond suffered a traumatic brain injury because of the September 14 Incident, noting that "[t]he development of pelvic pain and the inability to

volitionally relax the external urethral sphincter to allow voiding to occur is certainly consistent with a cognitive issue following TBI." Ex. 13 at 4. Concluding his analysis of Mr. Raymond's medical history and records, he opines: "Whatever the mechanism, it was that assault that led to Mr. Raymond's inability to urinate and the consequent necessity for suprapubic catheter placement in 2017 followed by major reconstructive surgery in 2020." *Id.*

Plaintiff's experts are well within the parameters of admissible expert opinions. *See Ismael*, 2020 WL 4003291, at *17 (S.D.N.Y. July 15, 2020) (expert examined plaintiff and reviewed his medical records; his opinion was "relevant and reliable" as physician specialized "in treating hands, and he applied his expertise to opine on the cause of Ismael's wrist injury.").

### 1. Dr. Leitch Considered and Ruled Out Alternative Causes of Mr. Raymond's Neurogenic Bladder

Contrary to Defendants' claims, Defs.' Br. at 7,[2] Dr. Leitch considered and ruled out alternatives causes of Mr. Raymond's neurogenic bladder other than the September 14 Incident:

> "In my professional opinion and to a reasonable degree of medical certainty, the records and documents I have reviewed present no other cause of Mr. Raymond's neurogenic bladder. Neurogenic bladder does not arise spontaneously, with no cause at all. In addition, Mr. Raymond's 2012 TBI would not have caused his neurogenic bladder condition to arise in late 2016, particularly since records reveal that the bladder condition arose just weeks after the 9/14/16 assault. Finally, Mr. Raymond's neurogenic bladder did not raise from improper catheter care, his seizure disorder, or any drug use or drug addiction."

Ex. 11 at 14.

Dr. Vapnek also considered whether another explanation for Plaintiff's injury existed and concluded that one did not. After a full and thorough review of the course of Mr. Raymond's

---

[2] Citations to "Defs. Br." are to Defendants' Memorandum of Law in Support of Motion for Summary Judgment, Dkt. 168-4.

urological problems, he opined that: "[i]t is abundantly clear that the assault of September 14, 2016 was the precipitating cause for Mr. Raymond's voiding dysfunction, given the absence of any suitable alternative explanation." Ex. 13 at 3.

Defendants focus entirely on one possible alternative cause—a seizure Mr. Raymond suffered on September 13. *See* Defs.' Br. at 4. Setting aside that Plaintiff's experts did, in fact, consider and rule out the seizure, Dr. Leitch was not required to conclusively rule out every single possible cause of Mr. Raymond's neurogenic bladder for her opinion to be reliable. "The testimony of doctors has also been admitted despite a failure to rule out alternative causes[.]" *Figueroa v. Boston Sci. Corp.*, 254 F. Supp. 2d 361, 366 (S.D.N.Y. 2003). That is because "[t]o the extent that physicians do not fully consider and rule out all possible causes, such deficiencies generally go to the weight of the evidence, not admissibility, and weighing the evidence is a function for the jury." *Id.*; *see also Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996) ("the possibility of some uneliminated causes presents a question of weight, so long as the most obvious causes have been considered and reasonably ruled out by the expert.").

Here, Dr. Leitch considered numerous potential causes and ruled out some of them. She reviewed Mr. Raymond's medical records, including his pre-September 14 Incident medical history and post-September 14 Incident complaints, and she examined him—all based on her extensive experience as a neurologist who frequently treats patients with traumatic brain injury and neurogenic bladder. Ex 11 at 13. Defendants' experts concede that Dr. Leitch conducted a proper neurological exam. Ex. 7 at 71:15–18; Ex. 9 at 65:11–14 ("Q. Is it your opinion that Dr. Leitch conducted a adequate examination of Mr. Raymond? A. Yes.). Then, using her education, experience, and training, she ruled out other potential causes of Mr. Raymond's injuries including a prior work injury from 2012, substance abuse, a seizure disorder or improper catheter

care.  Ex. 11 at 14, 16–17.  Defendants can cross-examine Dr. Leitch and attempt to convince a jury that her opinion deserves less weight due to the extent to which she purportedly failed to consider the September 13, 2016 seizure as another potential cause.  But as a matter of law, such arguments are inappropriate at the summary judgment stage.  Dr. Leitch's causation analysis easily meets the *Daubert* standard for admissibility.  *See Ismael,* 2020 WL 4003291, at *17 (expert's testimony on specific causation is admissible where the proponent merely demonstrates the expert did "think about—and reject—alternative causes"); *Rosario v. City of New York*, No. 18 Civ. 4023, 2021 WL 1930293, at *6-7 (S.D.N.Y. May 13, 2021) (expert adequately considered and eliminated alternate causes of traumatic brain injury before arriving at diagnosis).

Next, while Defendants quibble with how Dr. Leitch performed her differential diagnosis, those too are arguments for a jury.  The question at this stage is whether differential diagnosis, as used by Dr. Leitch, is a proper and accepted method of establishing specific causation.  It is. Differential diagnosis is "a patient-specific process of elimination that medical practitioners use to identify the 'most likely' cause of a set of signs and symptoms from a list of possible causes." *Ruggiero v. Warner-Lambert Co*., 424 F.3d 249, 254 (2d Cir. 2005) (citations omitted).  "A reliable differential diagnosis typically, though not invariably, is performed after physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests, and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." *Ellis v. Appleton Papers, Inc*., No. 94 Civ. 558, 2006 WL 346417, at *5 (N.D.N.Y. Feb. 14, 2006).  The Second Circuit accepts differential diagnosis as a reliable methodology for specific causation and it "has widespread acceptance in the medical community, has been subject to peer

review, and does not frequently lead to incorrect results." *Lancaster v. Ethicon*, *Inc*., No. 19 Civ. 1377, 2020 WL 819291, at *8 (N.D.N.Y. Feb. 19, 2020) (quotations omitted).

Even without a differential diagnosis, Dr. Leitch's causation opinion would be sufficiently reliable because she eliminates other potential causes of injury and opines that neurogenic bladder does not occur spontaneously. *Monterey v. City of New York*, No. 17 Civ. 4477, 2019 WL 5884466, at *3 (S.D.N.Y. Nov. 12, 2019) ("Moreover, although Dr. Jain did not conduct an explicit differential diagnosis, her report implicitly eliminates other potential causes of Plaintiff's injury by stating that Plaintiff's injury is unusual 'unless there has been trauma with sudden force.'"). Courts have also found that an express differential diagnosis may not be required when there are "other sufficient indicia of reliability" to the expert's opinion, such as reviewing medical records and conducting interviews with the plaintiff. *Tardif v. City of New York*, 344 F. Supp. 3d 579, 602 (S.D.N.Y. 2018) (citation omitted). Here, Dr. Leitch's extensive review of Plaintiff's medical records and her examination provide sufficient indicia of reliability.

Defendants are free to test Dr. Leitch's opinion regarding the cause of Mr. Raymond's neurogenic bladder during cross-examination at trial but there is no basis to exclude it. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### 2. Defendants' Remaining Critiques of Dr. Leitch's Opinion Do Not Support Exclusion and At Most Go to Weight

#### a. Dr. Leitch's Opinion Does Not Solely Depend on Temporal Proximity

Defendants overstate their case by arguing that Dr. Leitch's causation opinion should be excluded because it is "solely" based on temporal proximity, and that her consideration of temporal proximity is speculative. Defs' Br. at 19. "Courts have previously admitted expert

testimony where, as here, experts have relied, in part, on the temporal connection between an incident and an injury." *Figueroa*, 254 F. Supp. 2d at 367 (S.D.N.Y. 2003) (citing *Zuchowicz v. United States,* 140 F.3d 381, 385 (2d Cir. 1998) (declining to exclude expert's conclusion "based on the temporal relationship between the overdose and the start of the disease and the differential etiology method of excluding other possible causes.")); *Canino v. HRP, Inc.,* 105 F. Supp. 2d 21, 29-30 (N.D.N.Y. 2000) (admitting expert opinion that relied, in part, on "the temporal proximity between the . . . incident and plaintiff's onset of [the disease]").

Dr. Leitch relied *in part* on the temporal relationship between the September 14 Incident and Mr. Raymond's subsequent neurogenic bladder to support her causation analysis, opining that "[t]he temporal course of Mr. Raymond's symptoms and signs of neurogenic bladder indicates that the events of 9/14/16 resulted in neurogenic bladder." Ex. 11 at 13.  Dr. Leitch noted that Mr. Raymond had no history of urinary retention prior to the September 14 Incident. She further opines that he "developed urinary symptoms soon after the incident."[3]  *See id*. Defendants' experts' also note that Mr. Raymond's urinary problems started after the September 14 Incident.  *See* Ex. 9 at 30:2–31:12; Ex. 7 at 19:11–20.  The notable chronology is one important data point in this case but by no means the only factor that Dr. Leitch considered.  She also conducted a lengthy analysis of Plaintiff's medical records, performed a neurological exam, and considered and excluded other potential causes of the injuries.  Ex. 11 at 1, 4–15. Contrary to Defendants' argument, Dr. Leitch's opinion was, in fact, "grounded in more than the mere temporal proximity between a plaintiff's symptoms and the alleged cause of the symptoms."

---

[3]  With regard to a single medical record from 2014, she notes he was seen on one occasion for urinary retention, a complaint that "could have been for any reason unrelated to the neurogenic bladder that occurred years later."  Ex, 12 at 126:3-20.

Defs. Br. at 15 (quoting *DeRienzo v. Metro. Transp. Auth.*, 694 F.Supp.2d 229, 237 (S.D.N.Y. 2010)).  Defendants' argument that Plaintiff's experts' opinions are speculative has no merit.

### b. Whether Imaging Supports the Experts' Conclusion is Question of Weight for the Jury

Defendants next argue that Dr. Leitch's opinion is unreliable because she lacks "physical proof" of Plaintiff's brain injury.  Defs.' Br. at 8.  Defendants' expert Dr. Knapp testified that he expected brain imaging from 2019 to show injury to certain areas of the brain associated with bladder dysfunction.  Ex. 9 at 34:3-21.  Although now a centerpiece of Defendants' motion for summary judgment, Dr. Knapp's report does not address whether Plaintiff's 2019 brain imaging is consistent with a finding of brain-based neurogenic bladder.  Dr. Knapp conceded at his deposition that he failed to, but "should have" referenced the 2019 brain imaging *Id*. at 53:13-19.

In any case, on the merits, Defendants cite no authority beyond their own experts for the proposition that imaging is invariably required, instead assuming the truth of this premise.  But Dr. Leitch disputes that premise and disagrees with Dr. Knapp about the need for confirmatory imaging.  Dr. Leitch testified that it is "typical" for patients with neurogenic bladder caused by brain injury to have normal imaging and that such a brain injury often cannot be "measured" on CT or MRI.  Ex. 12 at 150:16–152:10 ("There was no abnormality on his imaging which is often consistent with a head injury because the head injury/concussion/ TBI can just be on the cellular level while a CT and MRI are more structural, so you wouldn't be able to see it on a CT or an MRI.").  Dr. Vapnek agrees that imaging is not definitive: "[w]hile it is helpful to have abnormal imaging or an abnormal neurological examination to bolster the diagnosis of neurogenic bladder, *there is no requirement for such evidence*."  Ex. 13 at 3 (emphasis supplied).

In short, Defendants assert that Plaintiff lacks "proof" that he suffered a brain injury absent specific findings on brain imaging.  Plaintiff's experts opine that certain brain injuries that

cause neurogenic bladder are not visible on brain imaging.  Defendants do not explain why the Court must accept the "say-so" of their experts regarding imaging rather than the equally considered opinion of Plaintiff's experts, much less how this dispute on a single diagnostic factor supports precluding Plaintiff's experts from testifying and requires granting summary judgment. Dr. Leitch and Dr. Knapp disagree about the need for imaging to confirm the cause of Mr. Raymond's neurogenic bladder, but a jury (not the Court) should resolve that a disagreement. *See Canino*, 105 F. Supp. 2d at 31 (expert's "opinion is not 'scientifically unreliable' merely because it is at odds with that offered by [other expert].").  At base, "[a]s long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Faulkner*, 46 F. Supp. 3d at 376 (quotation marks omitted).

### c.    Dr. Leitch's Neurological Exam Findings Are Consistent with Her Diagnosis of Brain-Based Neurogenic Bladder

Dr. Knapp also disagrees that Mr. Raymond's neurogenic bladder was caused by a brain injury—he claims that certain findings were not present at Dr. Leitch's neurological exam that would be required for that diagnosis. Ex. 10 at 5.  Specifically, he would expect "extremity spasticity, Babinski signs, weakness or other signs of neurologic abnormality." *Id*.

Several of the findings that Dr. Knapp associates with brain injury-induced neurogenic bladder are in fact present in Dr. Leitch's report and/or present on her exam: lower extremity weakness, issues with legs, sensation, bowlers.  See Ex. 9 at 84:21–87:10.  Dr. Leitch reported that Plaintiff was "[u]nable to perform toe and heel walk" and "has difficulty using the stairs." Ex. 11 at 2-3.  Plaintiff's experts also identified several post-incident symptoms evidencing his brain injury: increased severity of Plaintiff's underlying seizure disorder, Ex. 11 at 14; changes

in urinary function, Ex. 13 at 3; bladder dysfunction, *id.* at 3-4; and development of pelvic pain and the inability to volitionally relax the external urethral sphincter to allow voiding.  *Id.* at 4.

Dr. Leitch also identifies several new symptoms experienced by Mr. Raymond after the September 14 Incident that she identifies as sequalae of traumatic brain injury such as headaches, personality changes, sleep problems, and lightheadedness.  Ex. 11 at 13–14.  Dr. Leitch also considered that Mr. Raymond's seizure disorder worsened after the September 14 Incident and opines that trauma to the brain is "known to cause worsening of certain underlying conditions including seizure disorder."  *Id.* at 14.  Defendants' critique of Dr. Leitch as failing to consider the presence or absence of certain specific findings consistent with traumatic brain injury is not a ground to preclude her testimony but rather a topic of cross-examination at trial.

C.    **Defendants Fail to Offer Any Alternative Explanations for the Cause of Mr. Raymond's Neurogenic Bladder Condition**

Courts have discretion to exclude as "unreliable" a medical expert's opinion as to the specific source or cause of a plaintiff's medical condition where "(1) the [physician] engaged in very few standard diagnosis techniques by which doctors normally rule out alternative causes and (2) the defendant pointed to some likely cause of the plaintiff's illness other than the defendant['s] actions and [the physician] offered no reasonable explanation as to why he or she still believed that the defendant['s] actions were a substantial factor in bringing about that illness."  *Munafo v. Metro. Transp. Auth.*, No. 00 Civ. 0134, 2003 WL 21799913, at *18 (E.D.N.Y. Jan. 22, 2003) (citation omitted).

Here, Defendants fail both prongs of this test:  (1) as discussed, Plaintiff's experts in fact considered and ruled out alternative causes for Mr. Raymond's neurogenic bladder and (2) Defendants' *experts* (as opposed to counsel, *see* Section D, *infra*) fail to identify a single other likely cause of Mr. Raymond's neurogenic bladder that Plaintiff's experts should have ruled out.

Defendants' experts' only opinion on causation is that they do not know what caused Mr. Raymond's neurogenic bladder.

> Q. What is your opinion, if you have one, about what caused Mr. Raymond to develop neurogenic bladder in late 2016 or early 2017 as you described?
>
> A. I do not have an opinion.
>
> Q. Do you, based on your review of the records in the case 1 to 19, do you have any explanation for why Mr. Raymond developed neurogenic bladder at that time?
>
> Object to form.
>
> A. No.

Ex.7 at 20:1–10; *see* Ex. 9 at 32:9–14 ("Q. In your opinion, what is the cause of Mr. Raymond's neurogenic bladder?  A. I do not know. I have not examined him or taken a history from him.").

Defendants provide no "serious alternative factors" causing Mr. Raymond's neurogenic bladder and candidly admit they lack any:

> Q. Okay. Okay. And do you agree that you offer no alternative explanation for Mr. Raymond's severe voiding dysfunction that clearly began after the September 14, 2016 assault?
>
> Object to form.
>
> A. Yes. Yes.

Ex. 7 at 69:12–17.

While admitting that they do not know what caused Plaintiff's condition, Defendants' experts agree that it is "extremely rare", Ex. 9 at 60:19–22, and "uncommon," Ex. 7 at 42:10–21, for neurogenic bladder to develop spontaneously, particularly in a person of Mr. Raymond's age. When asked at his deposition, Defendants' neurologist Dr. Knapp suggested that "autonomic neuropathy and peripheral neuropathy" could cause neurogenic bladder.  Ex. 9 at 67:2–10. However, he agreed there was no evidence of the condition in Plaintiff's records.  *Id.* at 70:12–

16 ("Q. But you have agreed that there is no evidence of the symptoms of autonomic neuropathy in the medical records you reviewed, correct? A. Yes.").  Defendants' urology expert testified that substance abuse was a "leading candidate" for the cause of Mr. Raymond's neurogenic bladder.  Ex. 7 at 48:13–19.  But Defendants' other expert rejected that explanation and testified that substance abuse does not cause Plaintiff's neurogenic bladder.  Ex. 9 at 75:14–77:4 ("Q. You don't agree that substance abuse caused Mr. Raymond to develop neurogenic bladder, correct?  Objection to form.  A Yes.  Q. So if somebody said that they thought the most likely explanation for Mr. Raymond's neurogenic bladder was his substance abuse, would you disagree with that? Objection to form.  A. Yes.").  Therefore, to the extent one of Defendant' experts posits the cause of Mr. Raymond's neurogenic bladder, Defendants' other expert rejects it.

*Daubert* requires that an expert must meaningfully respond to and rebut the other side's competing explanation for the cause of an injury.  *See* Fed. R. Evid. 702 advisory committee's note (in assessing an expert's reliability, courts should determine whether the expert "has adequately accounted for obvious alternative explanations.").  For example, in *Munfao*, the Court rejected as unreliable a psychopharmacologist's opinion that defendants' treatment of plaintiff at work caused his depression, because the doctor failed to rule out "the serious alternative factors" contributing to plaintiff's depression that were raised by the defendants:

> Despite a number of significant events and emotional traumas in Munafo's recent past, Dr. Rao utterly failed to investigate or even inquire as to how these factors may have contributed to his depression. … Dr. Rao could give no satisfactory reason for discounting as contributing causes: his mother's murder; his father's diagnosis of cancer; possible hereditary or genetic mental illness; his divorce and the fact that he faced the stresses of single parenthood; or the fact that his girlfriend recently left him.  In lieu of any conscientious attempt to rule out these alternative factors, Dr. Rao's causation determination barely rises above mere speculation and cannot meet the reliability standards of expert testimony under Daubert.

2003 WL 21799913 at *19.

Here, Defendants' experts offer no alternative possible causes for Plaintiff's neurogenic bladder—there is nothing for Plaintiff's experts to rebut.  Ex. 13 at 4 ("Dr. Valvo . . .  offers no alternative explanation for Mr. Raymond's severe voiding dysfunction that clearly began after the September 14, 2016 assault.").  Defendants fail to meet their burden to offer specific alternate causes of Mr. Raymond's neurogenic bladder that his expert should have but failed to consider.

### D.    Plaintiff's Experts Were Not Required to "Rule Out" Defendants' Counsel's Unsupported Theory that Plaintiff Suffered a Brain Injury on September 13, 2016

Defendants' only attempt to proffer an alternative explanation for Mr. Raymond's injuries is counsel's lay speculation that Mr. Raymond's neurogenic bladder was caused by an injury he purportedly sustained to his neck during a seizure episode on September 13, 2016.  This argument lacks merit for several important reasons.

First, no evidence indicates that Plaintiff suffered a neck injury on September 13, 2016.  Rather, the available record evidence shows that he did *not* suffer any neck injury that day.  Dr. Leitch testified that she reviewed the medical records and imaging of September 13, 2016 and "there was no injury to the neck."  Ex. 12. at 86:12–18, 88:9–12.  She concluded that: "[T]his isn't even hypothetical.  He was evaluated to see if there was [an injury], which is pretty much always done in the emergency department, and there was no injury."  *Id*. at 88:13–17.

Second, Defendants' own experts explicitly rejected the idea that Mr. Raymond's September 13, 2016 seizure caused his current bladder injuries.  Defendants' neurological expert testified that banging one's head on the floor during a seizure would not be sufficient to cause a neurogenic bladder.  Ex. 9 at 78:13–79:2.  Both in his report and at his deposition, Dr. Valvo opined that based on his review of the medical records from both September 13, 2016 and

September 14, 2016, he did not "believe there was significant brain injury caused from an external force that caused this individual to develop a neurogenic bladder."  Ex. 8 at 2.

> Q. Okay. So your view is that whatever --that the seizures he had on 9/13 and 9/14 did not cause him to develop neurogenic bladder; is that fair to say?
>
>  A. Yes, I believe so.
>
> Q. And so, for example, the seizure he had on the 13th, you know, he reported after that he had tenderness to the neck, do you think that that was a symptom at that point that he had neurogenic bladder?
>
> A. No

Ex. 7 at 61:6–62:2.

The record does not support Defendants' claim that the September 13, 2016 seizure incident caused Mr. Raymond to suffer from neurogenic bladder.  Plaintiff does not have to "rule out" unsupported, unproved theories made up by counsel.  *See Ismael*, 2020 WL 4003291, at *17 (physician expert who found nothing in the medical records to refute causality adequately considered and rejected alternative causes under *Daubert*); *see also In re Term Commodities Cotton Futures Litig.*, No. 12 Civ. 5126, 2020 WL 5849142, at *22 (S.D.N.Y. Sept. 30, 2020) (expert "adequately ruled out the obvious alternative causes" and was not required to "rule out every potential cause in order to satisfy *Daubert*" (citations omitted)); *see also Monterey*, 2019 WL 5884466, at *3 ("Thus, although Defendants quarrel with her opinion because it did not expressly consider whether his injury could have been caused by playing basketball or from heavy lifting at work, her conclusion that Plaintiff's injury is rare in the absence of 'trauma with sudden force' implicitly rules out other potential causes.") (citation omitted).

Finally, although not required to do so, Dr. Leitch did rule out the September 13, 2016 seizure as the cause of Mr. Raymond's neurogenic bladder when asked about in her deposition:

Q. Okay. So the defendants in this particular case allege that they never assaulted Mr. Raymond on September 14th of 2016, and the reason I tell you that is I am wondering if the alleged assault of September 14th, 2016, did not happen as the defendants claim, is it possible that the neck injury that Mr. Raymond suffered on September 13th is the cause of his neurogenic bladder?

Objection to the form.

A. I don't think he suffered a neck injury on September 13th. I think he was evaluated and found to have no injury.

\* \* \*

Q. Okay. So the fact they mention the neck tenderness, that doesn't indicate there was some type of injury to his neck that day?

A. No. He said -- they pushed on it. He said it was tender, so they went on and got a CAT scan which is a pretty -- you know, a pretty highly technical test. There was no abnormality, and then they were assured that there was no injury. He doesn't go on to get any more treatment or anything, or there is no follow-up care for the neck. It was simply he had the tenderness when they touched it and they worked it up, which is what typically is done, but he didn't have an injury to it. Just like they did a CT of his head, and there was no head injury on September 13th either. Those are the things you do just to make sure nothing else happened.

Ex. 12 at 85:17–87:13.

The Court should reject Defendants' argument that Dr. Leitch's opinion is not reliable because she purportedly failed to "rule out" a possible cause that has no basis in the record, was rejected by Defendants' own experts, and which Dr. Leitch expressly rejected at her deposition.

### E.    Plaintiff's Experts' Testimony Will Be Helpful to the Jury

The final Daubert consideration asks whether the testimony fits the facts of the case. *See*, *e.g.*, *Daubert*, 509 U.S. at 595. Under this requirement, a court determines whether expert testimony will assist the trier of fact, which is only possible if the evidence is relevant. *See*, *e.g.*, *id*. As with the other Daubert factors (qualification and reliability), "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless

there are strong factors such as time or surprise favoring exclusions." *Washington v. Kellwood Co*., 105 F. Supp. 3d 293, 308 (S.D.N.Y. 2015) (internal citations omitted).

Here, Plaintiff's experts' opinions will assist the trier of fact in determining specific causation. *See, e.g.*, *In re Zyprexa Products Liability Litigation*, 489 F. Supp. 2d 148, 230 (E.D.N.Y. 2007) (finding expert testimony that goes towards causation is helpful to the jury). Courts "look to . . . Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it has any tendency to make the existence of any fact that is of consequence . . . more probable or less probable than it would be without the evidence." *Amorgianos*, 303 F.3d at 265 (citation and quotation marks omitted). Plaintiff's experts will explain to the jury the basis of their opinions that Mr. Raymond's injuries were caused by September 14 Incident, and why they ruled out other explanations or non-explanations. This testimony unquestionably has a tendency to make a fact of consequence—whether Mr. Raymond developed neurogenic bladder because of the alleged beating—more or less probable. It should be permitted.

## II.    EVEN IF THE COURT WERE TO EXCLUDE THE CAUSATION OPINIONS OF PLAINTIFF'S EXPERTS, SUMMARY JUDGMENT IS NOT APPROPRIATE

Even if the Court were to agree that Plaintiffs' experts' opinions about the cause of Mr. Raymond's neurogenic bladder injury are not sufficiently reliable, summary judgment must be denied. Plaintiff can seek damages for the other injuries he sustained in the September 14 Incident, without any expert testimony as to causation. Plaintiff's injuries include facial redness, swelling, pain, and other injuries sustained because he was repeatedly punched. Immediately after the September 14 Incident, prison medical staff documented that Plaintiff had redness and swelling to his face. Ex. 3 (Inmate Injury Report); Ex. 4 (Ambulatory Health Record). Even if the Court were to agree that Plaintiff's expert cannot opine on the causation of his neurogenic

bladder, summary judgment would be inappropriate because the jury can find that Plaintiff was injured to his face and body by the beating, without any expert testimony.

To sustain an award for compensatory damages, plaintiff must adduce evidence of the existence of damages as well as evidence that the damages were proximately caused by the constitutional violation. *Miner v. City of Glens Falls*, 999 F.2d 655, 662 (2d Cir. 1993); *Al–Jundi v. Oswald*, No. 75 Civ. 0132, 1997 WL 613232, at *4 (W.D.N.Y. Oct. 2, 1997). Expert testimony is required only where damages or causation are outside the knowledge of the jury. *See, e.g.*, *Miner*, 999 F.2d at 662–663 (finding testimony by plaintiff and his wife regarding his mental suffering sufficient to sustain and award for compensatory damages, where plaintiff had described "some objective correlation with events" that occurred as a result of the constitutional violation); *Al–Jundi*, 1997 WL 613232, at *3–4 (finding that plaintiffs' testimony as to occurrences and injuries sufficient to establish damages and proximate cause).

Here, the cause of Mr. Raymond's documented injuries—swelling and redness to his face and body that he alleges was a result of Defendants' beating—are well within the knowledge of the jury. With respect to Mr. Raymond's immediately apparent injuries from the assault, no expert testimony is required because the nexus between the injury and the alleged cause will be obvious to the lay juror. Expert testimony is unnecessary where a lay jury is as capable as an expert of "comprehending the primary facts and of drawing correct conclusions." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962)); *see also Lewis v. City of Albany Police Dept.*, 547 F. Supp. 2d 191, 203 (N.D.N.Y. 2008), *aff'd*, 332 Fed. Appx. 641 (2d Cir. 2009) (in a Section 1983 excessive force claim, plaintiff's testimony describing the use of force, the testimony of plaintiff's treating physician "that he suffered abrasions and a contusion to his face and a closed head injury," and

photographs admitted in evidence showing "the injuries to plaintiff's face," were sufficient basis

if credited, "upon which the jury could find that Bonanni used excessive force upon Lewis.").

Here too, Plaintiff's testimony, the testimony of his treating nurse, the contemporaneous medical

records, and the photographs of Mr. Raymond are all sufficient bases upon which the jury could

find that Defendant Mitchell used excessive force upon Plaintiff on September 14, 2016 in the

prison infirmary exam room.  Ex. 2; Ex. 3; Ex. 4; Ex. 5; Ex. 6.  Defendants' motion for summary

judgment on Plaintiff's excessive force claim based on a purported failure to provide admissible

expert testimony should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for summary

judgment.  Should the Court be inclined to exclude any portion of Plaintiff's experts' testimony

regarding causation, Plaintiff requests a *Daubert* hearing.

Dated: October 6, 2023
      New York, New York

<div style="margin-left:40%">

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

/s/ *Katherine Rosenfeld*
Katherine Rosenfeld

600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000
krosenfeld@ecbawm.com

*Attorney for Plaintiff*

</div>