UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MATTHEW RAYMOND,

Plaintiff,

– against –

TROY MITCHELL, et al.,

Defendants.

No. 18 Civ. 01467

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1(b) of the Local Rules of Civil Procedure for the United States District Court for the Northern District of New York, Plaintiff responds to Defendants' Statement of Material Facts (Dkt. 168-5) as follows:

1.      On the date of the alleged incident, September 14, 2016, Plaintiff was an inmate incarcerated at Auburn Correctional Facility. (*See* ¶ 2 to the Amended Complaint, Exhibit A to the Attorney Declaration of Patrick J. Mackey dated July 27, 2023 (the "Mackey Declaration").)

**Plaintiff's Response**:  Admit.

2.      On the date of the alleged incident, each Defendant was a DOCCS employee stationed at Auburn Correctional Facility. (*See* ¶¶ 10-14 to Exhibit A to the Mackey Declaration.)

**Plaintiff's Response**:  Admit.

3.      The Plaintiff has suffered epileptic seizures since 2012. The Plaintiff started experiencing seizures after being hit in the head by an I-Beam while working on a construction site. The Plaintiff suffered head and brain injuries, including bleeding on the brain, as a result of

being hit by the I-Beam. (*See* pp. 128-133 to Plaintiff's deposition transcript, Exhibit G to the Mackey Declaration.)

**Plaintiff's Response**:  Admit that Plaintiff testified at his deposition as summarized.

4.    The Plaintiff alleges that on September 14, 2016, he was subjected to use of excessive physical force at the hands of the Defendants when returning to Auburn Correctional Facility from Auburn Community Hospital. (*See* ¶¶ 34-53 to Exhibit A to the Mackey Declaration.)

**Plaintiff's Response**:  Admit that the Plaintiff alleges that on September 14, 2016, he was "subjected to use of excessive physical force at the hands of the Defendants."  Dispute any implication that Plaintiff alleges that the excessive force occurred "when returning to Auburn Correctional Facility from Auburn Community Hospital."  Plaintiff alleges he was beaten in an exam room in the infirmary at Auburn Correctional Facility, after he returned from Auburn Community Hospital.  *See* Am. Compl. ¶¶ 34–51.

5.    Specifically, Plaintiff alleges that upon returning to Auburn Correctional Facility on September 14, 2016, he was taken to the facility's "emergency treatment room" where Defendant Mitchell waterboarded him, and Defendant Mitchell: (i) punched the Plaintiff in the face, neck and chest; (ii) grabbed and twisted the Plaintiff's testicles and penis; and (iii) punched and used his baton on the Plaintiff's groin. (*See* ¶¶ 34-53 to Exhibit A to the Mackey Declaration.)

**Plaintiff's Response**:  Admit.

6.    Plaintiff further alleges that the remaining Defendants (Defendants Thomas, Phillips, Giancola and Harte) "stood by and observed this assault, and did nothing to intervene or stop the assault." (*See* ¶ 41 to Exhibit A to the Mackey Declaration.)

**Plaintiff's Response**:  Admit.

7.      Defendants deny that any force was used on the Plaintiff on September 14, 2016, and they deny all of the Plaintiff's' allegations of use of excessive force. (*See* Exhibit B to Mackey Declaration.)

**Plaintiff's Response**:  Admit that Defendants make such denials in their Answer.

8.      Defendants deny performing any actions on September 14, 2016, that caused bodily injury to the Plaintiff resulting in the Plaintiff suffering a permanent injury. (*See* ¶¶ 139-143 and ¶¶ 159-166 to Exhibit B to the Mackey Declaration.)

**Plaintiff's Response**:  Admit that Defendants make such denials in their Answer.

9.      Plaintiff was returning to Auburn Correctional Facility from Auburn Community Hospital on September 14, 2016 because earlier in the day, he had experienced a seizure.  (*See* ¶ 26 to Exhibit A to the Mackey Declaration.)

**Plaintiff's Response**:  Admit.

10.      One day earlier, on September 13, 2016, Plaintiff experienced a seizure while at Auburn Correctional Facility, and during that seizure he fell and suffered injuries to his head and neck. (*See* ¶ 25 to Exhibit A, p. 148 to Exhibit G, Exhibit H, and Exhibit I to the Mackey Declaration.)

**Plaintiff's Response**: Admit that Plaintiff experienced a seizure on September 13, 2016 while at Auburn Correctional Facility.  Dispute that Plaintiff "fell" and during that fall suffered "injuries to his head and neck."  Plaintiff was evaluated for injuries at the hospital and no injuries were found.  Ex. 12 at 85-88.

11.    The Plaintiff alleges that the excessive force used on him by the Defendants on September 14, 2016, caused him to suffer a permanent injury - neurogenic bladder. (*See* Exhibits A, D and F to the Mackey Declaration.)

**Plaintiff Response**: Admit.  Plaintiff also alleges that the excessive force used on him by the Defendants on September 14, 2016 caused non-permanent injuries to his face and body.  Ex. 1 at 213-214, 215-216, 229, 232-234, 236-238, 240-241, 245; Ex. 2 (photographs); Ex. 3 (Inmate Injury Report); Ex. 4 (Note from Ambulatory Health Record)).

12.    The Plaintiff's neurologist expert witness wrote in her report that a neurogenic bladder is a urinary bladder problem caused by an "injury to the central nervous system," and "traumatic brain injury is a well-established cause of neurogenic bladder." (*See* p. 13 to Exhibit D to the Mackey Declaration.)

**Plaintiff's Response**: Admit.

13.    In his report, the Defendants' neurologist expert witness stated that a determination that a person sustained a neurogenic bladder "requires a proper neurogenic diagnosis and a localization in the nervous system on which to base that claim." (*See* p. 5 to Exhibit J to the Mackey Declaration.) The Defendants' expert further stated in his report that "[n]eurogenic bladder caused by traumatic brain injury cannot exist by itself without other neurogenic findings." (*See* p. 5 to Exhibit J to the Mackey Declaration.)

**Plaintiff's Response**: Admit.

14.    The Plaintiff's neurologist expert witness wrote in her report that the Plaintiff's neurogenic bladder condition was caused by "traumatic brain injury" suffered by the Plaintiff on September 14, 2016. (*See* p. 13 to Exhibit D to the Mackey Declaration.)

**Plaintiff's Response**: Admit.

15.     The Plaintiff's urologist expert witness testified that the Plaintiff's urine retention problem was not caused by a stricture in the Plaintiff's urethra. A urethral stricture is scar tissue that can form in a person's urethra that may cause urination retention problems. (*See* pp. 37-40 to Exhibit E to the Mackey Declaration.)

**Plaintiff's Response**: Admit.

16.     The Plaintiff's neurologist expert witness testified that the Plaintiff's neurogenic bladder was not caused by any injury to the Plaintiff's neck or spinal cord. (*See* p. 151, lines 4-11, to Exhibit C to the Mackey Declaration.)

**Plaintiff's Response**:  Admit.

17.     The Plaintiff's expert witnesses determined that the Plaintiff's neurogenic bladder condition was caused by an injury to the Plaintiff's brain.  The Plaintiff's expert witnesses ruled out that the Plaintiff's neurogenic bladder condition was caused by a use of force on the Plaintiff's neck, chest, penis, testicles, and groin.

**Plaintiff's Response**:  Defendants' Fact No. 17 fails to set forth "a specific citation to the record where the fact is established" as required by Local Rule 56.1(a) and Plaintiff therefore cannot admit or dispute it.

18.     The Plaintiff's urologist expert witness determined that medical imaging taken of the Plaintiff's brain, neck and spine after the alleged September 14, 2016, incident did not reveal any evidence of injuries or trauma to said parts of the Plaintiff's body. (*See* p. 4 to Exhibit F to the Mackey Declaration.)

**Plaintiff's Response**:  Admit that Plaintiff's urologist expert stated that "imaging studies of his brain did not reveal any *obvious* evidence of trauma such as hematoma . . ." Ex. 13 at 4.

Dispute that Plaintiff's urologist expert opined on "evidence of injuries" to Plaintiff's brain in his Report: he did not.

19.    The Plaintiff's neurologist expert witness admitted during her deposition that no medical imaging of the Plaintiff's brain exists which shows the brain injury that caused the Plaintiff to suffer a neurogenic bladder. (*See* p. 151, lines 12-23, to Exhibit C to the Mackey Declaration.) The expert testified that "[t]here was no abnormality on his imaging which is often consistent with a head injury..."  (*See* p. 150, lines 12-22, to Exhibit C to the Mackey Declaration.)

       **Plaintiff's Response**: Admit.

20.    The Plaintiff's urologist expert witness also admitted during his deposition that there is no imaging of the Plaintiff's brain that shows the injury that caused the Plaintiff's neurogenic bladder condition. (*See* p. 27, lines 15-23, top. 28, lines 1-4, and p. 50, lines 19-23, to Exhibit E to the Mackey Declaration.) The Plaintiff's expert also wrote in his report that the "imaging studies of [the Plaintiff's] brain did not reveal any obvious evidence of trauma..." (*See* p. 4 to Exhibit F to the Mackey Declaration.)

       **Plaintiff's Response**: Admit.

21.    Since no physical evidence of trauma to the Plaintiff's brain exists, the Plaintiff's expert witnesses rely on the temporal proximity of the Defendants' alleged use of force and the subsequent onset of brain injury related symptoms to support their respective findings. The expert witnesses identified the following post-incident symptoms as evidence of brain injury: (i) headaches; (ii) difficulty concentrating; (iii) marked cognitive dysfunction; (iv) personality change; (v) sleep problems; and (vi) lightheadedness. (*See* p. 4 to Exhibit F and p. 14 to Exhibit D to the Mackey Declaration.)

**Plaintiff's Response**:  Admit that "Plaintiff's expert witnesses identified the following post-incident symptoms as evidence of brain injury: (i) headaches; (ii) difficulty concentrating; (iii) marked cognitive dysfunction; (iv) personality change; (v) sleep problems; and (vi) lightheadedness."  In addition, Plaintiff's experts identified additional post-incident symptoms as evidence of his brain injury: increased severity of Plaintiff's underlying seizure disorder, Ex. 11 at 14; feeling "unsteady with walking," having "difficulty using the stairs," and being "[u]nable to perform toe and heel walk," *id*. at 2-3; changes in urinary function, Ex. 13 at 3; bladder dysfunction, *id*. 3-4; and the development of pelvic pain and the inability to volitionally relax the external urethral sphincter to allow voiding, *see id*. at 4.  Dispute that Plaintiff's expert witnesses rely solely "on the temporal proximity of the Defendants' alleged use of force and the subsequent onset of brain injury related symptoms to support their respective findings."  Both of Plaintiff's experts also arrived at their conclusions by reviewing Plaintiff's extensive medical records, and by ruling out other explanations for the cause of Plaintiff's neurogenic bladder, including alternative explanations proffered by Defendants' experts.  Ex. 11; Ex. 13.  Plaintiff's expert Dr. Leitch also conducted a neurological examination of Plaintiff on August 25, 2020 that informed her opinions.  Ex. 11 at 1.

22.    In her report, the Plaintiff's neurologist expert witness did not provide facts to support her contention that prior to September 14, 2016, there is no "significant" history of headache, personality change, sleep problems and lightheadedness. (*See* p. 14 to Exhibit D to the Mackey Declaration.).

**Plaintiff's Response**:  Dispute.  Plaintiff's neurologist stated that her review of Mr. Raymond's records from before the September 14 Incident is the basis of her conclusion that "there is no significant history of headache, personality change, sleep problems and

lightheadedness." Ex. 11 at 14. At her deposition, Dr. Leitch confirmed that according to her review of his medical records, Mr. Raymond's headaches began after the incident. Ex. 12 at 45-46. Dr. Leitch testified that she "spent a great deal of time making sure what was before and what was after." *Id. at* 45.

23.     Contrary to the statement made by the Plaintiff's neurologist expert regarding the Plaintiff's past medical history, medical records from June 2014 (more than two years before the alleged September 14, 2016, incident) reveal that the Plaintiff: (i) had a clinical history of headaches; (ii) reported having trouble with his memory; and (iii) reported having a "headache above eyes." (*See* pp. 1-2 to Exhibit K to the Mackey Declaration.)

**Plaintiff's Response**: Admit that the medical record documented that on June 10, 2014, Plaintiff reported to an emergency room that he was having trouble with his memory and had a "headache above eyes." Dispute that this medical record is "contrary" to statements made by Plaintiff's neurologist regarding the Plaintiff's medical history. Plaintiff's neurologist expert stated that her "[r]eview of the records from prior to 9/14/16 shows no 'significant' history of headache." Ex. 11 at 14. Plaintiff's isolated report to an Emergency Room that he experienced a single headache on June 10, 2014 is not a "significant history of headache" and thus the medical record cited by Defendants does not contradict Plaintiff's expert's statement. Dispute that the cited medical record reveals a "clinical history of headaches." The cited record is a radiology report for an imaging study conducted of Plaintiff on June 1, 2014 in response to his report of a headache (singular) that day. In the context of the radiology report, "Clinical History: Headache" provides a concise description of the clinical reason or suspicion that led to the ordering of the imaging study on that particular day; it does not reflect that Mr. Raymond has a

"clinical history of headaches" beyond the one headache occurring that day which necessitated the imaging to rule out a brain bleed.

24.    The Plaintiff's medical records from June 2014 also reveal that over two years before the alleged September 14, 2016, incident, the Plaintiff was concerned that "he has been unable to urinate regularly." (*See* p. 3 to Exhibit K to the Mackey Declaration.)

**Plaintiff's Response**:  Admit that the record reflects this statement.  There is no indication in the records that Plaintiff repeated this concern on any occasion beyond this single date or required or received any medical treatment for the reported symptom.

25.    The Plaintiff's neurologist expert did not identify two post-incident symptoms mentioned by his urologist expert ("difficulty with concentration" and "marked cognitive dysfunction") as symptoms the Plaintiff did not experience prior to the alleged September 14, 2016, incident. (*See* Exhibit D to the Mackey Declaration.)

**Plaintiff's Response**:  Admit that Plaintiff's neurologist expert does not use the term "marked cognitive dysfunction" in describing the symptoms Plaintiff began to experience after the September 14 Incident.  Dispute that Plaintiff's neurologist expert failed to consider changes to Plaintiff's concentration and cognitive function that occurred after September 14, 2016.  Dr. Leitch states that Plaintiff exhibited "Decreased attention and concentration" during his Mental Status exam conducted on August 25, 2020, and also documented that Plaintiff reported increased memory problems since the assault, which is a symptom of cognitive dysfunction.  Ex. 11 at 2.

26.    With respect to the "personality change" post-incident symptom identified in the expert report written by the Plaintiff's neurologist expert, the Plaintiff's expert did not consider

that in 2015 and 2016, the Plaintiff spent time receiving treatment for depression. (*See* p. 7 to Exhibit D to the Mackey Declaration.)

**Plaintiff's Response**:  Dispute.  Plaintiff's expert specifically noted in her report that Mr. Raymond was treated for depression 2015 and 2016 while he was incarcerated.  Ex. 11 at 7.  Her conclusion that Mr. Raymond experienced personality change after the September 14 Incident reflects and incorporates her extensive medical record review.

27.    The Plaintiff's urologist expert witness did not review any medical records dated prior to the September 14, 2016, alleged incident. The expert witness's report provides that all of the Plaintiff's medical records reviewed by him for his evaluation of the Plaintiff are dated after September 14, 2016. (*See* p. 1 to Exhibit F to the Mackey Declaration.)

**Plaintiff's Response**: Admit that the expert's report provides as such.  In addition, the expert testified during his deposition that he believed he had seen "some earlier records as well." Ex. 14 at 33:4–11 ("Do you know, did you review any records that were dated prior to January 19th of 2017? . . . I know I had seen that emergency room visit, and I believe I had seen some earlier records as well.  I don't know, I might have missed them in this bullet list.").

28.    When asked during his deposition if he reviewed any of the Plaintiff's medical records dated prior to September 14, 2016, the Plaintiff's urologist expert stated, "I don't know." (*See* p. 33, lines 4-11, to Exhibit E to the Mackey Declaration.)

**Plaintiff's Response**:  Dispute that the cited testimony reflects that Plaintiff was asked if he reviewed any of Plaintiff's medical records dated prior to September 14, 2016.  The question asked related to whether the expert reviewed any records prior to January 19, 2017.  In addition, the expert testified during his deposition that he believed he had seen "some earlier records as well." Ex. 14 at 33:4–11 ("Do you know, did you review any records that were dated prior to

January 19th of 2017? . . . I know I had seen that emergency room visit, and I believe I had seen some earlier records as well. I don't know, I might have missed them in this bullet list.").

29. The Plaintiff's urologist expert witness identified stroke and multiple sclerosis as potential causes of a neurogenic bladder. (*See* p. 3 to Exhibit F and p. 25 to Exhibit E to the Mackey Declaration.)

**Plaintiff's Response**: Admit. Plaintiff's urologist expert witness also identified several additional causes of a neurogenic bladder including "extreme head injuries," Ex. 14 at 25:6-7, "spinal cord injury," and Parkinson's disease, Ex. 13 at 3.

30. The Plaintiff's urologist expert witness did not exclude stroke and multiple sclerosis as a possible cause of the Plaintiff's neurogenic bladder condition. (*See* Exhibit F to the Mackey Declaration.)

**Plaintiff's Response**: Dispute. Plaintiff's urologist expert witness opined in his Report that "[i]t is abundantly clear that the assault of September 14, 2016 was the precipitating cause of Mr. Raymond's voiding dysfunction, given the absence of any suitable alternative explanation." Ex. 13 at 3.

31. The Plaintiff's urologist expert witness admitted during his deposition that the seizure induced fall that the Plaintiff experienced on September 13, 2016 (one day before the alleged incident of September 14, 2016) could have caused the brain injury that the Plaintiff allegedly sustained, resulting in the Plaintiff acquiring a neurogenic bladder. (See p. 30, lines 11-23, to p. 31, lines 1-7, to Exhibit E to the Mackey Declaration.)

**Plaintiff's Response**: Dispute. When Defendant's counsel asked Dr. Vapnek if a seizure-related fall on September 13, 2016 could have been the cause of Plaintiff's brain damage, Plaintiff's expert urologist stated "I don't know enough about how much of a fall there was . . .

from what I saw in the records, *it wasn't anything severe at the time*." Ex. 14 at 31:1-8. Defendants' counsel asked then *if* Mr. Raymond fell and hit his head to the floor, whether that mechanism could cause a brain injury resulting in neurogenic bladder, and Plaintiff's expert stated: "I mean, hypothetically, it's certainly possible." *Id*. at 31:1-8. There is no evidence in the record that Mr. Raymond fell and "hit his head" following the seizure he experienced on September 13, 2016. None of the documents in the record cited for this assertion reflect that Mr. Raymond fell and "hit his head." For this assertion, Defendants cite "¶ 25 to Exhibit A, p. 148 to Exhibit G, and Exhibits H and I, to the Mackey Declaration.)" Defs. Br. at 2-3. None of the four exhibits cited for this assertion in fact reflect that the fall resulted in "injuries to his head and neck." First, Exhibit A is Plaintiff's Amended Complaint, paragraph 25 of which notes that Plaintiff suffered the seizure, but makes no mention of "injuries to his head and neck." Second, Exhibit G is an excerpt from Plaintiff's deposition, during which he was asked about the September 13 seizure, as reflected on page 148. But again, the deposition excerpt only discusses the fact that Plaintiff had a seizure. *See* Exhibit G to Mackey Declaration at 148:14–20 ("Q. Okay. Did you -- let me back up. The previous day, on September 13th, you had a seizure and went to the hospital, right? A. Correct. Q. And then you were brought back to the Auburn Facility on September 13th? A. Yes."). Third, Exhibit H is a medical record reflecting a consultation request from an Auburn Correctional Facility medical employee. While it notes that Plaintiff had a history of seizures and an "unwitnessed fall" and "neck pain," it does not state that Plaintiff "hit his head" or that his neck pain was as a result of the fall—rather, it notes that there was "no obvious trauma." Finally, Exhibit I is another medical record, which only states that Plaintiff was "[f]ound by prison staff lying on cell floor having total body shaking," but does not mention a seizure-induced fall or any resulting injuries to his head or neck.

32.    Although the Plaintiff's urologist expert witness testified during his deposition that the fall the Plaintiff experienced on September 13, 2016, "wasn't anything severe," the fall was serious enough to require the Plaintiff to be taken to Auburn Community Hospital for observation on the same day as the fall, and serious enough for a CT scan to be taken of the Plaintiff's head. (See p. 30, lines 17-23, to Exhibit E to the Mackey Declaration, and Exhibits H and I to the Mackey Declaration.)

**Plaintiff's Response**:  Dispute.  Plaintiff was taken to Auburn Community Hospital because he suffered a grand mal seizure on September 13, 2016 and to rule out that he suffered any injuries during the seizure, not because of a "fall."  He was found to have no injuries and released that day.  *See* Ex. 12 at 86:4–87:13 ("I don't think he suffered a neck injury on September 13th. I think he was evaluated and found to have no injury. . . . they poked on his neck and he said it felt tender. . . . I don't even know if that was related to the seizure. . . . So I agreed with them that they needed to poke and they needed to work it up, but the result was there was no injury to the neck. Q. Okay. So the fact they mention the neck tenderness, that doesn't indicate there was some type of injury to his neck that day? A. No. . . . There was no abnormality, and then they were assured that there was no injury. He doesn't go on to get any more treatment or anything, or there is no follow-up care for the neck. It was simply he had the tenderness when they touched it and they worked it up, which is what typically is done, but he didn't have an injury to it. Just like they did a CT of his head, and there was no head injury on September 13th either.").  The medical records Defendants rely on from Auburn Community Hospital show a diagnosis of "Grand Mal Seizure, Medication non-compliance."  Exhibit I to Mackey Declaration at 5.  The Complaint Comment states: "Witnesses grand mal seizure 28 yo M with hx of seizures presents from Auburn Correctional Facility with EMS after witnessed

grand mal seizures.  Pt reportedly told neighbor that he didn't feel well.  Found by prison staff

lying on cell floor having total body shaking. Administered 2mg of Ativan IN x 2 doses.  Seizure

lasted approx. 3-5 minutes per staff.  He was incontinent of urine.  Staff reports that he is non-

compliant with taking his seizure medication.  He is on Keppra.  Presents post-ictal/lethargic."

*Id*.

33.     The Plaintiff's medical records from Auburn Community Hospital dated

September 13, 2016, provide that the Plaintiff complained of "neck pain and [headache]" when

arriving at the hospital after experiencing the seizure induced fall. (*See* p. 2 to Exhibit I to the

Mackey Declaration.)

**Plaintiff's Response**:  Admit that the medical record from Auburn Community Hospital

shows that Plaintiff complained on September 13, 2016 about "neck pain and HA."  There is no

indication in the cited record as to whether Mr. Raymond's headache was related to his seizure,

his post ictal state or something else.  Dispute that the record references a "seizure induced fall."

34.     The Plaintiff's urologist expert witness did not write in his report that the fall the

Plaintiff experienced on September 13, 2016, did not cause, or could not have caused, the brain

injury allegedly sustained by the Plaintiff. (See Exhibit F to the Mackey Declaration.)

**Plaintiff's Response**:  Admit that Plaintiff's urologist expert did not reference Plaintiff's

September 13, 2016 seizure episode in his report.  Dispute that he did not rule out the September

13, 2016 seizure episode as the cause of Plaintiff's injury in his report.  The Plaintiff's urologist

expert stated in his report that "[i]t it abundantly clear that the assault of September 14, 2016 was

the precipitating cause of Mr. Raymond's voiding dysfunction, given the absence of any suitable

alternative explanation."  Ex. 13 at 3.  In so stating, Plaintiff's urologist expert implicitly ruled

out other causes for Mr. Raymond's condition.  Further state that there is no evidence in the

record that the September 13, 2016 seizure did cause or could have caused the brain injury

sustained by Plaintiff.  Defendants' expert urologist testified that he did not believe that the

September 13, 2016 episode caused any injury to Defendants' brain.  Ex. 7 at 61:6–62:2 ("So

your view is that whatever -- that the seizures he had on 9/13 and 9/14 did not cause him to

develop neurogenic bladder; is that fair to say? A. Yes, I believe so. Q. And so, for example, the

seizure he had on the 13th, you know, he reported after that he had tenderness to the neck, do

you think that that was a symptom at that point that he had neurogenic bladder? A. No.").

      35.     The Plaintiff's urologist expert witness admitted during his deposition that he

does not know much about the fall the Plaintiff experienced on September 13, 2016. (See p. 30,

lines 11-23, to Exhibit E to the Mackey Declaration.)

     **Plaintiff's Response**:  Dispute.  Plaintiff's urologist expert stated: "I don't know enough

about *how much of a fall there was.*"  Ex. 14 at 30:20-21 (emphasis supplied).

      36.     In her report, the Plaintiff's neurologist expert witness mentions that the Plaintiff

experienced a fall on September 13, 2016, but in no portion of her report does the expert witness

exclude the fall as a potential cause of the Plaintiff's alleged brain injury and resulting

neurogenic bladder. (*See* p. 15 to Exhibit D to the Mackey Declaration.)

     **Plaintiff's Response**:  Admit that Plaintiff's neurologist expert mentions that the medical

record from September 13, 2016 states: "an unwitnessed fall with neck pain" but dispute the

implication that Plaintiff's expert neurologist was required to "exclude the fall as a potential

cause of the Plaintiff's alleged brain injury and resulting neurogenic bladder."  Further state that

there is no evidence in the record of any kind that the September 13, 2016 episode did cause or

could have caused the brain injury sustained by Plaintiff.  Defendants' urological expert testified

that he did not believe that the September 13, 2016 episode caused any injury to Defendants'

brain.  Ex. 7 at 61:6–62:2 ("So your view is that whatever -- that the seizures he had on 9/13 and

9/14 did not cause him to develop neurogenic bladder; is that fair to say? A. Yes, I believe so.").

Defendants' neurological expert testified that if a person's head made contact with the floor

several times during a seizure, that would not be "adequate" to cause neurogenic bladder.  Ex. 9

at 78:13-79:2.  Further state that Dr. Leitch ruled out the seizure episode as the cause of

Plaintiff's brain injury when asked about it at her deposition.  Ex. 12 at 85:17-87:13.

37.    In her report, the Plaintiff's neurologist expert excludes the Plaintiff's 2012 brain

injury and his subsequent seizures, as well as improper catheter care and drug use, as potential

causes of the Plaintiff's brain injury and resulting neurogenic bladder; the expert, however, does

not exclude in her report the September 13, 2016, fall as a potential cause of the Plaintiff's brain

injury and resulting neurogenic bladder. (*See* p. 14 to Exhibit D to the Mackey Declaration.)

**Plaintiff's Response**:  Admit that Plaintiff's neurologist excludes the cited factors as

potential causes of the Plaintiff's brain injury and resulting neurogenic bladder and did not

explicitly address the September 13, 2016 seizure episode in her Report.  Dispute that she did not

"exclude" it as a cause of Plaintiff's brain injury and resulting neurogenic bladder: she did so in

her report and at her deposition.  *See* Ex. 11 at 14 ("In my professional opinion and to a

reasonable degree of medical certainty, the records and documents I have reviewed present no

other cause of Mr. Raymond's neurogenic bladder.); Ex. 12 at 85:17-87:13.

38.    The Plaintiff's neurologist expert admitted during her deposition that she did not

discuss with the Plaintiff the September 13, 2016, seizure induced fall, or the head and neck

injuries the Plaintiff sustained as a result of the fall. (*See* p. 70, lines 14-23, top. 71, lines 1-14, to

Exhibit C to the Mackey Declaration.)

**Plaintiff's Response**:  Dispute.  None of the cited testimony makes any reference to Mr. Raymond sustaining a "fall" or "injuries the Plaintiff sustained as a result of the fall."  Dr. Leitch testified at her deposition that she did not discuss "the seizure" with Mr. Raymond, and that she did not discuss with him his complaints of "neck pain and headache" after the seizure.

39.     Neither the Plaintiff's neurologist expert witness nor the Plaintiff's urologist expert witness performed a differential diagnosis, or any other scientific process, to negate the seizure induced fall the Plaintiff experienced on September 13, 2016, as a potential cause of the Plaintiff's alleged brain injury and resulting neurogenic bladder. (See Exhibits D and F to the Mackey Declaration.)

**Plaintiff's Response**:  Dispute.  Both of Plaintiff's experts performed a differential diagnosis to negate other causes of Mr. Raymond's brain injury and resulting neurogenic bladder.  Plaintiff's expert neurologist did exclude the September 13, 2016 episode as a potential cause of the Plaintiff's brain injury at her deposition.  *See* Ex. 12 at 85:20–87:13 ("Q. . . . I am wondering if the alleged assault of September 14th, 2016, did not happen as the defendants claim, is it possible that the neck injury that Mr. Raymond suffered on September 13th is the cause of his neurogenic bladder? Objection to the form. A. I don't think he suffered a neck injury on September 13th. I think he was evaluated and found to have no injury. . . . they poked on his neck and he said it felt tender. . . . I don't even know if that was related to the seizure. . . . So I agreed with them that they needed to poke and they needed to work it up, but the result was there was no injury to the neck. Q. Okay. So the fact they mention the neck tenderness, that doesn't indicate there was some type of injury to his neck that day? A. No. . . .).

40.     Considering that the Plaintiff's expert witnesses did not exclude the September 13, 2016, fall as a potential cause of the Plaintiff's alleged brain injury and neurogenic bladder,

the Plaintiff's contention that he suffered those injuries at the hands of the Defendants on

September 14, 2016, is speculative. (*See* Exhibit D and F to the Mackey Declaration.)

      **Plaintiff's Response**:  Dispute.  Plaintiff's expert neurologist did exclude the September

13, 2016 episode as a potential cause of the Plaintiff's brain injury at her deposition.  *See* Ex. 12

at 85:20–87:13 ("Q. . . . I am wondering if the alleged assault of September 14th, 2016, did not

happen as the defendants claim, is it possible that the neck injury that Mr. Raymond suffered on

September 13th is the cause of his neurogenic bladder? Objection to the form. A. I don't think he

suffered a neck injury on September 13th. I think he was evaluated and found to have no injury. .

. . they poked on his neck and he said it felt tender. . . . I don't even know if that was related to

the seizure. . . . So I agreed with them that they needed to poke and they needed to work it up,

but the result was there was no injury to the neck. Q. Okay. So the fact they mention the neck

tenderness, that doesn't indicate there was some type of injury to his neck that day? A. No. . . .).

Further state that the cause of Plaintiff's injuries being Defendants' assault is not speculative as

Plaintiff's expert concluded as much based on an analysis of Plaintiff's medical records, a

neurological exam, and the consideration and exclusion of other potential causes of the injuries.

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE

      Plaintiff contends that the following additional paragraph are materials facts in dispute.

These facts establish both that (1) there are material factual disputes that must be addressed by a

jury, and (2) even on the record of undisputed facts, Defendants are not entitled to judgment as a

matter of law and a jury must assess whether Defendants' actions were lawful in light of those

facts.

      1.     On September 14, 2016 while Plaintiff was handcuffed on an exam table in the

prison infirmary, Defendant Troy Mitchell punched Plaintiff in the face and torso, hit him in the

face and the genital with a baton, and smacked him the face, hereinafter "the Assault." Ex. 1 at

213:1–216:21.[1]  Other officer defendants stood by and failed to intervene, while assisting

Defendant Mitchell in the Assault by holding Plaintiff's legs open and pinning them down.  *Id*. at

208:10–210:10, 211:3–212:20, 220:14–21, 221:11–22, 225:20–226:10.

     2.     Defendant Mitchell used force upon Plaintiff on September 14, 2016 in the prison

infirmary exam room.  Ex. 1 at 213:1–216:21; Ex. 2; Ex. 3; Ex. 4; Ex. 5; Ex. 6 at 69:20–74:18.

     3.     After the Assault, Plaintiff had difficulty walking.  He was taken to the Special

Housing Unit, where officers cleaned blood off his face and put him in clean clothes before he

was photographed.  Ex. 1 at 232:12–234:9, 235:20–237:12, 240:1–241:20, 245.

     4.     Plaintiff suffered injuries on September 14, 2016 to his neck, face, chest, back,

eye, and genitals.  Ex. 1 at 226:20–227:13, 229:16–230:1.

     5.     Plaintiff suffered pain during and after the Assault.  Ex. 1 at 226:20–227:13,

229:16–230:1, 238, 270:10–271:7.

     6.     Plaintiff was bleeding after the Assault and his eye was swollen shut.  Ex. 1 at

241:3–9, 245:1–4.

     7.     Contemporaneous medical records and photographs document Plaintiff's injuries

from the Assault.  Ex. 2 (photographs); Ex. 3 (Inmate Injury Report); Ex. 4 (Ambulatory Health

Record) ("Has reddened and swollen area to left eye, left cheek and left ear, abrasions to upper

right chest times two.").

---

[1] Unless otherwise indicated, citations to "Ex." are to the Exhibits to the Declaration of Katherine Rosenfeld dated October 6, 2023.

8.     On September 15, 2016, the day after the incident, Mr. Raymond reported to prison medical staff that he was unable to urinate, a symptom of neurogenic bladder.  Ex. 9 at 74:1–75:6.

9.     Aimee Hoppins, a DOCCS nurse who was working at the Auburn infirmary on September 14, 2016, observed Mr. Raymond before and after his encounter with Defendant Mitchell.  Ex. 6 at 50:1–52:24.

10.     That day, after Mr. Raymond returned to the prison from the hospital following treatment of a seizure, Nurse Hoppins entered the exam room in the prison infirmary to examine him.  Ex. 6 at 17:4–19:22, 58:5–24.  Mr. Raymond was sitting handcuffed on the exam table.  *Id*. at 60:20–22.

11.     There were no marks on Mr. Raymond when he first entered the exam room.  Ex. 6 at 21:3–7.

12.     In addition to Defendant Mitchell, approximately five other correctional officers were present, one of whom was videotaping Mr. Raymond.  Ex. 6 at 58:1–60:19, 65:4–66:25.

13.     Defendant Mitchell told Nurse Hoppins that she "needed to leave the exam room."  Ex. 6 at 19:4–25, 21, 58:9–12.

14.     About 10-15 minutes later, Defendant Mitchell and other officers exited the exam room, and told Nurse Hoppins that she could go back in.  Ex. 6 at 65:13–25.

15.     Defendant Mitchell removed and discarded latex gloves after he exited the exam room, which had some discoloration on them.  Ex. 6 at 68:2–69:12.

16.     After Defendant Mitchell left the exam room on September 14, 2016, Plaintiff had fresh marks on his face, upper trunk and his arms.  Ex. 6 at 72:4–74:18, 136:5–140:9.

17.     After Defendant Mitchell left the exam room on September 14, 2016, Plaintiff had swelling to his left orbital bone, eye area, left jaw, and left ear.  Ex. 6 at 136:5–139:25.

18.     After Defendant Mitchell left the exam room on September 14, 2016, Plaintiff had reddened marks on his shoulder and arm, shoulder blade and back.  Ex. 6 at 147:2–148:11.

19.     On September 14, 2016, Defendant Mitchell told Nurse Hoppins that he was going to lie about how Mr. Raymond sustained his injuries and destroy the video of the incident to cover up the beating.  Ex. 6 at 84:3–86:25, 88:1–24.

20.     Mr. Raymond suffers from brain-based neurogenic bladder as a result of the September 14 Incident—specifically, from the blows to Mr. Raymond's head.  Ex. 11 at 13-15.

21.     Mr. Raymond suffered a severe traumatic brain injury on September 14, 2016. Ex. 11 at 13.

22.     After the Assault, Mr. Raymond suffered from symptoms of "persistent post-traumatic neurologic injury including neurogenic bladder, headache, personality change, sleep problems, lightheadedness, and increased risk of seizures."   Ex. 11 at 13.

23.     Mr. Raymond developing neurogenic bladder was caused by the brain injury he suffered on September 14, 2016.  Ex. 11 at 13-15; Ex. 13 at 3-4.

24.     The Assault led to Mr. Raymond's inability to urinate and the consequent necessity for suprapubic catheter placement in 2017 followed by major reconstructive surgery in 2020.  Ex. 13 at 2-4.

25.     Plaintiff's experts identify several symptoms evidencing his brain injury: increased severity of Plaintiff's underlying seizure disorder, Ex. 11 at 14; feeling "unsteady with walking," having "difficulty using the stairs," and being "[u]nable to perform toe and heel walk," *id*. at 2-3; changes in urinary function, Ex. 13 at 3; bladder dysfunction, *id.* at 3-4; and the

development of pelvic pain and the inability to volitionally relax the external urethral sphincter to allow voiding, *id.* at 4.

26.    Mr. Raymond experienced symptoms after the September 14 Incident that are sequalae of traumatic brain injury such as headaches, personality changes, sleep problems, and lightheadedness.  Ex. 11 at 13.

27.    Mr. Raymond's seizure disorder worsened after the September 14 Incident and trauma to the brain is "known to cause worsening of certain underlying conditions including seizure disorder."  Ex. 11 at 14.

28.    Defendants' experts agree that Mr. Raymond suffers from neurogenic bladder but they have no opinion regarding what caused Mr. Raymond to develop neurogenic bladder.  Ex.7 at 20; *see also* Ex. 9 at 32:5–14, 34:18–22.

29.    The September 13, 2016 seizure was not the cause of Mr. Raymond's neurogenic bladder condition.  The September 13, 2016 seizure was expressly ruled out as a cause of Mr. Raymond's neurogenic bladder condition by Plaintiff's neurologist expert, Ex. 12 at 85:17–87:13 and by Defendants' urologist expert, Ex. 8 at 2, Ex. 7 at 61:6–62:2.  Defendants' neurological expert also testified that if a person's head made contact with the floor several times during a seizure, that would not be "adequate" to cause neurogenic bladder.  Ex. 9 at 78:13–79:2.

Dated: October 6, 2023
    New York, New York

                                    EMERY CELLI BRINCKERHOFF
                                    ABADY WARD & MAAZEL LLP


                                    *Katherine Rosenfeld*
                                    Katherine Rosenfeld

                                    600 Fifth Avenue, 10th Floor
                                    New York, New York 10020

(212) 763-5000
krosenfeld@ecbawm.com

*Attorneys for Plaintiff*