# EXHIBIT 12

1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
2    ------------------------------------------------
     MATTHEW RAYMOND,
3                          Plaintiff,

4     -vs-                                    18-CV-01467

5    TROY MITCHELL, LIEUTENANT AT AUBURN
     CORRECTIONAL FACILITY; CHARLES THOMAS,
6    CORRECTION OFFICER AT AUBURN CORRECTIONAL
     FACILITY; THOMAS HARTE, SERGEANT AT AUBURN
7    CORRECTIONAL FACILITY; THOMAS PHILLIPS,
     CORRECTION OFFICER AT AUBURN CORRECTIONAL
8    FACILITY; THOMAS GIANCOLA, CORRECTION OFFICER
     AT AUBURN CORRECTIONAL FACILITY; HAROLD D.
9    GRAHAM, FORMER SUPERINTENDANT OF AUBURN
     CORRECTIONAL FACILITY; BRIAN BAUERSFELD,
10   CORRECTIONAL HEARING OFFICER OF AUBURN
     CORRECTIONAL FACILITY; BRIAN O'HORA,
11   CORRECTION OFFICER AT AUBURN CORRECTIONAL
     FACILITY; AIMEE HOPPINS, R.N.; DR. DEBORAH
12   GEER; AND "JOHN DOE", CORRECTION OFFICER AT
     AUBURN CORRECTIONAL FACILITY,
13                          Defendants.
     ------------------------------------------------
14        REMOTE EXAMINATION BEFORE TRIAL OF

15            SHERRY WITHIAM-LEITCH, MD

16

17            Tuesday, March 8, 2022

18            2:26 p.m. - 5:53 p.m.

19            pursuant to notice

20

21   REPORTED BY:

22   Carrie A. Fisher, Notary Public

23   APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

—SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22—

1      Patrick Mackey.  I represent the defendants in

2      this particular lawsuit and thank you for your

3      time today for your deposition.

4           Just a couple of things before I get

5      started with my questions.  I just kind of

6      wanted to lay down a couple ground rules so

7      this goes as smoothly as possible.  Please try

8      to wait until I am done with my question

9      before jumping in with an answer.  It's

10     easiest for the stenographer when everyone

11     avoids talking over each other, and I will try

12     to do the same.  I will try to make sure

13     you're done with your answer before I go onto

14     my next question.

15          We do need verbal answers.  A nod of the

16     head doesn't help with the stenographer and

17     neither does an mhmm or uh-huh.  Everything

18     needs to be verbal so if you could remember

19     that, that would be great.

20          If you don't understand a question,

21     please let me know.  I'd rather you give us an

22     answer with a question you understand.  If

23     you're not understanding what I am asking, I

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1      will ask it a different way or maybe even

2      break it down to smaller questions.

3           There may be or probably will be some

4      objections on the record placed by plaintiff's

5      counsel which is the norm, but I do ask you to

6      provide answers to those questions after the

7      objection is put on the record.

8           And, last, if you do need a break,

9      please let me know.  There is no reason we

10     can't take a break, be it a five-minute or

11     ten-minute break for whatever needs you have.

12     The only thing I ask is that if there is a

13     question pending that you answer the question

14     before we take the break, all right?

15  A. Yes.  The only thing is I could hear the

16     stenographer fine but you're kind of quiet and

17     kind of go in and out, and I am at my max

18     volume.

19  Q. Okay.  I will try to keep my voice up.

20  A. Okay.

21  Q. But thanks, that's a good point.  If I get cut

22     off somewhere in a question or my voice fades

23     for a reason and you're not quite sure of the

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    question, just let me know.  I'd rather you
2    hear the question than, you know, kind of
3    guess where I was going with it, but I will
4    try to keep my voice up.  Thank you.
5         Dr. Leitch, are you licensed to practice
6    medicine in the state of New York?
7  A. I am.
8  Q. How long have you been -- how long have you
9    held that license?
10 A. Since 1996.
11 Q. At any time has that license ever been
12    canceled or revoked or suspended?
13 A. It has not.
14 Q. Okay.  And do you have any board
15    certifications?
16 A. I am board-certified by the American Board of
17    Neurology and Psychiatry.
18 Q. Any other certifications?
19 A. That's it.
20 Q. Okay.  With respect to that one certification,
21    has that ever been canceled, revoked, or
22    suspended?
23 A. It has not.

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    Q. Okay.  And what is your concentration in the

2       medical field?

3    A. I am a neurologist.

4    Q. Where are you currently employed?

5    A. I have my own practice at the address I gave

6       in North Tonawanda, and I am the chief of

7       neurology at the Buffalo VA Medical Center.  I

8       am also a professor at the university, at

9       University at Buffalo.

10   Q. Okay.  And those three positions, how long

11      have you held those positions?

12   A. My private practice in North Tonawanda I have

13      had since 1999.  The professorship at the

14      university since 1996.  I worked at the VA

15      since 1996, and I have been the chief I think

16      for about ten years.

17   Q. Okay.  Have you ever provided medical services

18      in a correctional facility?

19   A. I think I did back in the early 2000s.  I -- I

20      have been there for evaluations, but I think I

21      also provided treatment either at Wende or

22      Gowanda.  I can't really remember, but there

23      was a several-month period I covered for

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1          somebody.

2      Q.  Okay.  So was that part of your job, providing

3          service -- medical services at one of New York

4          State's correctional facilities?

5      A.  Well, at that time I was working for ECMC and

6          that's the best I can remember.  I remember

7          going out there, but it was a long time ago.

8          And of course the Erie County Medical Center

9          has their lockup and I took care of patients

10         in the lockup for -- for quite a few years,

11         maybe from the late 90s through the mid 2000s.

12     Q.  Did you ever do any work at Auburn

13         Correctional Facility?

14     A.  I don't -- I don't recall so.  I don't think

15         so.

16     Q.  Okay.  Now, I think you mentioned you might

17         have gone to Wende Correctional Facility or

18         Gowanda Correctional Facility.  What -- if you

19         recall, what particular services did you

20         provide when you went there?

21     A.  It was -- if I remember correctly, I remember

22         going there.  I don't know if I was just doing

23         evaluations, but my vague memory is I was

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1        doing neurology for a different doctor that

2        had -- that was covering there.  It was a

3        brief time period.  It was a long time ago.  I

4        don't really have the details.  I could

5        probably find out, but I don't have the

6        details.

7    Q.  And you say "brief time period," how long do

8        you think you did that work?

9    A.  I don't remember.  I don't think -- I think

10       they were only going once a month so it might

11       have been just a few times I went for them.

12   Q.  Okay.  And you were providing neurological

13       services?

14   A.  Yes.

15   Q.  Okay.  And you think you said that was in the

16       90s?

17   A.  Maybe the late 90s.  I can't -- I mean, I

18       can't completely remember.  It was back when I

19       worked at ECMC, but maybe they brought the

20       patients to ECMC.  I have a vague memory of

21       it.

22   Q.  Okay.

23   A.  I was trying to be complete.  Maybe I

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1        should've just let it go, but I kind of

2        remember it.

3    Q.   Oh, that's fine.  I appreciate that.

4             With respect to today's deposition, did

5        you review any particular documents in

6        particular to prepare for the deposition?

7    A.   So I reviewed my report.  I reviewed the --

8        some of the records that were given to me

9        because there were a lot of records.  Most of

10       them are listed in my report.  So I went

11       through some, but not all of that.  I did for

12       the report, but for the preparation of this.

13       And then I was given -- I may have gone

14       through it before, too, but I was given

15       reports by a Dr. Vapnek, a Dr. Valvo, and

16       Dr. Knapp.

17   Q.   Okay.  So you took -- you reviewed those three

18       reports in preparation for today?

19   A.   Right, and the other things that I mentioned.

20   Q.   Okay.  Anything else that you reviewed?

21   A.   No, just -- and I said some of all of the

22       records I reviewed before.

23   Q.   Okay.  Now, has Matthew Raymond ever been a

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1        patient of yours?

2    A.  I saw him in my office.

3    Q.  Okay.  Outside the realm of you providing

4        expert witness services in this case and

5        meeting with Mr. Raymond for those purposes,

6        has he ever been a patient of yours?

7    A.  I only saw him the one time.  I only saw him

8        the one time.  I didn't give him any

9        treatment.

10   Q.  And has any members of Mr. Raymond's family

11       ever been a patient of yours?

12   A.  Not that I am aware of.

13   Q.  And did you know Mr. Raymond at all before

14       agreeing to provide him with expert witness

15       services in this case?

16   A.  I did not.

17   Q.  And did you know anyone from Mr. Raymond's

18       family prior to agreeing to provide

19       Mr. Raymond with expert witness services in

20       this case?

21   A.  I do not.

22   Q.  Now, have you provided expert witness services

23       in other cases in the past?

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    A. I have.

2    Q. Approximately how many times have you provided

3       expert witness services?

4    A. Do you mean actually went to court?

5    Q. No, I mean, in any aspect from just reviewing

6       documents or medical records to all the way to

7       going to court for a trial.  Any time you were

8       hired and compensated to provide expert

9       witness services.  I am just kind of

10      interested in how many times that was and you

11      can give me an approximate number.

12   A. So you mean --

13          MS. ROSENFELD:  Objection.  Objection to

14      the form.  You can answer, Dr. Leitch.  It's

15      okay.

16   A. You mean just like preparing an independent

17      medical exam; is that what you're saying?

18   Q. Anything that was related to you being

19      compensated as an expert witness.

20   A. Okay.  So --

21          MS. ROSENFELD:  One second, Dr. Leitch,

22      please.  Objection to the form.  You can

23      answer.

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    A.  So I believe I started this -- doing some of

2        this in about 1999 or 2000.  I do -- I mean,

3        of course it's increased and decreased over

4        the years but I do at least one -- I probably

5        do at least one a week since I began.

6    Q.  Okay.  And you said at least one a week

7        starting in 2000?

8    A.  Right.  I am giving variability.  For

9        instance, like COVID, I didn't do anything for

10       a year, and then I might have done a little

11       more afterwards.  And it's probably waxed and

12       waned depending on what other responsibilities

13       I had, but I think it would average out to be

14       about once a week.

15   Q.  Okay.  Let me put it this way:  Approximately

16       how many expert reports have you prepared as a

17       medical doctor?

18   A.  I -- I don't know.  I mean, I gave the

19       estimate based on the 20 years of how often I

20       did them.  Beyond that, I'd have to just get a

21       calculator and figure it out.

22   Q.  Okay.  Are you able to give an approximation

23       like over a hundred, under a hundred?

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    A. Oh, definitely over a hundred.

2    Q. Okay.  And how many times have you appeared in

3       court to provide testimony as an expert

4       witness?

5    A. So there are years where I don't go to court

6       at all and then years where I may go two or

7       three times.  So, again, I began going to

8       court probably in about 2000 so even if we do

9       once a year might be an average because

10      sometimes, as I said, it might be a couple

11      years I don't go I think that would be a

12      reasonable -- so I probably would have gone at

13      least once a year over all those years.

14   Q. Okay.  Just so I get a number to it, would you

15      say approximately 15 to 20 times?

16   A. Oh, no, more than that.

17   Q. Okay.

18   A. Right?  I mean, we're talking about how many

19      years?  2000, so that that's at least 22

20      times.

21   Q. So maybe between 20 and 30 times?

22   A. In my mind it would be more than that.  That

23      could be wrong.  I would think I have been to

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    court -- I would think I have been to court

2    about 50 times so maybe my estimate is not

3    very good.  I don't know, maybe not, but I

4    think it -- you know, they're such long,

5    disturbing events they seem to stick in your

6    mind as very frequent so maybe between 25 and

7    45.

8   Q. Okay.  Thank you.

9         Now, all the times that you have

10    provided expert witness services in the past,

11    has that always been in the field of

12    neurology?

13   A. Yes.

14   Q. Okay.  And all of the times that you provided

15    expert witness services in the past, has that

16    always been on behalf of a plaintiff who was

17    injured?

18   A. No.

19   Q. Okay.  Have you provided services to

20    defendants in cases?

21   A. That's correct.

22         MR. MACKEY:  If we can go off the record

23    for a moment.

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1            (An off-the-record discussion was held.)

2

3        BY MR. MACKEY:

4    Q.  Dr. Leitch, have you ever provided expert

5        witness services for state employees?

6    A.  Meaning they have been injured by the state or

7        they were -- I don't know what you mean.

8    Q.  Well, all right, let me maybe narrow it down.

9    A.  I don't know who all the people worked for.

10   Q.  Let me ask you this:  Have you ever provided

11       expert witness services for the Department of

12       Corrections being a defendant in the lawsuit?

13   A.  So I've done prison cases before.  I don't

14       know whose side I was on, if that's what you

15       mean, who hired me.

16   Q.  And when you say "prison cases," what do you

17       mean by that?

18   A.  I just mean the person either was in prison at

19       some point, like they could have been -- I

20       could have seen them for a car accident and

21       they subsequently got incarcerated, or it

22       could be they were injured while incarcerated,

23       or -- there was a couple different cases but I

1    have been plaintiff and defense in those.  Not

2    all of them had anything to do with being in

3    prison.  It's just where the person was.

4  Q. Okay.  Now obviously with this case you're

5    providing expert witness services for an

6    inmate whose alleged to have been injured by

7    corrections officers.

8  A. Could I just clarify my other statement?  I

9    also wouldn't even know if they were like

10   state or federal.  I don't know --

11 Q. Okay.

12 A. I don't know.  Yeah, that's -- sorry.

13 Q. Okay, I understand.

14 A. I didn't mean to interrupt, but I was thinking

15   I don't really know what the difference is.

16 Q. That's fine.

17       So what I was saying is with this

18   particular case you're providing expert

19   witness services for an inmate who alleges he

20   was injured by corrections officers at the

21   Auburn facility.  Have you in the past

22   provided expert witness services for inmates

23   who have been injured by corrections officers?

1    A. I believe I have on a few occasions.

2    Q. Okay.  Are you able to give an approximate

3       number of how many times you have done that?

4    A. I believe I did it once where I was asked by

5       the defense and once when I was asked on the

6       plaintiff.

7          Were you asking me specifically about

8       state or just any prison thing.

9    Q. Any prison.

10   A. There might have been three and they would

11      have been two the defense asked me and one

12      that plaintiff asked me.

13   Q. Okay.  Do you remember what the most recent

14      one was?

15   A. I -- who the person was?

16   Q. Like how recent?  What was the last time you

17      did or you provided services for an inmate who

18      was injured while being incarcerated?

19   A. So like in the last five years I believe I

20      have been to a prison three times.  I believe

21      once for a plaintiff, once for a defense, and

22      then I think one was the person just was in

23      prison.  I don't think -- I think they were

1      injured before.

2   Q. Okay.

3   A. I don't remember what side -- what side hired

4      me for that one.

5   Q. Now, have you ever provided expert witness

6      services for the law firm of Lipsitz Green

7      Scime Cambria?

8   A. I believe I have.

9   Q. Okay.  Do you know how many times?

10   A. I do not.

11   Q. Do you recall when the most recent time was?

12   A. I don't recall.

13   Q. Okay.  Do you recall the attorney you worked

14      with?

15   A. No.

16   Q. How many times, if you know, that you have

17      dealt with Lipsitz Green?

18   A. I don't recall.  The only reason I recall is

19      because often you have to put the -- not the

20      attorney's name but you put the name of the

21      firm on the report, and that's the only reason

22      I recall the name of the firm.

23   Q. Okay.  And do you recollect at all if you were

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1        representing a plaintiff or a defendant -- or

2        providing services for a plaintiff or

3        defendant in those cases?

4    A.  I do not.  I also think there were a couple

5        occasions where I had a patient who was suing

6        for something and used that firm.

7    Q.  Okay.

8    A.  So, I wasn't really requested by the firm, but

9        I was involved with them.

10   Q.  Oh, okay.

11   A.  It was my patient kind of thing.

12   Q.  The person was already a pre-existing patient

13       of yours?

14   A.  That's correct.

15   Q.  Okay.  Now, have you ever provided deposition

16       testimony -- well, strike that.

17           Other than today, how many times have

18       you provided deposition prior to today?

19   A.  Depositions?  I think I have only done like

20       four or five depositions, maybe not even that

21       much, three or four.

22   Q.  Okay.  And were they always -- were you always

23       appearing as an expert witness for those

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1       depositions?

2    A. Yes.

3    Q. And have you authored any publications?

4    A. Yes, but it was a long time ago.  I'd have to

5       look at my CV to even say what it was.

6    Q. Okay.  Any recollection at all of what the

7       topic was?

8    A. I believe it was -- it was so long ago.  It

9       was an astrocyte model, and there was one on

10      stroke.  Those are the only two I can think

11      of.

12   Q. What was the first one?  I didn't hear that.

13   A. Astrocytes.  It's a type of brain cell.

14   Q. Okay.  And how long ago do you think you --

15   A. Oh, this was -- I would think late 90s.  It

16      was like the end of my training.  I am not a

17      researcher.

18   Q. Okay.  Have you ever done any publications

19      regarding neurogenic bladder?

20   A. No.

21   Q. Have you ever done any independent research on

22      the condition of neurogenic bladder?

23   A. What would you mean by independent researcher?

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1          Where I used my patients as subjects?

2    Q.  Well, any type of research I guess really.

3          Have you ever done any research to really

4          learn more about the condition of neurogenic

5          bladder?

6    A.  Oh, to read on it?  I keep up to date on all

7          that, and neurogenic bladder is a topic that

8          comes up on a regular basis in our review

9          journals.  Like every two to three years they

10         come up, so every two to three years when it

11         comes up I review it all again.

12   Q.  Okay.  Have you ever done any type of -- with

13         respect to neurogenic bladder, have you ever

14         done any type of research in an attempt to

15         possibly create a new or different way of

16         treating the condition?

17   A.  No.  As I said, I am not a researcher.  At the

18         VA, as you can imagine, we have many men with

19         many bladder problems that we see so a good

20         part of our practice involves neurogenic

21         bladder due to a variety of neurologic causes.

22   Q.  Okay.  So it's safe to say you have a good

23         number of patients that they may have that

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

```
 1          neurogenic bladder condition?
 2     A.  Yes, I would -- I have some in my private
 3          practice as well, but at the VA it really is a
 4          pretty large population that we're either
 5          screening for it, they don't really know the
 6          cause of the bladder, so we're investigating
 7          for it.  We're treating it, monitoring it,
 8          that kind of thing, both as outpatients and
 9          inpatients that might more acutely present
10          with neurogenic bladder.
11     Q.  Sorry, I didn't mean to interrupt you.
12     A.  That's okay.
13     Q.  Have you ever diagnosed a person with
14          neurogenic bladder?
15     A.  Correct.  That's just part of like -- daily
16          part of the neurologic job that I have.
17     Q.  Okay.  Now, I know earlier you mentioned you
18          had testified at trial on numerous -- that you
19          had testified at a trial on numerous
20          occasions.  Has there ever been an instance
21          where you were not qualified as an expert
22          witness by a judge?
23     A.  Not that I know of.
```

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    Q. Dr. Leitch, do you have any felony

2       convictions?

3    A. I do not.

4    Q. Do you have any misdemeanor convictions?

5    A. I do not.

6    Q. Have you ever been disciplined for actions you

7       have taken as a medical doctor?

8    A. I have not.

9    Q. Have you ever been sanctioned by the ethics

10      board?

11   A. I have not.

12   Q. Have you ever been sued for medical

13      malpractice?

14   A. I have not.

15   Q. Have you ever had a court decide to give your

16      medical opinion little weight?

17   A. I -- I am not even sure what that means.  I

18      don't know what you mean.

19   Q. Have you ever had a court decide that your

20      opinion was not supported by the facts of the

21      case?

22          MS. ROSENFELD:  Objection to the form.

23      You can answer.

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    A. Not that I know of.  I mean, I don't know
2       anything either way.  No one has ever talked
3       about any of that to me.
4    Q. What do you mean by that?
5    A. Well, I testify and then I leave, you know
6       what I am saying.  I don't have like -- I
7       often don't have any relationship with the
8       lawyer to discuss that, so I have never -- I
9       have never been told anything like that.
10   Q. Okay.  Now, I think you mentioned earlier you
11      at one point physically examined Mr. Raymond,
12      correct?
13   A. That's correct.
14   Q. Do you remember when that was?
15   A. August 25th, 2020.
16   Q. And where did that exam take place?
17   A. At my office in North Tonawanda.
18   Q. And you examined Mr. Raymond just the one
19      time, correct?
20   A. That's correct.
21   Q. Who was present other than yourself and
22      Mr. Raymond?
23   A. His wife, Ms. Michelle Raymond.

1    Q. Anyone else present?

2    A. No.

3    Q. Did you talk with Michelle Raymond at all

4       about Matthew's -- or Mr. Raymond's condition?

5    A. She was involved -- the section I report the

6       history of the present illness, she was -- she

7       spoke but I didn't speak to her separate from

8       Mr. Raymond, just from when she was in the

9       office.

10   Q. So is it fair to say when you were obtaining

11      information from Mr. Raymond you basically

12      were getting information from both he and his

13      wife?

14           MS. ROSENFELD:  Objection to the form.

15   A. Everything I wrote down was directly from

16      Mr. Raymond.  So if she said anything, I would

17      have verified it with her -- with him.

18      Otherwise I would write in there "Mrs. Raymond

19      said," and I don't think that's anywhere.

20   Q. Okay.  Okay.  Approximately how long did the

21      examination take?

22   A. We were in there 70 minutes, 7-0.

23   Q. What type of -- or what tests did you perform

1        on Mr. Raymond during his examination?

2   A.   So I did a full neurologic exam.  I can

3        explain what that is if you want me to or --

4   Q.   Yes, please.

5   A.   Sure.  So it's a general physical exam, and

6        then the next thing I look at is mental status

7        which would involve level of arousal,

8        orientation, attention, concentration, short-

9        and long-term memory, cognition, fund of

10       knowledge, mood, affect.

11            And then after the mental status it's

12       cranial nerves, and those are the nerves that

13       are the direct extension of the brain.  So

14       there is 12 of them and so that would involve

15       vision, visual field, movements of the eyes,

16       sensation and movement of the face, the

17       tongue, the uvula, trapezius and

18       sternocleidomastoid, just sort of gross

19       testing of the hearing.  That's all for

20       cranial nerves.

21            And then motor I look at power, meaning

22       strength; tone, looking at whether it's

23       increased or decreased; bulk, which we think

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    of as somebody who works out a lot getting

2    hypertrophy.  Someone who doesn't move their

3    arm for whatever reason, their extremity, they

4    get atrophy.  So I look at power, tone, and

5    bulk and all of the muscles of the upper and

6    lower extremity.  That's done usually by

7    confrontation, meaning I would tell them to

8    raise their arms like this and then I would

9    push down and do that for all the muscles.

10    Coordination, observation of the muscles

11    because there is a number of abnormalities you

12    can see just with observation.  Walking, toe

13    and heel walking.

14        And then I do sensory which is broken

15    down into the different sensory modalities,

16    pinprick which I don't actually use a pin for

17    but it's called pinprick, light touch,

18    vibration, position sense, and then the

19    reflexes in the upper and lower extremities.

20    And then in addition I do range of motion,

21    straight leg raising.  I think that's

22    everything I did on him, and that's all

23    documented.

1    Q.  I am sorry?

2    A.  And that's all documented in the report.

3    Q.  Okay.  Did you do any -- during the

4        examination of Mr. Raymond, did you test to

5        determine whether he provides Babinski reflex?

6    A.  Yes, that's -- under deep tendon reflexes

7        where it says plantar response, that's just

8        another word for the Babinski.  They're the

9        same thing.

10   Q.  You mention it as deep tendon?  I'm sorry.

11   A.  Deep tendon reflexes.  You think of the knee

12       jerk, but there's reflexes -- there is three

13       in the arm and two in the leg, the knee and

14       the ankle actually.

15   Q.  Okay.  So deep tendon reflexes is what you're

16       referring to as testing for the Babinski

17       reflexes?

18   A.  No, no, no, the plantar response.  I meant

19       under the category deep tendon reflexes.

20   Q.  Oh, okay.

21   A.  You will see it says "plantar response was

22       downgoing," that's the Babinski.

23   Q.  And during your examination of Mr. Raymond,

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    did you test and determine whether he had any

2    lower extremity spasticity?

3    A. I did.

4    Q. And where is that identified in your report?

5    A. Under motor, where it says "power, tone," tone

6    is the -- is whether the person is spastic,

7    rigid, or normal or decreased tone.  He was

8    normal in the upper and lower extremities.

9    Q. Okay.  So that test came back negative?

10   A. That's correct.

11   Q. And with the test we were just discussing,

12   the -- I think you called it the plantar

13   response?

14   A. Yeah, the Babinski or the plantar response.

15   Q. Did that come back negative?

16   A. That's right, it did.  It came back as normal.

17   Q. When you spoke with -- let me back up.

18          I realize you met with Mr. Raymond one

19   time.  Have you ever spoken to him otherwise,

20   or was that the only time you have ever spoken

21   with him?

22   A. I believe that was the only time.

23   Q. Okay.  Did Mr. Raymond describe to you the

1      physical assault that he alleged happened on

2      September 14th of 2016?

3   A. So he stated he was assaulted on 9/14/2016.

4      He stated that he was struck in the head and

5      neck.  He said since the -- oh, he told me his

6      other problems.

7   Q. Did Mr. Raymond describe how he was hit in the

8      head and neck?  And what I mean by that, was

9      it with fist?  Was it with objects?  Was it

10     open, closed fist?  You know, did he give any

11     description on those?

12  A. He stated --

13         MS. ROSENFELD:  Objection to the form.

14  A. He only stated what I repeated but he was very

15     upset talking about it, so it wasn't something

16     I would probably press him on.

17  Q. He was very what?  I'm sorry.

18  A. Upset.

19  Q. Upset.

20  A. Very upset when he had to sort of relive it,

21     so all he wanted to say was he was struck in

22     the head and the neck.

23  Q. Okay.  So he didn't really go into much detail

1           about it?

2                MS. ROSENFELD:  Objection to the form.

3       A. No.

4       Q. Did Mr. Raymond identify the names of any

5           individuals who he claims assaulted him?

6       A. We didn't discuss that.  We just talked about

7           the -- his medical problems.  I didn't ask him

8           anything like that.

9       Q. Did he -- did Mr. Raymond physically show you

10          where on his body he was hit?

11      A. All he did was state that he was struck on the

12          head and the neck.  And as I said, I didn't

13          press him.

14      Q. Okay.  So he didn't show any particular areas

15          of his body where he was actually hit?

16      A. I didn't ask him to, and he did not offer.

17      Q. Now, did Mr. -- again, with respect to the

18          alleged assault of September 14th, 2016, did

19          Mr. Raymond state to you or tell you what

20          injuries he sustained immediately after the

21          alleged assault?

22      A. What he stated was since the assault he had

23          memory problems, had to write everything down,

1     memory problems increased, that he was

2     forgetful, that he had personality changes,

3     that he had sleep problems, headache,

4     lightheadedness, wooziness, and then discussed

5     the bladder issues.

6  Q.  Okay.  Did he specify at all -- I guess what I

7     am more interested in what immediate injuries

8     he claimed to have suffered the day of being

9     allegedly attacked?  I understand he may have

10    explained to you other symptoms that he

11    experienced later on, but I am more interested

12    in if he described to you what injuries he

13    sustained immediately after the assault.

14       MS. ROSENFELD:  Objection to the form.

15  A.  Well, as I said before, he was very upset

16    discussing this and this is sort of a common

17    thing at the VA where we discuss incidents

18    that occurred in the service, and many of the

19    people similar to Mr. Raymond have

20    posttraumatic stress and we really wouldn't --

21    I wouldn't really keep pressing him about the

22    actual events because I am -- the events of

23    that day was too upsetting and often that's

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1      the end of the exam and you don't get any

2      further, and that's where I felt we were

3      heading if we kept talking about reliving that

4      day.

5  Q.  Okay.

6  A.  I figured I -- I mean, I think I can get that

7      from what was documented around the time of

8      the incident, not at some point later,

9      especially since it was causing him a lot of

10     distress.

11 Q.  Okay.  I understand.  Is it fair to say then

12     that Mr. Raymond when you met with him did not

13     go into any detailed description of what

14     injuries he sustained that day?

15         MS. ROSENFELD:  Objection.

16 A.  Yeah, he appeared --

17         MS. ROSENFELD:  Objection to the form.

18 A.  It appeared that he could not.

19 Q.  He was just too upset to do that?

20 A.  That's correct.

21 Q.  Okay.  Did Mr. Raymond at all explain to you

22     when he first started having an inability to

23     urinate?

1    A.  Only that it started after the accident.

2    Q.  Okay.  Did he identify when after the

3        accident?

4    A.  It appeared that he could not based on being

5        upset, but also his memory of that time period

6        didn't seem particularly clear, which is often

7        what happens with people with head injuries.

8    Q.  Okay.  So -- strike that.

9            Did Mr. Raymond identify where on his

10       body he experienced pain because of the

11       alleged assault?

12   A.  As I stated just what's in my report he stated

13       he was struck in the head and the neck, and

14       beyond that he appeared both too upset and

15       having poor memory of the immediate events.

16   Q.  Okay.  Now you mentioned memory loss.

17       Mr. Raymond told you he had memory loss?

18   A.  Well, he stated that his memory has not been

19       as good since the incident.

20   Q.  Okay.  Did he describe to you when he started

21       having issues with his memory?

22   A.  That it began after the incident.

23   Q.  Okay.  Did he specify what he meant by after?

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    A. He did not.

2    Q. And I understand that Mr. Raymond told you he

3       experienced painful urination, correct?

4    A. What he told me is that he used a suprapubic

5       catheter, has pain in the abdominal area, the

6       catheter is painful, frequent bladder,

7       urinary, and kidney infections.  Those are his

8       actual words.

9    Q. Okay.  Did he ever tell you, to your

10      recollection, that he experienced pain while

11      urinating?

12   A. The only thing I recall is just what I wrote

13      down in this instance.

14   Q. Do you have your report in front of you?

15   A. I do.

16   Q. Okay.  I will put it up on the screen so it's

17      available for everyone, but feel free to just

18      look at the one you have in front of you.

19         Dr. Leitch, what I put on the screen for

20      everyone else is what we have marked as

21      Exhibit 10 for today's deposition, which is

22      your report.  Do you recognize this document?

23         MS. ROSENFELD:  I don't think you have

1    Q.  Did you -- did Mr. Raymond or any of the

2        medical records you reviewed indicate that he

3        experienced headaches before the alleged

4        assault because of the seizures he is

5        experiencing?

6    A.  No, that's what I was saying.  I don't see any

7        complaints of headaches.  And there is a

8        number of times he is seen for seizures, but I

9        don't see any significant headache associated

10       with those seizures either.

11   Q.  Okay.  Next paragraph which I am highlighting

12       references that Mr. Raymond stated to you that

13       since the incident he has feelings of

14       lightheadedness and wooziness.  Do you see

15       that?

16   A.  That's correct.

17   Q.  Okay.  Were those his words, your words?  How

18       did he describe his feelings?

19   A.  I believe he said that he felt lightheaded.

20       And then I usually go on to ask is it a

21       spinning sensation, is it a woozy sensation,

22       is it unsteadiness, so those are added in.  He

23       denied spinning because I would have asked him

1      that specifically.  He denied feeling

2      unsteady -- I am sorry, he said he feels

3      unsteady but those I would have asked him.  I

4      believe he just said he felt lightheaded.  So

5      woozy, spinning, unsteady was just trying to

6      define what he meant.

7    Q. Okay.  And what is your -- when you use the

8      word "wooziness," what do you mean by that?

9    A. So this feeling of woozy would be sort of

10     wobbly, unsteady.  We think of it as more of a

11     common term.  Different than spinning

12     sensation because sometimes when people are

13     lightheaded they're really describing spinning

14     which refers to vertigo which is a different

15     set of problems.  So woozy, more like

16     lightheaded woozy where you sort of --

17     sometimes when people stand up and they just

18     feel a little off, that would be that woozy

19     sensation, that feeling kind of off.

20   Q. Okay.  Now feelings of lightheadedness and

21     wooziness, would that -- is that a common

22     symptom of migraine headaches?

23   A. If it occurs during the headache, but he has

1          this outside of the headache.

2    Q.  Okay.  So he doesn't experience

3          lightheadedness while having a headache?

4    A.  He may, but what I am talking about in this

5          paragraph is a total separate issue.  He has

6          this feeling -- whether he is in the middle of

7          a headache or not, this feeling of

8          lightheadedness and wooziness and unsteadiness

9          with walking.

10   Q.  Okay.  And this description of feeling

11         unsteady with walking, was that Mr. Raymond's

12         description or is that more your terms,

13         terminology?

14   A.  I believe I just asked him "do you feel

15         unsteady when you walk" and he said yes.

16   Q.  Okay.  Did you notice Mr. Raymond appearing

17         unsteady while walking?

18   A.  So in the physical exam under gait, I

19         described him as being wide based and that

20         usually occurs when people have balance

21         issues, and not consciously, but their legs --

22         their stance and their way of walking has the

23         legs spread out a little bit.

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

```
1      Q. Scrolling onto page 3 so you're referring to
2         this entry?
3      A. Yep, yes.
4      Q. That's -- okay.
5            MS. ROSENFELD:  Pat, would you mind just
6         trying to make -- I don't know if it's
7         possible, just make your screen even bigger?
8         I don't know, is it possible?  I just can't
9         really see it.  I mean, I have my copy open
10        too.
11           MR. MACKEY:  I increased it.  Did that
12        help?
13           MS. ROSENFELD:  No, not really.  I will
14        just use my copy.  As long as the witness can
15        see what she needs, I am fine.
16           THE WITNESS:  Yeah, I am actually good
17        with both.
18           MS. ROSENFELD:  Okay, great.
19           THE WITNESS:  Maybe a little bit
20        smaller.
21
22        BY MR. MACKEY:
23     Q. So just to go back on your comment about his
```

1        walking, you mentioned that he has -- when you

2        observed Mr. Raymond walking, his legs are

3        wide set apart; is that what you saw?

4    A.  That's correct, wider than normal.

5    Q.  Are you able to describe how much wider than

6        normal?

7    A.  No, I -- there is no real measurement for

8        that.  It's a little different depending on

9        the height and the size, the build of the

10       individuals.

11   Q.  Okay.  So your opinion is that someone with a

12       wide gait generally has some unsteadiness

13       walking?

14   A.  So a wide-based gait would be an abnormal

15       gait.  It could be due to a number of things,

16       but to be wide based would be an abnormal

17       finding.

18   Q.  Did you ask Mr. Raymond whether that, his gait

19       that you observed, had changed at all since

20       the alleged incident?

21   A.  Well, he stated he felt unsteady just since

22       the incident.  He felt unsteady with walking.

23   Q.  Okay.  Did he identify exactly or specifically

1       when he started experiencing an unsteady

2       walking?

3    A.  Just after the incident.  This -- that kind of

4       response is typical with anybody of a head

5       injury.  They often don't know the exact

6       moment that they realized their gait was off.

7    Q.  I am going to go back to page 2 of your

8       report.  At any time did Mr. Raymond mention

9       to you that in the past he was diagnosed with

10      suffering depression?

11   A.  He did not describe depression, but I was

12      aware of it from his medical records.

13   Q.  Okay.  Upon your review of the records, do you

14      agree that the depression that Mr. Raymond

15      experienced, that was occurring prior to the

16      alleged incident of September 14th, 2016,

17      correct?

18   A.  That's correct.  He was seen at Central New

19      York Psychiatric Center.

20   Q.  Let's take another look at your report which

21      is on the screen.  This is page 3 at the top.

22      There is a reference to medical history and a

23      head injury in 2012.  Do you see that?

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    A. Yes.

2    Q. Did you have any discussions with Mr. Raymond

3       about this particular injury in 2012?

4    A. Yes, the history came from him.  This is his

5       part of it.

6    Q. Okay.  So your entry on page 3 of the report,

7       that's pursuant to statements provided to you

8       by Mr. Raymond?

9    A. Correct.

10   Q. Okay.  So he mentions "he was hospitalized for

11      two to three weeks."  Did he, Mr. Raymond,

12      identify why he was in the hospital for that

13      length of time?

14   A. He said he was struck in the head.  He

15      developed -- he said he was struck in the head

16      and he was hospitalized for it for two to

17      three weeks.  That's what he said.

18   Q. Okay.  Did he -- did Mr. Raymond explain to

19      you why he was at the hospital for such a long

20      period of time?

21        MS. ROSENFELD:  Objection to the form.

22   A. As I said, he said he was struck in the head

23      and then he was hospitalized for two to three

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1      weeks.

2   Q. Okay.  I guess I am just wondering if he

3      identified more specifically why there was a

4      need for him to be at the hospital for two to

5      three weeks.  I am just wondering if he

6      specified more about what injuries he

7      suffered.

8          MS. ROSENFELD:  Objection to the form.

9   A. Just what I wrote in the report.

10  Q. Okay.  Now later on in that portion of the

11     report he -- it looks like Mr. Raymond said he

12     developed seizures.  Did Mr. Raymond identify

13     that he started experiencing seizures after

14     being hit in the head with the beam?

15  A. That's correct.

16  Q. Okay.  And did he explain to you what exactly

17     those seizures are?

18  A. No, just that he had seizures.

19  Q. Okay.  Were you able to determine on your own

20     by speaking with Mr. Raymond and reviewing his

21     medical records why he continues to experience

22     seizures since the incident of 2012?

23  A. I didn't get that from Mr. Raymond.  I am not

1  so sure how much he understands, but I know on

2  January 25th, 2014, his EEG was active, showed

3  bifrontal relatively frequent sharp activity

4  which is consistent with epilepsy.

5 Q. Okay.  Is it your understanding that these

6  seizures are epileptic seizures?

7 A. The words are kind of interchangeable.

8 Q. I am sorry?

9 A. The words are interchangeable.

10 Q. What do you mean by that?

11 A. Well, epilepsy is sort of the overall term and

12  then there are different types of seizures.

13 Q. Okay.  Are you aware of what type of seizures

14  Mr. Raymond experiences?

15 A. I know that he has generalized seizures.  If

16  there's a focal onset or if it just comes

17  generalized, I am not sure.  I think they're

18  just generalized seizures as per that EEG, but

19  I am not entirely sure whether it's focal and

20  then generalizes or it's just generalized.

21 Q. Okay.  Later in that particular paragraph,

22  Mr. Raymond appears that he said that "his

23  seizures are much worse since the 2016

1          incident."

2     A.   That's correct.

3     Q.   Now, is it common for seizures to increase

4          after someone has injuries to their head?

5     A.   It can occur.  It can have an increase in

6          seizures.

7     Q.   Okay.  And he said they were "worse since the

8          2016 incident."  Do you know what he meant by

9          worse?  And what I mean by that, does he mean

10         they last longer, they occur more often?  What

11         did he mean by worse?

12    A.   It's my understanding he had increase in

13         severity and frequency.

14    Q.   The next entry is social history and it

15         mentions that "Mr. Raymond stated that he is

16         working as a union bricklayer, master welder,

17         and equipment operator."  Now are those jobs

18         that Mr. Raymond was doing at the time he met

19         with you?

20    A.   That was my understanding.

21    Q.   And did he describe to you how often he was

22         working?

23    A.   No.

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    Q. Okay.  So he didn't say if he was full time or

2       part time or anything like that?

3    A. No.

4    Q. And did Mr. Raymond mention, you know, he

5       works X amount of hours a week?  Did he say

6       anything like that?

7    A. He did not.

8    Q. Okay.  Did Mr. Raymond mention that he --

9       because of his condition, his neurogenic

10      bladder, that he has difficulty working as a

11      union bricklayer, master welder, and equipment

12      operator?

13   A. So I don't know if we talked about it directly

14      with just work, but what he -- the subject

15      that sort of went on throughout the

16      examination was that all of his life is more

17      difficult because of the urinary problems.

18   Q. Okay.  But he didn't go into detail about how

19      it makes his work more difficult?

20   A. I would -- my feeling was that he felt

21      everything was more difficult.  We'd have to

22      go through what wasn't more difficult, meaning

23      everything really was the issues that -- there

1        was nothing he mentioned that wasn't worsened

2        by the urinary symptoms.  It would be hard for

3        me to identify what he felt was not affected.

4   Q. Now, did he ever say to you -- did Mr. Raymond

5        ever state to you he would have to stop

6        working because of the neurogenic bladder

7        condition?

8   A. We didn't talk about that.

9   Q. The next entry is about medications.  There is

10       a reference to Keppra.  Are you familiar with

11       that medication?

12  A. Yes.

13  Q. What exactly is that for?

14  A. It's an antiepileptic.

15  Q. Okay.  And the next one is, I am not sure if I

16       am going to pronounce this correctly,

17       zonisamide?

18  A. Yes, also an antiepileptic.

19  Q. Okay.  So is Mr. Raymond taking any type of

20       medication for his current condition of the

21       neurogenic bladder?

22  A. He didn't have his medication list.  These are

23       the only two that I could work my way out from

1          him.  I don't -- he didn't know his
2          medications so these I could find in the
3          records and I said "are you still taking those
4          medications" and he gave me an affirmative.
5     Q.  Okay.  Did Mr. Raymond state that he was
6          taking some sort of medication for his
7          neurogenic bladder?
8     A.  He didn't know his medication.
9     Q.  I understand that, but he did indicate that he
10         was taking some medication?
11    A.  Again --
12             MS. ROSENFELD:  Objection to the form.
13    A.  Again, he didn't know his medication.
14    Q.  Okay.  I guess maybe when you say "he didn't
15         know his medication," do you mean he didn't
16         know the name of the medication?
17    A.  He didn't know the name.  He didn't know what
18         the medications were that he was on for.  He
19         didn't seem to have a real -- he didn't seem
20         to have much of an understanding of his
21         medications that I could tell.
22    Q.  Okay.  So is it fair to say that Mr. Raymond,
23         at least when he met with you, he wasn't aware

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1          if he was taking medication for his neurogenic

2          bladder?

3                MS. ROSENFELD:  Objection to the form.

4     A. He just didn't know what medications he was

5          on.  The only ones I found from the records

6          were Keppra and zonisamide so I asked him

7          specifically about those.

8     Q. Okay.  The next entry is about your physical

9          examination of Mr. Raymond.  Did you find --

10         the entry that you put in your report, is

11         there any reference to anything abnormal with

12         his physical examination?

13    A. So he had decreased attention and

14         concentration, and this was manifested by just

15         repeatedly having to redirect him to what the

16         question was to get him to focus on the

17         answer, sometimes repeating myself over and

18         over.

19    Q. Okay.  Well, let's back up because I was more

20         looking at the part I had highlighted, the

21         physical examination.  I was just wondering if

22         you're making any reference to any abnormal

23         findings in your description of the physical

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1      examination.

2  A.  No, there was no abnormality there.

3  Q.  Okay.  So with respect to the mental status

4      you mentioned that he had decreased attention

5      and concentration; is that something you

6      observed yourself, or is that something Mr.

7      Raymond told you?

8  A.  No, these are my -- these are observations.

9  Q.  Okay.  And what did you observe to determine

10     that he had decreased attention and

11     concentration?

12 A.  As I said, repeatedly having to ask him the

13     same questions, repeatedly have to refocus his

14     attention to what we were doing.

15 Q.  Okay.  And did you ask Mr. Raymond if he had

16     those type of problems in the past prior to

17     the incident?

18 A.  As I said before, he told me he never had

19     problems with his memory or understanding

20     before this, with his memory.

21 Q.  Okay.  Now the next entry says "normal short-

22     and long-term memory."  What do you mean by

23     that?

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    A.  So he was able to explain to me -- the only

2        things I can really verify are things in the

3        records, so he was able to explain to me

4        things from the records that was verifiable so

5        I found that normal.  If he has other more

6        subtle things wrong, that's not the level of

7        testing I can do.  But I asked him things

8        about what occurred after the incident and

9        later with his treatment, and he seemed to

10       remember that.

11            I mean, I guess you could say -- it's

12       hard to know whether not knowing any of your

13       medication is a memory problem.  It could just

14       be he never had paid attention to it so he

15       didn't -- he can't have -- if his attention is

16       decreased, then it never makes its way into

17       memory.

18   Q.  Okay.  You mentioned here that Mr. Raymond has

19       "normal short- and long-term memory."  But if

20       we scroll up to page 1 of the report, it says

21       Mr. Raymond complains of memory problems.  Do

22       those seem to contradict each other?

23   A.  Well, he complains of memory problems but on

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1    exam I thought it was more his attention and

2    concentration were the issues.  So if you

3    don't attend and you don't concentrate, you

4    don't get it into your memory.  But when I

5    asked him concrete things I could verify, it

6    seemed he could remember things.

7    Q. Okay.  So your opinion he has a short- and

8    long-term memory that falls within the realm

9    of normal?

10   A. Correct.  I think his issues are with

11   attention and concentration.  I mean, I am not

12   a neuropsychologist but that's where I thought

13   his real issues were.

14   Q. Okay.  The next section I highlighted was

15   cranial nerves, and you provided some

16   information in your report about that

17   particular topic.  Did you find anything

18   abnormal with respect to Mr. Raymond's cranial

19   nerves?

20   A. I did not.

21   Q. The next section is with respect to motor.

22   Did you find anything abnormal regarding

23   Mr. Raymond's motor skills?

1    A.  The only thing I found was the wide-based gait
2        and he couldn't toe-and-heel walk consistent
3        with balance problems.
4    Q.  Okay.  So I see that, there's a reference,
5        "unable to perform toe-and-heel walk."  What
6        does that indicate if someone is unable to
7        perform a toe-and-heel walk?
8    A.  Another finding that would be consistent with
9        balance.
10   Q.  Okay.  Having a lack of balance or I think you
11       referred to it earlier as unsteady with
12       walking, is that a symptom of neurogenic
13       bladder?
14   A.  No, it would be a symptom of the head injury.
15   Q.  Then there is an entry about sensory.  Was
16       anything -- did you find anything abnormal
17       about Mr. Raymond's sensory?
18   A.  No.
19   Q.  Let me go back.  When you mentioned "unable to
20       perform toe-and-heel walk," could you explain
21       a little bit more what does that mean?  What
22       did you observe when you tried to do that?
23   A.  So I demonstrate and I go up on my toes and I

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

```
1        walk and I asked him to do it, and he -- he
2        couldn't do it.  I mean, if I forced him,
3        there is the concern of falling.  He could not
4        walk on his toes in any way that would be
5        safe, and he was not able to walk on his heels
6        in any way that would be safe so we halt at
7        that point.
8     Q. Okay.  So if he tried to walk on his toe or
9        tried to walk on his heel, he just couldn't do
10       it?
11    A. That's correct.
12    Q. Okay.  And does that mean he would just kind
13       of fall to the side, like he just wasn't able
14       to move forward doing that?
15    A. Just too unsteady.  I don't think he even took
16       a step.  I think he went up on his toes, too
17       unsteady.  Not that he couldn't support -- it
18       wasn't a strength issue.  It was just a
19       balance issue.
20    Q. Okay.  Now, I know we discussed his wide-based
21       gait earlier.  When Mr. Raymond walks, does
22       he -- to your observation does he appear to be
23       unsteady?
```

1    A. Well, that would be what a wide-based gait is.
2       The base widens out to decrease the
3       unsteadiness, but the appearance of the gait
4       is still abnormal.
5    Q. Okay.  The next page is page 4 of your report
6       and, again, this is Exhibit 10 for today's
7       deposition.  Here at the top of the page there
8       is a reference to deep tendon reflexes, and I
9       think we talked about this earlier a little
10      bit because it makes a reference to "plantar
11      response was downgoing bilaterally."  That I
12      think you explained was the same as a Babinski
13      reflex; is that correct?
14   A. Correct.
15   Q. And you said he -- nothing was abnormal about
16      that, correct?
17   A. Correct.
18   Q. Now with respect to the other portions of the
19      section, the deep tendon reflexes, did you
20      observe anything abnormal regarding
21      Mr. Raymond?
22   A. No abnormality.
23   Q. The next section is range of motion which I

1       just highlighted, and within this section did

2       you observe anything abnormal with respect to

3       Matthew Raymond?

4  A.  I did not.

5  Q.  So moving down on page 4 of your report, there

6       is an entry regarding September 13th of 2016

7       which is the day before the alleged incident,

8       the alleged assault, and you put an entry in

9       there regarding that particular date.  The

10      information you included, did that come from

11      Mr. Raymond or is that something you just

12      gathered from the records that you received?

13  A.  All of this section is just from the records.

14  Q.  Okay.  Did you have any discussion with

15      Mr. Raymond about this seizure that he had on

16      September 13th of 2016?

17  A.  He didn't even describe the seizure.  All he

18      said that he was assaulted on September 14th,

19      2016.  As I told you, talking about it was

20      very upsetting to him.

21  Q.  Okay.  I am actually talking about the seizure

22      he had on September 13th, the day before.  Did

23      you have any discussions with Mr. Raymond

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1      about that?

2   A.  No, no, I said just -- the only thing from

3      that time period was just the statement that

4      he was assaulted.

5   Q.  Okay.  Now within that paragraph regarding

6      September 13th of 2016, you mention that

7      Mr. Raymond complains of neck pain and

8      headache.  Do you see that?  I highlighted it

9      for you on the screen.

10  A.  That's correct.

11  Q.  Okay.  Did you have any discussions with

12     Mr. Raymond about complaints of neck pain and

13     headache from what happened on September 13th?

14  A.  We did not.

15  Q.  Did you ask him at all about what happened on

16     September 13th of 2016?

17  A.  As I --

18         MS. ROSENFELD:  Objection to form.

19  A.  I made attempts initially to discuss in detail

20     that whole time period, but he would become

21     just too upset.

22  Q.  Okay.  Well, I want to differentiate the two

23     things, the two dates, because I understand

1      what you're saying about September 14th where

2      he claims he was assaulted, and I know you

3      said earlier that he was reluctant to talk

4      about that, but I am really isolating my

5      questions on September 13th when he had a

6      seizure in his cell.  I am wondering if you

7      had any discussions with Mr. Raymond about

8      that particular seizure in the cell.

9    A.  So as I stated, Mr. -- we may isolate it but

10     Mr. Raymond sees this as all one event, and

11     every training I've had in posttraumatic

12     stress if people are becoming upset reliving

13     something you really can't put them through

14     it.  I mean, unless I was doing it -- unless I

15     was doing it in some sort of psychological

16     treatment, but I was not doing -- that was not

17     my purpose, so I really can't push somebody to

18     do that.

19   Q.  No, I understand.

20          So just so it's clear, at no time during

21     your meeting with Mr. Raymond did he explain

22     to you about neck pain and headache that he

23     experienced on September 13th; is that

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

```
 1        correct?
 2   A.  He did not.
 3   Q.  And from what I understand, you didn't ask him
 4        any questions about that, correct?
 5   A.  Oh, I asked him about -- I asked him about all
 6        this time period, but I didn't get any
 7        answers.
 8   Q.  Okay.  When you say you didn't get any
 9        answers, was he -- did he state to you "I
10        don't want to talk about it," or was he just
11        quiet?
12   A.  Agitated, doesn't -- I don't know -- very
13        agitated about the whole thing, very agitated,
14        repeatedly becoming more upset.
15   Q.  Okay.  Now when you say "agitated," meaning in
16        just his words but also like physically was he
17        getting restless when you asked him questions
18        about this time period?
19            MS. ROSENFELD:  Objection to the form.
20   A.  I would say he appeared upset, I mean, in the
21        usual ways people appear upset.
22   Q.  I am going to look at a couple other exhibits
23        with you, Dr. Leitch.
```

```
1              So, Dr. Leitch, what's on the screen is
2        what I marked for today's exhibit as Exhibit
3        3, and it's a report, Urgent Care Report,
4        dated or for admission -- it looks like
5        Mr. Raymond was admitted on September 13th of
6        2016.  Do you see that?
7    A.  Yes.
8    Q.  Okay.  In one part of that document, I am
9        going to highlight it for you, there is a
10        reference to "neck tenderness along C spine on
11        palp.  Cervical collar applied."  What exactly
12        is a cervical collar?
13    A.  They don't describe what kind of cervical
14        collar they used, but usually it's a soft
15        cervical collar but maybe not.  They might
16        have put him in a hard collar, I don't know,
17        just so that the neck doesn't move.
18    Q.  Okay.  What the is the reason to apply a
19        cervical collar on someone?
20    A.  Well, he had a seizure and a seizure is a
21        pretty violent reaction to the body, and I
22        think they want to be sure he didn't have an
23        injury.  They go on to do a CT of the cervical
```

1        spine so they probably want him stable until

2        they clear his spine with the CT.

3   Q. And then earlier, I still have it highlighted,

4        it says "neck tenderness along C spine on

5        palp." What does that mean?

6   A. So they pressed on his neck, and he said it

7        felt tender. He said he had tenderness and at

8        that point, you know, I can't speak for them

9        but the typical thing is at that point they're

10       concerned that the seizure could have resulted

11       in a cervical spine problem. They put the

12       cervical collar on him to protect the cervical

13       spine, and then they get a CT of the cervical

14       spine which showed no abnormality. And at

15       that point, I believe they take it off him.

16  Q. Okay. What is "C spine on palp," what does

17       that mean?

18  A. They palpated. So there was tenderness along

19       the cervical spine so for -- not to say it in

20       words, so they take their hand and they just

21       push along the bones in the back of the neck

22       and he must have said, "ooh, that's

23       uncomfortable." And at that point -- they

1    didn't say pain, they said tenderness so he

2    must not have -- he must have felt some --

3    made some sort of negative comment about that

4    so they put that cervical collar on him to be

5    sure they don't make any anything worse, that

6    he doesn't move until they do the CAT scan.

7  Q. Okay.  So do you agree that related --

8    regarding this particular document and again

9    it's dated November -- excuse me, September

10   13th of 2016, that there was some reference to

11   Mr. Raymond experiencing tenderness with his

12   neck?

13 A. Yeah, the type of tenderness that would be

14   typical with any seizure, with any seizure

15   where you're jerking.  And to clear the

16   cervical spine after a seizure is pretty

17   much -- is pretty regular and they would --

18   even if you were found out in the field, you

19   know, outside in the community, the first

20   thing they do is put a collar on the person so

21   that's the usual thing with a seizure.

22 Q. And why is that common to have some neck

23   tenderness after a seizure?

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1     A.  A seizure is really violent shaking.  So if

2         you're standing, you stiffen, fall to the

3         ground, and then very violent shaking.  I

4         don't know if you have ever seen one.  They're

5         actually kind of horrifying to actually watch,

6         but the person violently shakes.  People -- I

7         mean, we just saw somebody in the VA today, a

8         young guy, who fell to the ground and his

9         seizure was so violent he broke his arm, so he

10       fractured his arm.  People often break their

11       teeth.  They can have injuries.  So this is a

12       typical thing.  So they are like palpating

13       everywhere to see if there is any injury.  And

14       that's why they put the collar on and

15       subsequently do the cervical spine CT, and

16       they determined there was no injury.

17     Q.  Okay.  So someone is capable of breaking a

18       bone in their body during a seizure?

19     A.  That's correct, depending how they fall, that

20       type of thing, and he has been having seizures

21       for years.  I imagine this has been a regular

22       occurrence that he has symptoms different

23       places, and then they resolve and he goes back

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1          to what he is doing.

2     Q.  Okay.  Is it possible for someone to break a

3          bone in their neck during a seizure?

4     A.  I think it could be possible, but we know he

5          didn't because he had the cervical CAT scan.

6     Q.  Okay.  Well, on this particular day we know

7          that you're saying he didn't?

8     A.  Well, we know on every -- never -- the CT is

9          normal so we know he never did.

10    Q.  Okay.

11    A.  We know he never had that happen to him.

12    Q.  Okay.  So when you say "never," are you

13         referring to all dates prior to September 13th

14         of 2016?

15    A.  All dates prior to the CAT scan that occurred

16         on September 13th, 2016, that's correct.

17    Q.  Okay.  So if he had a neck fracture before

18         that date, even if it was years earlier, you

19         would be able to notice that in a CT scan?

20    A.  Oh, yes, yes.

21    Q.  Okay.  And how would you notice that in a CT

22         scan?

23    A.  The old fracture would show.  It would just

1          show like old healed fracture.  It might show

2          that the disc has been all the way compressed.

3          It could show the little endpoints of the disc

4          or the bone have actually broken off.

5     Q.  Okay.  So Mr. Raymond is claiming that he was

6          assaulted on September 14th of 2016, right?

7     A.  Correct.

8     Q.  Okay.  And then he is also claiming that since

9          that date he experiences seizures quite

10         commonly, correct?

11              MS. ROSENFELD:  Objection to the form.

12    A.  You're saying his seizures increased after

13         September 14th; is that what you're asking me?

14    Q.  Not that they increase -- well, yeah, I mean,

15         did he -- did Mr. Raymond say that his

16         seizures increased after September 14th of

17         2016?

18    A.  He said they increased in severity and

19         frequency.

20    Q.  Okay.  So it's possible that Mr. Raymond could

21         have fractured a bone in his neck during one

22         of these seizures that happened after

23         September 14th, 2016, correct?

1    A. No, because we have a CT from February 10th,

2       2020, that doesn't show any fractures.

3    Q. Okay.  And do you have any -- well, let me ask

4       you this:  Could Mr. Raymond at any time

5       having a seizure injured a bone somewhere else

6       in his spine, not his neck but somewhere else?

7    A. Hypothetically or?

8    Q. Yeah, hypothetically.

9    A. I mean, anybody can have -- when you fall to

10      the ground, you can have an injury anywhere.

11      It's possible.  I don't see any report of any

12      of that.

13    Q. Okay.

14    A. I mean, the typical thing in the emergency

15      department, they're always going to go for the

16      neck because that's the most worrisome thing

17      so they're going to be palpating and poking on

18      the neck which is what they should do.

19    Q. Okay.  So is it possible that Mr. Raymond

20      after September 14th, 2016, may have injured a

21      bone in his spine during a seizure?

22    A. I don't think --

23         MS. ROSENFELD:  Objection to the form.

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1                Go ahead.

2        A.  I don't think it's possible because I have all

3            the records and I don't see any signs of that,

4            so I don't agree.

5        Q.  Well, I am talking about theoretically is it

6            possible that he could have.

7                MS. ROSENFELD:  Objection.

8        A.  It's honestly hard for me to answer a

9            theoretical when I have the actual documents

10           in front of me.

11       Q.  All right.  Well let's just say not

12           Mr. Raymond specifically but can anyone, can a

13           person who experiences a seizure, could they

14           possibly fracture a bone in their spine during

15           a seizure?

16               MS. ROSENFELD:  Objection.

17       A.  Well, I mean, the reason why it's so upsetting

18           that his seizure disorder increased is because

19           a seizure can lead to death.  It can lead to

20           bone breaking.  It can lead to all sorts of

21           terrible things.  So anything can happen once

22           somebody loses consciousness, drops from

23           whatever position they're in and shakes

1        violently for a period of time.

2    Q. Okay.  So someone can potentially fracture a

3        bone in their spine during a seizure, correct?

4    A. Yes.

5    Q. Okay.  One moment, please.

6            MS. ROSENFELD:  When you're at a good

7        point, can we take a five-minute break,

8        please?  No huge rush but when you can.

9            MR. MACKEY:  This next exhibit is kind

10       of associated with the previous one so after

11       that one.

12           MS. ROSENFELD:  Sure, that's fine.

13   Q. Okay.  The next exhibit, Dr. Leitch, is marked

14       as Exhibit 4 and I am scrolling to that right

15       now.  This is from the Imaging Department at

16       the Auburn Community Hospital dated September

17       13th of 2016.  Are you familiar with this

18       document?

19   A. Yes.

20   Q. Okay.  Did you review it before preparing your

21       report?

22   A. Yes.

23   Q. Now this is a report on a CT scan of

83

1      Mr. Raymond's brain on September 13th of 2016,

2      correct?

3   A. That's correct.

4   Q. Okay.  So this was taken before the alleged

5      incident of September 14th, correct?

6   A. Correct.

7   Q. Okay.  Now, there is a reference to

8      unwitnessed fall.  Do you see that?

9   A. Yes.

10  Q. Okay.  Did you have any discussions with

11     Mr. Raymond about falling during his seizure

12     on September 13th of 2016?

13  A. No, but you don't -- a person can't remember

14     anything from the seizure.  The loss of

15     consciousness occurs just prior to the fall

16     and then no memory probably is going to be

17     present until quite some time afterwards but,

18     again, I tried to talk about the time period

19     but he was not able to and this I wouldn't

20     expect him to know anyways.

21  Q. Okay.  So I am highlighting a portion of the

22     report and I will read it into the record.

23     "Small 13 by 9 millimeter isodense lesion

1        within the right anterior para midline frontal

2        bone just superior to the ethmoidal air

3        sinuses the lesion is well-circumscribed with

4        a," excuse me for this word, "sclerotic

5        border."  S-C-L-E-R-O-T-I-C border.  What

6        exactly is this describing?

7    A.  Can you just scroll up a little bit more?

8    Q.  Sure.  I will make it bigger too.

9    A.  To the next page -- so they talk about it

10       here:  Has a benign appearance, looks like a

11       dermoid or epidermoid cyst.  So it has the

12       characteristics of what look like skin cells.

13       It's just an incidental finding inside the

14       bone, common.

15   Q.  Okay.  What do you mean by "common"?

16   A.  You commonly find this on CTs or any sort of

17       x-ray of the bone you find like a little --

18       it's a little cyst of like skin cells.  It's a

19       common finding.

20   Q.  Now, could a lesion like this contribute to a

21       person's neurogenic bladder condition?

22   A.  No, this just like a little cyst in a bone.

23   Q.  Okay.

1    A.  The frontal bone is a big thick bone in the
2        front of your head.  It's just -- they just
3        found this little cyst in there.
4    Q.  Okay.
5    A.  Benign, incidental finding.
6    Q.  Okay.  I am going to go back up to Exhibit 3
7        which we were talking about earlier which
8        makes reference to the seizure and fall that
9        Mr. Raymond experienced on September 13th of
10       2016.
11           Now, are you aware that the defendants
12       in this lawsuit are alleging that they never
13       assaulted Mr. Raymond?
14   A.  I don't really know anything about the people
15       that were involved in the incident.  I only --
16       I only examined Mr. Raymond.
17   Q.  Okay.  So the defendants in this particular
18       case allege that they never assaulted
19       Mr. Raymond on September 14th of 2016, and the
20       reason I tell you that is I am wondering if
21       the alleged assault of September 14th, 2016,
22       did not happen as the defendants claim, is it
23       possible that the neck injury that Mr. Raymond

1          suffered on September 13th is the cause of his

2          neurogenic bladder?

3               MS. ROSENFELD:  Objection to the form.

4     A.  I don't think he suffered a neck injury on

5          September 13th.  I think he was evaluated and

6          found to have no injury.

7     Q.  Okay.  But he was experiencing some type of

8          sensation in his neck, was he not?

9     A.  Well, they poked on his neck and he said it

10         felt tender.

11    Q.  Okay.

12    A.  I don't even know if that was related to the

13         seizure.  I think if you poked on my neck on

14         certain days I would say "well that feels

15         tender."  So I agreed with them that they

16         needed to poke and they needed to work it up,

17         but the result was there was no injury to the

18         neck.

19    Q.  Okay.  So the fact they mention the neck

20         tenderness, that doesn't indicate there was

21         some type of injury to his neck that day?

22    A.  No.  He said -- they pushed on it.  He said it

23         was tender, so they went on and got a CAT scan

1    which is a pretty -- you know, a pretty highly
2    technical test.  There was no abnormality, and
3    then they were assured that there was no
4    injury.  He doesn't go on to get any more
5    treatment or anything, or there is no
6    follow-up care for the neck.  It was simply he
7    had the tenderness when they touched it and
8    they worked it up, which is what typically is
9    done, but he didn't have an injury to it.
10    Just like they did a CT of his head, and there
11    was no head injury on September 13th either.
12    Those are the things you do just to make sure
13    nothing else happened.
14  Q. Okay.  So going back to Exhibit 4, the CT scan
15    was of the brain, correct?
16  A. Correct.
17  Q. But it wasn't of the neck, correct?
18  A. No, there's a CT of the brain and CT of the
19    neck.  That's the brain, but there is a neck
20    too.
21  Q. Okay.  And you're saying that according to the
22    CT of the neck there was no neck injury?
23  A. That's correct.  Maybe it's the next thing

1       down.  I don't know if you have it there or

2       not.

3    Q. Well, let me ask you this:  Could there have

4       been an injury to his neck that did not show

5       up on the CT scan?

6    A. There was --

7         MS. ROSENFELD:  Objection.  Objection to

8       the form.  Go ahead.

9    A. No.  The examination, besides tenderness,

10      there was no signs of cervical spine trauma

11      and the CT of the cervical spine confirmed it

12      so there was no injury to the neck.  And there

13      really wasn't even -- this isn't even

14      hypothetical.  He was evaluated to see if

15      there was, which is pretty much always done in

16      the emergency department, and there was no

17      injury.

18    Q. Could an MRI or an x-ray have showed something

19      that the CT scan did not?

20    A. Well, an MRI is a different sort of test.  I

21      am not -- I wasn't there but the CT is better

22      for bones and for fracture and for trauma.

23      The MRI is better if you're just evaluating a

1      spinal cord issue.  They were looking more for

2      trauma.  So the CT was an adequate test.

3   Q. Right, but from what we understand, or at

4      least your understanding, is that there was no

5      MRI taken that day, correct?

6   A. No, the CT.  And usually they do a CT and then

7      if there is a question it goes on to MRI.  It

8      didn't even meet that threshold.  This was an

9      entirely normal CAT scan.

10  Q. Could an MRI that day have located an injury

11     that didn't show up on the CT scan?

12  A. I don't believe there was anything on that CT

13     that would suggest the MRI could find

14     anything.  I mean, that's the way the

15     reasoning works.

16  Q. No, I understand that.  I guess what my

17     question is, is it possible for an MRI to show

18     an injury that a CT scan would not?

19  A. Well, again, they --

20          MS. ROSENFELD:  Objection to the form.

21     Go ahead.

22  A. I think they're looking for different things.

23     The MRI looks at -- CT is better for bone and

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    A.  No.

2    Q.  Okay.  Have you ever had a patient with

3        neurogenic bladder that was a result of use

4        of -- continued use of illicit drugs?

5    A.  No.

6    Q.  And we also discussed about he had a traumatic

7        brain injury in 2012 when he was hit by a

8        beam, and I think you mentioned that here

9        later on in this paragraph and you claim that

10       that particular brain injury "would not have

11       caused his neurogenic bladder condition to

12       arise late in 2016."  Why do you say that?

13   A.  Well, if the head injury from 2012 had caused

14       the neurogenic bladder, he would have had

15       symptoms back in 2012, not four years later.

16       Just the temporal course of a head injury

17       resulting in bladder problems.

18   Q.  Okay.  So basically you're just saying that

19       the neurogenic bladder would have happened

20       much earlier, probably in 2012 if that

21       particular brain injury was the cause?

22           MS. ROSENFELD:  Objection.

23   A.  Yeah, I don't know what -- I don't know

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

1       offhand what month it was in 2012, but you

2       would expect the temporal course not to be

3       delayed by four years as a normal function.

4   Q.  The last page of your report and this is page

5       15, you wrote "9/14/16 assault on Mr. Raymond

6       resulted in a second, separate traumatic brain

7       injury."  What do you mean by "second"?

8   A.  The first traumatic brain injury was back in

9       2012.

10  Q.  Okay.  You're referring to when he was hit by

11      the beam?

12  A.  That's correct.

13  Q.  Okay.  I have some other documents I want to

14      look at.

15  A.  I just dropped my paper here.  One second.

16          Go on.  I am sorry.

17  Q.  That's all right.

18          So I am looking at -- this document is

19      Exhibit 2 from today's deposition, and it's a

20      document from Kenmore Mercy Hospital, has a

21      date of September 10th, 2014, so a little

22      about two years before the alleged incident of

23      September 14th, 2016, and this is a visit to

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1        the hospital by Mr. Raymond and he states that

2        he "had an object fall on his head in

3        February."  It doesn't mention the year but

4        maybe he is referring to February of 2014.

5            Did Mr. Raymond discuss anything about

6        suffering a head injury in February of 2014?

7   A.  He did not.

8   Q.  And then he mentions about the "past few days

9        having trouble remembering certain events that

10       happened earlier in the day."  Do you see

11       that?

12  A.  Yes.

13  Q.  Okay.  Do you agree then that this particular

14       medical record makes reference to some memory

15       problems that Mr. Raymond was experiencing

16       over two years before the alleged incident of

17       September 14th, 2016?

18           MS. ROSENFELD:  Objection.

19  A.  Yes.

20  Q.  The second page of Exhibit 2, again, this is

21       from June 10th of 2014, there is a reference

22       to "while attempting to discharge the patient,

23       the patient reports that he is concerned that

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1      he has been unable to urinate regularly, and

2      when he does urinate the urinate the urine is

3      dark."  Do you see this?

4  A.  Yes.

5  Q.  Okay.  Do you agree that this document from

6      2014 makes reference to Mr. Raymond having

7      problems urinating --

8  A.  Yes.

9  Q.  -- back then?

10         Did Mr. Raymond mention that he had

11     problems -- when you met with Mr. Raymond, did

12     he mention to you that he had experienced

13     problems urinating in 2014?

14  A.  He did not.

15  Q.  Did you ask him if he ever had any problems

16     urinating prior to September 14th of 2016?

17  A.  Well, in his past -- yes, in the past medical

18     history I asked him if he had any urinary

19     issues prior to 9/14/2016 and he said he did

20     not.

21  Q.  Okay.  So this reference to problems, unable

22     to urinate regularly and urinating -- or

23     having dark urine from June of 2014, you have

SHERRY WITHAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1      no information related to why he was

2      experiencing that, correct?

3    A. Well, from looking at the medical records

4      because I had them before, this was a -- you

5      know, this was an incident in which he had

6      urinary symptoms and I think that it's a

7      common thing from time to time.  He could have

8      had a urinary tract infection.  His urine was

9      dark.  He could have just been dehydrated and

10     so he wasn't urinating regularly.  And the

11     memory issues could have been related to that

12     actual time he was bumped in the head or if he

13     was having seizures.  All of those cause

14     memory issues.

15         So to me this kind of goes to show that

16     if he had urinary problems he would have

17     sought medical care but he only did on one

18     occasion which could have been for any reason

19     unrelated to the neurogenic bladder that

20     occurred years later.

21   Q. I am going to scroll down to Exhibit 5.  So

22     this is Exhibit 5 from today's deposition, and

23     this is a record from Upstate University

1       Health System and I will just highlight the

2       date January 19th of 2017.  I am just going to

3       go through a few pages.  At one point in this

4       document it mentions that "28-year-old male

5       presents with urinary retention and dysuria

6       for two days."  Do you see that?

7  A.  Yes.

8  Q.  Okay.  So I think earlier we mentioned that

9       dysuria is painful urination, correct?

10  A.  Yes.

11  Q.  Okay.  So if we read this particular record

12       from January 19th of 2017, it only mentions

13       that Mr. Raymond was having urinary retention

14       and dysuria for two days, correct?

15      MS. ROSENFELD:  Objection.

16  A.  That's what it states.

17  Q.  Okay.  So there is no mention of Mr. Raymond

18       having this problem for four months, correct?

19      MS. ROSENFELD:  Objection to the form.

20  A.  I just want to check.  What is the date of

21       this again?  I can't see it.  Oh, January

22       19th.  Right, that's all it says but we know

23       otherwise because we have all the other

1          records.

2    Q.  Okay.  But according to this document that's

3          what Mr. Raymond told the medical staff at

4          Upstate Hospital, correct?

5    A.  That's what he told them and that's what they

6          recorded, but in fact he had been having

7          urinary symptoms right along.  Maybe it was

8          worse for two days, I don't know.

9    Q.  Okay.  Scrolling to the next page of that --

10   A.  Can you stop there?  He said that it happened

11         before back in September after he sustained

12         trauma.  He is vague about what occurred.  So

13         he does talk about that.

14   Q.  I was actually going to ask you about that

15         particular sentence.

16   A.  Sorry.

17   Q.  So he makes reference that he had urinary

18         retention issues back in September of 2016,

19         correct?

20   A.  That's correct.

21   Q.  Okay.  But in that particular sentence the

22         reference is that it happened once before so

23         there is no reference in this document

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1          happening after September of 2016, correct?

2     A.  True.  But, again, we have the records that

3          show that it did.

4     Q.  Okay.  But this is what Mr. Raymond told the

5          doctors that they -- at Upstate Hospital,

6          correct?

7     A.  Yep, and they notice he is vague.  He is vague

8          about what occurred.

9     Q.  What do you mean by that?

10    A.  That's the next sentence:  "Patient vague

11         about what occurred."  Consistent with how he

12         was with me.  He doesn't seem to really want

13         to talk about it too much.

14    Q.  Okay.  Now, the next document is marked for

15         today's deposition as Exhibit 6, and this is

16         another report from Upstate University

17         Hospital.  This one is dated January 24th,

18         2017, so about five days after the previous

19         document.  Here it says the assessment is that

20         "28-year-old with likely urethral stricture

21         and gross hematuria."  What does that mean?

22    A.  He was bleeding a lot in the urine.  They

23         thought he had urethral stricture.  Where is

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1      he right now?  Is he in the emergency room?

2      Is he -- where is he?  He is at Upstate, but

3      what is this?

4   Q. Let me see if I can --

5   A. Is it the urologist?

6         MS. ROSENFELD:  Pat, can you just scroll

7      it out to show the entire page?  I know you

8      scrolled it in to accommodate me, thank you,

9      but I think it would be helpful to see the

10     whole page.

11  A. And go up one more.

12  Q. To the next documents you mean?

13  A. Yeah, is that a different document or does it

14     continue?

15  Q. It's a different document.

16  A. It's a different date?

17  Q. This is from January 19th.

18  A. Okay.  Then scroll down.  I don't know where

19     he is here.

20  Q. Okay.  Well, we know he is at Upstate

21     Hospital, right?

22  A. Yeah.

23  Q. Okay.  So the reference to a "likely urethral

1          stricture," according to this document, that

2          was the determination of why he was having

3          problems urinating, correct?

4               MS. ROSENFELD:  Objection.

5     A.  They state it's likely a urethral stricture

6          and they go on to order tests,

7          cystoscopy/retrograde urethrogram, to further

8          characterize the situation.

9     Q.  What do you mean?

10    A.  What they write is -- so they say he likely

11         has a urethral stricture and they discuss the

12         case and decide to perform a cystoscopy and

13         retrograde urethrogram in the next visit to

14         further characterize the situation.  They

15         don't have a firm diagnosis, but that's where

16         they're going to -- they're going to work him

17         up for possible urethral stricture.

18    Q.  Okay.  What is cystoscopy/retrograde

19         urethrogram, if you know?

20    A.  So it's a procedure where they also image the

21         bladder and all of the structures going to the

22         bladder.  It wouldn't be something I order.

23         You know, this is sort of to look at the

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1      anatomy of the urinary system.  So I would

2      send somebody to a urologist and they might

3      order it, but I wouldn't order this.

4   Q. So that particular test, would that be able to

5      determine if the individual has a neurogenic

6      bladder?

7   A. No, I think it's more to determine if they

8      have urethral stricture.

9   Q. Okay.  So on September 14th of 2017, at

10     Upstate Hospital, at that point it looks like

11     they were not examining whether he had a

12     neurogenic bladder yet, correct?

13  A. Oh, I think they're just looking for any cause

14     of his bladder issues and, you know, that's

15     what we send them to urology for, to see if --

16     to see what the problem could be and they're

17     usually looking at the bladder and the urethra

18     itself.

19  Q. Okay.  But at this point on January 24th of

20     2017, they're looking at whether he as a

21     stricture, correct?

22  A. That's right.

23  Q. I am going to go to Exhibit 8.  It's marked as

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1          Exhibit 8 for today's deposition.  This is

2          another record from Upstate Hospital.  This

3          one is from April 26th of 2017 and I am just

4          going to scroll down a few pages to this area

5          where it says physical exam.  I just have a

6          few questions about this record.  It says head

7          is "normocephalic and atraumatic."  What does

8          that mean?

9     A.   So his head is the normal shape and there is

10         no signs of trauma to his head.

11    Q.   Okay.  And then eyes --

12    A.   Meaning no bruising, nothing like that.

13    Q.   Got you.  So nothing abnormal, correct?

14    A.   Yes.

15    Q.   Okay.  For eyes it has "conjunctivae are

16         normal."  Do you know what that means?

17    A.   The white part of your eyes look normal.

18    Q.   Okay.  So nothing abnormal there, correct?

19    A.   Correct.

20    Q.   It says neck is "supple."  What does that

21         mean?

22    A.   Pressed on his neck or touched the front area

23         and it was all normal.

DEPAOLO CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    Q.  I am going to jump down a little bit.  It

2        makes reference to abdomen and it makes a

3        reference to "positive CVA tenderness

4        bilaterally."  Do you know what that means?

5    A.  So they were palpating sometimes like sort of

6        hitting with their fist gently on the trunk

7        towards the back on each side.

8    Q.  And does this particular -- this reference to

9        abdominal exam, does this show any type of

10       abnormality?

11    A.  So he was -- they did the CVA and he was

12       tender.  He had abdominal tenderness.  His

13       stoma appeared pink without any abnormalities

14       around it.  There was dried urine in the

15       catheter, and the urine in the catheter bag

16       was amber and clear.

17    Q.  So is it showing anything abnormal with

18       respect to his abdomen?

19    A.  Well, he had tenderness.  I don't do abdominal

20       exams like this so I'd have to defer that to

21       somebody else.

22    Q.  Sure.  Then there is a reference to

23       neurological exam.  "He is alert and oriented

1    to person, place, and time."  Does that show

2    anything abnormal?

3  A. No, no abnormality.

4  Q. Now by this point, April of 2017, do you know

5    if there had been any determination if

6    Mr. Raymond was experiencing a neurogenic

7    bladder by then?

8  A. Well, I believe his neurogenic bladder began

9    with the complaints right after the injury

10    back in October.

11  Q. Okay I.  Guess the question is by April 26th

12    of 2017, upon your examination of all the

13    medical records that were provided to you, was

14    there a diagnosis at that point that

15    Mr. Raymond was experiencing a neurogenic

16    bladder?

17  A. You mean by other providers?

18  Q. Yeah, by any -- by any medical personnel.

19  A. I'd have to go through and see at what point

20    the medical providers started to use the term

21    neurogenic bladder.  I am not sure of the

22    exact -- what exact time that happened.  I

23    mean, I see ones where they call it neurogenic

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1      bladder but I don't know when it turns.

2  Q. Okay.

3  A. I am sorry, I could find out but I just -- I

4      don't know if I know offhand.

5  Q. Okay.  That's fine.

6  A. I didn't jot that down.  Sorry about that.  It

7      probably would be easy to tell.  But with all

8      these records, to really know, I'd have to go

9      through record by record.

10 Q. Understood.  Now at one point during your

11     review you looked at -- I'll take this off the

12     screen.

13         At one point during your review you

14     looked at the medical records from Auburn

15     Correctional Facility, correct?

16 A. Yes.

17 Q. Okay.  So I just want to go through a few of

18     those documents because I have a few questions

19     regarding those.

20         I think there should be an Exhibit PL8.

21     Do you see that on the screen?

22 A. Okay.

23 Q. Okay.  Do you see it?

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    A. Yes.

2    Q. Okay.  There is just a few documents I want to

3        go through with you.  Let's actually skip to

4        what was previously marked as Plaintiff's

5        Exhibit 40 so -- actually, let's skip more.

6        Exhibit 41, so previously marked as Exhibit

7        41, are records, ambulatory health

8        records/progress notes from the date of the

9        alleged incident, November -- or September

10       14th of 2016.  Do you see that?

11   A. Yes.

12   Q. Okay.  It looks like there is two separate

13       entries, one from 4:25 PM and another from

14       6:10 PM.  Do you see that?

15   A. Yes.

16   Q. Okay.  So earlier you mentioned that it was

17       your opinion that the medical staff at Auburn

18       facility, Auburn Correctional Facility, should

19       have sent Mr. Raymond to a urologist for a

20       full medical assessment.  Is there anything in

21       this particular document which you base your

22       opinion on?

23   A. About his urology?

1    Q.  About having a full medical assessment done.

2    A.  So what I thought we talked about earlier was

3        a full urologic assessment; is that what

4        you're asking me?

5    Q.  Well, you mentioned in your report that you

6        thought that a full medical assessment should

7        have been done earlier after Mr. Raymond

8        started complaining of abdominal pain and

9        urination problems, and I am just wondering if

10       for instance with this particular document,

11       this is Plaintiff's Exhibit 41, if there is

12       anything here which indicates that you --

13       reading this, you would have said that he

14       should have been sent -- Mr. Raymond should

15       have been sent for a full medical assessment.

16   A.  Okay.  So let me look through it.

17   Q.  I will make it larger for you.

18   A.  He returned from the outside ambulance -- oh,

19       that's okay -- after being discharged.  He was

20       aggressive and yelling.  He had no seizures.

21       He disconnected the IV and let the blood drip

22       into his mouth.  Team sent to the emergency

23       department to escort inmate back.  Oh, okay.

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1    Upon return, he claims to be having a seizure.

2    Pupils were equal and reactive.  Responds

3    appropriately to stimuli.  Per security, was

4    thrashing around in the van.  Has reddened and

5    swollen areas.

6    So, I mean, typically he -- so from my

7    perspective, this is still part of his seizure

8    event.  So you have a seizure and then you

9    have a postictal period which is considered

10    part of the seizure which is a prolonged area

11    of either confusion or aggressive behavior.

12    We don't discharge people until their seizure

13    is complete, so I don't -- he looks like he is

14    just being assessed by a nurse in an

15    outpatient setting.  So at this point here, he

16    needs a higher level of care.

17    I don't know what -- I don't know what

18    the facility has, if they have like an

19    observation unit or -- but he would either --

20    if he was on the outside, he would stay in the

21    emergency department or an observation care in

22    the emergency department until his mental

23    status returned to normal.  He is far from a

1   normal mental status.  So at this point, I

2   would begin the trip back to the emergency

3   department because he is not stable unless

4   they have -- I mean, I don't know what they

5   have at the -- I don't know what kind of

6   services they offer here, but he needs like

7   one-to-one observation and medical care.

8         So that was at 4:25.  At 6:10 now he has

9   tied a sheet around his neck.  He has got some

10   sort of scratch or something on his neck.  He

11   is angry.  So, again, to me his mental status

12   is still not returning to normal.

13  Q. I think he used --

14  A. Also he was given IV Keppra in the emergency

15   department which can make you agitated.  To me

16   he is not -- he is not a stable patient so

17   neurology, if this was the hospital, we

18   wouldn't let him go.  I am not saying we'd

19   admit him to the hospital, but he would stay

20   either in the ER or in the obs unit in the

21   emergency department.  So, again, I don't know

22   what facilities they have here but he is not

23   stable.

1    Q. Okay.  So your opinion is with these two

2       entries from September 14th, 2016, that the

3       medical staff at the facility, Auburn

4       facility, should have -- and I think the term

5       you used was a higher level -- should have

6       sent Mr. Raymond to a higher level of care?

7    A. And maybe they did.  I mean, I don't know what

8       Auburn has but he needs something equivalent

9       to an acute medical area to observe him.

10      Maybe they have that there, but he needs -- he

11      doesn't need a clinic setting.  He doesn't

12      need -- he needs acute medical care which

13      would be like an ER.

14   Q. And this is related to his --

15   A. Postictal state.

16   Q. -- mental state at this point, correct?

17   A. That's right.

18   Q. So the next document I am showing you is

19      Plaintiff's -- was previously marked as

20      Plaintiff's Exhibit 42 and, again, this is an

21      ambulatory health record progress note from

22      the Auburn Correctional Facility and this one

23      is dated September 17th of 2016, so it's three

1          days after the alleged assault of September

2          14th, 2016.

3                Is there anything about this record

4          which you think indicates that Mr. Raymond

5          should have been sent to get a full medical

6          assessment?

7                MS. ROSENFELD:  Objection to the form of

8          the question.

9    A.   Well, it looks like they called a doctor.

10   Q.   Okay.  Is there anything in this document

11        which you feel indicates that Mr. Raymond

12        should have been taken out of the facility and

13        sent to, for instance, emergency care?

14   A.   Well, I guess the issue is whether in -- I

15        mean, I am looking in hindsight.  This is

16        probably the beginning of his neurogenic

17        bladder, but at the time I think they feel he

18        just has a urinary tract infection and they

19        treat him so I don't see any issue with this.

20   Q.   Okay.  So the next document is Plaintiff's

21        Exhibit 43 and this is again an ambulatory

22        health record progress note regarding Matthew

23        Raymond.  There is one entry from September

1       19th of 2014 [sic] and then two entries it

2       looks like from September 28th of 2016.  In

3       your opinion, is there anything in this record

4       which indicates that Mr. Raymond should be

5       sent to receive a full medical assessment?

6           MS. ROSENFELD:  Objection to the form of

7       the question.

8   Q.  Do you need me to make it smaller so you can

9       see?

10  A.  No, no, no.  So the first one he has missed

11      some doses of Keppra, and it looks like they

12      referred him to the treating provider to

13      review.  That seems okay.  The next one he has

14      more urologic issues.  Does that say

15      hematuria?  I can't read it.  Something on and

16      off; is that what it says?  It's just kind of

17      small.  Is that what they're talking about?

18      Yeah, that's a urology issue.  Again, I

19      wouldn't treat -- this wouldn't come to me.

20      This wouldn't come to me with his urine

21      dipstick and they're looking at urinary tract

22      infection.  I don't know -- I don't know

23      what -- how can I say, I am not part of the

1          treatment of urinary tract infections.

2      Q.  Okay.  Well I guess the question is, with

3          respect to this document, this page, is there

4          anything in it which you feel that Mr. Raymond

5          should have been sent to have a full medical

6          assessment to determine if he is having

7          potential neurogenic bladder?

8      A.  In hindsight, yes, but the kind of information

9          they get which is just a quick note, there is

10         nothing in that that I see that look like --

11         it's hard to read the writing, too.  I mean,

12         it's hard for me to say.

13              MS. ROSENFELD:  Dr. Leitch, you can look

14         at your own report, too, to the extent that

15         you want to cross reference the pages that

16         Mr. Mackey is showing you with what you wrote

17         about these records.

18              THE WITNESS:  Okay.

19     Q.  Let's go down.  So I am showing you what's

20         been marked, previously marked as Plaintiff's

21         Exhibit 45, which again is an ambulatory

22         health record progress note regarding Matthew

23         Raymond.  All three entries are October 6th of

1          2016.

2                  Is there anything in this document which

3          leads you to believe that the medical staff at

4          the Auburn facility should have sent

5          Mr. Raymond to receive a full medical

6          assessment?

7     A.   Again, I'd have to say that these kind of

8          issues wouldn't come to neurology, burning

9          with urinations, I can't really give a -- I

10         can't really give a -- I can't really give an

11         opinion because it's different than I would

12         have -- I would have assessed him different.

13         I would have examined him so I really can't

14         give an opinion on these sick calls.

15    Q.   Okay.  You did mention in your report though

16         that you felt that the medical staff at the

17         Auburn facility failed to timely have

18         Mr. Raymond receive a full medical assessment.

19         I guess --

20    A.   That --

21    Q.   -- why was that in your report if you're

22         unable to make any type of determinations of

23         whether urological care is being properly

1          provided to Mr. Raymond?

2     A.   I guess -- I guess my point is, I don't know

3          if I can tell you the exact date in which I

4          would have said this is the time he needed to

5          go based on what's written.  But as time

6          passed and he kept going, he kept -- he was

7          seen multiple times and nothing was done.  I

8          think they needed to send him before he had a

9          catheter in.

10    Q.   Let's look at Plaintiff's Exhibit -- this was

11         previously marked as Plaintiff's Exhibit 46.

12         This is an ambulatory health record progress

13         note for Mr. Raymond.  First entry doesn't

14         have a date.  The second entry has a date of

15         October 12th, 2016, and the third entry has an

16         October 19th, 2016, date.

17              With this particular document, is there

18         anything in here that you feel indicates that

19         Mr. Raymond should have been sent to receive a

20         full medical assessment?

21              MS. ROSENFELD:  Objection.  Asked and

22         answered.  I think she has answered this

23         question each time the same, Pat.  We can go

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1      through every record, but I think you just got

2      your answer.

3           MR. MACKEY:  Right.  I mean, it is a

4      different exhibit.

5   A. So my answer would be with each of these

6      things individually they came for blood in the

7      urine.  Again, this isn't my -- this isn't my

8      field.  But before when he kept having

9      problems that didn't improve and ends up with

10     a catheter, sometime before that catheter was

11     in I think they should have sent him for a

12     full examination.

13  Q. And I guess why do you feel that way?  How do

14     you know that that wasn't the proper time to

15     send him for the catheter?

16  A. When anyone -- so this is a general thing.

17     When people keep coming to you for a problem

18     that isn't improving, you need to send them on

19     to something -- to a higher level of care.  I

20     mean, he was seen -- this is just general

21     medicine.  He was seen just from what I have

22     one, two, three, four, five, six, seven, eight

23     times and nobody sent him for anything

1        further.  It seems like they weren't getting

2        anywhere.  At some point he needed to be sent

3        for higher level of care.

4    Q.  Okay.  Let's take a look at what was

5        previously marked as Plaintiff's Exhibit 47.

6        It appears to be an October 18th, 2016, report

7        of an ultrasound done of Mr. Raymond.  Are you

8        familiar with this document at all?

9    A.  What's the date?  I am not sure if I have seen

10       it before.  I'd have to look through.  I am

11       not sure.  What is the question?

12   Q.  Let's take a look at the findings which I just

13       highlighted.  With this particular finding, do

14       you find anything abnormal with respect to the

15       ultrasound that was given?

16   A.  Well, the impression is a spermatocele.

17   Q.  And what is that?

18   A.  I really don't know.

19   Q.  So this was done October 18th of 2016 ordered

20       by the Auburn Correctional Facility.  So it

21       does appear that sometime in October the

22       facility did ask or did have Mr. Raymond see

23       an outside medical provider to get ultrasound

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1      imaging, correct?

2  A.  Well I, don't know.  Auburn itself ordered

3      this testicular exam.  I don't know if he ever

4      got a medical -- full medical follow-up.  The

5      ordering provider was Auburn Correctional

6      Facility.  So somebody ordered an ultrasound

7      of the testicles.  I really don't know

8      anything about what the diagnosis of a

9      testicle problem is.  I don't mean that in a

10     glib way.  I really just don't.

11 Q.  No, I understand.

12 A.  I don't know whether to believe that was the

13     necessary test.

14 Q.  The part I highlighted, do you agree that it

15     indicates that Auburn Correctional Facility

16     was the provider that ordered this exam?

17 A.  Right.  So I don't know if he got a medical --

18     a full medical assessment.  I don't know who

19     ordered that, like what individual, what kind

20     of person just at the correctional facility

21     ordered it.

22     MR. MACKEY:  Okay.  If you don't mind

23     giving me five minutes, I just want to go

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1     through my notes and make sure I have

2     everything covered so if we could take a

3     five-minute break.

4          MS. ROSENFELD:  Sure.  That's fine.

5             (A recess was taken.)

6

7     BY MR. MACKEY:

8  Q. Dr. Leitch, thank you for your time.  I just

9     have a few more questions.  We should be done

10    in like five minutes.

11 A. That's no problem.

12 Q. I guess the question I have is what actual

13    physical injury did Mr. Raymond sustain which

14    caused him to suffer neurogenic bladder?

15 A. The traumatic brain injury.

16 Q. Okay.  And what type of test indicates that he

17    had a brain injury?  Is there like a CT scan

18    or an MRI?  Is there anything that shows the

19    injury?

20          MS. ROSENFELD:  Objection to the form.

21 A. There was no abnormality on his imaging which

22    is often consistent with a head injury because

23    the head injury/concussion/ TBI can just be on

1       the cellular level while a CT and MRI are more

2       structural, so you wouldn't be able to see it

3       on a CT or an MRI.

4  Q.  Okay.  So just so I understand, your opinion

5       is that he did not suffer a neurogenic bladder

6       because of a spinal injury, correct?

7  A.  That's correct.

8  Q.  And it's your opinion that Mr. Raymond did not

9       suffer a neurogenic bladder because of a neck

10      injury, correct?

11  A.  That's correct.

12  Q.  Okay.  So you're basing your opinion on the

13      fact that he suffered a neurogenic bladder

14      because of a brain injury?

15  A.  Correct.

16  Q.  Okay.  Now, what would we be able to look at,

17      whether it be an MRI, CT scan, x-ray, to see

18      that injury, if anything?

19  A.  You cannot.  I mean, the only thing you're

20      down to is biopsy which of course you can't

21      do.  So most of the testing you could see it

22      on postmortem, but we would hope we don't have

23      to do that so CT and MRI are often normal.

1    Q.  Okay.  So -- and with respect to your

2        experience with dealing with patients with

3        neurogenic bladder caused by brain injury, is

4        that common that you cannot see the actual

5        physical injury?

6    A.  That's the typical thing, that's right.

7    Q.  Okay.  So how do you rule out that the

8        neurogenic -- that he even has a neurogenic

9        bladder, that the cause of his problems

10       urinating is unrelated to neurogenic bladder?

11            MS. ROSENFELD:  Objection to the form.

12   A.  So for me, if I was concerned he had

13       neurogenic bladder, I would send him to the

14       urologist because I wouldn't know if it was

15       caused by any of the other types of strictly

16       urologic issues such as problems with the

17       bladder, problems with the urethra, and that's

18       what they did in this case.  They sent him to

19       the urologist, and the urologist makes the

20       conclusion that he has a neurogenic bladder.

21   Q.  Okay.  So just so I understand, is it fair to

22       say that the determination that Mr. Raymond

23       has a neurogenic bladder is based on the fact

SHERRY WITHIAM-LEITCH, MD - BY MR. MACKEY - 03/08/22

1      that the doctors have ruled out it's a
2      urological cause and the doctors have ruled
3      out it's an injury to his spine and neck?
4            MS. ROSENFELD:  Objection to the form.
5   A. You have to say it again.  I am sorry.
6   Q. Sure.
7            So the determination that Mr. Raymond
8      has a neurogenic bladder, is that based on
9      doctors just ruling out that it's not a
10     urological issue and that it's not an injury
11     to his neck or spine?
12           MS. ROSENFELD:  Objection to the form.
13  A. Well, an injury to the neck or spine could
14     cause neurogenic bladder as well.  The
15     neurogenic bladder would have been the
16     suspicion from the beginning, but whenever you
17     do a diagnosis you have to look at any other
18     possible cause.  So I think the neurogenic
19     bladder diagnosis stands on its own based on
20     the head injury and the subsequent development
21     of the neurogenic bladder and the temporal
22     course, but it only would be good medicine to
23     make sure there is anything else that could be

```
 1          causing it or contributing to it that could be

 2          treated.

 3     Q.   Okay.  Not sure you exactly answered my

 4          question so maybe let me break it down for

 5          you.

 6               With Mr. Raymond's particular case, are

 7          you stating that his diagnosis of neurogenic

 8          bladder is based both on a ruling out that it

 9          was caused by urological problem and a ruling

10          out that it was caused by a neck or a spine

11          injury?

12     A.   I am not.

13     Q.   Okay.  So what physical evidence do you have

14          to show that it's caused by a brain injury?

15     A.   He had --

16               MS. ROSENFELD:  Objection.  Go ahead.

17     A.   He had a traumatic brain injury.  The

18          occurrence of a traumatic brain injury with

19          the subsequent temporal course of developing

20          the neurogenic bladder would be the same as

21          any sort of -- any sort of problem to the

22          brain and subsequent problems that occur

23          afterwards.  You can make sort of a direct
```

1  line.

2  Q. Okay.  So I understand you're stating that the

3     alleged assault of September 14th, 2016, is

4     the cause of the neurogenic bladder.  Was he

5     more susceptible at that point because of his

6     previous injuries for suffering a neurogenic

7     bladder?

8  A. I --

9         MS. ROSENFELD:  Objection.  Go ahead.

10 A. I think it's been well established that people

11    with recurrent brain injury tend to be more

12    susceptible.  So you had someone who already

13    didn't have a great brain, who already had

14    some susceptibility, then to get another

15    traumatic brain injury, I think it led to the

16    neurogenic bladder.

17 Q. Okay.

18 A. Maybe he would have got it anyways, but it

19    didn't help that he had the previous head

20    injury and the previous seizure disorder.

21    That certainly didn't help.

22 Q. What do you mean he may have gotten it anyway?

23 A. He may have had the assault, had the traumatic

1    brain injury and got neurogenic bladder.  I am

2    saying that the previous events increased the

3    chance of it occurring.

4        MR. MACKEY:  Okay.  All right.  I don't

5    have any further questions.

6        MS. ROSENFELD:  I don't have any

7    questions either.  Thank you.

8        MR. MACKEY:  Okay, all set.

9        THE REPORTER:  For the billing, are you

10   each paying separately or are you being

11   supplied?

12       MS. ROSENFELD:  I think that Mr. Mackey

13   is going to provide us a copy for the witness.

14       MR. MACKEY:  Yes.

15

16       (Deposition concluded at 5:53 p.m.)

17               *  *  *  *  *  *

18

19

20

21

22

23