UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MATTHEW RAYMOND,

                                    Plaintiff,

v.                                                                    9:18-CV-1467
                                                                      (GTS/MJK)
TROY MITCHELL, Lieutenant, Auburn Corr. Facility;
CHARLES THOMAS, Correction Officer, Auburn
Corr. Facility; THOMAS HARTE, Sergeant, Auburn
Corr. Facility; THOMAS PHILLIPS, Correction Officer,
Auburn Corr. Facility; and THOMAS GIANCOLA,
Correction Officer, Auburn Corr. Facility;

                                    Defendants.

_____

APPEARANCES:                                          OF COUNSEL:

EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL LLP                                 KATHERINE R. ROSENFELD, ESQ.
Counsel for Plaintiff
600 Fifth Avenue, 10th Floor
New York, NY 10020

LIPSITZ GREEN SCIME CAMBRIA LLP          BARRY NELSON COVERT, ESQ.
Counsel for Defendants                             DIANE M PERRI ROBERTS, ESQ.
42 Delaware Avenue - Suite 120                  PATRICK MACKEY, ESQ.
Buffalo, NY 14202

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

        Currently before the Court, in this prisoner civil rights action filed by Matthew Raymond

("Plaintiff") against Lieutenant Troy Mitchell ("Mitchell"), Correction Officer Charles Thomas

("Thomas"), Sergeant Thomas Harte ("Harte"), Correction Officer Thomas Phillips ("Phillips"),

and Correction Officer Thomas Giancola ("Giancola"), is Defendants' motion for summary

judgment.   (Dkt. No. 168.)   For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## I.      RELEVANT BACKGROUND

### A.      Plaintiff's Claims

The claims in this action are: (1) Eighth Amendment excessive force claims against Defendants; and (2) Fourteenth Amendment failure-to-intervene claims against Defendants Thomas, Harte, Phillips, and Giancola.   (Dkt. No. 20.)

### B.      Statement of Undisputed Material Facts on Defendants' Motion for Summary Judgment

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises."   N.D.N.Y. L.R. 56.1(b).   This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties."   *LaFever v. Clarke*, 17-CV-1206 (DNH), 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (quoting *Frantti v. New York*, 414 F.Supp.3d 257, 284 (N.D.N.Y. 2019)).   Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.' "   *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845 (DNH), 2018 WL 5297809, at *2 (N.D.N.Y. Oct. 25, 2018)).   "The Court may deem admitted any properly supported facts set forth

in the Statement of Material Facts that the opposing party does not specifically controvert."

N.D.N.Y. L.R. 56.1(b).

Applying this legal standard here, the following facts have been asserted and supported by record citations by Defendants, and either expressly admitted or denied without a supporting record citation by Plaintiff.   (*Compare* Dkt. No. 168-5 *with* Dkt. No. 174-1.)[1]

1.  In September 2016, Plaintiff was an inmate incarcerated at Auburn Correctional Facility ("Auburn C.F.").   (Dkt. No. 168-5 at ¶ 1.)   Since 2012, Plaintiff has suffered from epileptic seizures.   (*Id.* at ¶ 3.)   Plaintiff began experiencing seizures after being hit in the head by an I-Beam while working at a construction site.   (*Id.*)   Plaintiff suffered head and brain injuries, including bleeding on his brain.   (*Id.*)   In June 2014, Plaintiff was treated at Kenmore Mercy Hospital for headaches, trouble with his memory, and an inability to "urinate regularly."   (Dkt. No. 169 at 10-14; Dkt. No. 168-5 at ¶¶ 23-24.)

2.  On September 13, 2016, Plaintiff experienced a seizure.   (Dkt. No. 168-5 at ¶¶ 1, 10.) Medical records from Auburn C.F. indicate that plaintiff suffered an "unwitnessed fall" and complained of neck pain.   (Dkt. No. 169 at 2.)[2]   Plaintiff was transported to Auburn Community Hospital.   (Dkt. No. 168-5 at ¶ 9.)

3.  Upon arriving at the hospital, Plaintiff complained of "neck pain and [headache]."   (*Id.* at ¶ 33.)   Medical records from Auburn Community Hospital indicate Plaintiff was "[f]ound

---

[1] Plaintiff also offers "Plaintiff's Statement Of Additional Material Facts In Dispute."   (Dkt. No. 174-1 at 18-23.)   Local Rule 56.1(b) provides that "the opposing party's Response may set forth any assertions that the opposing party contends are in dispute in a short and concise Statement of Additional Material Facts In Dispute, containing separately numbered paragraphs, followed by a citation to the record where the fact is established."   N.D.N.Y. L.R. 56.1(b).

[2] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office, and not the numbers on the documents themselves.

by prison staff lying on cell floor having total body shaking" and that he was "incontinent of urine."   (Dkt. No. 169 at 5.)   Plaintiff was examined, treated and released from the hospital.   (*Id*.)

4. Plaintiff alleges that Defendants subjected him to excessive force on September 14, 2016. Specifically, Plaintiff claims that he was taken to the "emergency treatment room" where Defendant Mitchell "waterboarded" him, punched him in the face, neck, and chest, grabbed his testicles and penis, and hit Plaintiff in the groin with his baton.   (Dkt. No. 168-5 at ¶¶ 4-5.)

5. Plaintiff alleges that Defendants Thomas, Phillips, Giancola, and Hart "stood by and observed this assault and did nothing to intervene or stop the assault."   (*Id*. at ¶ 6.)

6. Defendants deny that any force was used and deny all of Plaintiff's allegations.   (Dkt. No. 168-5 at ¶ 7.)

7. Plaintiff claims that the excessive use of force caused him to suffer a permanent injury – neurogenic bladder.[3]   (*Id*. at ¶ 11.)

## C.   Expert Reports

The parties have submitted four expert reports:   Dr. Sherry A. Leitch, M.D. ("Dr. Leitch"), a neurologist, Dr. Jonathan M. Vapnek, M.D. ("Dr. Vapnek"), a urologist, Dr. John R. Valvo, M.D. ("Dr. Valvo"), a urologist, and Dr. Robert Knapp, M.D. ("Dr. Knapp"), a neurologist.

### 1.   Plaintiff's Experts

#### a.   Sherry A. Leitch, M.D.

According to her expert report, Dr. Leitch is a board-certified neurologist.   (Dkt. No.

---

[3]  Neurogenic bladder dysfunction refers to urinary bladder problems due to injury of the central nervous system.   (Dkt. No. 168-2 at 62.)

168-2 at 64.)   Since 2010, Dr. Leitch has been employed as the Chief of Neurology at Veteran's

Administration Medical Center in Buffalo.   (*Id*.)   Dr Leitch received a Bachelor of Science

degree, as well as a medical degree from the State University of New York ("SUNY") at Buffalo.

(*Id*.)   Dr. Leitch completed a neurology residency at SUNY Buffalo.   (*Id*.)   Dr. Leitch is licensed

to practice medicine in New York and has her own practice.   (*Id*.; Dkt. No. 174-14 at 6.)

Currently, Dr. Leitch is a clinical instructor and assistant professor of neurology at SUNY at

Buffalo.   (Dkt. No. 168-2 at 64.)

On August 25, 2020, Dr. Leitch performed a full neurological examination of Plaintiff.

(Dkt. No. 174-14 at 25-26.)   Dr. Leitch also reviewed various records to form her opinion.

Specifically, Dr. Leitch reviewed the following records: (1) medical records from Auburn

Community Hospital Emergency Department from visits dated March 2016, April 2016, August

14, 2016, September 13, 2016, and September 14, 2016; (2) records from DOCCS dated

December 22, 2015, July 2016, September 2016, October 2016, January 2017 through December

2017, January 2018, November 2018, January through March 2019, May through December 2019,

January 2020, and February 2020; (3) medical records from Upstate University Hospital from

visits dated January 2017, February 2017, March 2017, April 2017, July 2017, September 2017,

March 2018, May 2017, and July 2017; (4) medical records from Elmira Correctional Facility

dated September 14, 2016; (5) medical records from Central New York Psychiatric Center from

December 2015 through September 2016; (6) medical records from Arnot Ogden Medical center

from visits dated March 2018 and May 2018; (7) medical records from Mobile Physicians

Services from visits dated August 2018, September 2018, and October 2018; (8) medical records

from Erie County Medical Center from visits dated July 2018, August 2018, September 2018,

October 2018, November 2018, January 2019, and February 2019; (9) medical records from Wyoming County Community Hospital from visits dated September 2018, October 2018, January 2019, and July 2019; (10) medical records from Kenmore Mercy Hospital from visits dated June 2014 and March 2015; (11) medical records from Westfield Memorial Hospital Emergency Department from a visit dated May 2015; (12) medical records from Trinity Medical WNY from visits dated March 2020, June 2020, July 2020, November 2020, and January 2021; (13) medical records from WNY Urology Associates from visits dated March 2020, April 2020, May 2020, June 2020, July 2020, September 2020, November 2020, and December 2020; (14) medical record from John Bodkin III, MD from a visit on August 31, 2020; (15) medical records from Kaleida Health from November 2020; (16) records from Elmira Pharmacy; (17) CT scan results dated November 23, 2015, September 13, 2016, June 28, 2017, and January 25, 2019; (18) EEG studies from 2016 and 2019; (19) Plaintiff's amended complaint; (20) DOCCS photographs; and (21) transcript from Auburn C.F. hearing dated September 23, 2016.   (Dkt. No. 168-2 at 53-61.)

After examining Plaintiff and reviewing the above-stated records, Dr. Leitch concluded that Plaintiff suffered a severe, traumatic brain injury because of the use of force incident on September 14, 2016.   (Dkt. No. 168-2 at 62.)   Dr. Leitch noted that Plaintiff developed urinary symptoms soon after the incident and concluded that "[t]he temporal course of Mr. Raymond's symptoms and signs of neurogenic bladder indicate that the events of 9/14/16 resulted in neurogenic bladder."   (*Id*.)   Dr. Leitch opined that, "the records and documents I have reviewed present no other cause of Mr. Raymond's neurogenic bladder."   (Dkt. No. 168-2 at 63.)   Dr. Leitch noted that neurogenic bladder "does not arise spontaneously" and concluded that Plaintiff's condition did not arise from "improper catheter care, his seizure disorder, or any drug use or drug

addiction."   (*Id.*)

### b.   Jonathan M. Vapnek, M.D.

Dr. Vapnek is a practicing neuro-urologist.   (Dkt. No. 168-2 at 84.)   Dr. Vapnek prepared

his report based upon his review of medical records related to Plaintiff's medical care.   (Dkt. No.

174-16 at 19-20.)   Specifically, Dr. Vapnek reviewed the following records: (1) Dr. Leitch's

report; (2) reports from defense experts, John R. Valvo, M.D. and Robert Knapp, M.D.; (3)

medical records from Upstate University Hospital from visits dated January 2017 through July

2018; (4) medical records from WNY Urology Associates from visits dated March 2020 through

November 2021; (5) medical records from Erie County Medical Center from visits in February

2020; (6) medical records from Kenmore Mercy Hospital from visits dated February 2020 through

April 2020, and June 2020; and (7) medical records from Buffalo General Medical Center from

visits dated November 2020, December 2020, July 2021, August 2021, and November 2021.   (*Id.*

at 82.)

Dr. Vapnek opined that, "the assault of September 14, 2016 was the precipitating cause for

Mr. Raymond's voiding dysfunction given the absence of any suitable alternative explanation."

(Dkt. No. 168-2 at 84.)   Dr. Vapnek further noted, "[w]hile imaging studies of [Plaintiff's] brain

did not reveal any obvious evidence of trauma [. . .], it is clear that he developed multiple issues

consistent with TBI[.]"   (*Id.* at 84-85.)

### 2.   Defendants' Experts

### a.   John R. Valvo, M.D.

Dr. Valvo, a urologist, reviewed Plaintiff's medical records at the request of Defendants'

counsel.   (Dkt. No. 174-10 at 2.)   Dr. Valvo noted that, a review of medical records from

September 13, 2016 and September 14, 2016, revealed that Plaintiff experienced seizures on both

days.   (*Id.* at 3.)   Dr. Valvo opined, "I do not believe that there was significant brain injury

caused from an external force that caused this individual to develop a neurogenic bladder."   (*Id.*)

### b.    Robert Knapp, M.D.

Dr. Knapp is a semi-retired neurologist who, at the request of Defendants' counsel,

reviewed Plaintiff's medical records.   (Dkt. No. 168-3 at 2; Dkt. No. 174-11 at 11.)   Dr. Knapp

opined that a neurologic diagnosis is necessary to conclude that Plaintiff suffered from a

neurogenic bladder.   (Dkt. No. 168-3 at 6.)   Dr. Knapp also noted, "neurogenic bladder caused

by traumatic brain injury cannot exist by itself without other neurologic findings."   (*Id.*)

### C.    Parties' Arguments on Defendants' Motion

### 1.    Defendants' Memorandum of Law

Generally, in their memorandum of law, Defendants assert two arguments.   (Dkt. No.

168-4.)   First, Defendants argue, Plaintiff's excessive force claims must be dismissed, because

Plaintiff has failed to adduce admissible record evidence from which a rational jury could find that

Plaintiff's neurogenic bladder condition was caused by Defendants' actions.   (Dkt. No. 168-4 at

12-27.)   Specifically, Defendants contend that there is no physical proof (i.e., medical imaging) of

an injury to Plaintiff's brain.   (*Id.* at 16-17.)   Defendants also argue that Plaintiff's experts'

opinions are unreliable for three reasons:   (1) they relied solely upon the temporal proximity

between the alleged use of force and the onset of brain injury related symptoms. which cannot be

the sole basis for establishing causation; (2) the use of temporal proximity to establish specific

causation is flawed because Plaintiff's experts failed to establish that Plaintiff did not suffer from

neurological symptoms prior to September 14, 2016; and (3) Plaintiff's experts failed to perform a

differential diagnosis and failed to consider whether Plaintiff's fall and seizure on September 13, 2016 was the cause of Plaintiff's alleged brain injury.   (*Id.* at 18-20, 22, 27.)

Second, Defendants argue, Plaintiff's Fourteenth Amendment claims must be dismissed, because the substantive due process claims are subsumed by the Eighth Amendment claims.   (*Id.* at 10-12.)

### 2.   Plaintiff's Opposition Memorandum of Law

Generally, in his opposition, Plaintiff asserts four arguments.   (Dkt. No. 174.)

First, Plaintiff argues that Defendants failed to cite to any authority to support the proposition that medical imaging is required to diagnosis Plaintiff's condition. (Dkt. No. 174 at 20.)   Moreover, Plaintiff contends that while his experts and Defendants' experts may disagree on the need for imaging to confirm Plaintiff's neurogenic bladder, that disagreement must be left for a jury to resolve.   (*Id.* at 21.)

Second, Plaintiff argues that his expert witnesses did not rely "solely" on temporal proximity.   Rather, Dr. Leitch engaged in "a lengthy analysis of Plaintiff's medical records, performed a neurological examination, and considered and excluded other potential causes of the injuries."   (Dkt. No. 174 at 18-19.)

Third, with respect to a differential diagnosis, Plaintiff alleges that his expert witnesses are not "required" to rule out all possible causes, and that any deficiency therein goes to the weight of the evidence.   (Dkt. No. 174 at 15-16.)   Moreover, Plaintiff argues, contrary to Defendants' assertions, that his experts considered the September 13th fall and seizure and rejected the notion that Plaintiff's condition was caused by these events.   (*Id.* at 16.)

Finally, Plaintiff argues that even if Plaintiff's experts' opinions are disregarded, summary

judgment must be denied because Plaintiff suffered other injuries on September 14, 2016, for which expert testimony is not necessary to establish causation.   (Dkt. No. 174 at 28.) Specifically, Plaintiff suffered facial redness, swelling, pain, and other injuries from being "repeatedly punched."   (*Id*.)

Plaintiff does not oppose the portion of Defendants' motion that seeks summary judgment on behalf of Defendants on Plaintiff's Fourteenth Amendment substantive due process claim. (*See generally* Dkt. No. 174.)

### 3.    Defendants' Reply Memorandum of Law

Generally, in their reply, Defendants assert four arguments.   (Dkt. No. 176-2.)   First, Defendants argue that the admissible medical evidence establishes that Plaintiff suffered a fall on September 13, 2016, which caused injury to Plaintiff's head and neck.   (*Id*. at 5-6.)

Second, Defendants argue that Plaintiff failed to show that there is a genuine issue of material fact with respect to the Eighth Amendment claims because Plaintiff's experts were required to rule out the injuries suffered on September 13, 2016 as a potential cause of Plaintiff's neurogenic bladder.   (Dkt.   No. 176-2 at 7.)

Defendants also argue that, "the opinions of Plaintiff's expert witnesses must be precluded[.]"   (Dkt. No. 176-2 at 5.)

Finally, Defendants argue, Plaintiff does not oppose Defendants' request for summary judgment on his Fourteenth Amendment substantive due process claims and Plaintiff fails to set forth any admissible record evidence creating a genuine issue of material fact precluding summary judgment on his substantive due process claims.   (Dkt. No. 176-2 at 13.)

## II.    GOVERNING LEGAL STANDARDS

### A.      Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted."   *Id.* at 248.   As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."   *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted).   As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant.   *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."   *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).   However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.   Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant

11

willfully fails to respond to a motion for summary judgment, a district court has no duty to

perform an independent review of the record to find proof of a factual dispute.   *Cusamano v.*

*Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (citing cases).   Of course, when a

non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has

been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted

automatically."   *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).   Rather, as indicated above,

the Court must assure itself that, based on the undisputed material facts, the law indeed warrants

judgment for the movant.   *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group,*

*Inc.*, 140 F.Supp.2d 229, 232 (N.D.N.Y. 2001); N.D.N.Y. L.R. 56.1(a).   What the non-movant's

failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set

forth in a movant's statement of material facts to be admitted, where (1) those facts are supported

by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that

statement.[4]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's

properly filed and facially meritorious memorandum of law, the non-movant is deemed to have

"consented" to the legal arguments contained in that memorandum of law under Local Rule

7.1(a)(3).   *See, e.g., Beers v. GMC*, No. 97-CV-0482 (NPM/DNH), 1999 WL 325378, at *8-9

(N.D.N.Y. March 17, 1999) (deeming plaintiff's failure to oppose certain of defendants' arguments

as consent to the granting of summary judgment for defendants with regard to those arguments,

---

[4] Among other things, Local Rule 56.1 (previously Local Rule 7.1(a)(3)) requires that the
non-movant file a response to the movant's Statement of Material Facts, which admits or denies
each of the movant's factual assertions in matching numbered paragraphs and supports any denials
with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 56.1.

under Local Rule 7.1(a)(3) (previously Local Rule 7.1(b)(3)); *Devito v. Smithkline Beecham Corp.*, No. 02-CV-0745 (NPM), 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground). Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini*, No. 07-CV-0279 (GTS/GHL), 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722 (GTS/GHL), 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (collecting cases).

###    B.    Expert Witness Testimony

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert testimony, provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis removed).

From this rule, the Supreme Court and Second Circuit have derived the following legal standard.   As an initial matter, generally, the trial judge is to act as a "gatekeeper," charged with

13

determining whether the proffered testimony satisfies a number of standards, including, among other things, that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or to determine a fact in issue."  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013) (quoting Fed. R. Evid. 702(a)).   "In other words, '[e]xpert testimony must be helpful to the [trier of fact] in comprehending and deciding issues beyond the understanding of a layperson.' "  *Id.* (quoting *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005)).

Additionally, the proposed expert must be "qualified" to give the proffered opinion.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 & nn. 7, 10.   "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *U.S. v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (citation omitted).   In assessing whether a proposed expert is "qualified," the trial judge should remember the "liberal[ ] purpose" of Fed. R. Evid. 702, and remain "flexibl[e]" in evaluating the proposed expert's qualifications.   *See U.S. v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (holding that Fed. R. Evid. 702 "must be read in light of the liberalizing purpose of the rule"); *Lappe v. Am. Honda Motor Co., Inc.,* 857 F.Supp. 222, 227 (N.D.N.Y. 1994) ("[L]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications."), *aff'd without opinion,* 101 F.3d 682 (2d Cir. 1996).   Having said that, of course, "a district court may properly conclude that witnesses are insufficiently qualified . . . [where] their expertise is too general or too deficient."  *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997), *accord, Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F.Supp.2d 413, 425-26 (W.D.N.Y.

2005); *Byrne v. Liquid Asphalt Sys., Inc.*, 238 F.Supp.2d 491, 494 (E.D.N.Y. 2002); *Trumps v. Toastmaster, Inc.,* 969 F.Supp. 247, 252 (S.D.N.Y. 1997); *see, e.g., McCullock v. H.B. Fuller Co*., 981 F.2d 656, 657-58 (2d Cir. 1992) (affirming district court's ruling that plaintiff's proffered expert did not possess the required qualifications to testify as an expert on the subject of warning labels for hot melt glue).

Finally, a witness qualified as an expert will be permitted to testify if his testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue."   *U.S. v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (quoting Fed. R. Evid. 702).   "To be admissible, expert testimony must be both relevant and reliable."   *Melini v. 71st Lexington Corp.*, 07-CV-0701, 2009 WL 413608, at *4 (S.D.N.Y. Feb. 13, 2009) (citing *Daubert*, 509 U.S. at 589).   "Specifically, expert opinion testimony must be (1) 'based on sufficient facts or data,' (2) 'the product of reliable principles and methods,' and (3) the result of applying those principles and methods to the facts of the case in a reliable manner."   *Id*. (quoting Fed. R. Evid. 702).   "The proponent of expert testimony must establish its admissibility by a preponderance of the evidence."   *Id.* (citing *Astra Aktiebolag v. Andrx Pharm., Inc.*, 222 F.Supp.2d 423, 487 (S.D.N.Y. 2002) (citing Fed. R. Evid. 104(a)).

In *Daubert*, the Supreme Court set forth a non-exclusive list of factors for a trial court to use when assessing the reliability of expert testimony: (1) whether the expert's technique or theory can be, or has been, tested–that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4)

the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.   *Daubert*, 509 U.S. at 593-94; *see also* Fed. R. Evid. 702, Advisory Committee Notes: 2000 Amendments.

In addition, "[c]ourts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact." Fed. R. Evid. 702, Advisory Committee Notes: 2000 Amendments.   These factors include the following: (1) whether the expert is "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying"; (2) whether the expert has unjustly extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations for the plaintiff's condition; and (4) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

In sum, the Second Circuit has explained the trial court's duties when evaluating expert testimony in the following manner:

> First, . . . *Daubert* reinforces the idea that there should be a presumption of admissibility of evidence. Second, it emphasizes the need for flexibility in assessing whether evidence is admissible. Rather than using rigid 'safeguards' for determining whether testimony should be admitted, the Court's approach is to permit the trial judge to weigh the various considerations pertinent to the issue in question. Third, *Daubert* allows for the admissibility of scientific evidence, even if not generally accepted in the scientific community, provided its reliability has independent support. Finally, the Court expressed its faith in the power of the adversary system to test 'shaky but admissible' evidence, and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable.

*Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (internal citations omitted).   "A minor flaw in

16

an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).   Instead, "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, Advisory Committee's Note; *see also E.E.O.C. v. Morgan Stanley & Co.,* 324 F.Supp.2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union*, 313 F.Supp.2d 213, 226 (S.D.N.Y. 2004).   "This principle is based on the recognition that 'our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.' "  *Melini*, 2009 WL 413608, at *5 (quoting *Amorgianos*, 303 F.3d at 267).

However, "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Amorgianos,* 303 F.3d at 266; *accord, Ruggiero v. Warner-Lambert Co.,* 424 F.3d 249, 253 (2d Cir. 2005).   Furthermore, "it is critical that an expert's analysis be reliable at every step."  *Amorgianos,* 303 F.3d at 267.   Of course, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions."  *Id*. at 266 (citing *Daubert*, 509 U.S. at 595).   Nevertheless, "conclusions and methodology are not entirely distinct from one another."  *Gen. Elec. Co., v. Joiner*, 522 U.S. 136, 146 (1997).   Accordingly, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Id.*

III.   **ANALYSIS**

   **A.   Whether Defendants' Motion for Summary Judgment and Dismissal of Eighth Amendment Claims Should Be Granted**

Defendants seek dismissal of Plaintiff's excessive force claims arguing that the alleged use of force by Defendants did not proximately cause Plaintiff's neurogenic bladder condition. Defendants argue Plaintiff cannot prove specific causation because (1) the record lacks medical proof that he suffered a brain injury; (2) Plaintiff's experts improperly relied solely upon temporal proximity; and (3) Plaintiff's experts failed to perform a differential diagnosis to rule out other potential causes of Plaintiff's injuries.   (*See generally* Dkt. No. 168-4.)

To determine whether prison officials used excessive force in violation of the Eighth Amendment, a court considers "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."   *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).   To succeed on such a claim, a plaintiff must prove both an objective and subjective element.   *See id.* at 7-8.

The objective element is "contextual and responsive to contemporary standards of decency,"   *Hudson*, 503 U.S. at 8-9 (quotation and citation omitted), and requires that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection."   *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999).   Thus, the Eighth Amendment "necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."   *Hudson*, 503 U.S. at 9-10 (quotation marks and citation omitted).   "Consequently, not every malevolent touch by a prison guard gives rise to a federal cause of action."   *Id*. at 9 (citation omitted).

The subjective component "requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct."   *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir.

18

2000) (quotation marks and citations omitted).   Whether the defendant's conduct was "wanton" turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."   *Blyden*, 186 F.3d at 262-63.

"To prevail on an excessive force claim, [a p]laintiff must have suffered an actual injury that resulted from [the d]efendant['s] use of force."   *Portillo v. Webb,* No. 16 CIV 4731, 2022 WL 2337380, at *9 (S.D.N.Y. June 29, 2022) (citing *Youngblood v. City of Mount Vernon*, 2017 WL 7804731, at *7 (S.D.N.Y. Dec. 29, 2017)), *report and recommendation adopted*, 2022 WL 16736980 (S.D.N.Y. Nov. 7, 2022); s*ee also Johnson v. County of Nassau,* No. 09-CV-4746, 2010 WL 3852032, at *3 (E.D.N.Y. Sept. 27, 2010) ("Proximate cause requires connecting the force used with the plaintiff's injury."); *Delee v. Hannigan*, 729 Fed. App'x 25, 30 (2d Cir. 2018) (noting the proximate causation requirement for an excessive force claim.)

### 1.   Lack of Physical Proof

Defendants argue that summary judgment is warranted because Plaintiff's experts "cannot point" to any "physical proof" of a brain injury that resulted in the development of neurogenic bladder.   (*See* Dkt. No. 168-4 at 14-16.)   The Court rejects this argument for the following reasons.

Initially, the Court notes that Plaintiff's experts and Defendants' experts agree that the present record lacks physical proof a brain injury.   However, the experts disagree as to whether physical proof (i.e., medical imaging) is required to confirm the cause of Plaintiff's neurogenic bladder.   To wit, Defendants' expert, Dr. Knapp opined that "[n]eurogenic bladder caused by traumatic brain injury cannot exist by itself without other neurological findings."   (Dkt. No. 168-3 at 6.)   Conversely, Dr. Vapnek opined that, "[w]hile it is helpful to have abnormal imaging or an

abnormal neurological examination to bolster the diagnosis of neurogenic bladder, there is no requirement for such evidence."   (Dkt. No. 168-2 at 84.)   Additionally, Dr. Leitch was deposed and was asked whether she could "look at" an MRI, CT scan, or x-ray "to see that injury."   Dr. Leitch responded, "[y]ou cannot. I mean, the only thing you're down to is a biopsy which of course you can't do. So most of the testing you could see it on postmortem, but we would hope we don't have to do that so CT and MRI are often normal."[5]   (Dkt. No. 174-14 at 105.)   Dr. Leitch concluded that it is "typical" that you cannot see the actual physical injury.   (*Id*. at 106.)

As Plaintiff correctly notes, Defendants fail to cite to any relevant caselaw in support of the motion for summary judgment on this ground.   In fact, a review of relevant caselaw belies Defendants' argument.   The absence of medical proof to support an expert's opinion is not a reason to exclude the testimony entirely.   *See West v. Bayer HealthCare Pharms. Inc*., 293 F.Supp.3d 82, 93 (D.D.C. 2018) (rejecting the defendant's argument that the plaintiff's expert opinion was unreliable because the experts did not "have conclusive medical proof that [the] [p]laintiff was infected with B. cereus, such as 'cultures' or 'microbiological data' ").   "Where [ ] highly experienced and knowledgeable [ ] doctors opine about the most likely [ ] cause" of a plaintiff's injury or symptoms "based on all of the facts surrounding his history and clinical presentation, those opinions are not subject to exclusion simply because they are not also confirmed by tests[.]"   *Id*.   Here, the conflicting medical expert opinions presented raise the issue of credibility, which must be resolved by the jury.   *Doane v. United States*, 369 F.Supp.3d 422, 447 (N.D.N.Y. 2019); s*ee also A.H. by Horowitz v. Precision Indus. Maint. Inc.*, No. 1:19-CV-298 (FJS/CFH), 2021 WL 2417610, at *7, n.2 (N.D.N.Y. June 14, 2021) (denying summary judgment

---

[5]  With the motion for summary judgment, Defendants provided a partial transcript from Dr. Leitch's deposition.   *See* Dkt. No. 168-2 at 40-47.   In opposition to the motion, Plaintiff provided the complete deposition transcript.   *See* Dkt. No. 174-14.

where the experts disagreed on whether the plaintiff suffered an injury or disability) (citations omitted); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 134 (2d Cir. 2006) ("To the extent that there are gaps or inconsistencies in [expert] testimony, those issues go to the weight of the evidence, not to its admissibility.") (internal quotation marks omitted).

Accordingly, the Court rejects Defendants' argument that Plaintiff's excessive force claims should be dismissed on this ground.   Rather, Defendants "may inquire about this point during cross-examination."  *See West*, 293 F.Supp.3d at 93.

### 2.   Reliability of Expert Opinions

Defendants argue that Plaintiff's experts relied solely upon temporal proximity and failed to perform a differential diagnosis to exclude other potential causes of the brain injury. Therefore, Plaintiff's experts "only speculate" that Defendants' actions caused the brain injury and thus, their opinions cannot be used to support specific causation.   (Dkt. No. 168-4 at 18-22, 27.)

### a.   Temporal Proximity

Defendants argue that Plaintiff's experts' opinions are unreliable because the doctors improperly relied <u>solely</u> upon temporal proximity and failed to establish that Plaintiff did not suffer from neurological symptoms prior to September 14, 2016.   (Dkt. No. 168-4 at 18-20.) Accordingly, Defendants contend that summary judgment is warranted.   The Court rejects this argument for the following reasons.

"A strong temporal relationship between the injury and its alleged cause may be one of several factors considered by a medical doctor to reliably determine causation, but, standing alone, relying wholly on a temporal relationship is not sound scientific methodology that is admissible under Rule 702 and *Daubert*."  *In re Fosamax Prod. Liab. Litig.*, No. 1:06-CV-7631, 2009 WL

4042769, at *7 (S.D.N.Y. Nov. 23, 2009) (citations omitted), *aff'd sub nom. Flemings v. Merck & Co.*, 399 Fed. App'x 672 (2d Cir. 2010). The Second Circuit has dismissed cases where temporal proximity is the <u>only</u> connection between a plaintiff's symptoms and the alleged cause. *See Israel v. Spring Indust. Inc.*, 2006 WL 3196956, at * 6 (E.D.N.Y. Nov. 3, 2006) (emphasis added) (citation omitted); *see also Higgins v. Consol. Rail Corp.,* No. 1:06-CV-689 (GLS/DRH), 2008 WL 5054224, at *3 (N.D.N.Y. Nov. 21, 2008) ("[S]everal courts have rejected expert causation opinions which are based solely on the temporal proximity between a plaintiff's injury and a purported cause.") (citation omitted).

The Court has thoroughly reviewed Plaintiff's experts' reports and their deposition transcripts and finds that the record lacks support for Defendants' conclusions. As discussed *supra*, Dr. Leitch conducted a full neurological examination of Plaintiff. Moreover, both experts examined Plaintiff's extensive medical records, including imagining reports. *See Etherton v. Owners Ins. Co.*, 35 F.Supp.3d 1360, 1370 (D. Colo. 2014), *aff'd*, 829 F.3d 1209 (10th Cir. 2016); s*ee also Woniewala v. Merck & Co.*, No. CV 15-3089, 2017 WL 4047379, at *7 (E.D. Pa. Sept. 13, 2017) (reasoning that the experts did not rely solely upon temporal proximity because they thoroughly examined the plaintiff's renal biopsies and reviewed his medical records). The experts also relied upon their qualifications, the veracity of which Defendants do not dispute.[6] *See Deatherage v. Schindler Elevator Corp.*, No. 3:16-CV-00206, 2018 WL 3212013, at *5 (D. Nev. June 29, 2018) (concluding that the doctors relied on more than temporal proximity including a

---

[6] On March 11, 2022, Vapnek was deposed. With the motion for summary judgment, Defendants provided a partial transcript from Dr. Vapnek's deposition. (Dkt. No. 168-2 at 67-80.) In opposition to the motion, Plaintiff provided the complete deposition transcript. (Dkt. No. 174-16.) Dr. Vapnek testified that he is a board-certified urologist with his own practice in Manhattan, with a subspecialty in the area of neurology and voiding dysfunction. (*Id.* at 9, 15.) From 1993 until 2002, Dr. Vapnek was employed at Mount Sinai Medical Center. (*Id.*) Dr. Vapnek has issued between 30 to 40 publications related to bladder control. (*Id.* at 15.)

review of the plaintiff's medical history, their own experience, medical literature, and a review of

the treatment records and radiological films).   Courts have held that a medical diagnosis,

generated by an expert who has "applied their education, experience and knowledge" may be

"fallible" but is not unreliable.   *See West*, 293 F.Supp.3d at 91 (finding the opinions of infectious

disease experts, who applied their education, experience, and knowledge of infectious disease to

the information about the plaintiff, to be reliable).   Although Dr. Vapnek did not conduct a

physical examination of Plaintiff, that fact goes to the weight of his opinion, not the admissibility.

*See Higgins,* 2008 WL 5054224, at *3.

Defendants' argument that Plaintiff's experts failed to "spend[] the appropriate amount of

time confirming that the Plaintiff did not suffer from neurologic related symptoms prior to the

alleged incident, is equally unpersuasive.

In her report, Dr. Leitch referenced Plaintiff's "[h]ead injury in 2012" in her summary of

Plaintiff's medical history and reviewed Plaintiff's 2014 medical records from Kenmore Mercy

Hospital.   (Dkt. No. 168-2 at 52, 58.)   Dr. Leitch opined that "the pre-existing head injury and

seizure disorder rendered him at increased risk of severe sequelae from traumatic brain injury."

(*Id*. at 52, 62.)   Dr. Leitch also opined that Plaintiff's "2012 traumatic brain injury would not have

caused his neurogenic bladder condition to arise in late 2016[.]"   (*Id*. at 63.)   Dr. Leitch also

concluded that Plaintiff's bladder condition did not arise from improper catheter care, his seizure

disorder, or any drug use or drug addiction.   (Dkt. No. 168-2 at 63.)

Dr. Leitch confirmed these opinions during her deposition.   Specifically, Dr. Leitch

testified that Plaintiff's prior spinal injury and neck injury did not result in a neurogenic bladder.

(Dkt. No. 174-14 at 104.)   Dr. Leitch explained that Plaintiff's 2012 accident involving a beam,

which resulted in a head injury, could not have caused the neurogenic bladder because "he would have had symptoms back in 2012, not four years later." (*Id.*) Dr. Leitch also noted that, while Plaintiff complained of urinary symptoms in 2014, the symptoms were "unrelated to the neurogenic bladder that occurred years later." (Dkt. No 174-14 at 80.) Dr. Leitch was also asked whether a cyst, lesion, or illicit drug use could contribute to Plaintiff's neurogenic bladder and responded, "No."[7] (*Id.* at 69-70, 76.)

Throughout the motion, Defendants repeatedly argue that Dr. Vapnek failed to review any medical records prior to September 14, 2016. (*See* Dkt. No. 168-4 at 21, Dkt. No. 176-2 at 9.) However, in support of that proposition, Defendants cite to Dr. Vapnek's deposition testimony, which is taken largely out of context. A complete review of the transcript reveals that Dr. Vapnek testified that he reviewed the following: (1) records related to Plaintiff's 2007 motorcycle accident that resulted in an injury to his spine; (2) records related to Plaintiff's 2012 head injury; (3) emergency room records from September 2016 and DOCCS; and (4) Auburn C.F. medical records. (Dkt. No. 174-16 at 20-21, 34-35.) When asked about records predating September 14, 2016, Dr. Vapnek testified that he remembered reviewing those records, but did not know why he "might have missed them in the [the] bullet list." (Dkt. No. 174-16 at 34.) Dr. Vapnek also explained that the records pre-dating the alleged assault may have been "embedded in some of the other records. The records were rather voluminous so I wouldn't be surprised if they were contained within one of the other ones and I forgot to tease it out." (*Id.* at 34-35.) Defense counsel specifically asked Dr. Vapnek if he was aware that Plaintiff suffered an injury to his spine in 2007 due to a motorcycle accident and a head injury in 2012 when he was hit by a beam at a

---

[7] The Court notes that Defendants' experts disagree as to whether drug abuse "explains" Plaintiff's neurogenic bladder. Dr. Valvo testified that drug abuse may have contributed to Plaintiff's condition. (Dkt. No. 174-9 at 49). Conversely, Dr. Knapp testified that drug use "cannot" cause

work site.   (Dkt. No. 174-16 at 20-21.)   Dr. Vapnek responded, "yes".   (*Id.*)

Dr. Vapnek testified that it was "highly, highly unlikely" that Plaintiff's spinal injury from a motorcycle accident in 2007 caused a neurogenic bladder.   (Dkt. No. 174-16 at 23, 76-77.)   Dr. Vapnek also rejected defense counsel's insinuation that Plaintiff's illicit drug use could cause a neurogenic bladder.   (*Id.* at 53-55.)   Dr. Vapnek reiterated Dr. Leitch's conclusion that it was "highly unlikely" that a brain lesion caused a neurogenic bladder.   (*Id.* at 59-60.)   Dr. Vapnek also opined that a prior medical procedure, a hydrocelectomy, could not have resulted in a neurogenic bladder.   (Dkt. No. 176-14 at 73.)

Accordingly, based upon the record, the Court does not find Plaintiff's expert opinions to be unreliable, on this ground.

### b.   Differential Diagnosis

"A differential diagnosis is a patient-specific process of elimination that medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes."   *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005) (internal quotation marks omitted).   An expert conducts a differential diagnosis by "considering numerous potential causes and conditions and ruling out some of them[.]"   *Rosario v. City of New York*, No. 18 CIV. 4023, 2021 WL 1930293, at *7 (S.D.N.Y. May 13, 2021).   However, "the fact that other potential causes for Plaintiff's illness cannot be definitively ruled out does not preclude Plaintiffs' experts from testifying about what they conclude is the most likely of the remaining possible causes."   *West*, 293 F.Supp.3d at 94 (reasoning that "the issue of other possible causes can be explored before the jury. The jury can weigh this issue when they consider the import of the experts' conclusions").   "The district court has the discretion to exclude as 'unreliable' a medical

---

someone to develop neurogenic bladder.   (Dkt. No. 174-11 at 76-77.)

expert's opinion as to the specific source or cause of a plaintiff's medical condition where '(1) the [physician] engaged in very few standard diagnosis techniques by which doctors normally rule out alternative causes and (2) the defendant pointed to some likely cause of the plaintiff's illness other than the defendant['s] actions and [the physician] offered no reasonable explanation as to why he or she still believed that the defendant['s] actions were a substantial factor in bringing about that illness.' " *Munafo v. Metro. Transp. Auth.*, No. 00-CV-0134, 2003 WL 21799913, at *18 (E.D.N.Y. Jan. 22, 2003) (citation omitted).   "While an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *Cantelmo v. United Airlines, Inc*., No. 17 CV 1730, 2019 WL 13147326, at *5 (E.D.N.Y. Sept. 30, 2019) (citing *DeRienzo v. Metro. Transp. Auth.*, 694 F.Supp.2d 229, 236 (S.D.N.Y. 2010)).

Here, Defendants argue that Plaintiff's experts' opinions are unreliable because they failed to rule out the seizure and fall on September 13th as a possible cause for Plaintiff's neurogenic condition.   For the reasons that follow, the Court finds Defendants' argument to be nothing more than conjecture and unsupported by the record.

First, Defendants' counsel argument lacks any factual support.   Indeed, Dr. Valvo, Defendants' expert, testified that the seizures Plaintiff experienced on September 13th **did not** cause him to develop neurogenic bladder.   (Dkt. No. 174-9 at 62.)   Accordingly, because Defendants do not point to any basis to connect the September 13, 2016 seizure and fall to Plaintiff's neurogenic bladder, other than their own conjecture, this argument weighs against finding Plaintiff's experts' opinions unreliable.  *See Rosario*, 2021 WL 1930293, at *7 (S.D.N.Y.

May 13, 2021) (rejecting the defendants' contention that the plaintiff's expert should have ruled out

substance abuse as a cause for the plaintiff's disorder because the defendants' experts did not offer

a meaningful basis linking substance abuse to the plaintiff's symptoms); *but cf. Magistrini v. One*

*Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584, 609 (D.N.J. 2002) (" 'where a defendant

points to a plausible alternative cause and the doctor offers no reasonable explanation' for why he

still concludes that the chemical was a substantial factor in bringing about the plaintiff's disease,

'that doctor's methodology is unreliable.' "), *aff'd*, 68 Fed. App'x 356 (3d Cir. 2003).

Second, Defendant's argument that Plaintiff's experts failed to rule out the "obvious"

potential cause of Plaintiff's symptoms, is specifically contradicted by Plaintiff's experts'

deposition testimony.

During Dr. Leitch's deposition, counsel asked specific questions regarding the September

13, 2016 seizure and fall.   (Dkt. No. 174-14 at 56-69.)   Dr. Leitch testified that she "made

attempts initially to discuss in detail that whole time period, but he would become just too upset."

(*Id*. at 57.)   When Defendants' counsel asked for clarification, Dr. Leitch responded, ". . . we may

isolate it but Mr. Raymond sees this as all one event, and every training I've had in posttraumatic

stress if people are becoming upset reliving something you really can't put them through it. I

mean, unless I was doing it - - unless I was doing it in some sort of psychological treatment, but I

was not doing - - that was not my purpose, so I really can't push somebody to do that."   (*Id*. at

58.)   Defense counsel continued this line of questioning and asked, "you didn't ask him any

questions about that, correct" and Dr. Leitch responded, "oh, I asked him about - - I asked him

about all this time period, but I didn't get any answers."   (*Id*. at 59.)   Despite Plaintiff's refusal to

answer questions, Dr. Leitch was aware of the September 13, 2016 incident from her review of

Plaintiff's records from Auburn Community Hospital, including records from the imaging

department, from a visit dated September 13, 2016.   (Dkt. No. 174-14 at 59, 68.)

Defense counsel specifically asked Dr. Leitch the following question and Dr. Leitch gave

the following answer:

> Q.   . . . is it possible that the neck injury that Mr. Raymond suffered on September
> 13th is the cause of his neurogenic bladder?
>
> A.   I don't think he suffered a neck injury on September 13th.   I think he was
> evaluated and found to have no injury.

(Dkt. No. 174-14 at 71-71.)

Similarly, Dr. Vapnek was questioned extensively about his conclusions regarding

causation.   Dr. Vapnek noted that "any time one is doing a review and looking for causation one

has to fairly take into account all of the potential issues that might impact."   (Dkt. No. 174-16 at

21.)   Defense counsel specifically asked Dr. Vapnek whether the seizure and fall on September

13, 2016 could have been the cause of damage to Plaintiff's brain.   (*Id*. at 31.)   Dr. Vapnek

conceded that he "did not know enough about how much of a fall there was" but "from what [he]

saw in the records, it wasn't anything severe at the time."   (*Id*.)   Dr. Vapnek stated that

"hypothetically" it was "possible" if Plaintiff hit his head on the floor that a brain injury and

neurogenic bladder could result.   (*Id*. at 32.)   However, Dr. Vapnek also noted that Plaintiff was

treated at the hospital and "they decided that he didn't require hospital admission."   (Dkt. No

174-16 at 32.)

Dr. Vapnek opined that the "most likely" cause of Plaintiff's neurogenic bladder "is his traumatic

brain injury" and based his opinion on "the fact that he really had no urological complaints

whatsoever before the injury and after the injury he developed marked voiding dysfunction

associated with pelvic pain."   (*Id*. at 71.)

Thus, despite counsel's arguments to the contrary, Plaintiff's experts' "testimony [ ] directly addresses Defendants' proposed alternative cause, and 'provide[s] a reasonable explanation' for [the] conclusion[s]."   *Cantelmo v. United Airlines*, Inc., No. 17 CV 1730, 2019 WL 13147326, at *5 (E.D.N.Y. Sept. 30, 2019).   Based upon the record, the Court will not, therefore, find the expert opinions unreliable on this ground.   *See id.*

Moreover, even assuming that Drs. Leitch and Vapnek did not rule out alternative causes for Plaintiff's neurogenic bladder, that argument goes to the weight of the evidence rather than its admissibility and "does not operate to exclude [expert] testimony."   *Figueroa v. Bos. Sci. Corp.*, 254 F. Supp. 2d 361, 367 (S.D.N.Y. 2003); *see also Ismael v. Charle*s, No. 1:18-CV-3597, 2020 WL 4003291, at *17 (S.D.N.Y. July 15, 2020) ("[t]o the extent that physicians do not fully consider and rule out all possible causes, such deficiencies generally go to the weight of the evidence, not admissibility, and weighing the evidence is a function for the jury."); *see also Woniewala v. Merck & Co.*, No. CV 15-3089, 2017 WL 4047379, at *7 (E.D. Pa. Sept. 13, 2017) (reasoning that "the Third Circuit does not require that medical experts rule out all possible causes to offer a differential diagnosis").

Finally, the Court notes that the caselaw cited by Defendants is readily distinguishable from the facts at hand.   Specifically, the facts in *DeRienzo v. Metropolitan Transp. Auth.*, 694 F.Supp.2d 229 (S.D.N.Y. 2010) and *Tardif v. City of New York,* 344 F.Supp.3d 579 (S.D.N.Y. 2018) are distinguishable from the facts at hand.   In *DeRienzo*, the defendants sought to exclude expert testimony arguing that temporal proximity alone was insufficient to establish causation. (*DeRienzo*, 694 F.Supp.2d at 232.)   The Court excluded the physicians' opinions as unreliable

because that the experts specifically noted, in their reports, that the opinions were based upon the "close temporal relationship."   (*Id*. at 241, n.3.)   With respect to the plaintiff's treating neurosurgeon, the Court noted that "Dr. Pikus did not simply fail to fully consider and rule out all possible causes of plaintiff's injuries; rather, he failed to rule out *any* possible alternative causes of plaintiff's apoplexy."   (*Id*. (emphasis supplied)).

Similarly, in *Tardif*, the defendant sought to exclude the plaintiff's expert arguing, *inter alia*, that the expert failed to perform a differential diagnosis.   *Tardif,* 344 F.Supp.3d at 601.   The Court agreed, noting that the doctor did not review any of the plaintiff's mental health records that predated the incident, despite being aware that the plaintiff suffered prior trauma.   *Id*.   The Court concluded that the expert's opinion, based upon the plaintiff's account of her conditions and contemporaneous medical records, rendered his report unreliable.   *Id.*

Here, as noted *supra*, Drs. Leitch and Vapnek relied upon more than temporal proximity and Plaintiff's account of the events that transpired in September 2016.   The experts relied upon their experience, diagnostic studies, and voluminous medical records.   Moreover, Dr. Leitch conducted a full neurological examination of Plaintiff.   Additionally, Plaintiff's experts were questioned by Defendants' counsel about other possible causes of Plaintiff's neurogenic bladder and ruled out those causes.

This Court also notes that the *DeRienzo* court reasoned, "[w]hile not raised by the parties, the Court is aware of authority supporting the position that a failure on the part of a treating physician to rule out all possible causes of an injury goes to the weight, rather than the admissibility, of the opinion."   *DeRienzo*, 694 F.Supp.2d at 239 (citations omitted).

To the extent that Defendants take issue with Plaintiff's experts' opinions, Defendants are free to challenge those on cross examination.   *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"); s*ee Ellerbee v. Ethicon, Inc*., No. 8:20-CV-1514-T-60AEP, 2020 WL 4815818, at *3 (M.D. Fla. Aug. 19, 2020) (reasoning that perceived "faults" in an expert's reliance upon temporal proximity and differential diagnosis "are better suited for cross-examination and do not affect admissibility"); *Monterey v. City of New Yor*k, No. 17-CV-4477, 2019 WL 5884466, at *5 (S.D.N.Y. Nov. 12, 2019) ("Any criticism of [the expert's] conclusion goes to the weight, not the admissibility, of her testimony and can be addressed through effective cross-examination.").

Accordingly, Defendants' motion for summary judgment and dismissal of Plaintiff's excessive force claims based upon the unreliability of Plaintiff's experts' opinions is denied.

### c.      Other Injuries

Even if the Court accepts Defendants' argument and finds that the opinions expressed by Drs. Leitch and Vapnek to be "unreliable," summary judgment is still not be appropriate because Plaintiff alleges, in addition to neurogenic bladder, he also suffered facial redness, swelling, and pain as a result of being "repeatedly punched."   (*See generally* Dkt. No. 175.)

"A plaintiff is not necessarily required to offer evidence of causation beyond his own testimony to survive summary judgment."   *Portillo*, 2022 WL 2337380, at *9 (citing *Fernandez v. City of New York*, 2020 WL 3448019, at *2-4 (S.D.N.Y. June 24, 2020)).   The Second Circuit has held an "appellant need not prove 'significant injury' to make out an excessive force claim and, thus, the fact that he suffered only minor injuries does not warrant dismissal."   *See Griffin v.*

*Crippen*, 193 F.3d 89, 92 (2d Cir. 1999).   "[A]lthough lack of proof of serious physical injury is

relevant to the [E]ighth [A]mendment inquiry, it does not end it."   *Johnson v. Coughlin*, No.

94-CV-257H, 1997 WL 250060, at *3 (W.D.N.Y. Apr. 2, 1997).   "[A] medical expert is not

required to establish a causal connection between the injury suffered and a defendant's actions in

an excessive force case where the injuries complained of 'are within the jury's common

experiences and observations.' "   *Hayes v. New York*, No. 9:10-CV-1201, 2013 WL 5278879, at

*7 (N.D.N.Y. Sept. 18, 2013), a*ff'd sub nom. Hayes v. Smith & Wesson*, 692 Fed. App'x 70 (2d

Cir. 2017).

    During his deposition, Plaintiff described the alleged use of force.   Plaintiff testified that

Mitchell "waterboarded" him and punched him in the face, while he was shackled.   (Dkt. No.

174-3 at 6-7.)   Plaintiff was trying to "get away from his punches" and Mitchell punched his

upper torso, head, and face with his fists.   (*Id.* at 8.)   Mitchell then grabbed Plaintiff's genitals,

pulled out his baton, and started to hit Plaintiff between his legs with the baton.   (*Id.* at 8-9.)

Mitchell also hit Plaintiff in the face with the baton, held Plaintiff's legs open, and punched him in

the genitals.   (*Id.* at 9-10.)

    Plaintiff testified that, because of the use of force, he was "bleeding" from his face, ear,

chest, and eye.   (Dkt. No. 174-3 at 15-16.)   Plaintiff told Nurse Hoppins that he had pain in his

penis, neck, face, and that his eye was swollen shut.   (*Id.* at 16, 18.)   When asked what caused his

neck pain, Plaintiff responded:

> A.   When I'm trying to get my head away from him as he's throwing punches and,
> you know, I'm moving around, and he's hitting me and [. . . ] that caused trauma to
> my neck[.]"   (Dkt. No. 174-3 at 19.)

The record before the Court also includes an Inmate Injury Report dated September 14,

2016 and a transcript from Nurse Hoppins' deposition.   The Injury Report indicates that Plaintiff's

left eye, cheek and ear had "redness and swelling to areas. Scelera pink in color. Abrasions x2

noted to upper chest area."   (Dkt. No. 175.)   Nurse Hoppins testified that she examined Plaintiff

on September 14, 2016 at 4:25 p.m.   (Dkt. No. 174-8 at 18.)   At that time, she observed

"reddened and swollen area to left eye, left cheek and left ear, abrasions to upper right chest times

two."[8]   (*Id*. at 19.)

Upon review of the record, the Court finds that Plaintiff's claims of injury are "far from

conclusory" and are sufficient to establish an issue of fact to be resolved by a jury.   *See Duncan v.*

*City of New York*, No. 11-CV-3901, 2017 WL 3105856, at *8 (E.D.N.Y. July 21, 2017) (holding

that while the plaintiff's injuries were not severe and she did not seek medical treatment, "these

factors, by themselves, do not doom [the plaintiff's] excessive force claim as a matter of law."),

*adhered to on denial of reconsideration*, 2018 WL 3421312 (E.D.N.Y. July 13, 2018); *see also*

*Joseph v. Deluna*, No. 15-CV-5602, 2018 WL 1474398, at *5 (S.D.N.Y. Mar. 23, 2018) (holding

that despite the lack of documentation of a serious injury, the plaintiff's deposition testimony that

he suffered several injuries, including injuries to his wrist, both of his arms, his left ear, and his

head was "sufficient for the excessive force claim to survive summary judgment") (citations

omitted).

Accordingly, Defendants' motion for summary judgment and dismissal of Plaintiff's

excessive force claims is denied.

**B.      Whether Plaintiff's Experts Should Be Precluded From Testifying**

In the alternative, Defendants move for an order precluding Dr. Leitch and Dr. Vapnek

---

[8]  In the report, Nurse Hoppins noted "[p]er security was thrashing around in van."   (Dkt. No.
175-1 at 2.)   During the deposition, Nurse Hoppins testified that Plaintiff's injuries "couldn't have
come from what happened in the van."   (Dkt. No. 174-8 at 22.)   Hoppins also stated, "[i]t was

from providing testimony at trial and precluding Plaintiff and all witnesses from referring to Plaintiff's neurogenic condition at trial.   (Dkt. No. 176-2 at 13.)

Initially, the Court notes that Defendants raised this argument for the first time in the reply memorandum of law, effectively preventing Plaintiff from responding to it.   *See, e.g., Brown v. Ionescu*, 380 Fed. Appx. 71, 72 n.1 (2d Cir. 2010) (summary order) (declining to reach arguments raised for the first time in a reply); *Knipe v. Skinner*, 999 F.2d 708, 710-11 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.").

Even if the Court were inclined to reach this argument, the Court would find it unavailing. In assessing whether expert witness testimony is admissible, the Court must first address " 'the threshold question of whether a witness is qualified as an expert by knowledge, skill, experience, or education to render his or her opinions.' "   *I.M. v. United States*, 362 F.Supp.3d 161, 191 (S.D.N.Y. 2019) (quoting *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005)). This first step means the Court determines "whether the proffered expert has the educational background or training in a relevant field . . . by looking at the totality of the witness's background."   *Arista Records LLC v. Lime Grp. LLC,* 06-CV-5936, 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011).   Next, to ensure that the expert's testimony will be on the same "issues or subject matter[s] within his or her field of expertise," the Court must "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."   *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004); *see also Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997).   Furthermore, "[a]n expert 'need not be a specialist in the exact area of medicine implicated by the plaintiff's injury, [but] he must have relevant experience and qualifications such that whatever opinion he will ultimately

---

obvious something had occurred [in the exam room]."   (*Id*. at 24.)

express would not be speculative.' "   *I.M.*, 362 F.Supp.3d at 192 (quoting *Loyd v. United States*,

08-CV-9016, 2011 WL 1327043, at *5 (S.D.N.Y. Mar. 31, 2011)).

As noted *supra*, Defendants do not challenge Plaintiff's expert's qualifications and based

on the entirety of Dr. Leitch's and Dr. Vapnek's backgrounds, the Court concludes that they are

qualified to offer expert testimony surrounding the nature and cause of Plaintiff's injury.

Defendants also do not argue that the experts' testimony would be unhelpful to the jury.

Accordingly, the only basis for preclusion would be reliability.   As the Court has already

discussed the issue of reliability, for the reasons set forth *supra,* this request is denied.

### C.     Whether Plaintiff's Fourteenth Amendment Substantive Due Process Claims Must Be Dismissed

As an initial matter, because Plaintiff did not oppose Defendants' argument that his

substantive due process claims should be dismissed, Defendants' burden regarding this claim is

lightened such that, to succeed, they need only show the facial merit of their request, which has

appropriately been characterized as a "modest" burden.   *See Rescuecom Corp. v. Chumley*,

07–CV–0690 (GTS/GHL), 2011 WL 2791272, at *3 & n. 4 (N.D.N.Y. July 14, 2011) (collecting

authorities); *Singleton v. City of Newburgh*, 1 F.Supp.2d 306, 312 (S.D.N.Y.1998) (deeming the

plaintiff's claim "abandoned" and granting the defendants' motion for summary judgment where

claim was alleged in the complaint but "not raised elsewhere in the record"); *Anti–Monopoly, Inc.

v. Hasbro, Inc.*, 958 F.Supp. 895, 907 n. 11 (S.D.N.Y.1997) ("[T]he failure to provide argument

on a point at issue constitutes abandonment of the issue."), *aff'd*, 130 F.3d 1101 (2d Cir.1997).

After carefully considering the matter, the Court finds that Defendants have met this

modest burden, for the reasons stated by them in their memoranda of law.   The Court would add

only that, because of a general reluctance "to expand the concept of substantive due process,"

"[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."   *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (internal citations and quotation marks omitted).

The Court finds that Plaintiff's claims of excessive force and failure-to-intervene are all encompassed by a more specific constitutional provision - the Eighth Amendment–and, as a result, the Substantive Due Process Clause is not the appropriate vehicle for those claims.   *See Felix-Torres v. Graham,* 521 F.Supp.2d 157, 164 (N.D.N.Y. 2007) ("The Supreme Court has noted that where Eighth Amendment and Fourteenth Amendment due process protections overlap, the [substantive] due process claim will be subsumed by the Eighth Amendment claim as the Eighth Amendment offers greater protection to prisoners.").

The Court therefore finds that Plaintiff's Substantive Due Process Claims must be dismissed.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 168) is **GRANTED in part and DENIED in part** as described above in this Decision and Order; and it is further

**ORDERED** that the Clerk of the Court shall enter Judgment for Defendants on Plaintiff's substantive due process claims under the Fourteenth Amendment, which are **DISMISSED**.

Dated: June 11, 2024
　　　　Syracuse, New York

Glenn T. Suddaby
U.S. District Judge

36